```
                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA

     - - - - - - - - - - - - - - - - x
     ALAN BURKS, et al.,
                                             CA No:  1:16-cv-01102-CRC
               Plaintiffs,
                                             Washington, D.C.
                                             Thursday, July 6, 2017
     vs.                                     2:05 p.m.

     ISLAMIC REPUBLIC OF IRAN, et al.,

               Defendants.
     - - - - - - - - - - - - - - - - x
     _____

                      TRANSCRIPT OF MOTION HEARING
           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                      UNITED STATES DISTRICT JUDGE
     _____
     APPEARANCES:

     For the Plaintiffs:      STEVEN ROBERT PERLES, ESQ.
                              JOSHUA PERLES, ESQ.
                              PERLES LAW FIRM, PC
                              1050 Connecticut Avenue, NW
                              Suite 500
                              Washington, DC 20036
                              sperles@perleslaw.com

                              JAMES P. BONNER, ESQ.
                              Stone Bonner & Rocco LLP
                              447 Springfield Avenue
                              Summit, NJ 07901
                              (908)516-2066

     For the Defendants:      (No one appeared for Defendants)

     Court Reporter:          Lisa A. Moreira, RDR, CRR
                              Official Court Reporter
                              U.S. Courthouse, Room 6718
                              333 Constitution Avenue, NW
                              Washington, DC  20001
                              202-354-3187

     Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription
```

```
1                       P R O C E E D I N G S
2             THE COURTROOM DEPUTY:  Your Honor, we're on the
3    record for Civil Case 16-1102, Alan Burks, et al. vs.
4    Islamic Republic of Iran, et al.
5             Counsel, please approach the lectern and identify
6    yourself for the record.
7             MR. PERLES:  Good afternoon, Your Honor.
8             THE COURT:  Good afternoon.
9             MR. PERLES:  Steven Perles for the plaintiffs.  If
10   I might introduce the other members of our litigation team,
11   please?  Thank you.
12            We'll start with Joshua Perles.
13            THE COURT:  Mr. Perles, how are you?
14            MR. J. PERLES:  I'm good.  Thank you, Your Honor.
15            THE COURT:  Good.
16            MR. PERLES:  Mr. Edward MacAllister.
17            THE COURT:  Mr. MacAllister, you're not on my
18   list.  Are you admitted?
19            MR. MacALLISTER:  Yes, Your Honor, I have entered
20   an appearance in the case, and I also notified the court
21   reporter of my presence.
22            THE COURT:  Thank you.  Welcome.
23            MR. PERLES:  Mr. Jim Bonner has joined us from New
24   York.  He is not a member of my firm.
25            THE COURT:  Good afternoon.
```

1                    Okay.  And the record will reflect that there is
2      no representation from the defendant here.
3                    MR. PERLES:  With Your Honor's permission, might I
4      also introduce Ms. Emily Amick, who has just joined us from
5      the Senate Judiciary Committee Staff, and I'd also like to
6      introduce Mr. -- it's actually Colonel Kevin McDonnell, U.S.
7      Army Retired, who is a consultant to our office.
8                    THE COURT:  Okay.  Welcome.
9                    MR. PERLES:  Thank you.
10                   THE COURT:  Okay.  Thanks for coming down this
11     afternoon.  I've obviously read the complaint and the motion
12     to extend the time to move to certify the proposed class.  I
13     thought it would be worthwhile getting together because I
14     wonder whether it would be -- as I indicated in the minute
15     order, I'm happy to let you all proceed the way that you see
16     fit, but instead of having you spend a lot of time and
17     effort on whatever class discovery you've undertaken this
18     far, I wondered whether it would make sense to at least
19     discuss the merits of your claim.
20                   And in that regard, I must say I'm somewhat -- I'm
21     having trouble conceptualizing the claim in terms of the
22     terrorism exception, and I guess the first question I have
23     is is there any authority or similar cases that are pending
24     elsewhere that supplying a particular weapon in connection
25     with an authorized military operation fits within the

