**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                         )
ALAN BURKS, *et al.*,                    )
                                         )
                  Plaintiffs,            )        CIVIL ACTION NO.: 16-cv-1102 (CRC)
                                         )
        v.                               )
                                         )
ISLAMIC REPUBLIC OF IRAN, *et al.*,      )
                                         )
                  Defendants.            )
_____)


**PLAINTIFFS' MOTION TO COMPEL DOCUMENTS**
**FROM NON-PARTY DEFENSE THREAT REDUCTION AGENCY AND**
**MEMORANDUM IN SUPPORT THEREOF**

Plaintiffs respectfully submit this memorandum of law in support of their motion to

compel documents from non-party Defense Threat Reduction Agency ("DTRA"), part of the

United States Department of Defense, pursuant to Fed. R. Civ. P 45.

**PRELIMINARY STATEMENT**

Plaintiffs are U.S. servicemen (and their families) who were killed or gravely injured in

three separate Iranian-sponsored terrorist attacks in Iraq from late 2006 to 2007 using explosive

devices known as explosively formed penetrators ("EFPs").  As part of their efforts to gather

evidence to establish that Iranian-sponsored EFPs were used in those attacks, Plaintiffs served a

subpoena on the Joint Improvised Threat Defeat Organization ("JIDO").  JIDO, leads, advocates,

and coordinates all Department of Defense actions and their respective Joint Task Forces' efforts

to defeat Improvised Explosive Devices ("IED"s), including EFPs, as weapons of strategic

influence.[1]  Plaintiffs' subpoena seeks various government reports regarding the three attacks on

---

[1] *See* February 20, 2019 Declaration of Greg Carl in Support of Plaintiffs' Motion to Compel
Documents From DTRA ("Carl Decl.") at ¶ 12 (submitted herewith).

Plaintiffs that almost certainly contain evidence of Iran's material support for the EFP attacks that harmed Plaintiffs.

DTRA has appeared as the supervising agency of JIDO and objected to the subpoena. DTRA does not claim that it lacks responsive documents.  Rather, it has made an unsupported, blanket assertion that *all* of the requested documents are classified and immune from production. As demonstrated below, DTRA's blanket assertion of classified confidentiality is both unlawful and meritless.  The attacks in question occurred, and the reports investigating those attacks were generated, nearly 12 years ago.  Those reports are typically classified for only 10 years.  Thus, they are likely no longer to be immune from production.  Indeed, the United States Central Command of the Department of Defense ("CENTCOM"), has already publicly produced in another lawsuit redacted versions of the *very same types of reports* that Plaintiffs seek here for other EFP attacks in Iraq that occurred in the *very same timeframe* as the attacks on Plaintiffs. That production belies any claim that those reports are classified in their entirety.

At a minimum, this Court should compel DTRA to itemize the responsive documents it has and justify its claims of classified privilege as to each document with the detailed evidence required by law. That effort will demonstrate that much of the information Plaintiffs seek is no longer classified and should be produced immediately.

STATEMENT OF FACTS

The following is a brief summary of the facts relevant to this motion as set forth in the Complaint.  A more complete recitation of the facts is set forth in Plaintiffs' Brief in Response to Court's Order Dated July 11, 2017 (Docket Entry 24).

**A.  Iran's Use of Terrorism to Undermine American Interests in Iraq**

Iran has consistently worked to undermine American efforts to bring peace and
democracy to Iraq following the 2003 Gulf War. *See* Complaint at ¶¶ 2, 22-25, 36-42. In
particular, Iran has attempted to advance its anti-American agenda in Iraq by sponsoring post-
Gulf War terrorist attacks against soldiers from the U.S. and its allies, also known as the
"Coalition Forces." *See* General David H. Petraeus, Commander, Multinational Force – Iraq,
REPORT TO CONGRESS ON THE SITUATION IN IRAQ, 2 (Apr. 8-9, 2008) ("Gen. Petraeus Report").

