**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **PETER BURKS, _et al._,**<br><br>Plaintiffs,<br><br>v.<br><br>**ISLAMIC REPUBLIC OF IRAN, _et al._,**<br><br>Defendants. | Case No. 16-cv-1102 (CRC) |

## OPINION AND ORDER

Plaintiffs are U.S. servicemembers and their families who seek to hold Iran responsible for the role it allegedly played in terrorist attacks in Iraq.  They have sued the Islamic Republic of Iran under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, asserting that Iran provided material support to Shi'a paramilitary organizations known as "Special Groups."  According to Plaintiffs, Iran trained the Special Groups to create and use explosively formed penetrators ("EFPs"), particularly deadly improvised bombs, to injure and kill U.S. servicemembers stationed in Iraq.

To establish that Iran is not immune under the FSIA's state-sponsored terrorism exception, Plaintiffs "must establish the linkage between a particular EFP attack and the Iranian role in the attack."  Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12, 30 (D.D.C. 2019).  Seeking to gather evidence to prove that the named victims were harmed by Iranian-sponsored EFP attacks in Iraq, Plaintiffs subpoenaed the Defense Threat Reduction Agency ("DTRA"), a component of the Defense Department, requesting documents confirming that two of the victims—Captain Benjamin Tiffner and Second Lieutenant Peter Burks—were killed in Iranian-

sponsored EFP attacks.  In response, DTRA conducted an internal search of its records and produced several hundreds of pages of heavily redacted documents.

After lengthy negotiations over the adequacy of the disclosures, Plaintiffs moved to compel DTRA to (1) reveal the redacted portions of previously produced documents, (2) provide an affidavit describing the material withheld and identifying the damage to national security that would ensue if the information were to be disclosed, and (3) conduct an additional search for responsive documents.  DTRA countered with an assertion of the state secrets privilege, contending that disclosure of the requested information would threaten national security, and insisted that its search was adequate.

As explained below, the Court will grant Plaintiffs' motion in part and deny it in part. The government has adequately justified withholding information about specific details of the attacks, which it attests could divulge intelligence sources and reveal countermeasures to the enemy.  On the present record, however, the government has not carried its burden of showing that the release of information that simply confirms that Captain Tiffner and Lieutenant Burks were killed in Iranian-linked EFP attacks, which is all Plaintiffs say they now seek, would threaten national security, especially given that military officials have publicly disclosed Iran's role in EFP attacks in Iraq and that DTRA has released information confirming that another named victim in this case, Captain James Hochstetler, was injured in an EFP attack carried out by an Iranian-proxy group.  The Court will therefore order the government to file an *ex parte*, sealed affidavit describing the basis for withholding the specific information Plaintiffs seek. After considering that affidavit, the Court will determine whether *in camera* review of the unredacted documents is necessary.  Because Plaintiffs have failed to show that the government's search was inadequate, the Court will deny their request for a supplemental search.

I.      **Background**

A.   Plaintiffs' Claims

Plaintiffs are the personal representatives of two U.S. servicemembers killed by EFP attacks in Iraq (Peter Burks and Benjamin Tiffner), two U.S. servicemembers injured in EFP attacks in Iraq (James Hochstetler and Randolph Delbert Nantz), and certain of the soldiers' family members.  In June 2016, they filed this suit on behalf of themselves and a putative class of similarly situated plaintiffs.  The suit seeks to hold Iran responsible for the role it allegedly played in Burks' and Tiffner's deaths, Hochstetler's and Nantz's serious injuries, and the injuries and deaths of other U.S. servicemembers from EFP attacks in Iraq since 2006.

According to Plaintiffs, Iran financed, designed, manufactured, and supplied EFPs to terrorist groups in Iraq—as part of a strategy to kill U.S. troops and drive the United States from the Middle East.  They name as defendants the Islamic Republic of Iran itself and the Iranian Revolutionary Guard Corps (the "IRGC"), both of which the United States has designated a state sponsor of terrorism.  Compl. ¶¶ 22, 24; see also State Sponsors of Terrorism, U.S. Dep't of State (Dec. 20, 2017) (noting that Iran has been designated a state sponsor of terrorism since 1984); U.S. Dep't of Treasury, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism (Oct. 25, 2007) (designating the IRGC as a state sponsor of terrorism).  Plaintiffs allege that Iran and the IRGC, an elite military unit charged with protecting the Iranian government, supported attacks against U.S. servicemembers through the IRGC's Quds Force ("IRGC-QF"), a specialized military branch that serves as the "regime's primary mechanism for cultivating and supporting terrorists abroad."  U.S. Dep't of State, Country Reports on Terrorism 2011 (July 2012); Compl. ¶ 24.  The IRGC-QF, Plaintiffs claim, provides "lethal support in the form of weapons, training, funding, and guidance" to the

Special Groups, "'select groups of Iraqi Shi'a militants who target and kill [U.S.] Coalition and Iraqi forces and innocent Iraqi civilians' in Iraq."  Compl. ¶ 25 (quoting U.S. Treasury Dep't Press Release, Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism (Oct. 25, 2007)).

