# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAN BURKS, *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) No. 16-cv-1102 (CRC) |
| | ) |
| vs. | ) |
| | ) |
| ISLAMIC REPUBLIC OF IRAN, *et al.* | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFFS' MOTION FOR ENTRY OF DEFAULT JUDGMENT AS TO LIABILITY AND MEMORANDUM IN SUPPORT THEREOF

## TABLE OF CONTENTS

I.   MOTION ....................................................................................................................... 1

II.  STATEMENT OF THE CASE ....................................................................................... 2

III. THE PARTIES .............................................................................................................. 6

   A.  Plaintiffs ................................................................................................................ 6

   B.  Defendant .............................................................................................................. 6

IV. STATEMENT OF FACTS ............................................................................................ 8

   A.  History of Iranian Support of Iraqi Terrorist Groups ......................................... 8

   B.  Iran's Support of Lebanese Hezbollah ................................................................ 10

      1.  *Iran's Creation of Lebanese Hezbollah as a Proxy in the Early 1980s* ... 11

      2.  *Iran's "Lebanonization" of Iraq under the Hezbollah Model* ................. 11

   C.  Iran's Responsibility for All EFP Casualties in Iraq ......................................... 13

      1.  *The August 23, 2007 attack that injured Captain Hochstetler* ............... 21

      2.  *The November 14, 2007 attack that killed Lieutenant Peter Burks* ........ 23

      3.  *The November 7, 2007 attack that killed Captain Benjamin Tiffner* ....... 24

      4.  *The December 22, 2006 attack that injured Sergeant First Class Randolph Nantz* ................................................................................... 24

V.  ARGUMENT ................................................................................................................ 26

   A.  Legal Standard ................................................................................................... 26

   B.  Subject Matter Jurisdiction over Plaintiffs' Claims and over the Claims of all Members of the Proposed Class ......................................................................... 27

      1.  *EFP attacks are Attempted or Actual "Extrajudicial Killings"* ............. 28

      2.  *Iran Proximately Caused the Attacks that Injured Plaintiffs, Members of the Proposed Class* ................................................................................ 30

   C.  Personal Jurisdiction ......................................................................................... 32

   D.  Liability .............................................................................................................. 34

VI. CONCLUSION ............................................................................................................ 35

**EXHIBIT LIST**

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBIT |
|---|---|
| 1 | Autopsy Report Peter Burks |
| 2 | Certificate of Death and Report of Casualty Peter Burks |
| 3 | Twelve records of medical care of Randolph Delbert Nantz 2006-2011 |
| 4 | Purple Heart Personnel Action and Purple Heart Certificate of James David Hochstetler |
| 5 | Medical Records of Captain James D. Hochstetler |
| 6 | Autopsy report ICO Captain Benjamin Tiffner, |
| 7 | Autopsy photos ICO Captain Benjamin Tiffner |
| 8 | Certificate of Death ICO Captain Benjamin Tiffner |
| 9 | Video of TEDAC EFP demonstration titled "EFP Basic Understanding." |
| 10 | James David Hochstetler SIGACT Report |
| 11 | Abu Sajad al-Gharawi - Target Package -OBJ WELLINGTON |
| 12 | DTRA Report 14 0815C Nov 07 EFP ATTK  – Peter Burks |
| 13 | Tiffner AR 15-6 Report |
| 14 | MNF-I Report, February 11, 2007: "Iranian Support for Lethal Activity in Iraq" |
| 15 | MNF-I Commander Weekly Assessment to SECDEF, June 3-9, 2007 |
| 16 | MNF-I Commander Weekly Assessment to SECDEF, March 17-23, 2008 |
| 17 | MNF-I Commander Weekly Assessment to SECDEF, June 2-8, 2008 |
| 18 | MNF-I Commander Weekly Assessment to SECDEF, July 15-21, 2007 |
| 19 | MNF-I Commander Weekly Assessment to SECDEF, August 24-30, 2009 |
| 20 | Nov. 30, 2007 JIEDDO Report |
| 21 | Burks AR 15-6 Report |
| 22 | Photo of hole created by EFP copper slug, top view |
| 23 | Photo of hole created by EFP copper slug, side view |
| 24 | TEDAC informational video: "Manufacturing Equipment Indicators" |
| 25 | Wasit Province Study Update |
| 26 | Tiffner attack report |
| 27 | Tiffner attack video |
| 28 | Still frames from Tiffner attack video |
| 29 | Declaration of Dr. Matthew Levitt |
| 30 | Declaration of Gen. Michael Oates (Ret.) |
| 31 | Declaration of Gen. George Casey (Ret.) |
| 32 | Declaration of Special Agent Greg Carl (Ret.) |

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBIT |
|---|---|
| 33 | Al-Khazali Interrogation Report 10 – Mar. 26, 2007 |
| 34 | Al-Khazali Interrogation Report 18 – Mar. 30, 2007 |
| 35 | Image of copper shrapnel removed from Sergeant First Class Randolph Nantz |
| 36 | Declaration of Colonel Kevin McDonnell (Ret.) |
| 37 | Declaration of Dr. Craig Mallak |
| 38 | Hochstetler AR 15-6 Report |
| 39 | Declaration of James Lorraine |
| 40 | Burks Family Declarations |
| 41 | Tiffner Family Declarations |
| 42 | Hochstetler Family Declarations |
| 43 | Nantz Declaration |
| 44 | CENTCOM EFP statistics Iraq 2005-2011 |
| 45 | Photograph of Hochstetler Vehicle Damage |
| 46 | Declaration of Steven R Perles |
| 47 | Al-Khazali Interrogation Report 11 – Mar. 26, 2007 |
| 48 | Al-Khazali Interrogation Report 54 – Apr. 18 2007 |
| 49 | Al-Khazali Interrogation Report Enclosures June-July 2007 |
| 50 | Declaration of James Bonner |

## I.  <u>MOTION</u>

Plaintiffs in the above-captioned matter respectfully submit this Motion for Entry of Default Judgment as to Liability pursuant to Federal Rule of Civil Procedure 55 and 28 U.S.C. § 1608(e) against the Islamic Republic of Iran ("Iran") and the Iranian Revolutionary Guard Corps ("IRGC") for their material support of various proxy terrorist groups in Iran in their 1) extrajudicial killings of Second Lieutenant Peter Burks and Captain Benjamin David Tiffner, 2) attempted extrajudicial killings of Captain James David Hochstetler and Sergeant First Class Randolph Delbert Nantz, and 3) extrajudicial killings and attempted extrajudicial killings of every member of the proposed class: all U.S. service members, military contractors and American civilians injured by terrorist attacks involving EFPs during the U.S. military's operations in Iraq between 2005 and 2011, the estates of individuals killed in those EFP attacks, and the family members of the foregoing individuals.

As Plaintiffs discuss in their brief in support of their motion for class certification, due process principles and the text of Fed. R. Civ. P 23(c)(2)(B) demand that class members receive notice of a class certified under Rule 23(b)(3).  *See* Pl. Motion for Class Certification and Memorandum of Law in Support Thereof ("Class Cert. Mem.").  Because the commonality, typicality, adequacy and predominance requirements for class certification under Rule 23(a) and Rule 23(b)(3) require that Plaintiffs maintain the incentive to prove facts common to all class members' claims, *see* Class Cert. Mem., the Court should delay ruling upon Plaintiffs' motion for entry of a default judgment with respect to their individual causes of action and as to the causes of action of the proposed class members until after the absent class members receive the requisite class notice and the opt-out period expires.  While Plaintiffs have every intention of pursuing the best interests of all Class Members irrespective of Plaintiffs' personal litigation

1

incentives, the procedure Plaintiffs suggest protects the interests of absent class members, adheres to the conventional practice of resolving class certification issues before deciding the merits of class members' claims, and avoids creating theoretical obstacles to Plaintiffs' ability to serve as class representatives.

Plaintiffs submit the following memorandum and exhibits appended thereto in support of their Motion, and to demonstrate that this Court has subject matter jurisdiction over Plaintiffs' claims.

## II.    **STATEMENT OF THE CASE**

Plaintiffs' evidence, along with the previous findings of this District Court in other similar cases, shows that Iran provided material support for every attack in this case and for every attack which killed or injured a member of the proposed class or which killed or injured an immediate relative of a member of the proposed class. These attacks involved a unique weapons system, the explosively formed penetrator ("EFP") that inflicted casualties on U.S. armed forces and civilians in Iraq from 2005 to 2011. Indeed, this Court has already found that evidence of an EFP attack is rebuttable proof of Iranian involvement. *Pennington v. Islamic Republic of Iran*, No. CV19-796 (JEB), 2021 WL 2592910, at *4 (D.D.C. June 24, 2021) ("[T]he connection between [Iran] and EFPs was so strong that 'absent any indication that any of these EFPs was not backed by Iran, the Court shall find that Iran was indeed the provider of the EFP(s) in each bellwether attack.'") (quoting *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 30 (D.D.C. 2019)).