1    terrorism exception?
2            I mean, usually these cases -- and I've had some
3    of them -- involve terrorism against civilians.  This is
4    obviously an authorized and declared military action in
5    connection with which you've alleged that these particular
6    weapons were used, and, you know, what is -- educate me as
7    to the conceptual framework and underlying support for this
8    particular action.
9            MR. PERLES:  Yes, I will be pleased to, and thank
10   you for making this a threshold question.  I think that's
11   very helpful in this proceeding.
12           My office does a lot of this.  Arguably we do more
13   than the rest of the private bar combined.  Whether that's
14   quite true or not is irrelevant.  We've done any number of
15   these cases, and a large number of them have been for
16   military personnel because, by virtue of their visibility,
17   they are the most frequently attacked of our citizens.  And
18   I can give you some examples of military -- successful
19   military cases that we've brought in the past and the
20   circumstances involving each of those cases.
21           Perhaps in a sequence that's most helpful to
22   understanding where we're trying to take this case, I would
23   start with Libya's bombing of the La Belle discotheque in
24   Berlin.  That case ultimately was settled with the Libyan
25   government, but there it was quite clear that off-duty U.S.

1  servicemen, who are nonetheless targeted because they are
2  U.S. servicemen, fall within the grant of subject matter
3  jurisdiction in this action.
4           THE COURT:  I can understand that.
5           MR. PERLES:  All right.  Okay.  We have the Beirut
6  Marine Barracks bombing, which was a case that was before
7  Judge Lamberth.  It's a large, sprawling case that an
8  enforcement just went up to the Supreme Court last year.  I
9  believe up at the Court it was styled as *Peterson vs.*
10 *Markazi*, or maybe I have it flipped around.  Maybe it's
11 *Markazi vs. Peterson*.  Markazi is the central bank of Iran.
12 That's the -- it was their assets that we were enforcing
13 against.
14          There you have marines in a setting very similar
15 to what you find in Iraq except they are there as --
16 officially they are there as peacekeepers, and that is
17 reflected on their -- the death certificates for each of
18 these 241 U.S. marines.  So effectively we've stepped the
19 issue -- side-stepped the issue that Your Honor now has to
20 confront because of the duty status of those troops.
21          We will brief all of this for you.  I think at the
22 end of the day what it's going to come down to is we need to
23 write a briefing for you, but you'll see how we walked Judge
24 Lamberth around the question that you are now trying to
25 brief.  It comes very close.

1          We have a case which is before Judge Kollar-
2  Kotelly that we have won on liability -- we're still working
3  on the damages phase of the case -- which is called *Foley*
4  *vs. The Islamic Republic of Iran*.  Again, the fact pattern
5  of that case is a little bit different than the case we have
6  here.  The fact pattern of that case -- and there were three
7  families participating in that case.  The first was an
8  American diplomat that was assassinated in Amman, Jordan.
9  The second two were U.S. servicemen who were kidnapped --
10 I'm sorry, that case is versus the Syrian Arab Republic.  I
11 misspoke.  Excuse me.
12         THE COURT:  Who did or did not appear?
13         MR. PERLES:  Did not appear in that case.  The
14 Syrians -- and we have a series of five, six, seven cases
15 against the Syrians, all involving their material support of
16 the same terrorist organization that has morphed into
17 several different names, and they seem to weave their way in
18 and out of different proceedings as they find it
19 advantageous.  My recollection is that in that proceeding
20 they did not enter an appearance.
21         Am I correct on that?  They did not enter an
22 appearance.
23         MR. MacALLISTER:  They challenged service.
24         MR. PERLES:  I stand corrected.  They challenged
25 service and then failed to participate after that.

1                    In those cases, again, we have three families, all
2      who lost loved ones to the same Syrian materially supported
3      terrorist organization.  The first of these three was an
4      American diplomat who was killed in his garage.  He was
5      gunned down in Amman, Jordan.  Now, he's a civilian.  Is
6      that really any different than an American serviceman who
7      was pulled out of a Humvee in Iraq, taken into POW status,
8      held as a hostage, tortured, and then executed?  They are
9      both extrajudicial killings within the meaning of this
10     statute.
11                   The third family, again, involves another
12     serviceman who is pulled out of a Humvee, taken into POW
13     status, and executed while in POW status.  Of course the
14     big --
15                   THE COURT:  And what were the service members'
16     status in Jordan at the time?
17                   MR. PERLES:  No, I'm sorry, the servicemen were
18     pulled out of Humvees in Iraq.
19                   THE COURT:  In Iraq.
20                   MR. PERLES:  In Iraq.
21                   The diplomat was assassinated in Jordan.  The two
22     servicemen were pulled out of Humvees in Iraq.
23                   So it is the same theater, as you would, as the
24     servicemen in this case.  The difference, if we are
25     differentiating between cases, is the servicemen in this