Iran sponsored and fomented those attacks by financing the operations of militant Shiite
terrorist organizations operating within Iraq that the U.S. military refers to as "Special Groups."
*Id*. The Iranian-sponsored Special Groups include, among others, the Qazali Network, the
Hezbollah Brigades, the Shebani Network, the Promised Day Brigades, and the Badr Corps.
Complaint at ¶ 2. In addition to financing the Special Groups' operations in Iraq, Iran has
provided those terrorist organizations with weapons, ammunition and technology that the Special
Groups needed to attack American soldiers and other Coalition Forces. *Id.* at ¶ 25 (citing Dept.
of the Treasury, FACT SHEET: DESIGNATION OF IRANIAN ENTITIES AND INDIVIDUALS FOR
PROLIFERATION ACTIVITIES AND SUPPORT FOR TERRORISM (2007), https://www.treasury.gov/
press-center/press-releases/Pages/hp644.aspx. ("TREASURY DESIGNATION FACT SHEET 2007");
Gen. Petraeus Report at 2.

**B.  Iran's Use of EFPs to Advance Its Terrorist Agenda in Iraq**

Beginning in mid-2005, Iran sought to advance its efforts to maim and kill American
troops by supplying the Special Groups with EFPs and training their members how to use those
deadly weapons. Complaint at ¶ 2. EFPs consist of a steel tube that is welded closed on one end,
packed with plastic explosives and a detonator, and then capped with a precision-manufactured,

inverted copper cone. *Id.* at ¶ 32. When detonated, the explosives liquefy the copper cone and

project it out of the tube at hypersonic speed. *Id*. The Special Groups employ EFPs both singly

and in arrays. *Id.* at ¶ 32.

   The EFPs that Special Groups employed to attack Coalition Forces exhibited

significantly greater explosive force than the IEDs that terrorists operating in Iraq had typically

utilized in their attacks against American forces. *Id*. As Gen. Martin E. Dempsey, the former

Chairman of the Joint Chiefs of Staff, confirmed during a Senate Armed Services Committee

hearing, the slug of molten copper that EFPs produce is capable of cutting through the heavy

armor plating of American military vehicles from a tactically meaningful distance. *Id.* at ¶ 37

(citing Video: Senate Armed Services Committee Hearing on the Iran Nuclear Agreement, C-

SPAN (July 29, 2015), http://www.c-span.org/video/?327380-1/hearing-iran-nuclear-agreement

(beginning at 1:57:22) ("Gen. Dempsey Testimony")). When EFPs pierce that armor plating, the

copper and the steel "spall" (or fragments) that the EFPs generate frequently kill or severely

injure the occupants of the vehicles. Complaint at ¶¶ 32.

   At Iran's direction and with Iran's material support, the Special Groups killed hundreds

of American servicemen stationed in Iraq with EFP attacks. Complaint at ¶ 36 (citing Dexter

Filkins, *The Shadow Commander*, THE NEW YORKER, Sept. 30, 2013, http://www.newyorker.

com/magazine/2013/09/30/the-shadow-commander (quoting Gen Stanely McChrystal (ret.) as

stating, "There was zero question where they [the EFPs] were coming from . . . . We knew where

all the factories were in Iran. The E.F.P.s killed hundreds of Americans.")). According to the Iraq

Index, a collection of publicly available data regarding violence in Iraq that the Brookings

Institution compiled, there were 62 reported EFP attacks in December 2006, 65 in April 2007,

approximately 60 in May 2007, 99 in July 2007, 78 in August 2007, 52 in September 2007, 53 in

October 2007, less than 40 in November 2007, less than 20 in July 2008, and 12 in November

2008. Complaint at ¶ 42 (citing Michael E. O'Hanlon, Jason H. Campbell, BROOKINGS INST.,

IRAQ INDEX: TRACKING VARIABLES OF RECONSTRUCTION & SECURITY IN POST-SADDAM IRAQ 26

(March 26, 2009), https://www.brookings.edu/wp-content/uploads/2016/07/index20090326.pdf.