Plaintiffs describe the EFP as the signature weapon of Iranian-backed Special Groups. Compact but lethal, an EFP is like a traditional improvised explosive device ("IED") but is uniquely able to cleave through armored plating on military vehicles, making it especially deadly.  Id.  ¶¶ 32–35.  According to Plaintiffs, an EFP "consist[s] of a steel tube welded closed on one end, packed with plastic explosives and a detonator, then capped with a precision-manufactured, inverted copper cone."  Id. ¶ 32.  Upon detonation, "the explosives liquefy the copper cone and project it out of the tube," thereby creating a "slug of molten copper . . . capable of penetrating the steel plating of many U.S. armored vehicles, creating steel spall, or fragments, that along with the copper slug wreak havoc on the interior of vehicles, dismembering and killing its occupants."  Id. ¶ 32.  Manufacturing and deploying an EFP require specialized training and a sophisticated assembly operation, Plaintiffs allege, and is not something "someone can produce in a garage."  Id. ¶ 35.  They contend that EFP attacks "produce a characteristic hole (or holes) in armor plating that is distinct from the damage inflicted by other and typical [IEDs]" and often leave behind copper residue.  Id. ¶ 33.

The named plaintiffs bring claims arising out of four alleged EFP attacks in Iraq.  They contend that:

- On December 22, 2006, Sergeant First Class Randolph Nantz was seriously injured when his convoy was struck by an EFP.  Id. ¶ 46.[1]

- On August 23, 2007, Captain James Hochstetler was severely injured while riding in a vehicle struck by an array of at least three EFPs.  Id. ¶ 45.

- On November 7, 2007, Captain Benjamin Tiffner was killed by an EFP while part of a convoy.  Id. ¶ 44.

- On November 14, 2007, Second Lieutenant Peter Burks was killed when his vehicle was struck by an array of six to eight EFPs.  Id. ¶ 43.

Plaintiffs sue under 28 U.S.C. § 1605A(c), which grants U.S. citizens and servicemembers a private right of action against a foreign state that has been designated as a state sponsor of terrorism, as well as its agents, for certain specified terrorist acts, including extrajudicial killing and providing material support as alleged here.  Plaintiffs seek compensatory damages for wrongful death, severe injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses, as well as punitive damages for Defendants' conduct.  Id. ¶¶ 60, 64, 68.

On February 19, 2017, Plaintiffs effectuated service of process on the Defendants consistent with 28 U.S.C. § 1608.  Neither Defendant appeared.  On May 22, 2017, the clerk of the court entered default as to both Defendants at Plaintiffs' request.  Since then, the case has been stalled while Plaintiffs sought to obtain information from DTRA concerning the details of the attacks involving three of the four named claimants.  Before turning to the parties' arguments on the pending motion to compel, the Court will briefly summarize the background principles

---

[1] In part of the complaint, Plaintiffs allege that Sergeant Nantz was injured on August 23, 2007, not December 22, 2006.  Compl. ¶ 21.  The Court assumes that is a typographical error.

governing default judgments under the FSIA, which are essential to understanding the present motion.

B. The Foreign Sovereign Immunities Act

In order to establish subject matter jurisdiction under the FSIA, plaintiffs must overcome the presumption that the foreign state is immune from suit by producing evidence that the claims fall within one of the statute's exceptions. Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993). As relevant here, the FSIA's terrorism exception, 28 U.S.C. § 1605A(a)(1), greenlights lawsuits against a foreign country where:

> money damages are sought against [it] for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.[2]

The FSIA permits a plaintiff to obtain a default judgment when the defendant fails to enter an appearance, 28 U.S.C. § 1608(e), but "the entry of a default judgment is not automatic," Mwani v. bin Laden, 417 F.3d 1, 6 (D.C. Cir. 2005). Rather, even if the foreign state does not assert an immunity defense, the trial court must ascertain that it has subject matter jurisdiction over the defendant.[3] FC Inv. Grp. LC v. IFX Mkts., Ltd., 529 F.3d 1087, 1091 (D.C. Cir. 2008);

---

[2] Additionally, the terrorism exception requires: (1) that the defendant was a designated state sponsor of terrorism both at the time of the act and within six months prior to the date of the suit, id. § 1605A(a)(2)(A)(i); (2) that the "claimant or the victim" in the case was "a national of the United States," "a member of the armed forces," or "otherwise an employee of the Government of the United States" at the time of the act, id. § 1605A(a)(2)(A)(ii); and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration," id. § 1605A(a)(2)(A)(iii).

[3] "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made

Thuneibat v. Syrian Arab Republic, 167 F. Supp. 3d 22, 33 (D.D.C. 2016).  Further, a plaintiff

must establish the "right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).

"Thus, rather than accept unsupported allegations as true, the Court must examine the plaintiff's

allegations and any proof provided to ensure the plaintiff has carried her burden."  Bathiard v.

Islamic Republic of Iran, No. 1:16-CV-1549 (CRC), 2019 WL 3412983, at *2 (D.D.C. July 29,

2019) (Cooper, J.).  The D.C. Circuit has emphasized, however, that "courts have the authority—

indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing

situations.'"  Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1048 (D.C.

Cir. 2014) (quoting Bundy v. Jackson, 641 F.2d 934, 951 (D.C. Cir. 1981)); see also Owens v.

Republic of Sudan, 864 F.3d 751, 785–86 (D.C. Cir. 2017) (The FSIA "does not require a court

to step into the shoes of the defaulting party and pursue every possible evidentiary challenge;

only where the court relies upon evidence that is both clearly inadmissible and essential to the

outcome has it abused its discretion.").  Put differently, "the FSIA leaves it to the court to

determine precisely how much and what kinds of evidence the plaintiff must provide," Han Kim,

774 F.3d at 1047, and courts in this district have held that a party seeking to establish its right to

relief "may rely upon uncontroverted factual allegations that are supported by affidavits,"

Bathiard, 2019 WL 3412983, at *2 (quoting Worley v. Islamic Republic of Iran, 75 F. Supp. 3d

311, 319 (D.D.C. 2014)); see also Thuneibat, 167 F. Supp. 3d at 33.