Plaintiffs' experts concur. General George W. Casey, Jr. (ret.), Commander of the Multi-National Force in Iraq from 2004-2007, states that "I can say with great confidence that Iran provided material and/or training and logistical support for virtually all EFP devices deployed in

Iraq, and that it is more likely than not that *all* successful EFP devices in Iraq were deployed with Iranian support." PX[1]-31 (Nov. 11 2021 Declaration of Gen. George W. Casey, Jr.) ["Casey Decl."] at ¶ 11.

Similarly, the former Director of the Joint Improvised Explosive Device Defeat Organization ("JIEDDO") from 2009-2011, General Michael Oates (ret.), concludes that, "Iran was directly and indirectly responsible for all of the effective EFP attacks against U.S. forces and U.S. civilians in Iraq." PX-30 (Nov. 11, 2021 Declaration of Gen. Michael Oates) ["Oates Decl."] at ¶ 105; *see also* ¶¶ 13, 29, 32. The head of JIEDDO's civilian counterpart, the FBI's Terrorist Explosive Device Analytical Center ("TEDAC") from 2012-2017, Special Agent Greg Carl (ret.), concludes that "it is my expert opinion that it is substantially more likely than not that Iran played a material role in all EFP attacks in Iraq that were effective against U.S. Forces." PX-32 (Declaration of Special Agent Greg Carl) ["Carl Decl."] at ¶ 54, 20. Dr. Matthew Levitt,[2] cited dozens of times by this District Court in *Fritz, Karcher*, and *Lee*, concludes:

> The EFP was an Iranian device, in that I am unaware of any instance in which an EFP deployed in Iraq (1) was not smuggled into Iraq by Iranian agents, (2) did not contain components smuggled into Iraq by Iranian agents, (3) did not contain components manufactured by Iranian agents or manufactured by recipients of training from Iranian agents, (4) was not assembled by Iranian agents or assembled

---

[1] Throughout the document PX is used to denote "Plaintiffs' Exhibit", thus PX-1 is Plaintiffs' Exhibit 1.

[2] Dr. Levitt is an expert on Middle East terrorist groups, particularly their logistical and financial support networks, director of The Washington Institute for Near East Policy's Reinhard Program on Counterterrorism and Intelligence, former counterterrorism intelligence analyst with the FBI and former Deputy Assistant Secretary for Intelligence and Analysis in the United States Department of the Treasury, whose testimony this District Court has relied upon many times in 28 U.S.C. § 1605A cases. *See e.g.*, *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 18 (D.D.C. 2019) ("The Court found Dr. Levitt qualified to address 'Iran's role as a state sponsor of terrorism, Iran's Islamic Revolutionary Guard Corps, or IRGC; the Islamic Revolutionary Guard Corps Qods Force, or IRGC-QF; Hezbollah; and those entities' support and training of the Special Groups in Iraq.'")

by recipients of training from Iranian agents, or (5) was not deployed by Iranian agents or recipients of training from Iranian agents.

PX-29. (Declaration of Dr. Matthew Levitt) ["Levitt Decl."] at ¶ 5.

Plaintiffs' expert Dr. Craig Mallak is the former Armed Forces Medical Examiner, head of the Armed Forces Medical Examiner System ("AFMES") from 2002-12, who in that capacity oversaw the system that conducted the autopsies of Second Lieutenant Peter Burks and Captain Benjamin David Tiffner. Dr. Mallak reviewed the forensic materials available to Plaintiffs and concludes that EFPs caused the deaths of Peter Burks and David Tiffner and severe physical injuries to James David Hochstetler and Randolph Delbert Nantz. PX-37 (Declaration of Dr. Craig Mallak) ["Mallak Decl."] at ¶ 9. Gen. Oates and S.A. Carl further conclude that EFPs were used to kill or injure all four direct Plaintiff victims, and that those EFPs were of Iranian origin. PX-32 (Carl Decl.) at ¶ 54 ("It is also my expert opinion, that based on all available data, that the four attacks on Second Lieutenant Burks, Captain Hochstetler, Captain Tiffner, and Sergeant First Class Nantz were all EFP attacks in which Iran played a substantial role."); PX-30 (Oates Decl.) at ¶ 105 ("Based on the foregoing, it is my opinion that all four U.S. servicemen named in the complaint were the victims of EFP attacks sponsored by Iran.").

Plaintiffs' evidence establishes beyond a preponderance of the evidence that Iran provided material support for every EFP attack in Iraq resulting in a U.S. casualty from 2005 to 2011. Plaintiffs also provide particularized evidence of Iranian culpability in the attacks that killed and maimed the four direct victims in this case. Additionally, this Court has subject matter jurisdiction over the claims because:

(1) Iran is a designated state sponsor of terrorism, *see* 28 U.S.C. § 1605A(a)(2)(A)(i)(I);

(2) the proposed class representatives pursue money damages on behalf of the class, *see* 28 U.S.C. § 1605A(a)(1);

(3) as EFP casualties and their immediate relations, members of the proposed class necessarily suffered personal injury or death, *see id.*;

(4) as EFP casualties and their immediate relations, members of the proposed class necessarily suffered actual or attempted extrajudicial killing, *see id.*, *Karcher*, 396 F. Supp. at 55-58 (D.D.C. 2019) (finding that Iranian EFP attacks through proxies that result in fatalities are extrajudicial killings, and that those that did not result in fatalities were still "attempted" extrajudicial killings falling under the statute.); *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491-92 (D.D.C. 2021) (same); *Pennington v. Islamic Republic of Iran*, No. CV19-796 (JEB), 2021 WL 2592910, at *2 (D.D.C. June 24, 2021) (same); and

(5) Members of the proposed class are definitionally U.S. nationals, members of the armed forces, or U.S. government contractors, and their immediate relations; *see* 28 U.S.C. § 1605A(2)(A)(ii)(I)-(III)

Finally, by proving that this Court has subject matter jurisdiction over their claims, both individually and on behalf of the proposed class, Plaintiffs have also proven Iran's liability for the harms enumerated in the complaint, given the overlap between the requirements for both subject matter jurisdiction and liablity. *See Karcher*, 396 F. Supp. 3d at 59 ("[T]his section creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity. Given the overlap between the elements of this cause of action and the terrorism exception, Iran's liability has already been established . . . .").

5

### III.   **THE PARTIES**

#### A.  **Plaintiffs**

Plaintiffs in this case are all U.S. citizens who were either the victims of Iranian-sponsored EFP attacks in Iraq or their family members. PX-40 (Declarations of Burks family members) ["Burks Decl"]; PX-41 (Declarations of Tiffner family members) ["Tiffner Decl"]; PX-42 (Declarations of Hochstetler family members) ["Hochstetler Decl"]; PX-43 (Declaration of Sergeant First Class Randolph Nantz) ["Nantz Decl"]. They sue either in their individual capacity, or where appropriate, as personal representatives of the estates of Second Lieutenant Peter Burks and Captain Benjamin Tiffner, the two U.S. servicemen referenced in the Complaint who were killed by EFPs, or as guardians of the minor children of the U.S. servicemen killed or injured in Iraq by EFPs. Dkt. No. 1 (Complaint) at ¶¶ 4-21. All Plaintiffs also seek to represent the proposed class of: all U.S. service members, military contractors and American civilians injured by terrorist attacks involving EFPs during the U.S. military's operations in Iraq between 2005 and 2011, the estates of individuals killed in those EFP attacks, and the family members of the foregoing individuals.

#### B.  **Defendant**

Defendant Islamic Republic of Iran ("Iran") is a foreign state that is a long-standing and notorious sponsor of international terrorism. Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to section 6 of the Export Administration Act of 1979, 50 U.S.C. § 4605(j), section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, 22 U.S.C. § 2780. Iran has remained so designated continuously ever since. During the time relevant to Plaintiffs' class claims here (June 1, 2005 through the end of 2011), Iran focused its terrorism on U.S. Forces in Iraq by financing, training

and arming various Shi'a militia groups that came to be known as "Special Groups." PX-29

(Levitt Decl.) at ¶¶ 92, 98-117, 127, 147-51, 180.[3] In an April 2008 "Report to Congress on the

Situation in Iraq," the U.S. Commander of the Coalition Forces in Iraq acknowledged Iran's

malign influence, noting that "Iran has fueled the violence [in Iraq] in a particularly damaging

way, through its lethal support to the Special Groups."[4]

    Defendant Iranian Revolutionary Guard Corps, also known as the Islamic Revolutionary

Guard Corps (the "IRGC"), was founded in the aftermath of the 1979 Islamic Revolution as a

military organization charged with safeguarding and protecting the ruling men of the Islamic

Republic of Iran against internal and external challenges and threats. It is a military branch of the

Iranian government and therefore is considered "the state itself." The U.S. Government has

described defendant IRGC as being "composed of five branches (Ground Forces, Air Force,

Navy, Basij militia, and Qods [sic] Force special operations) in addition to a counterintelligence

directorate and representatives of the Supreme Leader" of Iran.[5] According to the 2008 State

Department Report, the IRGC and its leaders "were directly involved in the planning and support

---

[3] *See* U.S. DEP'T OF STATE, OFFICE OF THE COORDINATOR FOR COUNTERTERRORISM, COUNTRY REPORTS ON TERRORISM 2008, 183 (Apr. 2009) (the "2009 State Department Report") ("Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces"), https://www.hsdl.org/?abstract&did=37161.