1   action are fielded, and the servicemen -- they are fielded
2   at the time of their extrajudicial killings.
3              THE COURT:  Meaning they are involved in combat
4   operations?
5              MR. PERLES:  They're involved in some kind of
6   fielded operation.  They may simply be driving down the
7   roadside not involved in an active combat operation when one
8   of these EFPs is detonated.
9              In the case of the two servicemen in the *Foley*
10  case, they are in POW status.  Both of these servicemen were
11  awarded the POW medal by the Department of Defense, meaning
12  for Department of Defense classification purposes they have
13  been removed from the battlefield, and they are in a
14  protected status.
15             THE COURT:  And did Judge Kollar-Kotelly issue an
16  opinion on liability?
17             MR. PERLES:  She did.
18             THE COURT:  Okay.  Do you know the cite offhand,
19  or no?  We'll get it.
20             MR. PERLES:  We'll get it for you.  And that case
21  is currently with a special master who is working on
22  damages.
23             Here -- and those are examples of -- those are our
24  major military cases.
25             Here you have the Islamic Republic of Iran, who is

1   not a party to this engagement, materially supporting
2   terrorist organizations by the manufacture, provision and
3   fielding of a particular weapons system, which is called an
4   EFP, and those terrorist organizations are using those EFPs
5   against U.S. troops.
6           THE COURT:  How would that be any different than a
7   terrorist organization using a Russian MiG or another piece
8   of military equipment supplied by a third party in order to
9   defend an authorized use of force against them?  It is a war
10  on terror, after all.
11          MR. PERLES:  If you're saying how is it different
12  for purposes of U.S. law?
13          THE COURT:  Yes.
14          MR. PERLES:  Okay.
15          THE COURT:  If one fits under the terrorism
16  exception, why wouldn't the other?
17          MR. PERLES:  Because the use of a Russian MiG or
18  any other kind of Russian-made platform does not fall within
19  this exception.
20          THE COURT:  Because Russia's not a designated
21  terrorist state.  So any weapon used in Iraq against U.S.
22  forces supplied by a designated terrorist state, a state-
23  sponsored terrorism, would be subject to the terrorism
24  exception?  Is that your view?
25          I'm having trouble understanding why this -- I

1    understand it's a devastating and deadly and ravaging piece
2    of equipment, but why --
3             MR. PERLES:  I don't have to argue -- I'm arguing
4    something much narrower than that.  I'm not arguing that
5    every weapon that went to a Shia militia that's a designated
6    terrorist organization constitutes material support for
7    purposes of this case.  What we are arguing here is much
8    narrower.
9             Now, there's another -- at least one other case
10   pending before the U.S. District Court for the District of
11   Columbia that take this broader view, and I think it's
12   called *Karcher*, K-a-r --
13            THE COURT:  Spell it.
14            MR. PERLES:  It's *K-a-r-c-h-e-r vs. The Islamic
15   Republic of Iran*.  The cite is 16-232.
16            THE COURT:  Who is that before?
17            MR. PERLES:  That is before Judge Kollar-Kotelly.
18   And that case seems to take the broader view, the one that
19   Your Honor's articulating.
20            In our memo that we will file with you, we're
21   really going to differentiate ourselves from that kind of
22   action.  That is where I didn't want to be in this case for
23   just these jurisdictional reasons.
24            So what we will argue in this memo is you have
25   this device.  It's got only one purpose, and that's to

1    pierce armor.  And one could argue that materially
2    supporting a Shia militia, for example, in Iraq with all
3    kinds of toys, whatever they might be, could have any number
4    of purposes, but if you're providing those forces with an
5    armor piercer, it only has one purpose and one purpose
6    alone, and that purpose is to kill and maim U.S. forces.
7    There is no other legitimate reason for a terrorist state to
8    be giving a terrorist organization that kind of weapons
9    system.
10              So what we're going to do in this memo is we're
11   going to draw a very bright line between *Karcher*-type cases
12   and the material support of these organizations with this
13   kind of weapons system.
14              THE COURT:  But the material support provision
15   doesn't rise or fall on the type of weapon.  It rises or
16   falls on the intent of the supporter, correct?  And so if a
17   third party gives and howitzer, automatic weapons, to a
18   terrorist group with the intent to further the terrorist
19   activities of that group, it doesn't matter if the weapon is
20   as egregious as the one that you've alleged in your
21   complaint, correct?
22              MR. PERLES:  That's correct. Yes, I do agree with
23   that.  It is what you and I would call a vicarious liability
24   statute.
25              THE COURT:  Okay.  Obviously, you know, there are