Moreover, unlike other weapons that Iran is commonly alleged to have smuggled into Iraq, EFPs

produce distinctive damage to vehicles and injury patterns in their victims. *See* Complaint at ¶

33. Those unique characteristics will allow Plaintiffs to positively identify the source of their

injuries.

### C.  Substantial Publicly Available Evidence Demonstrates Iran's Responsibility for All EFPs that the Special Groups Employed to Attack Coalition Forces

Substantial evidence already publicly released by the U.S. government ties Iran to all of

the EFPs that the Special Groups employed to attack American military personnel in Iraq. The

2007 State Department Report noted the Quds Force's central role in promoting the Special

Groups' use of EFPs against Coalition Forces in Iraq. Complaint at ¶ 23 (citing COUNTRY

REPORTS ON TERRORISM 2007). The Report stated that, in 2007, the Quds Force continued to

provide "Iraqi militants with Iranian-produced . . . explosively formed projectiles (EFPs) that

have a higher lethality rate than other types of improvised explosive devices (IEDs), and are

specially designed to defeat armored vehicles used by Coalition Forces." *Id.*

Coalition Forces also captured Iranian agents attempting to smuggle EFP components

into Iraq. In 2007, Coalition Forces captured a Special Groups operative with direct ties to the

Quds Force in the midst of an EFP smuggling operation. *Id.* at ¶ 39 (quoting *Coalition Forces

Capture High-Priority Weapons Smuggler, 62 Others*, AMERICAN FORCES PRESS SERVICE, Aug.

16, 2007, http://archive.defense.gov/news/newsarticle.aspx?id=47065. Regarding that arrest, Lt.

Col. Christopher Garver commented that "Coalition troops continue to target terrorists who bring weapons and explosives, especially explosively formed penetrators, and other aid into Iraq." *Id.*

The sophisticated manufacturing techniques required to produce EFPs also confirm Iran's responsibility for the Special Groups' EFP attacks against Coalition Forces. Complaint at ¶ 35. According to Joint Task Force Troy, a multinational task force operating in Iraq responsible for analyzing evidence retrieved by explosive ordinance disposal teams, the need for "very precise machining" in the manufacturing of EFPs means that they are not something "someone can produce in a garage." *Id.* (quoting U.S. Dep't of Defense News Article, *Extremists Use Iranian Weapons, Iraq Command Spokesman Says* (July 11, 2011), http://archive.defense.gov/news/newsarticle.aspx?id=64630 ("Task Force Troy Press Release"). Specifically, if the parabola of the copper cone of an EFP is not lathed into a precise arc, the detonation produces a relatively less harmful, diffuse spray of copper. *Id.* If the parabola of the copper cone is too "sharp," the EFP produces a stream of copper, rather than a slug. *Id.* That stream of copper remains deadly at close range, but dissipates its energy over the course of just a few feet. *Id.* On the other hand, if the parabola of the copper cone is too "flat," the copper fragments expand into an arc that is ineffective at piercing armor plate. *Id.*

Without Iran's guidance and assistance, the Special Groups lacked the technical ability to engineer and manufacture EFPs that complied with the exacting technical requirements necessary to produce successful and lethal results. *Id.* at ¶ 31. Also, Iran eventually supplemented its own direct distribution of EFPs to the Special Groups by providing certain Special Groups with the materials, equipment and training necessary to build those deadly devices. *Id.* at ¶ 39-41. For example, in raids against the Iran-supported Mahdi Army in Sadr City, Iraq, Coalition Forces uncovered multiple EFP "factories" containing various components, including dozens of