In Karcher v. Islamic Republic of Iran, Judge Colleen Kollar-Kotelly of this court

recently considered whether plaintiffs alleging that Iran injured U.S. servicemembers in EFP

---

under section 1608 of this title."  28 U.S.C. § 1330(b).  "In other words, 'under the FSIA, subject
matter jurisdiction plus service of process equals personal jurisdiction.'"  GSS Grp. Ltd v. Nat'l
Port Auth., 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting Price, 294 F.3d at 95).

attacks had established subject matter jurisdiction and the right to relief under the FSIA. 396 F. Supp. 3d 12 (D.D.C. 2019). Like Plaintiffs here, the Karcher plaintiffs contended "that Iran went to great lengths to enlist, train, and supply operatives in Iraq to attack American forces," including through hundreds of attacks involving EFPs, which they alleged was attributable to Iran. Id. at 15.[4] After Iran was served and defaulted, plaintiffs moved for default judgment. Judge Kollar-Kotelly proceeded to hold a three-day bench trial covering six of the EFP attacks, the "bellwether" attacks,[5] to determine the sufficiency of evidence needed to support entry of a default judgment under the FSIA. Id. at 16. The Karcher plaintiffs submitted considerable evidence on subject matter jurisdiction and liability. This evidence included military documents, which were sealed subject to a protective order; demonstrative exhibits including a model EFP and military vehicle; and public government records concerning Iran's role in cultivating the use of EFPs in Iraq. Id. The plaintiffs also elicited trial testimony from eight fact witnesses describing their personal experiences during the six bellwether attacks, and seven expert witnesses who spoke to "Iran's role in Iraq, Iran's relationship with its Lebanese and Iraqi proxies, the weapons they used in Iraq, and the U.S. military's efforts to respond." Id. at 17.

Having considered the evidence presented, Judge Kollar-Kotelly found that Iran, operating through the IRGC-QF and in concert with Hezbollah, provided training outside of Iraq as well as advisors inside Iraq to aid the Special Groups "in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry." Id. at 24

---

[4] Given the close similarity between the two cases, this Court vacated proceedings regarding subject matter jurisdiction in this case pending Judge Kollar-Kotelly's resolution of jurisdiction in Karcher. See October 17, 2018 Minute Order.

[5] Karcher also analyzed a seventh, conventional attack that did not involve EFPs. The findings and analysis regarding that attack are not relevant here.

(quoting U.S. Dep't of State, Country Reports on Terrorism 2011 at 172 (July 2012)).  Turning to EFPs specifically, Judge Kollar-Kotelly credited expert testimony that "making effective EFPs requires substantial technical expertise" and that it is likely "not possible to create an EFP without being 'a classically trained engineer.'"  Id. at 27.  She also found that "[e]ffectively deploying the EFP called for a further layer of technical know-how combined with substantial strategic planning."  Id.  Because few actors "in the Iraqi theater possessed sufficient expertise to make and deploy [EFPs]," Judge Kollar-Kotelly concluded that it was highly likely that the EFPs encountered by plaintiffs could be traced to Iran and one of its proxies, Hezbollah.  Id.  However, she took pains to note that "[w]hile the evidence shows that Iran supplied EFPs to Shi'a militia groups, Iran is not necessarily responsible for all of the EFPs deployed by Shi'a militia [in Iraq]."  Id. at 30.

Based on these background findings, Judge Kollar-Kotelly concluded that the plaintiffs' case turned on whether, for each attack, they could establish: (1) that the weapon involved in the attack "was indeed an EFP" and (2) that "Iran or one of its agents furnished that EFP, its constituent parts, and/or the training to assemble or deploy it."  Id.  For each bellwether attack, Judge Kollar-Kotelly analyzed plaintiffs' evidence and identified the elements of the attack that persuaded her "that it is, in fact, an EFP strike."  Id.  Primarily, the court compared the circumstance of each bellwether attack to the unique profile of EFP attacks.  Next, Judge Kollar-Kotelly "trace[d] the connection to Iran," based on plaintiffs' expert's testimony "that a given attack was likely the work of an Iran-sponsored Special Group, including his comments about

any particularly unique indicia of that sponsorship." Id.   Applying this framework, she

concluded that each of the six bellwether attacks was an EFP attack facilitated by Iran.[6]

Judge Kollar-Kotelly turned next to the legal analysis under the FSIA's terrorism

exception and concluded that plaintiffs had established subject matter jurisdiction under

§ 1605A(a)(1) and therefore also made out claims for relief under § 1605A(C).  She focused

most on "whether the relevant personal injuries and deaths in the bellwether attacks were caused

by . . .  extrajudicial killing" and whether Iran had furnished material support for those acts.  Id.

at 54.  Regarding causation, she held that the FSIA required that "[p]laintiffs must establish that

Iran's material support or resources were the 'proximate cause' of plaintiffs' personal injuries or

deaths," which requires simply "*some* reasonable connection between the act or omission of the

defendant and the damage which the plaintiff has suffered."  Id. at 54–55 (internal citations and

quotations omitted) (emphasis added).  Plaintiffs easily established that there was a "'reasonable

connection' between Iran's material support and the personal injuries and deaths in the

bellwether attacks."  Id. at 55.