[4] GENERAL David H. Petraeus, COMMANDER, MULTINATIONAL FORCE-IRAQ, REPORT TO CONGRESS ON THE SITUATION IN IRAQ, 2 (Apr. 8, 2008), http://iraq.usembassy.gov/uploads/3m/Gl/3mGlIE3hK_bMMKoly4AKAQ/petraeus-testimony-8-april-2008.pdf.

[5] U.S. Treasury Dep't Press Release hp-644, *Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007) (the "2007 U.S. Treasury Department Press Release"), http://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

of terrorist acts throughout the region and continued to support a variety of groups in their use of terrorism to advance their common regional goals."[6]

## IV.  **STATEMENT OF FACTS**

Plaintiffs' individual claims arise from four EFP attacks on U.S. Forces in Iraq. Peter Burks was killed in an Iran-sponsored EFP attack in Iraq on November 14, 2007. PX-40 (A. Burks Decl.) at ¶ 2. Benjamin David Tiffner was killed in an Iran-sponsored EFP attack in Iraq on November 7, 2007. PX-42 (T. Tiffner Decl.) at ¶ 2. Plaintiff James David Hochstetler is a retired Major in the U.S. Army Special Forces. PX-42 (J. Hochstetler Decl.) at ¶ 2. He suffered serious injuries, including a traumatic brain injury in an Iran-sponsored EFP attack in Iraq on August 23, 2007, when he was a Captain in the U.S. Army Special Forces. *Id*. Plaintiff Randolph Delbert Nantz is a former Sergeant First Class in the U.S. Army Special Forces. He suffered severe injuries, including nerve damage, burns on 23% of his body, and the amputation of his left leg below the knee in an Iran-sponsored EFP attack in Iraq on December 22, 2006. PX-43 (Nantz Decl.) at ¶¶ 2-3.

### A.  **History of Iranian Support of Iraqi Terrorist Groups**

Iran's history of materially supporting proxy terrorist groups in Iraq is well-known to this Court, which has repeatedly held Iran liable for the intended result of this support: the death and injury of U.S. nationals and service members at the hands of Iranian proxies. *See* e.g., *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 59 (D.D.C. 2018); *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 40 (D.D.C. 2019). In particular, this Court has already found Iran liable for the systematic introduction of the EFP weapon system to Iraq through the provision of

---

[6] U.S. DEP'T OF STATE, OFFICE OF THE COORDINATOR FOR COUNTERTERRORISM, COUNTRY REPORTS ON TERRORISM 2007, 183 (Apr. 2008) (the "2008 State Department Report"), https://www.hsdl.org/?abstract&did=485619.

components and training to its proxy groups. *See e.g.*, *Karcher*, No. CV 16-232 (CKK), 2021 WL 133507, at *12 (D.D.C. Jan. 14, 2021) (hereinafter "*Karcher*, 2021"); *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 495 (D.D.C. 2021).

As this Court recounted in *Karcher*,[7] the history of Iranian EFPs in Iraq begins "with the revolution in 1979." *Karcher*, 2021 at *6-7. Relying in part on the expert report of Dr. Matthew Levitt—also an expert witness for Plaintiffs in this case—the court in *Karcher* detailed the creation of the IRGC as a parallel military structure to protect "the revolution and Iran's Islamic theocratic government," as well as the creation of the Qods Force, an IRGC subsidiary tasked with "training Muslim groups to support the revolution through insurgency and terrorism" abroad. *Id.*; *see also* PX-29 (Levitt Decl.) at ¶¶ 20, 35-36, 70-71.

When the United States forced the collapse of Saddam Hussein's regime in Iraq, it removed "Iran's greatest enemy and longtime nemesis." PX-29 (Levitt Decl.) at ¶ 22; *Karcher*, 2021 at *7; *see also Lee*, at 483. Since at least the Iran-Iraq War in the 1980s, the Shi'a Muslim regime in Iran sought to undermine its regional rival Saddam Hussein's largely Sunni Muslim government by supporting Shi'a political groups in Iraq, which escalated after the U.S. invasion of Iraq. PX-29 (Levitt Decl.) at ¶¶ 20, 23-29; *Karcher,* 2021 at *7. Iran recognized this "historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region" and to that end Iran employed an "all elements of national power" approach including both soft and hard power, from the use of political, economic, religious, and cultural leverage to the support of militant proxies. *Karcher*, 2021 at *7.

---

[7] Similar histories are recounted by the court in *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 58; *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 38; *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 482.

Iran's direct goals were straightforward: to "push the United States out of the Gulf region . . . [and] pursu[e] "a Shia-dominated and unified Iraq" while causing the United States "continued setbacks in [its] efforts to promote democracy and stability" there. *Id.* at *7 (quoting Annual Threat Assessment of the Director of National Intelligence for the Senate Select Comm. on Intelligence (Feb. 2, 2006)). Powerful and deadly Iranian EFPs used against U.S. Forces became the most effective way for Iran to attempt to achieve these goals in Iraq. PX- 30 (Oates Decl.) at ¶¶ 26; PX-31 (Casey Decl.) at ¶¶ 21-24; PX-32 (Carl Decl.) at ¶¶ 19-20; PX-29 (Levitt Decl.) at ¶¶ 97, 153-171.

**B. Iran's Support of Lebanese Hezbollah**

Iran's creation of Hezbollah as its proxy in Lebanon is relevant to this case in two ways. First, it serves as a roadmap of how the IRGC fosters militant organizations in other countries and employs them as surrogates—a model that Iran then applied to Iraqi Shi'a militias. PX-29 (Levitt Decl.) at ¶ 128, *see also Karcher*, 2021 at *7-9. Second, Iran used Hezbollah operatives to train Iraqi Shi'a militias in the use of Iranian EFPs, which Hezbollah itself had used to great effect against Israeli forces' armored vehicles in southern Lebanon in the 1990s. PX-30 (Oates Decl.) at ¶¶ 35, 44-45, 53-57[8]; PX-29 (Levitt Decl.) at ¶ 97; *Lee*, 518 F. Supp. at 483 ("The earliest known EFPs "appear[ed] on modern battlefields in the 1990s as a weapon deployed in Lebanon by Hezbollah.").

---

[8] This was also discussed in *Karcher* with a quote from Col. Kevin Lutz, "the weapon that killed Sgt. Morin was part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies." *Karcher*, 2021 at *15.

1. *Iran's Creation of Lebanese Hezbollah as a Proxy in the Early 1980s*

In the 1980s, Iran helped form Hezbollah by selecting more radical members of the relatively moderate Amal militia in Lebanon. PX-29 (Levitt Decl.) at ¶ 31. After Israel invaded Lebanon in 1982, around 1,500 IRGC advisors set up a base in Lebanon "with the goal of exporting the Islamic revolution to the Arab world." *Fritz*, 320 F. Supp. 3d at 60; *see also* PX-29 (Levitt Decl.) at ¶ 44. In exchange for "swearing an oath of fealty to Iran," and for its "unwavering dedication to Iran and its revolutionary aims," Iran bankrolled, armed, and trained Hezbollah. *Lee*, 518 F. Supp. 3d at 482; *see also* PX-29 (Levitt Decl.) at ¶ 5, 39-69. "'Hezbollah has been Iran's proxy ever since, and it is estimated that,' today, 'Iran provides Hezbollah with as much as $700 million–$1 billion per year', in the form of cash, training, intelligence, and weapons. *Fritz*, 320 F. Supp. 3d at 60 (quoting Dr. Levitt) (internal citations removed). For this reason, this Court has repeatedly found Hezbollah to be a proxy for Iran, and held Iran legally liable for Hezbollah's activities, including its operations in Iraq. *Fritz*, 320 F. Supp. 3d at 60–61 (citing *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 53–55 (D.D.C. May 1, 2018); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003)); *Lee*, 518 F. Supp. 3d at 483; *Karcher*, 2021 at *6-8.