1   any number of issues that will play into your ability to
2   invoke the terrorism exception against the defendants.  I'm
3   happy to allow you additional time to proceed with class
4   discovery, but I would rather, sooner rather than later, you
5   know, resolve these threshold issues on a procedural basis
6   that makes sense, and I'm not -- I mean, generally we would
7   get a motion for a default judgment if this weren't a class
8   case.
9            MR. PERLES:  That's correct, uh-huh.
10           THE COURT:  Right.  And we would have to apply
11  essentially a motion to dismiss standard or we would apply a
12  preponderance of the evidence standard to that motion for a
13  default judgment.
14           Can we -- by doing that here, would that foreclose
15  your ability to proceed as a class if the motion were
16  granted, or do you want some time to think about
17  procedurally how we tee up the immunity issue while at the
18  same time preserving your right to proceed as a class if the
19  motion is -- if the motion -- if I decide that it's likely
20  that you have a viable legal theory?
21           MR. PERLES:  We'd like to preserve the class
22  certification until after you determine whether we have a
23  viable theory to proceed on the case.
24           You know, this is all a little bit new, if you
25  would, and we're struggling like you are struggling.  We

1    have this big case-in-chief that we'd like to put on in
2    liability, and that we certainly want to do after the
3    certification question has been resolved because it affects
4    how we lay out the case in liability.  At the same time,
5    we'd like to get through this more front-end, if you would,
6    question of liability before we get to the class
7    certification.  So we rather see it as a three-step process.
8             THE COURT:  So if the defendant were here, we
9    would brief and argue and decide a 12(b)(6) motion.
10            MR. PERLES:  Right.  That's right.
11            THE COURT:  And that's what we should do without
12   the motion.
13            MR. PERLES:  You know, we went through, in
14   preparation for today, and we laid out the elements that we
15   are required to prove.  I mean, we're required to prove that
16   the claimants are either U.S. nationals or members of the
17   U.S. armed forces.  Some of these elements are really pro
18   forma for purposes of our discussion today.  We need to --
19   you know, we need to prove that Iran was a state sponsor of
20   terrorism at the time.  Again, that's very pro forma.
21            There are two issues; one, a pure issue of law and
22   a pure issue of fact that are really interesting in this
23   proceeding.
24            The first is whether the death and injuries of
25   these servicemen are extrajudicial killings or attempted

1   extrajudicial killings within the meaning of that statute.
2   I think that's most of the front-end question.
3           And then we have to -- and this is still a little
4   unclear to me.  If you look at the -- you know, the Supreme
5   Court's recent decision in *Helmerich*, I'm trying to figure
6   out how much of the factual portion of this we have to put
7   on at what we just called the motion to dismiss stage.  I
8   don't think we have to put on much.  We may not put on
9   anything other than written submissions.  For example, we
10  may reference public congressional testimony by officials
11  from the Department of Defense that these weapons systems
12  were being made in Iran and used to provision certain
13  militias in Iraq.
14          I think those kind of pretty rudimentary things
15  are sufficient to get us through what I'll call the first
16  step.  Then we'll go to the certification question, and
17  then, when we understand where we are at the end of the
18  certification question, we're going to be able to lay out
19  our damages case.
20          That does bring me to --
21          THE COURT:  Well, you need to obtain a default.
22          MR. PERLES:  That's correct.
23          THE COURT:  Right?
24          MR. PERLES:  There should be a -- at least the way
25  the district court has practiced up until this recent