EFP copper cones and the machinery necessary to create them. *Id.* at ¶ 41 (citing Bill Roggio, *Iraqi Troops Find EFP Factory in Sadr City*, THE LONG WAR JOURNAL (Oct. 30, 2008), http://www.longwarjournal.org/archives/2008/10/iraqi_troops_find_ef.php. In the offensive that pushed back the Mahdi Army and revealed these factories, Coalition Forces detained or killed over one hundred Iran-backed Special Group members, including 19 Hezbollah operatives. *Id.*

Forensic analysis performed by Joint Task Force Troy also demonstrates that Iran was the source of all of the EFPs that the Special Groups employed to attack U.S. servicemen in Iraq. *Id.* at ¶ 35 (citing Task Force Troy Press Release). As a Joint Task Force official explained, the unit employed materials collected by explosive ordnance disposal teams following attacks on Coalition Forces in order to "put all those puzzles together, and . . . determine where they [the EFPs] are from." *Id.* Based on that analysis, Joint Task Force Troy concluded that "the forensic teams can categorically state that the weapons are from Iran." *Id.*

### D.  Plaintiffs and Their Claims

Plaintiffs include the personal representatives of two servicemen killed by EFP attacks in Iraq on November 7 and 14, 2007, two servicemen injured in another EFP attack in Iraq on August 23, 2007, and the family members of those soldiers. *Id.* at ¶¶ 3-6, 16, 21.  All Plaintiffs assert claims under 28 U.S.C. § 1605A. *Id.* at ¶ 57-68. That statute provides an exception to foreign sovereign immunity for, among other terrorist attacks, extrajudicial killings committed by, or with the material support of, one of the four nations the U.S. government has designated as a state sponsor of terrorism. 28 U.S.C. § 1605A(a)(1). Plaintiffs seek damages for the wrongful death of the Plaintiffs killed by EFPs and the personal injuries suffered by the other Plaintiffs as a result of those terrorist attacks. *Id.*

### G.    Plaintiffs' Subpoena for Documents Served on JITDO/DITRA

As part of their efforts to obtain evidence to prove that they were each the victims of Iranian-sponsored EFP attacks in Iraq, Plaintiffs served a subpoena on JIDO on October 31, 2018 requesting details regarding all three of the EFP attacks in Iraq that killed or maimed Plaintiffs:

> A 'request for support' response with all associated data, attribution, technical reporting, and all source intelligence analysis, SIGACTS and intelligence reporting, and OPIR having to do with the attacks on: (a) 23 AUG 2007 at approximately 11:00AM in the vicinity of 38S NB 09056 37928; (b) 7 NOV 2007 in the vicinity of 38S MB 39800 91300; and (c) 14 NOV 2007 at approximately 8:15AM in the vicinity of 38S MB 43459 86710 . . . .

*See* March 5 , 2019 Declaration of Joshua Perles ("Perles Decl.") submitted herewith at ¶ 3 and Ex. A. 56 days after service, by letter of December 26, 2019, DTRA responded to the subpoena, noting that JITDO is now subordinate to DTRA and that DTRA "asserts the claim of privilege regarding the information and documents sought" because they are allegedly "properly classified pursuant to DoD 5200.1-R" and "vital to national security." *Id*. at Ex. B.  Accordingly, DTRA refused to produce a single document in response to the subpoena.

On January 15, 2019, Plaintiffs' counsel contacted counsel for DTRA to discuss whether DTRA would identify any documents responsive to the subpoena in DTRA/JITDO's possession, produce any of those documents, and whether it would provide any justification for its blanket assertion of privilege. *Id*. at ¶ 6-12.   DTRA's counsel refused all of Plaintiffs' counsel's requests and refused to discuss the matter further. *Id*.  DTRA also refused Plaintiffs' counsel's offer to compromise by having Plaintiffs' consultant who has the required security clearance review the responsive documents and prepare unclassified summaries of them that would then be submitted to DTRA for its approval. *Id*.   This reasonable solution to potential issues surrounding classified materials was also offered via the *Touhy* letter accompanying the subpoena served on DTRA. *Id*. Counsel for DTRA also remarked that absent a motion to compel, they would refuse to provide any responsive documents to the Court for *in camera* review. *Id*.