---

[6] Judge Kollar-Kotelly also stated that "absent any indication that any of these EFPs was
*not* backed by Iran," she would "find that Iran was indeed the provider of the EFP(s) in each
bellwether attack."  396 F. Supp. 3d at 30 (emphasis in original).  To the extent this sentence,
taken in isolation, could be read to suggest that the *absence* of evidence is sufficient to establish
a link between the defendant and the act of terrorism under the default judgment standards of the
FSIA, this Court is not inclined to follow that approach.  Though "the FSIA leaves it to the court
to determine precisely how much and what kinds of evidence the plaintiff must provide," Han
Kim, 774 F.3d at 1047, a court must also "examine the plaintiff's allegations and any proof
provided to ensure the plaintiff has carried her burden," Bathiard, 2019 WL 3412983, at *2.
Thus, consistent with the standard Judge Kollar-Kotelly actually applied in Karcher, Plaintiffs
must offer affirmative evidence establishing (1) that the weapon involved in the attack "was
indeed an EFP" and (2) that "Iran or one of its agents furnished that EFP, its constituent parts,
and/or the training to assemble or deploy it," 396 F. Supp. 3d at 30, though that evidence may
take the form of "uncontroverted factual allegations that are supported by affidavits," Bathiard,
2019 WL 3412983, at *2.

Judge Kollar-Kotelly further concluded that the EFP attacks were "extrajudicial killings" under the statute because the EFPs were deliberately deployed to kill U.S. servicemembers. Although some of the servicemembers in the bellwether attacks were injured, not killed, she found that "[n]othing on the face of Section 1605A(a)(1) requires that the material support or resources for an intended extrajudicial killing actually result in someone's death, as long as the victim represented in the case was injured." Id. at 57.  In sum, she held that "material support or resources to facilitate EFP attacks qualify as material support for attempted extrajudicial killings. Those attempts bring Iran within the terrorist exception to foreign sovereign immunity." Id. at 58.  Lastly, because the FSIA "creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity," Judge Kollar-Kotelly also held that the plaintiffs had "established their entitlement to relief under 28 U.S.C. § 1605A(c)." Id.

C. Plaintiffs' Negotiations with the Defense Threat Reduction Agency

With that background, the Court returns to the dispute at hand.  Seeking to support their anticipated motion for default judgment, in October 2018 Plaintiffs served a subpoena on one of DTRA's subordinate offices, the Joint Improvised Threat Defeat Organization ("JIDO"), which coordinates the Department of Defense's efforts to combat EFPs and other adversarial weapons. (Although the parties have taken pains to recount various changes to the name of this agency,[7] to avoid any confusion the Court will simply refer to it as DTRA.)  Plaintiffs sought records

---

[7] JIDO's name has undergone several changes and various acronyms are used by the parties.  As the government explains, prior to 2016, this organization was known as the Joint Improvised-Threat Defeat Organization (JIEDDO), but in 2016 was renamed the Joint Improvised-Threat Defeat Agency (JIDA), and then subsequently became the Joint Improvised Defeat Organization (JIDO) under the authority and control of DTRA.  In 2019, JIDO was renamed OI.  See Opp. 2 n.3.

showing the details regarding the attacks that injured Captain James Hochstetler (August 23, 2007) and killed Captain Tiffner (November 7, 2007) and Second Lieutenant Burks (November 14, 2007).  (The December 22, 2006 EFP attack on Plaintiff Randolph Nantz was not part of the subpoena to DTRA.)  Plaintiffs' subpoena sought ten categories of information about these attacks:

1) all source analysis of the data and attribution as to the source of the weapons, network responsible for the execution of the attack and affiliation to local insurgent groups and IRGC controlling elements;

2) whether the EFP used in the attack was of the type seen to be manufactured by hydroform presses like those in Iran;

3) whether devices found in the vicinity of the attack relating to hydroform presses known to be operating in Iran at that time;

4) whether an EFP was used in the attack;

5) whether the EFP used in the attack was associated with tactics, deployment and/or production techniques, and procedures employed by Iranian networks known to be operating in Iraq against U.S. Forces;

6) whether the attack device used in the attack can be attributed to a hostile Iraqi network cell and associated IRGC control cell;

7) enemy networks analysis operating within 10km of the attack at the time of the attack;

8) network analysis connecting IRGC elements to local network groups in relation to the attack;

9) whether the attack is associated with weapons systems, triggers, training, logistics, networks of use, and employment tied to a specific group;

10) identification of EFP resupply networks, movement and storage of EFPS.

ECF No. 31-2 at 8.  The government's response asserted that the records sought by Plaintiffs were privileged and classified.  DTRA therefore refused to produce any documents in response to the subpoena.

In March 2019, Plaintiffs filed a motion to compel, but after DTRA indicated that it intended to comply with the subpoena, the Court stayed and ultimately vacated Plaintiffs' motion.  Thereafter, DTRA conducted a search of its records and produced 117 pages of partially redacted documents.  After Plaintiffs complained that these documents were redacted to an unusable extent and did not include any reports regarding the November 7, 2007 attack that killed Captain Tiffner, the government conducted a supplemental search and released 261 additional pages of partially redacted documents—for a total of 378 including the original production.  The records released included JIDO presentations, Significant Activity ("SIGACT") reports from the battlefield, and other intelligence reports prepared in connection with the three specific attacks and EFP attacks in general.  One of these reports disclosed that the August 23, 2007 attack which injured Captain Hochstetler was an EFP attack linked to Iran.  It states:

> IUSAYN 'ALWAN ABD-AL-SADAHS IMPROVISED EXPLOSIVE DEVICE CELL HAS TIES TO IRAN AND USES IRANIAN MADE EXPLOSIVELY FORMED PENETRATORS . . . ON 23 AUGUST 2007 AT 1100 HOURS, ABD-AL-SADAHS CELL DETONATED AN IRANIAN MADE EXPLOSIVELY FORMED PENETRATOR (EFP) AGAINST A U.S. CONVOY . . . ABD-AL-SADAHS CELL WORKS WITH IRANIAN INSURGENTS").