2. *Iran's "Lebanonization" of Iraq under the Hezbollah Model*

As alluded to in the preceding section, "Lebanon's devastating 15-year civil war hardened divisions between the various sectarian communities that comprise Lebanese society. Against this backdrop, the 1982 Israeli invasion and subsequent occupation of southern Lebanon created the space in which Iranian diplomats and agents were able to help fashion Hezbollah from a motley crew of Shi'a militias and groups into a powerful, international terrorist

11

organization. PX-29 (Levitt Decl.) at ¶ 47. Likewise, the U.S. invasion of Iraq created the opportunity for Iran to pursue a "Lebanonization strategy" in Iraq modelled on the success of Hezbollah. *Fritz*, 320 F. Supp. 3d at 61; PX-29 (Levitt Decl.) at ¶ 30. Ambassador Crocker, at the time U.S. Ambassador to Iraq and former U.S. Ambassador to Lebanon, noted that, "Iran is pursuing, as it were, a Lebanonization strategy, using the same techniques they used in Lebanon, to co-opt elements of the local Shi'a community and use them as basically instruments of Iranian force." *Id*.. "In Lebanon the IRGC helped create Hezbollah. In Iraq the IRGC did much the same for Iraqi Shi'a militias, sometimes on their own but often using Hezbollah to provide training and operational supervision on its behalf." *Id*. at ¶ 78.[9]

Iran's goals for Iraq were twofold, the creation of a "weak federal state, dominated by Shi'a allies and vulnerable to Iranian influence," and to "bloody coalition forces in Iraq." PX-29 (Levitt Decl.) at ¶ 28. "To that end, Iran developed numerous Shi'a proxies with a presence in Iraq . . . . Iran offered the movement and its armed wing 'financing and weapons training,' and the Qods Force 'dispatched Hezbollah operatives . . . to help establish JAM and provide it with logistical assistance.' al-Sadr ultimately split JAM into different branches to address competing priorities and developed 'Special Groups' that were specifically designed to attack American and coalition forces." *Lee*, 518 F. Supp. 3d at 483 (internal citations omitted) (quoting expert report in that case by Gen. Oates); *see also* PX-29 (Levitt Decl.) at ¶¶ 127-128, 133 (describing formation of Special Group with Iranian support, noting explicit and formal relationship between Iran, Hezbollah, and JAM); PX-31 (Casey Decl.) at ¶¶ 8-10 ("In the second half of 2005, we

---

[9] *See also Karcher*, 2021 at *7 ("In order to bolster its influence in Iraq, and counter American efforts there, Iran continued to sponsor Shi'a political movements—now vying for control of the post-Hussein government—while funding and facilitating the training of Shi'a militia groups, with Hezbollah's help.").

started getting intelligence indicators that [the IRGC] and Iran's proxy, Hezbollah, were

providing training to terror cells within Muqtada al-Sadr's Jaysh al-Mahdi ("JAM") and Badr

Corps," and that both groups were 'directly supplied and trained by Hezbollah and the IRGC.").

### C. Iran's Responsibility for All EFP Casualties in Iraq

In *Karcher*, this Court found evidence of systematic Iranian involvement in EFP attacks

in Iraq, holding that "absent any indication that any of these EFPs were not backed by Iran, the

Court shall find that Iran was indeed the provider of the EFP(s) in each attack." *Karcher*, 2021 at

\*12. Using a "bellwether" process, the court evaluated the non-bellwether plaintiffs' claims,

repeatedly finding that "the broader evidence of Iran's use of EFPs in Iraq" merited a finding that

Iran bears responsibility for each of those individual attacks. *See id.*, throughout. The *Karcher*

*court* stated that "identification of the weapon as an EFP *all but* necessitates the inference that

Iran was responsible;" and, despite testimony that "that Iran may not be implicated in every

instance," the *Karcher* court nonetheless created a rebuttable presumption of Iranian involvement

in the case of EFP attacks. *Id*.[10]

Subsequently, in *Pennington*, this Court relied on *Karcher*'s rebuttable presumption in

finding Iran liable for individual attacks based on generalized evidence of Iranian material

support for EFP attacks:

> [A] court in this district recently held that plaintiffs had sufficiently demonstrated
> Iran's responsibility, noting that the connection between it and EFPs was so strong
> that "absent any indication that any of these EFPs was not backed by Iran, the
> Court shall find that Iran was indeed the provider of the EFP(s) in each bellwether
> attack." *Karcher*, 396 F. Supp. 3d at 30. The Court finds such evidence — and the
> reasoning of *Karcher* — to be persuasive. It thus concludes that Plaintiffs have

---

[10].U.S. Army Col. Lutz offered the above-referenced caveat in *Karcher*. *Karcher*, 2021 at \*12.
That testimony appears to acknowledge, as General Oates notes in this case, that there were
some crude forms of EFPs that did not implicate Iran. *See* PX-30 (Oates Decl.) at 13 n.2.
However, those exceptions are irrelevant to this case because Iran was responsible for all
*effective* EFPs - *i.e.*, those that injured or killed U.S. service members. *Id*.

sufficiently proven that Iran was responsible for providing the relevant EFPs.

*Pennington*, 2021 WL 2592910, at *4. The *Pennington* opinion does not detail any particularized

evidence of Iranian culpability for the attacks at issue in that case, merely noting (1) the findings

of the *Karcher* opinion, citing (2) two expert opinions expressing a "'high level of confidence'

that Iran was responsible for EFP attacks," and that "only groups with links to Iran have actually

used EFPs," and finding (3) that:

> [f]ormer CIA Director General Michael V. Hayden has testified that "[t]**he EFPs
> are coming from Iran.**" Byman Decl. at 18. General Stanley McCrystal, former
> Commander of the Joint Special Operations Command, discussing EFPs, told the
> New Yorker: "**There was zero question where they were coming from. We
> knew where all the factories were in Iran.**" Id. Similarly, three non-
> governmental Middle East experts — Michael Eisenstadt, Michael Knights, and
> Ahmed Ali — wrote a joint piece for the Washington Institute for Near East Policy
> in which they claimed that **EFPs are exclusively associated with Iran**. *Id.*

*Id.* at *2-4 (emphasis added).

Plaintiffs' experts in this case concur. General George W. Casey Jr. (ret.), Commander of

the Multi-National Force in Iraq from 2004-2007, states that "**I can say with great confidence

that Iran provided material and/or training and logistical support for virtually all EFP

devices deployed in Iraq, and that it is more likely than not that *all* successful EFP devices

in Iraq were deployed with Iranian support**." PX-31 (Casey Decl.) at ¶ 11.

Similarly, the former Director of JIEDDO from 2009-2011, General Michael Oates (ret.),

concludes that, "**Iran was directly and indirectly responsible for all of the effective EFP

attacks against U.S. forces and U.S. civilians in Iraq**." PX-30 (Oates Decl.) at ¶ 105 (emphasis

added). Gen. Oates's conclusion carries considerable weight because at the time of his tenure,

JIEDDO was the Defense Department's "central repository of information on all improvised

explosive device ("IED") attacks in Iraq during the conflict." PX-30 (Oates Decl.) at ¶ 5.

In addition, the head of JIEDDO's civilian counterpart, the FBI's TEDAC, from 2012-2017, S.A. Greg Carl, concludes that "it is my expert opinion that it is **substantially more likely than not that Iran played a material role in all EFP attacks in Iraq that were effective against U.S. Forces.**" PX-32 (Carl Decl.) at ¶ 54 (emphasis added). S.A. Carl's conclusion also carries considerable weight because at the time of his tenure there, "TEDAC coordinate[d] the efforts of the entire government, from law enforcement to intelligence to military, to gather and share forensic data and intelligence about devices, tactics, techniques, and procedures—helping to disarm and disrupt improvised explosive devices ('IEDs'), link them to their makers, and, most importantly, prevent future attacks." PX-32 (Carl Decl.) at ¶ 3.

Finally, Dr. Levitt concludes:

> **The EFP was an Iranian device**, in that I am unaware of any instance in which an EFP deployed in Iraq (1) was not smuggled into Iraq by Iranian agents, (2) did not contain component smuggled into Iraq by Iranian agents, (3) did not contain components manufactured by Iranian agents or manufactured by recipients of training from Iranian agents, (4) was not assembled by Iranian agents or assembled by recipients of training from Iranian agents, or (5) was not deployed by Iranian agents or recipients of training from Iranian agents.

PX-29. (Levitt Decl.) at ¶ 180 (emphasis added).

Indeed, evidence that Iran systematically introduced the EFP weapon system into Iraq through provision of material and training is overwhelming, as is evidence that Iran was the exclusive source of these weapons and training. First, large numbers of EFPs found in Iraq were found in the hands of Iran-backed Shi'a militias. *See* PX-31 (Casey Decl.) at ¶ 21. EFP attacks were occurring largely in the 30-40-mile radius around Baghdad, where Iranian-backed Shi'a militias were active. *Id.* at ¶ 28 ("The Sunni terrorist groups and insurgents active in other parts of Iraq did not use EFPs.").

Second, forensic evidence traced EFPs and EFP components that were recovered in Iraq

back to Iran. While JIEDDO coordinated counter-IED efforts from Washington, D.C., Joint Task

Force Troy was "on the ground" collecting forensic evidence from EFPs. PX-32 (Carl Decl.) at ¶

25; *Karcher*, 2021 at *11. Together, JIEDDO, Task Force Troy, and TEDAC conducted

extensive forensic analysis after EFP attacks, as well as when EFP components were found in

caches. PX-32 (Carl Decl.) at ¶ 25; *Karcher*, 2021 at *11. The *Karcher* Court credited Gen.

Oates's testimony that "Task Force Troy and/or JIEDDO "unequivocally" concluded that "[t]he

principal source of the materials and the completed munition, the EFP, was . . . Iran." *Karcher*,

2021 at *11 (quoting Gen. Oates testimony and expert report in that case) ("[O]ne of Iran's

primary forms of material support to the [JAM] Special Groups was financing, manufacturing

and deploying EFPs . . . . The U.S. military traced much of the machinery used to manufacture

the EFPs, high explosives and PIR devices deployed in Iraq to Iran and its illicit supply chain.").