1   Supreme Court decision is the clerk basically enters a
2   technical default, which is nothing more than an
3   administrative notation that the defendant has -- the
4   defendant terrorist state has failed to appear within a
5   reasonable period of time, but it is not a substantive
6   determination --
7           THE COURT:  You move for a default.  We have a
8   hearing.
9           MR. PERLES:  That's right.
10          THE COURT:  We hear liability first, and then we
11  move to damages with a special master or something along
12  those lines, if necessary.
13          MR. PERLES:  That's right.
14          THE COURT:  Okay.  On the factual issues, is it
15  your claim that all of the EFPs found in Iraq originated in
16  Iran?  I understand that some are manufactured in Iraq; is
17  that correct?
18          And --
19          MR. PERLES:  It's our contention that -- and I
20  need to be very careful because we're going to build this
21  factual record later -- most of these devices were
22  manufactured in Iran.  To the extent that some were made in
23  Iraq, they were made with Iranian-furnished equipment.
24  These devices, the copper end -- this is basically a
25  custom-milled copper plate.  It actually looks like a cone.

1    I joke that -- I'm showing my age -- it looks like a
2    Vietnamese farmer's peasant hat, okay, and it's loaded --
3    you and I intuitively would say it's loaded into the weapons
4    system backwards, and the copper melts and changes shape and
5    is fired at a U.S. armored vehicle.
6             The shape of that piece of copper is quite
7    precise.  It has to be precision-lathed, and there are very
8    few lathe manufacturers in the world who can make a lathe
9    that will allow this device to be made with sufficient
10   precision, and my understanding is that the forensics on
11   these devices are so good that when the devices fail to
12   detonate and United States recovers the plate, they can
13   actually identify which lathe the plate was made on.
14            So I would say that almost all of these devices
15   were made in Iran.  The few that were made in Iraq were made
16   on the Iranian-furnished mills, so to me, at law there's
17   going to be no difference.
18            THE COURT:  So your allegation is that any service
19   member injured by one of these devices Iran is liable for
20   because of either direct manufacture or material support for
21   the manufacturer elsewhere.
22            MR. PERLES:  That is correct.
23            THE COURT:  Okay.  Any other cases, to your
24   knowledge, involving this particular weapon, or are you the
25   only ones out there?

Case 1:16-cv-01102-CRC Document 23 Filed 07/14/17 Page 17 of 19    17

1    MR. PERLES: My understanding is that embedded
2  somewhere in *Karcher* there are some EFP cases, but *Karcher*
3  includes a lot of deaths and injuries that are in no way
4  associated with this weapons system.
5    There are also, I believe, some cases that are
6  brought under the Anti-Terror Act against Iranian money
7  launderers where again EFP victims are embedded in a much
8  larger class of -- I don't want to use the word "class" --
9  group of plaintiffs. I don't believe any of those are
10 brought here, but we will -- we can furnish Your Honor those
11 in the memo that we're prepared to brief.
12    THE COURT: All right. What I think we should do
13 is simply stay the class cert deadline for the time being --
14    MR. PERLES: Okay.
15    THE COURT: -- instead of a 30-day continuance.
16    MR. PERLES: Good.
17    THE COURT: And then we will issue an order
18 directing briefing on the threshold legal viabilities of the
19 allegation in the complaint, okay?
20    MR. PERLES: Okay. Again, I must say I remain a
21 little bit confused about -- in our opening brief we have
22 this question of law that we're going to brief. We have to
23 make some rudimentary factual showing, and the Supreme Court
24 was not particularly helpful in how far we have to carry
25 that ball. So we'll make -- with Your Honor's permission,

```
 1    we'll make an opening threshold stab at that.  I think Your
 2    Honor will find it sufficient.
 3              THE COURT:  Okay.
 4              MR. PERLES:  If you find it wanting, perhaps we
 5    can have another status call, and we can simply fill out the
 6    factual underpinning to Your Honor's satisfaction.
 7              THE COURT:  How long do you need?
 8              MR. PERLES:  30 days would be fine.
 9              THE COURT:  All right.  We will issue an order to
10    that effect and likely have you back thereafter for a
11    hearing.
12              MR. PERLES:  Good.
13              THE COURT:  Okay.
14              MR. PERLES:  Thank you.
15              THE COURT:  Anything else?
16              MR. PERLES:  Mr. Bonner, do you have anything?
17              THE COURT:  Okay.  We're adjourned.
18              MR. PERLES:  Thank you.
19                   (Whereupon the hearing was
20                     concluded at 2:32 p.m.)
21
22
23
24
25
```

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 14th day of July, 2017.

/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001