The documents subpoenaed from JIDO are critical to this pending litigation, as they go directly to the issue of whether Plaintiffs were the victims of EFP attacks, and whether Iran was responsible for those attacks. *See* Carl Decl. at ¶¶ 20-21.  Indeed, the requests were prepared with the assistance of Plaintiffs' expert, Greg Carl, the former Director of the U.S. Department of Justice's Terrorist Explosive Device Analytical Center ("TEDAC"), who worked closely with JIDO during the relevant time period to study EFP attacks in Iraq. *Id*. at ¶¶ 19, 24.  According to Mr. Carl, JIDO, now under DTRA's control, almost certainly has numerous reports regarding the three attacks on Plaintiffs that would demonstrate the nature of those attacks and the forensic evidence and intelligence gathered concerning whether they were EFP attacks and whether Iran was responsible for them.  *Id*. at ¶¶ 19-21.  In particular, as demonstrated in Mr. Carl's Declaration, JIDO likely has in its custody or control all of the following reports that should include information highly relevant to Plaintiffs' claims:

**Significant Activity ("SIGACT") Reports** that compile evidence gathered from the scene of IED attacks in IRAQ;

**Explosive Ordnance Disposal ("EOD") Reports** and "storyboards" prepared by United States Armed Forces EOD technicians who detect, identify, evaluate, render safe at the site and dispose of all explosive ordnance, including EFPs;

**Storyboards** designed for briefing commanders in Iraq with details of IED attacks, including EFPs;

**Weapons Intelligence Team ("WIT") Reports** that reflect intelligence gathered regarding all IED attacks, including photographs, drawings, and analyses made by examining the tactical level technical and forensic exploitation reports;

**Combined Explosive Exploitation Cell ("CEXC") Reports** prepared by various military explosive specialists, law enforcement bomb technicians and investigators/scientist, reflecting the initial examination of IEDs, technical triage of all devices, including the first documentation of the exploitation process; and

> **TEDAC Reports** which technically and forensically exploit all IEDs of interest to
> the United States Government worldwide, including EFPs, in an effort to provide
> actionable intelligence to the offensive missions against terrorism and to the Force
> Protection mission, including photographs, technical and forensic conclusions from
> subject matter experts in the following disciplines: DNA, Latent Fingerprints, Trace
> Evidence, Toolmarks, Explosive Chemistry, Technical Exploitation (electronics
> analysis), and Explosive Device functionality.

Carl Decl. at ¶ 19.  Mr. Carl has not only testified that all of these reports are highly likely to contain relevant information to support Plaintiffs' claims, Carl Decl. at ¶ 20, but he has also demonstrated that due to their age—more than 10 years—and the nature of these reports, many of them are likely no longer classified, even if they once were. *Id*. at ¶¶ 23-29.  The arbitrariness of DTRA's refusal to even discuss the requests is demonstrated by CENTCOM's recent public production for use in a similar case of the very same types of reports involving the very same time frame at issue here provides powerful evidence that the reports responsive to Plaintiffs' subpoena here contain vast amounts of information that is no longer classified. *Id*. at ¶¶ 27-29. For example, as noted in the Carl Declaration, CENTCOM has publicly produced redacted copies of CEXC Reports, SIGACT Reports and IED Reports of other EFP attacks in Iraq in 2007 in the FOIA lawsuit brought by other victims of Iranian terrorism in *Osen LLC v. United States Central Command*, Case No. 17-CV-4457 (KPF) pending in the U.S. District Court for the Southern District of New York. ("*Osen*").  Carl Decl. at ¶ 28, Ex. B.  That production demonstrates that large, segregable portions of the very same types of reports of the same vintage as those requested here contain information that is no longer classified or otherwise privileged. *Id*.[2]