Oates Decl. Exh. K.  DTRA indicated that this production contained all documents in its possession that were responsive to Plaintiffs' subpoena.

Satisfied by DTRA's disclosure linking Captain Hochstetler's August 23, 2007 attack to Iran, Plaintiffs did not pursue additional information from DTRA in connection with that attack. As for the November 7, 2007 attack that killed Captain Tiffner and the November 14, 2007 attack that killed Lieutenant Burks, however, Plaintiffs again complained that the documents were so heavily redacted that they obscured any connection to Iran.  Seeking a compromise, Plaintiffs offered to have retired Army General Michael Oates, the director of JIDO from 2009 to 2011, or special agent Gregory Carl, the former director of the Terrorist Explosive Device

Analytical Center ("TEDAC"), both of whom maintain their top-secret clearances, review the unredacted, classified versions of the documents produced by DTRA and prepare an unclassified summary under DTRA's supervision.  As an alternative, Plaintiffs offered to accept sworn testimony establishing that Tiffner and Burks were the victims of EFP attacks perpetrated by Iranian-backed organizations.  Lastly, Plaintiffs sought a privilege log describing the material withheld and the national security interest that would be implicated by its disclosure.

After DTRA rejected these requests, Plaintiffs renewed their motion to compel and, in response, the government asserted the state secrets privilege.  The motion is now ripe.

## II.   Legal Standards

Federal Rule of Civil Procedure 26 provides that a litigant may generally obtain discovery regarding any matter that is relevant to a party's claim or defense, while Rule 45 authorizes court-issued subpoenas to obtain discovery from third parties.  Watts v. S.E.C., 482 F.3d 501, 503, 507 (D.C. Cir. 2007).  Where a litigant seeks to compel the production of privileged information, however, Rule 45 requires the court to deny the motion to compel and quash the subpoena.  Fed. R. Civ. P. 45.  While a movant typically bears the burden of establishing that the information sought is relevant and otherwise discoverable, the burden lies on the party resisting discovery to "adequately demonstrate that applicable privileges would in fact protect' the material sought."  Gouse v. D.C., 359 F. Supp. 3d 51, 56 (D.D.C. Jan. 14, 2019) (quoting Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 403 (D.C. Cir. 1984)).

## III.   Analysis

In their motion to compel, Plaintiffs stated that they seek an order compelling DTRA to: (1) "produc[e] those redacted portions of previously produced documents not properly classified"; (2) "provid[e] an affidavit listing the remaining redactions, describ[e] with

reasonable specificity the material withheld, and identify the damage to the national security expected to attend its disclosure"; and (3) "conduct[] a reasonable search for responsive documents or explain[] why they no longer have custody of documents known to have been in their possession." Mot. 1. In response, the government invoked the state secrets privilege, claiming that it cannot reveal the information Plaintiffs seek without causing harm to national security. It further argued that Plaintiffs have failed to establish that the DTRA's search was inadequate. In their reply brief, Plaintiffs clarified that, notwithstanding the requests in their opening brief, they "merely seek attribution of the three listed attacks to either Iran or a specific Iranian proxy group." Reply 2.[8] Accordingly, the Court will focus its analysis on Plaintiffs' narrowed request to compel the government to produce information showing that the Iranian-linked EFPs were used in the November 7, 2007 attack that killed Captain Benjamin Tiffner and the November 14, 2007 attack that killed Second Lieutenant Peter Burks.

A. Classification of the Redacted Materials

As a preliminary matter, Plaintiffs contend that the records withheld by the government are not properly classified and, therefore, are not covered by the state secrets privilege. Section 1.5(b) of Executive Order 13,526 ("E.O. 13,526") provides as a general rule that classified "information shall be marked for declassification 10 years from the date of the original decision." However, E.O. 13,526 goes on to provide that "[a]n original classification authority

---

[8] Plaintiffs contend that "[f]or over fifteen months, Plaintiffs have made clear to the government that they do not seek any of the "sources and methods" materials, including the identification of individual human intelligence sources, described by [Defense] Secretary Esper, but rather merely seek attribution of the three listed attacks to either Iran or a specific Iranian proxy group." Reply 2. Yet, Plaintiffs' narrowing of their request was not apparent from their initial motion, which clearly sought broader relief. The government's broad invocation of the state secrets privilege is therefore understandable.

may extend the duration of classification up to 25 years from the date of origin of the document, change the level of classification, or reclassify specific information," subject to the requirements of the Order.  Here, as Secretary of Defense Dr. Mark Esper attests, an original classification authority "conducted a mandatory declassification review of the information and determined portions remained currently and properly classified," and the Secretary concurred in that assessment.  Esper Decl. ¶ 6.  The records at issue are over 10 years old.  Although Secretary Esper's declaration is not crystal clear on the point, the Court infers from it that the government has extended the duration of the original classification of these documents beyond 10 years based on its determination that they were properly classified in the first instance and should remain so.

The Court's inquiry does not end there, however.  "Although matter qualifying as a secret of state will presumably always qualify for classified status," it does not follow that all classified material is necessarily covered by the state secret privilege.  Halkin v. Helms, 690 F.2d 977, 996 n.69 (D.C. Cir. 1982).  That is so because "the privilege operates on premises, rooted in the careful consideration by an executive officer in a policymaking role, entirely different from those governing the routine classification of information by lesser officials."  Id.  The Court therefore turns to assessing the government's assertion of the privilege.