The metal, explosives, and some degree of EFP manufacturing have each been attributed

to Iran. *Karcher*, 2021 (citing Gen. Oates' testimony in that case) ("[Gen. Oates agreed] that 'the

actual metal,' as well as 'the milling or the actual manufacture,' could be traced to Iran."). In

*Lee*, this court also gave credence to forensic evidence of a systemic link between Iran and EFPs:

> These opinions are confirmed by U.S. military forensic analyses of IED and EFP
> detonations. Tr. 5 at 27:14–28:10. Via such analyses, the U.S. military was able to
> "identify signatures by bomb makers" and "the emerging enemy tactics,
> techniques and procedures" that were being used. *Id.* "**The U.S. military traced
> much of the machinery used to manufacture the EFPs, high explosives and
> [passive infra-red] devices deployed in Iraq to Iran and its illicit supply
> chain.**" Oates Report, PX-153, at 25. U.S. intelligence ultimately traced tens of
> thousands of devices that interfered with the United States' counter-EFP measures
> from Iran to Baghdad.

*Lee*, 518 F. Supp. 3d at 484; *see also* PX-31 (Casey Decl.) at ¶ 25 (Because "the EFP was a

sophisticated weapon that Iraqi militias could not make and deploy without substantial assistance

from Iran[,] . . . at least 75% of the copper plating used in EFP's in Iraq were machined tooled in

Iran [and] U.S. intelligence had also traced back to Iran the serial numbers of the firing

mechanisms of EFP's detonated in Iraq."); PX-32 (Carl Dec.) at ¶¶ 26-28 (Shi'a militias lacked

the capability to manufacture EFPs without Iranian assistance).

Third, as this District Court has already found, "Iran facilitated the smuggling of [EFP]

components into Iraq along well-established, yet clandestine supply lines for assembly into the

finished weapons." *Karcher*, 2021 at *11; PX-30 (Oates Decl.) at ¶ 12; Special Group leader

Qais al-Khazali confessed in no uncertain terms that "**EFPs still come solely from Iran and**

**there is currently nobody in Iraq manufacturing the components of an EFP. EFP**

**components can be obtained or smuggled from Iran** by the same smugglers that get small

arms." PX-29 (Levitt Decl.) at ¶ 162 (quoting PX-47 (Qais al-Khazali Interrogation Report 11 –

Mar. 26, 2007) at 099) (emphasis added). Khazali elaborated that, "the transfer of EFP IED's

from Iran to Iraq is facilitated by the same . . . IRGC officers that are in charge of facilitating the

movement of insurgent group members into Iran for advanced training." PX-29 (Levitt Decl.) at

¶ 164 (quoting PX-34 (Qais al-Khazali Interrogation Report 18 – Mar. 30, 2007) at 137).

In his expert Declaration submitted in this case, Gen. Oates concurs, adding that:

> Khazali admitted that EFPs were smuggled from Iran through heavy marsh of
> Maysan Province by Iraqi tribes that have smuggled for generations and that EFPs
> themselves are not widely distributed; rather they go to well-trusted Shi'a groups.
> "JAM and the 'Special Groups' do receive a limited number of EFP IEDs, but
> most of them go to Al-Khameini groups." Khazali further confirmed that the
> IRGC facilitated the transfer of EFPs from Iran to Iraq.

PX-30 (Oates Decl.) at ¶ 52. Gen. Casey likewise confirms that "[U.S.] intelligence forces also

identified the network of supply lines used by Iran to smuggle weapons and supplies from Iran

into Iraq's Wasit Province south of Baghdad and Karbala, a city southwest of Baghdad." PX-31

(Casey Decl.) at ¶ 26. S.A. Greg Carl also concludes that "Iran smuggled both completed EFPs

and expertly made copper liners across the border to its Special Groups operating in Iraq" adding that:

> **To the limited extent any EFP cones were ever manufactured in Iraq, it was by individuals trained in this manufacturing process by Iran.** This has been confirmed by chemical analysis of the copper liners, fragments recovered by CEXC teams from cache sites in Iraq, by interception of the smuggled material, and by other sources of intelligence.

PX-32 (Carl Decl.) at ¶ 28 (emphasis added).

Fourth, the design and precision manufacturing needed to produce effective EFPs was beyond the ability of Shi'a militias in Iraq. PX-32 (Carl Decl.) at ¶ 26. The *Karcher* court similarly recognized that EFPs are precision devices that require advanced manufacturing techniques:

> If the depth of the disk is too thick or too thin, or if the curvature of the disk is incorrect, then the slug may be unable to form or may split into multiple pieces during flight. As a result, the slug may be unable to penetrate the target or may miss it entirely. Moreover, the disk must consist of copper, rather than other metals whose melting points are not conducive to proper formation of an effective slug. The explosive too must be of a certain type and strength in order to shape and propel the slug fast enough . . . . [M]aking effective EFPs requires substantial technical expertise. [Capt. Donald Wade Barker (ret.) qualified by the court as **an IED expert**] **acknowledged that it had "taken [him] years to even understand how" to make an EFP, and that building the demonstrative EFP exhibit for trial involved two months of work by two electrical engineers and two mechanical engineers**.

2021 WL 133507, at *9 (internal citations omitted) (emphasis added).

Because the copper cone of an EFP "must be lathed into a specific and precise parabolic arc, or the detonation will result in a relatively less harmful, diffuse spray of copper," they require "very precise machining" and are not something "someone can produce in a garage." PX-32 (Carl Decl.) at ¶ 25. Achieving the precision results described above "**requires either sophisticated hydroforming equipment or a specialized press and die, along with a high-precision lathe** and an appropriately trained machinist. **Those resources were not domestically

**available to terrorist groups operating in Iraq from 2005 to 2011**." PX-32 (Carl Decl.) at ¶ 26 (emphasis added). During S.A. Carl's tenure at TEDAC, they "processed thousands of precisely manufactured EFP copper liners recovered in Iraq – the vast majority of which were manufactured using the press and dye method described above." PX-32 (Carl Decl.) at ¶ 29. Because "[e]ach press used to make those copper liners creates unique toolmarks (fingerprints)," TEDAC was able "to link the copper liners recovered to specific presses." PX-32 (Carl Decl.) at ¶ 29. TEDAC identified at least 12 unique "fingerprints" left by presses on the recovered EFP liners. *Id.*

Because these presses were crucial to Iran's supply of EFP's to the Shi'a Special Groups in Iraq, U.S. Forces were all alerted to be on the lookout for those presses and any manufacturing operations in Iraq using them:

> Despite numerous raids that recovered thousands of EFPs and related equipment and components in Iraq, **there were no press and dies recovered in Iraq that matched any of the 12 unique toolmarks of the presses that were used to manufactured the thousands of the precision-made copper liners that were recovered in Iraq** and sent to TEDAC for examination. This corroborates the conclusion of U.S. intelligence (shared with TEDAC) that all of the precision-made EFP copper liners capable of piercing U.S. armored vehicles were being manufactured in Iran, using Iranian presses and technical expertise.

PX-32 (Carl Decl.) at ¶ 30 (internal citations omitted) (emphasis added).

Fifth, Iran and Hezbollah trained Shi'a militias in the assembly and use of EFPs. As Dr. Levitt notes, according to Special Group leader Qais al Khazali:

> "[A]nyone can receive EFP training and Iran does not care who gets it. This is because of the availability and low cost of EFPs," which all came from Iran. "Normal JAM units did not receive EFP training," he added, "but all of the special groups did. At first, very few people went through the EFP training but after EFPs became so effective and the EFP experts became famous, everybody wanted to learn how to make them. Now, every JAM group has an EFP cell."

(Levitt Decl.) at ¶ 163. Khazali further explained that training for "Jaysh al-Mahdi (JAM) Special Groups" was conducted inside of Iran at three IRGC bases near Tehran including, the Imam al-Khameini base (about two to two and a half hours outside of Tehran). PX-33 (Qais Khazali Interrogation Report 10 [Mar. 26, 2007]) at 091-92; PX-48 (Qais Khazali Interrogation Report 54 [Apr. 18, 2007]) at 351.

The Iranian government agents conducted the training, which included "full scale warfare," and "urban or guerilla warfare." PX-49 (Al-Khazali Interrogation Report Enclosures June-July 2007) at 21. The training lasted approximately one month, and if a group wanted specialized EFP training, they could return for another month. PX-48 (Qais Khazali Interrogation Report 54 [Apr. 18, 2007]) at 351. The groups that "receive training from Hezbollah are the Special Groups and the Jaysh al Mahdi (JAM) Groups that fight the Coalition Forces (CF)." PX-48 (Qais Khazali Interrogation Report 54 [Apr. 18, 2007]) at 351. As General Casey summarized:

> We believed that Iran provided the financing, explosives, other components and/or the training and know-how for virtually all EFPs used in Iraq. Specifically, we had significant evidence that Iran was operating training bases in Iran for various Iraqi militia groups, such as Jaysh al-Mahdi ("JAM"), to educate them on the manufacture and use of EFPs. Iran was also using trainers and operators from its proxy, Lebanese Hezbollah, in both Iran and Iraq to assist in that training.

PX-31 (Casey Decl.) at ¶ 25.