---

[2] Samples of those reports produced by CENTCOM are attached as Exhibit B to Mr. Carl's Declaration.  Carl Decl. at ¶ 28 (including CEXC Reports, SIGACT Reports and IED Reports for

**ARGUMENT**

**Because DTRA Has Failed Entirely to Sustain its Burden to Establish Under
Rule 45 That Any Privilege Applies, the Subpoenaed Documents Should Be Produced**

Fed. R. Civ. P. 45 applies to document subpoenas issued to third-party agencies or

agency employees in federal civil suits. *See e.g.*, *Watts v. S.E.C.*, 482 F.3d 501, 508 (D.C. Cir.

2007) ("government agencies are 'persons' subject to Rule 45 subpoenas); *Singh v. S. Asian

Soc'y of George Washington Univ.*, No. CIV A 06-574 RMC, 2007 WL 1556669, at *2 (D.D.C.

May 24, 2007).

"[A] party seeking to quash a subpoena based on the invocation of privilege 'must

adequately demonstrate that applicable privileges would in fact protect' the material sought."

*Gouse v. D.C.*, No. CV 17-2566 (RDM), 2019 WL 188382, at *4 (D.D.C. Jan. 14, 2019); *accord

Mobley*, 870 F. Supp. 2d 61, 67–68 (D.D.C. 2012); *Elec. Privacy Info. Ctr.,* 296 F. Supp. 3d 109,

118 (D.D.C. 2017). Under Rule 45, the burden of presenting sufficient facts to establish the

privilege rests with the party claiming it. *Duran v. Andrew*, No. 09-730 (HHK/AK), 2010 WL

1418344, at *2 (D.D.C. Apr. 5, 2010); *cf. Nat'l Sec. Counselors v. C.I.A.*, 960 F. Supp. 2d 101,

132 (D.D.C. 2013) ("[w]hen an agency's response to a FOIA request is to withhold responsive

records, either in whole or in part, the agency 'bears the burden of proving the applicability of

claimed exemptions.'" ) *quoting Am. Civil Liberties Union v. U.S. Dep't of

Def.* ("*ACLU/DOD* "), 628 F.3d 612, 619 (D.C. Cir. 2011). Moreover, "[t]he burden is on the

agency at the trial level to show that the information is properly classifiable in accordance with

the substantive requirements of the applicable Executive Order." *Taylor v. Dep't of the Army*,

---

other terrorist attacks against U.S. service members in Iraq that occurred in 2006-2008). The
remainder of those documents are available on the public ECF docket in *Osen LLC v. United
States Central Command*, Ca. No. 17-cv-4457 (KPF) (S.D.N.Y.).

684 F.2d 99, 105-106 (D.C. Cir. 1982) (data classified under Army regulations Dod 5200.1-R

must still comply with applicable executive order governing government classified data (then EO

12,065)).[3]

      This requires that the party present detailed affidavits or similarly competent evidence

"supporting each of the essential elements necessary to sustain a claim of privilege." *Taylor*, 684

F.2d at 106 (upholding assertion of state secrecy under FOIA based on detailed supporting

affidavits); *Alexander v. FBI,* 192 F.R.D. 42, 45 (D.D.C.2000) (involving the assertion of

attorney client privilege); *cf. Al-Turki v. Dep't of Justice*, 175 F. Supp. 3d 1153, 1169 (D. Colo.

2016) ("To satisfy its burden of proof under FOIA, an agency typically submits affidavits" which

"must contain 'reasonably detailed descriptions of the documents and allege facts sufficient to

establish an exemption.'") (citations omitted); *King v. U.S. Dep't of Justice*, 830 F.2d 210, 221

(D.C. Cir. 1987) (FBI failed to carry its burden to demonstrate the propriety of its classification

decisions because it failed to "describe with reasonable specificity the material withheld, and

identify the damage to the national security expected to attend its disclosure."); *see Mobley v.