B.  Government's Invocation of the State Secrets Privilege

"The state secrets privilege is a common law evidentiary rule that protects information from discovery when disclosure would be inimical to the national security."  In re U.S., 872 F.2d 472, 474 (D.C. Cir. 1989).  Analyzing a claim of the privilege involves two steps: first, the Court must ascertain that the government agency formally invoked the privilege; next, it must determine whether invocation of the privilege was proper.

### 1. *Formal Invocation of State Secret Privilege*

Because the privilege "is not to be lightly invoked," courts must ensure that the government has made a "formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." United States v. Reynolds, 345 U.S. 1, 7–8 (1953) (footnotes omitted). Here, Defense Secretary Esper, who obviously heads the Defense Department, has submitted an affidavit formally invoking the privilege after personally considering the matter. Esper Decl. ¶ 8. The government has therefore satisfied the procedural requirements for invoking the privilege.

### 2. *The Court's Evaluation of the Claim of Privilege*

Next, "[t]o some degree at least, the validity of the government's assertion must be judicially assessed." Molerio v. FBI, 749 F.2d 815, 822 (D.C. Cir. 1984). If the government shows that "the information poses a reasonable danger to secrets of state," courts must uphold the privilege, Halkin v. Helms, 690 F.2d 977, 990 (D.C. Cir. 1982), and "[n]o competing public or private interest can be advanced to compel disclosure." Ellsberg, 709 F.2d at 57; see Reynolds, 345 U.S. at 11 ("[E]ven the most compelling necessity cannot overcome the claim of privilege.").

To sustain its burden, the government is required to "either provide[] some form of detailed public explanation of the kinds of injury to national security [it] seek[s] to avoid and the reason those harms would result from revelation of the requested information, or indicate[] why such an explanation would itself endanger national security." Linder v. Dep't of Def., 133 F.3d 17, 23 (D.C. Cir. 1998) (internal quotation marks omitted). "[T]he more compelling a litigant's showing of need for the information in question, the deeper the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate." Ellsberg at 58–59 (internal

quotation marks and footnotes omitted); see also Reynolds, 345 U.S. at 11 ("Where there is a

strong showing of necessity, the claim of privilege should not be lightly accepted[.]").  Thus,

while the state secrets inquiry "is not a balancing of ultimate interests at stake in the litigation,"

Halkin, 690 F.2d at 990, the degree of judicial scrutiny varies according to the importance of the

information sought.

A district court may "examine the privileged materials *in camera* to satisfy itself that

invocation of the privilege was proper," though "[a] court may rely on affidavits in lieu of an *in

camera* review when they are sufficiently detailed[.]"  Linder, 133 F.3d at 23 (citing Ellsberg,

709 F.2d at 63–64).  Whether to conduct an *in camera* examination of the material the

government claims to be privileged is evaluated on a "sliding scale."  Northrop Corp. v.

McDonnell Douglas Corp., 751 F.2d 395, 401 (D.C. Cir. 1984).  As the D.C. Circuit has

explained:

> When a litigant must lose if the claim [of privilege] is upheld and the government's
> assertions are dubious in view of the nature of the information requested and the
> circumstances surrounding the case, careful *in camera* examination of the material
> is not only appropriate . . . but obligatory.
>
> . . .
>
> When the litigant requesting the information has made only a trivial showing of
> need for it and the circumstances of the case point to a significant risk of serious
> harm if the information is disclosed, the trial judge should evaluate (and uphold)
> the privilege claim solely on the basis of the government's public representations,
> without an *in camera* examination of the documents.

Ellsberg, 509 F.2d at 59 nn.37–38.

In evaluating the government's claimed need for secrecy, courts must give "great

deference" to the government's "determination that a classified document could reveal

intelligence sources and methods and endanger national security."  Id. at 25 (quoting CIA v.

Sims, 471 U.S. 159, 176, 179 (1985)).  Nevertheless, the Supreme Court has cautioned that

"[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." Reynolds, 345 U.S. at 9–10.  Rather, "[t]o ensure that the state secrets privilege is asserted no more frequently and sweepingly than necessary, it is essential that the courts continue critically to examine instances of its invocation." Ellsberg, 709 F.2d at 58.  In short, courts must navigate competing obligations: they may not accept the government's claim of privilege at face value but must also be careful not to "forc[e] a disclosure of the very thing the privilege is designed to protect." Reynolds, 345 U.S. at 8.

These principles in mind, the Court turns to the government's privilege claim.  The Court begins by considering the appropriate level of scrutiny to apply, which requires assessing whether Plaintiffs have "made a compelling showing of need for the information in question." Ellsberg, 709 F.2d at 59.

Plaintiffs maintain that without information from DTRA showing that the attacks that killed Tiffner and Burks involved EFPs linked to Iran, they will be unable to satisfy the evidentiary standard established in Karcher—which they assume will be the standard applied to their forthcoming motion for default.  Plaintiffs' assumption is well-founded.  Given the overwhelming similarity between this case and Karcher, and the care with which Judge Kollar-Kotelly analyzed the issues, the Court is inclined to take judicial notice of her factual findings and, with the caveat noted above, see n.6 *supra*, to adopt her framework for evaluating claims that U.S. servicemembers were injured by Iranian-sponsored EFP attacks.  Specifically, the Court intends to require Plaintiffs to offer evidence establishing (1) that the weapon involved in the attack "was indeed an EFP" and (2) that "Iran or one of its agents furnished that EFP, its constituent parts, and/or the training to assemble or deploy it." Karcher, 396 F. Supp. 3d at 30.