Iran's efforts to design and manufacture EFPs, as well as to smuggle them to its proxies in Iraq and to train those proxies in their use, described above, were well rewarded. EFPs were highly successful at furthering Iran's objective of killing and maiming Coalition Forces in Iraq. *See* PX-29 (Levitt Decl.) at ¶ 28 (noting Iran wanted to "bloody" Coalition Forces). "Indeed, Iranian EFPs were the only IEDs capable of piercing the enhanced armor used on U.S. army vehicles deployed in Iraq." PX-32 (Carl Decl.) at ¶ 23. While EFPs made up "only 2% of all

20

IEDs deployed against Coalition forces in Iraq," they "accounted for a 'very large percentage' of casualties from such attacks." PX-32 (Carl Decl.) at ¶ 24 (quoting a statement by Barry Schoop, former Chief Scientist at JIEDDO). Because these "Iranian designed and manufactured weapon[s]" are "lathed into a specific and precise parabolic arc" using "sophisticated precision machining," they are able to "project a hypersonic slug of copper . . . producing a characteristic hole (or holes) in armor plating that are distinct from the damage inflicted by other, more typical IEDs." PX-32 (Carl Decl.) at ¶¶ 19-23. The resulting impact by the "copper slug creates a signature steel spall, or fragments, that along with the copper slug wreak havoc on the interior of vehicles, frequently dismembering and killing its occupants." PX-32 (Carl Decl.) at ¶ 23.

**D. Iran's responsibility for the Attacks on Second Lieutenant Peter Burks, Captain Benjamin David Tiffner, Captain James David Hochstetler, and Sergeant First Class Randolph Delbert Nantz**

Plaintiffs' experts Gen. Michael Oates and S.A. Greg Carl are of the same view that Iran was responsible for each of the four specific attacks giving rise to Plaintiffs' claims. PX-30 (Oates Decl.) at ¶ 105; PX-32 (Carl Decl.) at ¶ 54.

1. *The August 23, 2007 attack that injured Captain Hochstetler*

On August 23, 2007, while returning from a meeting at the Aziziyah City Mayor's Office, Captain Hochstetler rode in the left rear seat of an armored Humvee. PX-38 (Hochstetler AR 15-6 Report) at 2, 9. Between Aziziyah and Zubidayah, his vehicle was struck by an EFP emplaced in the median of the road. PX-38 (Hochstetler AR 15-6 Report) at 2. Medics immediately began triage and Captain Hochstetler was MEDEVAC'ed after he was found with deep lacerations to the face, chin, and head. PX-38 (Hochstetler AR 15-6 Report) at 2. In addition to these external injuries, Captain Hochstetler suffered a traumatic brain injury. PX-42 (Hochstetler Family Declaration).

In response to Plaintiffs' subpoena and motion to compel, the Defense Threat Reduction

Agency ("DTRA") produced a SIGACT[11] Report ("Hochstetler SIGACT Report") that explicitly

discloses that the August 23, 2007 attack on Captain Hochstetler's convoy was carried out with

an "Iranian made" EFP deployed by an Iranian proxy:

> IUSAYN 'ALWAN ABD-AL-SADAHS IMPROVISED EXPLOSIVE DEVICE
> CELL HAS **TIES TO IRAN AND USES IRANIAN MADE EXPLOSIVELY
> FORMED PENETRATORS**. HUSAYNS CELL ATTACKED A COALITION
> FORCES AND IRAQI SECURITY CONVOY WITH AN EXPLOSIVELY
> FORMED PENETRATOR ALONG THE BAGHDAD-AL l<UTHIGHWAY. A
> LISTOF HUSAYNS CELL MEMBERS IS GIVEN. . . . EFP DETONATES ON
> CF CONVOY. HUSAYN 'ALWAN ((ABD·AL-SADAH)) LEADS A 12 MAN
> IMPROVISED EXPLOSIVE DEVICE CELL. ON 23 AUGUST 2007 AT 1100
> HOURS, A**BD-AL-SADAHS CELL DETONATED AN IRANIAN MADE
> EXPLOSIVELY FORMED PENETRATOR (EFP) AGAINST A U.S.
> CONVOY**. THE BLAST DESTROYED ONE HIGH MOBILITY
> MULTIPURPOSE WHEELED VEHICLE (HMMWV). **ABD·AL·SADAHS
> CELL WORKS WITH IRANIAN INSURGENTS**.

PX-10 (emphasis added); Additionally, images of Captain Hochstetler's armored vehicle reveal

that "the damage caused at the entry point of the projectile into Captain Hochstetler's vehicle is

consistent with the molten projectile formed by a copper EFP liner penetrating the armor." PX-

32 (Carl Decl.) at ¶ 34. The AR 15-6 report for this attack also concludes that an EFP was used

to destroy Hochstetler's vehicle and caused Hochstetler's injuries. PX-30 (Oates Decl.) at ¶ 88;

PX-32 (Carl Decl.) at ¶ 35 ("I have reviewed the AR 15-6 report concerning the August 23, 2007

attack . . . that severely injured Captain Hochstetler. That report's conclusion that the vehicle was

struck by an EFP is consistent with the [Tactics, Techniques and Procedures] typical in Iranian

---

[11] "SIGACT is a reference to a Significant Activity Report. Those reports were prepared by
various U.S. Army groups in the [field] in Iraq, such as Combined Explosives Exploitation
Cells CEXC platoons, Weapons Intelligence Teams, Weapons Technical Intelligence analysts
and Explosive Ordnance Disposal technicians concerning evidence gathered from the scene of
an IED attack in Iraq, including EFP attacks." PX-30 (Oates Decl.) at ¶ 86 n.70.

EFP attacks."). Likewise, the Army awarded Captain Hochstetler a Purple Heart for injuries resulting from an EFP attack. PX-30 (Oates Decl.) at ¶ 89.

> 2. *The November 14, 2007 attack that killed Lieutenant Peter Burks*

On November 14, 2007, Lieutenant Burks was returning from mission while riding in a Stryker armored vehicle. PX-21 (Burks AR 15-6 Report) at 9. According to the relevant U.S. Army 15-6 incident report, upon entering the International Zone, Lieutenant Burks' vehicle was struck by a 6-8 EFP array which had been placed across the street from the Ministry of Public Affairs. PX-21 (Burks AR 15-6 Report) at 9. Lieutenant Burks was taken to a combat surgical hospital where he was pronounced dead. PX-21 (Burks AR 15-6 Report) at 9.

DTRA produced a "storyboard" report establishing that Lieutenant Burks was killed by an EFP attack. PX-30 (Oates Decl.) at ¶¶ 93-94. As with the AR 15-6 report, the storyboard report also lists the West Baghdad neighborhood of Karkh, across the street from Ministry of Public Affairs, as the location of the attack on Lieutenant Burks' three-vehicle U.S. Army convoy. PX-30 (Oates Decl.) at ¶ 94. The report includes photos of the attack location and notes that the "[f]irst Stryker of three vehicle convoy was struck by [redacted] EFP just prior to turning into Checkpoint 2 (IZ)." DTRA also produced a report entitled "Abu Sajad al-Gharawi - Target Package -OBJ WELLINGTON (As of 04 July 2008)."  PX-30 (Oates Decl.) at ¶ 91. That report notes that "Abu Sajad al-Gharawi has direct links to the IRGC-QF . . . Gharawi [oversees] . . . a lethal aid facilitation network that specializes in the smuggling of weapons components and financial support from Iran into Iraq," and that "[a] JAM special group is most likely responsible for the EFP" detonated on November 14, 2007. *Id.* In 2007, there were many Shi'a militia groups that were prevalent in the area of the attack on Second Lieutenant Peter Burks that were directly backed by Iran or Iran's proxy Hezbollah. PX-32 (Carl Decl.) at ¶ 40.

### 3. *The November 7, 2007 attack that killed Captain Benjamin Tiffner*

On the afternoon of November 7, 2007, Captain Benjamin Tiffner left an Advanced

Operating Base ("AOB") in Baghdad, Iraq as the passenger in a Humvee. PX-13 (Tiffner AR 15-

6 Report) at 9. Around 150 meters from the "Adhamiya Bridge, . . . a Shi'a-dominated area that

has a history of Shi'a militia malign activity," his vehicle was struck by a 3-EFP array. PX-30

(Oates Decl.) at ¶¶ 97-98. The EFPs penetrated the vehicle's armor, striking Captain Tiffner's

right side, causing multiple traumatic injuries and resulting in his death. PX-30 (Oates Decl.) at

¶¶ 99-100, (citing the U.S. Army 15-6 report). Given the location of the attack, and the fact that

post-blast analysis confirmed the weapon to be an EFP, Gen. Oates is "confident the attack on

Captain Tiffner was the work of Iran-supported Shi'a militia." PX-30 (Oates Decl.) at ¶ 99.

Having reviewed the U.S. Army 15-6 report, as well as video and still images of the attack S.A.

Carl concurs that Captain Tiffner's death was caused by an EFP attack conducted with Iranian

material support. PX-32 (Carl Decl.) at ¶ 49.

### 4. *The December 22, 2006 attack that injured Sergeant First Class Randolph Nantz*

On December 22, 2006, Sergeant First Class Randolph Delbert Nantz was riding in the

rear right seat of an armored Humvee in a three-vehicle convoy in the Baghdad Al Jadida

neighborhood of Baghdad, Iraq. PX-36 (Declaration of Colonel Kevin McDonnell (ret.))