Dep't of Justice*, 870 F. Supp. 2d 61, 67–68 (D.D.C. 2012) (upholding government's withholding

of documents under FOIA on state secrecy grounds only after reviewing government's *"ex parte*,

*in camera* . . . declarations . . . showing that the E.O. [13,526] classification requirements are

met" and a "classified *Vaughn* index with pertinent details for [the withheld] documents," all of

---

[3] The requirements under FOIA are instructive by analogy.  As this Court has held, "[w]hen an agency's response to a FOIA request is to withhold responsive records, either in whole or in part, the agency 'bears the burden of proving the applicability of claimed exemptions." *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 61 (D.D.C. 2013) ("'If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption,' and 'is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone.'" ) (citation omitted).

which were "sufficiently thorough and detailed" to support government's claim.); *accord Elec. Privacy Info. Ctr. v. Dep't of Justice*, 296 F. Supp. 3d 109, 118 (D.D.C. 2017) ("agency's affidavits must describe 'the justifications for nondisclosure with reasonably specific detail, [and] demonstrate that the information withheld logically falls within the claimed exemption,' and must not be 'controverted by either contrary evidence in the record [ ] or by evidence of agency bad faith.'") (citations omitted).

Indeed, courts have rejected an assertion by the Department of Defense's ("DoD") of the state secrecy privilege even where DoD put forth far more detail than offered here. *See, e.g. Nat'l Res. Def. Council v. U.S. Dep't of Def.*, 388 F. Supp. 2d 1086, 1089 (C.D. Cal. 2005) ("DoD has failed to demonstrate an adequate search for responsive documents, and has failed to meet its burden of proving that the withheld materials are exempt from disclosure. The declarations submitted by DoD suggest that it conducted an improperly narrow search, and further fail to provide sufficiently detailed, nonconclusory statements, which together with the index, would allow the Court to assess whether the documents were properly withheld."). Here, in sharp contrast DTRA had provided absolutely no basis to support its sweeping claims of privilege.

DTRA has failed entirely to comply with Rule 45, and the law regarding government secrets because it has produced ***nothing*** to support its sweeping assertion that all of the requested documents are "properly classified pursuant to DoD 5200.1-R" and "vital to national security"; nor has DTRA provided any index of such responsive documents. The law requires DTRA to do much more than this.[4] "[B]ecause of the broad sweep of the [state secrets] privilege, the

---

[4] Even under FOIA the government must "satisfy its burden of establishing its right to withhold information from the public by submitting appropriate declarations and, where necessary, an index of the information withheld." *Am. Immigration Lawyers Ass'n v. U.S. Dep't of Homeland Sec.,* 852 F.Supp.2d 66, 72 (D.D.C. 2012) (citing *Vaughn v. Rosen,* 484 F.2d 820, 827–28 (D.C.Cir.1973)).

Supreme Court has made clear that '[i]t is not to be lightly invoked.'  Thus, the privilege may not

be used to shield any material not strictly necessary to prevent injury to national security; and,

whenever possible, sensitive information must be disentangled from nonsensitive information to

allow for the release of the latter." *Ellsberg v. Mitchell,* 709 F.2d 51, 57 (D.C. Cir. 1983), *cert.*

*denied,* 465 U.S. 1038, 104 S. Ct. 1316 (1984) (reversing District Court's denial of motion to

compel government agency defendants to answer interrogatories to disclose the names of which

attorneys general authorized the warrantless electronic surveillance of plaintiffs where

government failed to provide adequate detailed support for its claim of state-secrets privilege)

(citation omitted).  The *Ellsberg* Court further held:

> in situations in which close examination of the government's assertions is
> warranted, the trial judge should insist (1) that the formal claim of privilege be made
> on the public record and (2) that the government either (a) publicly explain in detail
> the kinds of injury to national security it seeks to avoid and the reason those harms
> would result from revelation of the requested information or (b) indicate why such an
> explanation would itself endanger national security.