Given that framework, Plaintiffs have credibly asserted that without these documents, they will face a potentially insurmountable battle to connect the attacks that killed Tiffner and Burks to Iranian-linked EFPs.  Though Plaintiffs may provide evidence of liability through a variety of means—such as expert testimony, as the plaintiffs in Karcher did—experts are able to assess liability for individual attacks only to the extent they are able to review records describing each attack.  See Karcher, 396 F. Supp. 3d 12, 16-cv-232, Unsealed Expert Report of Kevin Lutz 2, ECF No. 90 (describing how Lutz used his "extensive professional experience studying EFPs in Iraq as well as the available documentary records provided to [him] by Plaintiffs' counsel from the U.S. military in order to evaluate both individual attacks described in these lawsuits"); id., Unsealed Expert Report of Michael Pregert, ECF No. 86 (same); id., Unsealed Expert Report of Michael Oates, ECF No. 85 (same).  Here, a review of the sample DTRA documents provided by Plaintiffs, Mot. to Compel, Oates Decl. Exhs. B–L, reveals that the reports are redacted to such an extent that it is difficult to discern very much at all about the specific attacks.  To take one example, in the military reports concerning the November 14, 2007 attack in which Peter Burks was killed, the sections labeled "Sect Responsible" are redacted in their entirety.  Id. at ¶¶ 21, 28 and Exh. C.  As Plaintiffs' expert, retired General Oates, notes, this section likely contains "information . . . critical to linking this attack to Iran."  Id. at ¶ 21.  Based on these reports, which Plaintiffs aver are representative of DTRA's disclosures as a whole, the Court finds it hard to see how Plaintiffs' experts could assess Iran's role in the Burks and Tiffner attacks.  The Court therefore concludes that Plaintiffs have established a compelling need for the information they seek and, consequently, will scrutinize the government's claim more closely than it would otherwise.  See Ellsberg, 709 F.2d at 59 n.37.

The Court next considers whether the government's affidavits are sufficient to carry its burden or whether "the government's assertions are dubious in view of the nature of the information requested and the circumstances surrounding the case, [making] careful *in camera* examination of the material . . . not only appropriate . . . but obligatory." Ellsberg, 709 F.2d at 59 n.37. The government has provided the Court a detailed affidavit from Defense Secretary Esper, which identifies numerous reasons for invoking state secrets privilege. First, he attests that disclosing human intelligence and geospatial intelligence sources regarding EFP attacks would give enemy forces insight into U.S. intelligence capabilities and enable them to avoid detection. Id. ¶¶ 9, 15. Revealing such information, he maintains, would put human intelligence sources at risk and make those sources more reluctant to come forward to share further information. Second, Secretary Esper asserts the privilege over U.S. assessments of individual members of certain EFP networks. Id. ¶ 16. If such information were publicly revealed, he explains that it would provide enemy forces with insight into the U.S.'s assessment of EFP networks, which they could exploit to their advantage. Although the intelligence assessments concern attacks that took place thirteen years ago, "[e]ven with the passage of time, enemy forces could presume that the types of information U.S. forces had difficulty obtaining on suspected terrorist organizations around 2007 remain elusive." Id. ¶ 17. Third, the Secretary explains that withholding the requested information is necessary to protect gaps in U.S. intelligence, which could similarly be exploited by enemy forces. Id. Fourth, the Secretary asserts that invoking the privilege is required to prevent the disclosure of information regarding "U.S. efforts to disrupt EFP networks, disable EFP devices, or otherwise mitigate risks" from EFPs, id. ¶ 18, and intelligence regarding U.S. assessments of damage caused by EFPs to particular vehicles, id. ¶ 19.

Without question, Secretary Esper's affidavit provides a "detailed public explanation of the kinds of injury to national security [the government] seek[s] to avoid and the reason those harms would result from revelation of the requested information[.]"  Linder, 133 F.3d at 23 (internal quotation marks omitted).  Lest there be any doubt, to the extent that Plaintiffs sought information related to (1) human intelligence or geospatial intelligence resources that formed the basis for intelligence analysis; (2) U.S. assessments of individual members of certain EFP networks; (3) gaps in U.S. intelligence regarding EFP devices; (4) U.S. efforts to disrupt EFP networks, disable EFP devices, or otherwise mitigate risks from EFPs; or (5) intelligence assessments regarding the damage caused by EFPs to particular vehicles, the Court is persuaded that the state secrets privilege bars the disclosure of such information.

While the government's privilege assertion may have been reasonable in response to the broad relief Plaintiffs declared they sought in their opening brief, Mot. 2, Plaintiffs clarified in their reply that they no longer seek such sensitive details, Reply 2.  Rather, they have narrowed their request to information confirming that the attacks that killed Tiffner and Burks were caused by Iranian-linked EFPs.  Because this narrowing was not entirely clear in their opening brief, the government might be excused for neglecting to explain how releasing *that* information alone could compromise national security.  Absent any such explanation, however, the Court cannot conclude that the government has satisfied its burden of providing "detailed public explanation of the kinds of injury to national security [it] seek[s] to avoid and the reason those harms would result from revelation of the requested information[.]"  Linder, 133 F.3d at 23.