["McDonnell Decl"] at ¶¶ 5-7. The convoy had just pulled into a side residential street when it

was ambushed by attackers using multiple weapon systems that engaged every vehicle in the

convoy; one of these weapons was an EFP device. *Id*. at ¶ 7.

The resulting firefight continued for two days as U.S. Forces tried to recover what was

left of the vehicles. *Id*. at ¶ 7 ("Every time the recovery force went in, the firefight started up

again.") As a result, investigators were not able to recover normal forensic evidence from the

vehicles that would have revealed every type of weapon used in the ambush, and no AR 15-6 incident report was generated regarding this attack. *Id.* at ¶¶ 7,11. It was not until Sergeant First Class Nantz reached level-one trauma care and copper shrapnel was detected in his tissue that his commanders realized that he and his vehicle had been struck by an EFP. *Id.* at ¶ 7.

The EFP attack on Sergeant First Class Nantz resulted in "full thickness degloving type burns of his legs, upper extremities, and trunk . . . [and] a large open wound of the buttocks. PX 37 (Mallak Decl.) at ¶ 27. He underwent multiple surgeries, including the amputation of his left leg below the knee. PX 37 (Mallak Decl.) at ¶ 27. The blunt, melted copper removed from Nantz's wounds reveals that he was struck by an EFP. PX 37 (Mallak Decl.) at ¶¶ 27-28, 30-32 ("In particular, copper slag in the bodies allows [medical professionals], to a degree of medical certainty, to opine that an EFP was at least part of the process that resulted in death or injury.") *see also* PX-30 (Oates Decl.) at ¶ 103 ("The presence of copper shrapnel is a key indicator of an EFP weapon as the effective EFPs use a copper shape charge as the penetrator. I know of no other weapon used in Iraq that would leave copper shrapnel behind at the point of attack and there is no copper inside the U.S. military vehicle that could serve as shrapnel.").

Given the evidence the nature of Nantz's injuries, and because "[i]n late 2006, there were many Shi'a militia groups that were prevalent in the area of the attack on Sergeant First Class Nantz that were directly backed by Iran or Iran's proxy Hezbollah," Gen. Oates concludes that "Sergeant First Class Nantz was attacked with an EFP and that Iran provided the effective EFP to the Shi'a militia that carried out the attack." PX-30 (Oates Decl.) at ¶ 104; PX-32 (Carl Decl.) at ¶ 53.

V.     **ARGUMENT**

   A.  **Legal Standard**

   Under the FSIA, this Court may enter default judgment against Iran if it deems that Plaintiffs have established their claim "by evidence satisfactory to the court," 28 U.S.C. § 1608(e), a standard that may be met "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (emphasis added and internal quotation marks omitted); *accord Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (quoting 28 U.S.C. § 1608(e)); *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1050-51 (D.C. Cir. 2014) (relying on affidavits by two experts to reverse and remand to the District Court to enter a default judgment without an evidentiary hearing). "This 'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)" and "[i]n evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (citations omitted).

   In assessing whether a plaintiff has established a claim under the FSIA, the court "must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the 'aim[ ] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins.'" *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 56 (D.D.C. 2018) (quoting *Han Kim*, 774 F.3d at 1047–48). Thus, the U.S. Court of Appeals for the D.C. Circuit in *Owens* recently observed that a "district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism":

> **Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion**. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems.

864 F.3d at 785-86 (emphasis added). In short, the standard of Section 1608(e) is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Id.* (internal citations and quotations omitted). The Court of Appeals in *Owens* observed: "[t]his lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id*. Here, Plaintiffs' evidence far exceeds this standard.

**B.  Subject Matter Jurisdiction over Plaintiffs' Claims and over the Claims of all Members of the Proposed Class**

"The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States." *Karcher*, 2021 at *63 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002)). "Under the FSIA, this Court has 'original jurisdiction' over 'nonjury civil action[s]' against foreign states 'without regard to amount in controversy' if the claims seek 'relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.'" *Id.* (quoting 28 U.S.C. § 1330(a)). Here, these requirements of the FSIA are easily disposed of. As in *Karcher*, Plaintiffs do not demand a jury trial, they claim civil causes of action and seek *in personam* relief against Iran, a foreign sovereign.

Next, Plaintiffs must proceed through one of the FSIA's enumerated exceptions to sovereign immunity to pierce Iran's presumptive immunity. *See e.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citing 28 U.S.C. § 1604). Plaintiffs rely on the Terrorism Exception to the FSIA found at 28 U.S.C. § 1605A which states:

27

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in [1] which money damages are sought against a foreign state for personal injury or death that was [2] caused by an act of [3] torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The statute additionally requires that:

(4) the defendant be a designated state sponsor of terrorism when the act happened, § 1605A(a)(2)(A)(i); and
(5) that the "claimant or the victim" in the case was "a national of the United States," "a member of the armed forces," or "otherwise an employee of the Government of the United States" when the act happened,

§ 1605A(a)(2)(A)(ii).

Most of §1605A's requirements are easily satisfied here. Claimants seek only money damages and no other form of relief, Dkt. No. 1 (Complaint) at ¶¶ 57-68; Iran has been designated a state sponsor of terrorism at all times relevant to this case, *see supra* Section III.B at p. 6-7; all Plaintiffs are U.S. nationals, and the direct victims are both U.S. nationals and members of the armed forces, *see supra* Section III.A at p. 6.

1. *EFP attacks are Attempted or Actual "Extrajudicial Killings"*

Section 1605A(h) defines "extrajudicial killing," as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples" and that, "under international law," is not "lawfully carried out under the authority of a foreign nation." Torture Victim Protection Act of 1991 (set forth as a note to 28 U.S.C. § 1350); 28 U.S.C. § 1605A(h)(7). The Court of Appeals recognizes three elements of this definition: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Karcher*, 2021 at *65. (quoting *Owens*, 864 F.3d at 770).

The courts in *Karcher*, *Lee*, and *Pennington* all found that EFP attacks satisfy this definition. *See Karcher*, 2021 at *65; *Lee*, 518 F. Supp. 3d at 491-92; *Pennington*, 2021 WL 2592910 at *2. EFP attacks are inherently "deliberated" efforts to "kill" in that the destructive capacity of the EFP itself, "a uniquely powerful weapon utilized in the Iraqi theater to defeat armored vehicles," is itself proof of the "lethal intentionality" of EFP attacks. *Karcher*, 2021 at *65. "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Lee*, 518 F. Supp. 3d at 491-92 ("Planning an EFP's location and constructing a means to trigger the device require forethought, and an EFP therefore cannot be detonated on "a sudden impulse.") (quoting *Salzman v. Republic of Iran*, No. 17-cv-2475 (RDM), 2019 WL 4673761, at *2 (D.D.C. Sept. 25, 2019)). As noted by Plaintiffs' experts, EFPs were the only form of IED capable of penetrating the enhanced armor of U.S. military vehicles that operated in Iraq and they accounted for a disproportionate number of U.S. casualties, *see supra* Section IV.C at p. 20, that gained popularity among Iranian proxy groups specifically because of their lethality, *see supra* Section IV.A at pp. 10.

Moreover, there is no evidence that any EFP attack, let alone the four at issue in this case, were ever "authorized by a previous judgment pronounced by a regularly constituted court" or "lawfully carried out under the authority of a foreign nation" *See Karcher*, 2021 at *65 (finding same).

Finally, even EFP attacks in which no one is killed constitute "attempted' extrajudicial killing within the meaning of the statute:

> At least several sister courts have found that injuries resulting from "deliberated" attempts to kill fall within the scope of Section 1605A(a)(1). Deploying an EFP represents a "deliberated" attempt to kill someone. In the alternative to a plain-text reading of Section 1605A(a)(1) that is bolstered by legislative history, the Court concludes that material support or resources to facilitate EFP attacks

> qualify as material support for attempted extrajudicial killings. Those attempts
> bring Iran within the terrorist exception to foreign sovereign immunity.

*Karcher*, 396 F. Supp. 3d at 58 (internal citations omitted); *see Karcher*, 2021 at *65 ("The

uniquely lethal design and destructive capacity of an EFP compels the conclusion that an EFP

attack represents an attempt to kill, whether or not the attackers realize their goal."); *Pennington*,

2021 WL 2592910 at *2. As the *Pennington* court further explained:

> [A]s to the family members of individuals injured but not killed by the EFPs,
> other courts in this district have held that the FSIA terrorism exception
> encompasses attempted extrajudicial killings, at least where the attack resulted in
> casualties. *See, e.g.*, *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81
> (D.D.C. 2017) (concluding that "extrajudicial killing" occurred under FSIA, even
> though plaintiffs survived, because attack resulted in casualties); *Gill v. Islamic
> Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017))(finding that an attempted
> "extrajudicial killing" as defined by the FSIA occurred where no victims died in
> attack). This Court agrees.

*Id.*

Accordingly, because Burks and Tiffner were killed by, and Hochstetler and Nantz

injured by EFPs, *see supra* Section II at pp. 2-5, those attacks are attempted or actual

"extrajudicial killings." Additionally, because the attacks that killed or injured members of the

proposed class were also EFP attacks, they too are "extrajudicial killings" within the meaning of

the statute.