709 F.2d at 63–64.

DTRA's failure to comply with these requirements is especially egregious here.

Plaintiffs are servicemen who sacrificed their lives or were grievously injured in service of their

country.  In strong contrast to DTRA's blanket refusal to engage in the discovery process

required under the Federal Rules, Plaintiffs' requests are carefully-crafted and surgical in the

context of the broad issues and the 15-year relevant time-frame implicated in this class action

lawsuit. The subpoena calls for documents regarding only three of the hundreds of EFP attacks

that killed or wounded U.S. service members in Iraq, on only three discreet dates in 2007.

Plaintiffs' expert has demonstrated that JIDO/DTRA must surely possess responsive

documents.  Carl Decl. at ¶¶ 19-21.  And, many of those documents contain at minimum non-

classified information from which any classified data can, and must be, be redacted and

segregated. *See Krikorian v. Dep't of State*, 984 F.2d 461, 466 (D.C. Cir. 1993) ("'It has long

been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they

are inextricably intertwined with exempt portions.'") (citation omitted);[5] *see also* Carl Decl. at ¶¶

27-28, Ex. B (noting that portions of similar reports have been produced by CENTCOM in

redacted form and in his experience, the reports responsive to Plaintiffs' requests must contain

non-classified data, especially given that those reports are now more than 10 years old).[6]

      Yet, here DTRA has failed to meet its burden to show that it even searched for and found

responsive documents, let alone justify its blanket assertion of privilege with proper evidence.

*See, e g. James Madison Project v. Dep't of Justice*, 208 F. Supp. 3d 265, 287 (D.D.C. 2016)

(DoD's categorical assertion of secrecy exemption under FOIA without conducting a reasonable

search for responsive records is inadequate to justify exempting documents from disclosure).

## CONCLUSION

      For the foregoing reasons, the Court should order DTRA to produce all responsive

documents forthwith, or submit a detailed index of responsive documents with an affidavit

supporting its claims of privilege as to each responsive document or portion thereof withheld on

the basis of privilege, including certification of DTRA's compliance with EO 12356, EO 12958,

and DOD 5200.1-R, the specific privilege applicable to each document, and in the case of

---

[5] The *Krikorian* Court also held that "[t]he withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and *correlating those claims with the particular part of a withheld document to which they apply.*'" 984 F.2d at 467 (citation omitted) (emphasis in original).

[6] DOD 5200.1-R's "10-Year Rule" requires that when information is classified the "original classification authority (OGC)" shall "[a]ttempt to determine a date within 10 years from the date of classification upon which the information can be automatically declassified." DOD 5200.1-R § C4.2. This regulation also provides a series of "Exemption[s] from the 10-Year Rule," including, for example if disclosure would "reveal information that would assist in the development or use of weapons of mass destruction." *Id*. Additionally, an "Extension of the 10-Year Declassification Period" can be applied by the OGC. *Id*.

documents that have exceeded their 10-year term of classification, proof that the classified status

of such documents were either exempted from the "10-year rule" or renewed prior to the service

of Plaintiffs' subpoena.

                                        Respectfully Submitted,

Dated: March 6, 2019               /s/ Steven R. Perles
                                          Steven R. Perles (D.C. Bar No. 326975)
                                          Edward B. MacAllister (D.C. Bar No. 494558)
                                          Joshua K Perles (D.C. Bar No. 1031069)
                                          PERLES LAW FIRM, PC
                                          1050 Connecticut Ave., NW
                                          Suite 500
                                          Washington, DC 20036
                                          Tel: (202) 955-9055

                                          James P. Bonner
                                          Patrick L. Rocco
                                          FLEISCHMAN BONNER & ROCCO LLP
                                          447 Springfield Avenue, 2nd Fl.
                                          Summit, NJ 07901
                                          Tel: (908) 516-2045

                                          *Attorneys for Plaintiff*