And without more from the government, its assertion of the state secrets privilege to conceal information linking Iran to the EFPs used in the Tiffner and Burks attacks appears "dubious" given that the link between Iran and EFP attacks in Iraq has long been a matter of

official public record.  Ellsberg, 709 F.2d at 59 n.37.  For example, the Army described Iranian

support for EFP attacks in a 2019 official recounting of the Iraq war.  Godfroy, Jeanne, et al, The

U.S. Army in the Iraq War Vol 2: Surge and Withdrawal, at 65-68, 72-73.[9]  The State

Department has also confirmed that "Iran was responsible for the increase of lethal attacks on

U.S. forces [in Iraq] and provided militants with the capability to assemble explosives designed

to defeat armored vehicles."  U.S. Dep't of State, Country Reports on Terrorism 2011 (July

2012), at 172.  Judge Kollar-Kotelly likewise concluded in Karcher that "Iran supplied EFPs that

were fired in Iraq."  396 F. Supp. 3d at 28.  And most tellingly perhaps, DTRA released a report

in this very litigation linking Iran to the EFP attack that injured named victim James Hochstetler:

> IUSAYN 'ALWAN ABD-AL-SADAHS IMPROVISED EXPLOSIVE DEVICE
> CELL HAS TIES TO IRAN AND USES IRANIAN MADE EXPLOSIVELY
> FORMED PENETRATORS . . . ON 23 AUGUST 2007 AT 1100 HOURS, ABD-
> AL-SADAHS CELL DETONATED AN IRANIAN MADE EXPLOSIVELY
> FORMED PENETRATOR (EFP) AGAINST A U.S. CONVOY . . . ABD-AL-
> SADAHS CELL WORKS WITH IRANIAN INSURGENTS").

Oates Decl. Ex. K.  If it does not endanger national security to confirm Iran's role in EFP attacks

in general and in Captain Hochstetler's attack in particular, the Court struggles to discern from

Secretary's Esper's otherwise comprehensive declaration why simply confirming Iran's role in

the attacks that killed Captain Tiffner and Lieutenant Burks would threaten national security.

The Court therefore concludes that, based on the current record, the government has not

carried its burden to support an assertion of the state secrets privilege over information simply

indicating that Iranian-linked EFPs were used in the attacks on Captain Tifffer and Lieutenant

Burks.  The Court will, accordingly, grant Plaintiffs' motion to compel in part.  In deference to

---

[9] https://publications.armywarcollege.edu/pubs/3668.pdf.

the executive's assessment of national security matters, however, the Court declines to order government to produce any unredacted records at this juncture, as Plaintiffs request.  Rather, the Court will order the government to file a declaration under seal, consistent with the requirements of the state secrets privilege, describing why it would implicate national security to disclose references indicating that Iranian-linked EFPs were used to carry out these two attacks.  See Molerio, 749 F.2d at 822 n.2 (noting that inspection of an affidavit in camera is one permissible way to determine the validity of a claim of privilege for state secrets); Kasza v. Browner, 133 F.3d 1159, 1169 (9th Cir. 1998) ("Elaborating the basis for the claim of privilege through in camera submissions is unexceptionable.").  After reviewing the government's affidavit, the Court may require the government to produce, *in camera*, unredacted versions of the documents at issue for the Court's review.  See Ellsberg, 709 F.2d at 60 ("It is well settled that a trial judge called upon to assess the legitimacy of a state secrets privilege claim should not permit the requester's counsel to participate in an *in camera* examination of putatively privileged material.").  The Court takes no position on the likelihood that the government will ultimately prevail in its assertion of state secrets privilege over the specific information sought.

C.  The Adequacy of DTRA's Search

Plaintiffs also contend that the government's search for responsive records was inadequate because their expert, retired General Oates, identified several types of documents that he believes should be in DTRA's possession but were not included in the production. Specifically, General Oates expected DTRA's production to include: intelligence assessments of who was responsible for the attacks from the Combined Information Data Network Exchange ("CIDNE") database, which is used by the U.S. military to collect data from the battlefield; reports from either the Tactical Ground Reporting System ("TIGR") or the Command Post of the

Future system ("CPOF"); CIDNE data from significant activity reports ("SIGACTs"); and assessments analyzing the attacks by Task Force Troy, a multinational task force that operated in Iraq during the relevant time period.  Mot. to Compel 10; Oates Decl. at ¶¶ 14, 20, 49, 52.

"[T]he party seeking to compel discovery has the burden of proving that a discovery response is inadequate."  Barnes v. District of Columbia, 289 F.R.D. 1, 6 (D.D.C. 2012).  Courts will only order further production if "the documents that have been produced permit a reasonable deduction that other documents may exist or did exist and have been destroyed."  Hubbard v. Potter, 247 F.R.D. 27, 29 (D.D.C. 2008). "Lack of evidence showing that a producing party is in fact in possession of a document is grounds to deny a motion to compel."  Harris v. Koenig, 271 F.R.D. 356, 371 (D.D.C. 2010).

Here, Plaintiffs fail to carry their burden of showing that an additional search is required. The government has produced a detailed affidavit from veteran Intelligence Specialist Alexander Edwards, who attests that he personally conducted two searches of DTRA's available databases, using multiple search terms and variations on those terms.  Edwards Decl. ¶¶ 11–20.  Mr. Edwards' declaration carries a presumption of good faith, which Plaintiffs fail to rebut with General Oates' suspicions (however well informed) that other responsive military documents should have been located. See SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (Agency affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.").

### IV.   Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [43] Plaintiff's Motion to Compel is GRANTED in part and DENIED in part.  It if further

**ORDERED** that the government produce a sealed, *ex parte* affidavit describing the basis for withholding the specific information Plaintiffs seek by September 22, 2020.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>August 21, 2020</u>