2.   *Iran Proximately Caused the Attacks that Injured Plaintiffs, Members of the
     Proposed Class*

Plaintiffs' evidence leaves no doubt that Iran caused the deaths and injuries of Plaintiffs,

of their immediate relatives, of members of the proposed class, and of their immediate relatives.

As noted above, Section 1605A requires that the extrajudicial killings, torture, and hostage

taking be "caused by" the provision of material support. 28 U.S.C. § 1605A(a)(1). This

requirement is satisfied by a showing of proximate cause. *Owens*, 864 F.3d at 794. "Proximate

cause requires 'some reasonable connection between the act or omission of the defendant and the

damage which the plaintiff has suffered.'" *Id.* (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127-28 (D.C. Cir. 2004) (quoting *Prosser & Keeton on the Law of Torts* 263 (5th ed. 1984)). The D.C. Circuit has explicitly rejected reading into proximate causation any requirement of specific intent or advanced knowledge by the foreign state. *Owens*, 864 F.3d at 798-99. Finally, "the inquiry into proximate cause contains two similar but distinct elements": "[f]irst, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury," "[s]econd, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens*, 864 F.3d at 794. (internal citations omitted) (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).

Iran provided material support to the groups that carried out the attacks that killed or injured Plaintiffs, *see supra* Section IV.D at pp. 21-25, and more generally, provided material support for all EFP attacks in Iraq in which U.S. personnel were injured or killed, *see supra* Section IV.C at pp. 13-21. As in *Karcher*, this material support included the provision of EFP, EFP components, and EFP training, *see supra* Section IV.C at pp. 13-21. *See Karcher*, 2021 at *66. In light of such material support:

> **there is more than a "reasonable connection" between Iran's material support for its Iraqi proxies and the deaths and injuries suffered in each of the seventy-three non-bellwether EFP attacks** addressed in the Court's Findings of Fact. Iran, through the IRGC and/or Hezbollah, furnished EFPs or the components thereof, facilitated training of Shi'a militia groups, and supported their effective deployment of EFPs in the Iraqi theater. And, as described above, these Iranian-backed EFPs were specifically designed to inflict maximum and lethal damage to U.S. military vehicles and service members. Moreover, the record evidence also demonstrates that Iranian expertise was necessary for the sophisticated manufacturing and deployment of EFPs. For these reasons, the Court concludes that Iran's "material support" proximately caused the deaths and injuries sustained in each of the seventy-three non-bellwether EFP attacks

*Karcher*, 2021 at *66. Indeed, the death and injury of U.S. personnel was not merely the foreseeable result of, but the explicit, intended purpose of Iran's provision of EFPs, EFP components, and EFP training to Shi'a proxy groups in Iraq. *See supra* Section IV.C at pp. 13-21; *see also Lee*, 518 F. Supp. 3d at 494. "Plaintiffs' injuries were also a reasonably foreseeable consequence of Iran's conduct . . . . It is clear from Iran's financial support and its provision of evolving and ever-more lethal weaponry to insurgents in Iraq that Iran reasonably anticipated— and indeed, intended—that its support would lead to the death and serious injury of U.S. soldiers." *Id.* (citing *Karcher*, 396 F. Supp. 3d at 56–57). Harm to plaintiffs is reasonably foreseeable consequence when Iran intended to use these weapons "to kill people, not just disable vehicles . . . ." *Id.* Accordingly, Iran's material support for EFP attacks—attempted and actual extrajudicial killings—proximately caused Plaintiffs' death and injuries, as well as those of proposed class members.

For the aforementioned reasons, this court has subject matter jurisdiction pursuant to 28 U.S.C. § 1605A(a)(1) over the claims of Plaintiffs,[12] and over the claims of all members of the proposed class.

### C. Personal Jurisdiction

Under the FSIA, a court has personal jurisdiction over a foreign sovereign where the court has subject matter jurisdiction and "service has been made under" 28 U.S.C. § 1608. 28 U.S.C. § 1330(b); *Lee*, 518 F. Supp. 3d at 494 ("'In other words, under the FSIA, subject matter

---

[12]Plaintiffs brief the court on its subject matter jurisdiction over their claims individually—in addition to over the claims of all proposed class members—to (1) demonstrate that as an initial matter the Court has jurisdiction to hear Plaintiffs' motion for class certification, and (2) to preserve judicial resources should the Court deny Plaintiffs' motion for class certification.

jurisdiction plus service of process equals jurisdiction.'") (quoting *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012)).

The FSIA provides four means for serving a foreign state. *See* 28 U.S.C. § 1608(a). First, a plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." *Id.* § 1608(a)(1). If service cannot be made under such an arrangement, then the plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). If the plaintiff cannot serve the defendant via the first two methods, then the plaintiff must attempt to effect service "by sending a copy of the summons and complaint and a notice of suit," as well as "a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). If, after thirty days, service cannot be effected by this third option, the plaintiff must attempt service through diplomatic means. To do so, the plaintiff must provide the clerk of court with two copies of the summons and complaint, and a notice of the suit, along with a translation of each into the official language of the foreign state, which the clerk of court transmits to the Secretary of State. *Id.* § 1608(a)(4). The Secretary of State will then "transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*

The United States and Iran do not have a "special arrangement" for service, nor is Iran a "party to an international convention on service of judicial documents." Plaintiffs attempted but were unable to effect service under § 1608(a)(3). *See* Dkt. No. 11, December 16, 2016 Notice of

Failed Service under 28 U.S.C. sec. 1608(a)(3). On December 19, 2016, at Plaintiffs' request the Clerk of Court mailed two copies of the summons, complaint, and notice of suit together with a translation of each in the official language of the foreign sovereign to the Department of State to effectuate service pursuant to 28 U.S.C. § 1608(a)(4). Dkt. No. 14. On March 24, 2017, the Department of State notified the court that service was completed on Defendants Iranian Revolutionary Guard Corps and Islamic Republic of Iran Dkt. No. 15. Plaintiffs have therefore properly effected service on Iran under 28 U.S.C. § 1608(a)(4).

Because the Court has subject matter jurisdiction over Plaintiffs claims, *see supra* Section V.B at pp. 27-32, and Plaintiffs have properly effected service, the court likewise has personal jurisdiction over Iran. *See Lee*, 518 F. Supp. 3d at 494.

### D.  Liability

Once this Court rules on Plaintiffs' motion to certify a class and, if granted, once the Class is notified and the opt-out period expires, this Court should proceed to determine Iran's liability for all EFP attacks on U.S. Forces in Iraq. *See* supra Section I at pp. 1-2.

"There is almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." *Lee*, 518 F. Supp. 3d at 495–96 (quoting *Salzman*, 2019 WL 4673761, at *15 (cleaned up) (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)) (additionally citing *Karcher*, 396 F. Supp. 3d at 59; *Allan v. Islamic Republic of Iran*, No. 17-cv-338, 2019 WL 2185037, at *6 (D.D.C. May 21, 2019); *Fritz*, 320 F. Supp. 3d at 86–87. Plaintiffs are all members of the armed forces killed or injured by EFPs, and their U.S.-national immediate family members (parents, siblings, and children). *See supra* Section II at pp. 2-5.

Members of the proposed class are also necessarily U.S. national, U.S. armed services, or U.S. employee victims of EFPs and their immediate family members. *See supra*, Part I, at p. 1. Additionally, the Court has subject matter jurisdiction over Plaintiffs' claims and those of the proposed class members under the terrorism exception. *See supra* Section V.B at pp. 27-32. Accordingly, Iran is liable for Plaintiffs' injuries and for the injuries to the proposed class members under 28 U.S.C. § 1605A(c).

## VI.   **CONCLUSION**

For the above-mentioned reasons, the Court should enter a default judgment as to liability against Defendants for the (1) extrajudicial killings of Second Lieutenant Peter Burks and Captain Benjamin David Tiffner, (2) attempted extrajudicial killings of Captain James David Hochstetler and Sergeant First Class Randolph Delbert Nantz, and (3) extrajudicial killings and attempted extrajudicial killings of every member of the proposed class.

As discussed above, *see supra* Section I at pp. 1-2, Plaintiffs respectfully request that the Court rule upon this motion with respect to their individual causes of action and as to the causes of action of the proposed class members only after ruling on Plaintiffs' motion for class certification and, if applicable, after members of the proposed class receive their class notice and the opt-out period expires.

Respectfully Submitted,

Dated: November 12, 2021

/s/ Steven R. Perles
Steven R. Perles (D.C. Bar No. 326975)
Edward B. MacAllister (D.C. Bar No. 494558)
Joshua K. Perles (D.C. Bar No. 1031069)
PERLES LAW FIRM, PC
816 Connecticut Ave., NW
12th Floor
Washington, DC 20006
Tel: (202) 955-9055

James P. Bonner
Patrick L. Rocco
Susan M. Davies
Thomas M. Caroccia
FLEISCHMAN BONNER & ROCCO LLP
447 Springfield Avenue, 2nd Fl.
Summit, NJ 07901
Tel: (908) 516-2045

*Attorneys for Plaintiff*