PX-32

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ————————————————— ) | |
| ALAN BURKS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No.: 16-cv-1102 (CRC) |
| ) | |
| v. ) | |
| ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ————————————————— ) | |

**DECLARATION OF GREGORY A. CARL IN SUPPORT OF PLAINTIFFS'**
**MOTION TO ESTABLISH SUBJECT MATTER JURISDICTION**
**AND FOR CLASS CERTIFICATION**

I, Gregory A. Carl, declare pursuant to 28 U.S.C. § 1746, subject to penalties of perjury,

as follows:

**I.      Background & Qualifications**

1.      I am a retired Special Agent of the Federal Bureau of Investigation ("FBI").  I was

the Director of the Terrorist Explosive Device Analytical Center ("TEDAC") from November

2012 through January 2017 and, prior to that, I was the Chief of TEDAC's Explosives Unit from

July 2003 to November 2012.  Additionally, I served as the Acting Deputy Director and then

Acting Director of the TEDAC from July 2006 through August 2007.  A copy of my resume is

attached hereto as Exhibit A.

2.      I make this Declaration based on my own personal knowledge in support of

Plaintiffs' motion to establish subject matter jurisdiction and for class certification.

3.      As noted on its website, "TEDAC coordinates the efforts of the entire

government, from law enforcement to intelligence to military, to gather and share forensic data

1

and intelligence about devices, tactics, techniques, and procedures—helping to disarm and disrupt improvised explosive devices ('IEDs'), link them to their makers, and, most importantly, prevent future attacks."[1]  TEDAC served the same function during my tenure there, including analyzing and processing many of the Explosively Formed Penetrator ("EFP") attacks on U.S. service-members in Iraq.

4.      In February 2006, the U.S. Department of Defense created the Joint Improvised Explosive Defeat Organization (JIEDDO) (later known as JITDO and now known as JIDO) to lead, advocate, and coordinate all Department of Defense actions in support of the Combatant Commanders' and their respective Joint Task Forces' efforts to defeat Improvised Explosive Devices as weapons of strategic influence.[2]  TEDAC worked closely with JIDO to examine all IEDs, including all EFPs, recovered in Iraq.

5.      Since its inception, JIDO has invested heavily in TEDAC because, as the Director of JIDO, Lieutenant General ("LTG") John Johnson, has noted, "[w]e needed the highest level of forensic capabilities to take a look at these IEDs and tell us who was responsible for them and also to help us track if they were flowing from one country to the next."[3]

6.      In the wake of the domestic jihadi-inspired terrorist IED bombings at the Boston Marathon, LTG Johnson confirmed the close working relationship between JIDO and TEDAC, noting, "[t]he discussions were really a comparison of experiences to see if there were ways that we could learn from what happened there, and they could learn from anything that we did.  One

---

[1]  "Terrorist Explosive Device Analytical Center (TEDAC)," Federal Bureau of Investigation, https://www.fbi.gov/services/laboratory/tedac.

[2]  *See* Feb. 14, 2006 DOD Directive at https://www.hsdl.org/?view&did=771397.

[3]  C. Todd Lopez, "Joint IED defeat capability to endure, at smaller size," U.S. Army (Feb. 26, 2014), https://www.army.mil/article/120668/joint_ied_defeat_capability_to_endure_at_smaller_size.

of the most important things we've done is in the investment of the Terrorist Explosive Device Analytical Center [TEDAC] that the FBI has."[4]

7.     The escalation of IED incidents and IED-related casualties during Operation Iraqi Freedom from March 2003 through November 2011 and Operation Enduring Freedom in Afghanistan from October 2001 through December 2014 gave rise to a new intelligence field related to technical intelligence called weapons technical intelligence ("WTI"), which combined technical and forensic IED exploitation techniques to link persons, places, things, and events. WTI fuses the technical, forensic, and biometric disciplines to produce actionable intelligence for attacking adversary networks, including terrorist organizations. WTI takes primacy in irregular warfare, including terrorist attacks in undeclared wars.  It is an especially powerful tool against enemies that rely on IEDs as a primary weapon in their arsenal.

8.     The development of WTI has been incremental and has led to the creation of a number of new organizations—including Counter-IED ("C-IED") Task Forces, C-IED Operations/Intelligence Centers, Combined Explosives Exploitation Cells ("CEXCs"), Expeditionary Forensic Labs - formerly Joint Expeditionary Forensic Facilities, and Weapons Intelligence Teams, all of which contribute to WTI.

9.     Analysis of IEDs begins in the field, with post-event investigation and acquisition of devices that have detonated or been retrieved pre-detonation by active military and law enforcement elements worldwide where IED threats exist.  DOD fills this role by fielding a CEXC team of specialists from the FBI, ATF and military units, including individuals with explosive ordnance disposal and related expertise.

---

[4] *Id.*

10.     CEXC staff performs the initial examination of IEDs, including EFPs, ensures the devices are rendered safe, conducts a technical triage of all devices, and generates the first documentation of the examination process.  During my tenure working for TEDAC, much of the data processed by those teams were provided to TEDAC in an effort to keep us abreast of all incidents of IEDs, including EFPs, in Iraq.

11.     In my roles at TEDAC from 2003 through 2012, I was involved in supervising: the collection of data regarding IEDs; the testing of those devices; and the analysis of data concerning those devices, including the EFPs used in attacks on U.S. service-members in Iraq during the time period relevant to this case.  In that role, I was also privy to U.S. intelligence reports concerning the use and origin of EFPs deployed against U.S. forces, government workers and civilians in Iraq.  As a result of my work at TEDAC, I became an expert regarding the EFPs used in those attacks, including their explosive effects, how and where they were manufactured, and their sources of supply.

## II.     Prior Relevant Expert Witness Testimony

12.     I was certified as an accredited Explosives and Hazardous Devices Examiner on March 19, 1998 by Louis Freeh, the then-Director of the FBI.  I have testified in Federal Court as an expert in Explosives and Hazardous Devices and related counterterrorism matters on several occasions.  I worked on some of the most notorious terrorist bombing cases against citizens of the United States, including the Oklahoma City bombing attack, the first attack on the World Trade Center in New York City and the bombing of Pan-Am Flight 103 in Lockerbie, Scotland. I have also been responsible for supervising and managing the investigations in numerous high-profile cases.  For example, I was the Explosive and Hazardous Devices examiner who managed the forensic/bombing aspects of the BORDERBOM investigation (Millennium Bomber - Ahmed

Ressam) and the Attempted Bombing of American Airlines Flight 63 from Paris to Miami (Shoebomb – Richard Reid).  This involved coordinating examinations of evidence possessed by foreign government laboratories, directing field agents concerning investigative leads developed as a result of the forensic investigation, writing the scientific reports that documented my conclusions and providing expert testimony at trial in regard to these terrorist devices.  I was also responsible for comparing these incidents to other bombing cases attributed to al Qaeda and providing expert testimony.  I was placed in charge of the on-scene post-blast evidence collection for the 1998 bombing of the U.S. Embassy in Dar es Salaam, Tanzania as well.

## III.    Expert Retention

13.    Plaintiffs' attorneys have retained me as a testifying expert in this litigation pursuant to Rule 26 of the Federal Rules of Civil Procedure.  I have prepared this expert declaration in that capacity. I am being compensated at a rate of $250 per hour by Plaintiffs' counsel.  I have no prior or current professional connection with any of the parties in this case that would preclude my ability to provide impartial testimony herein.

## IV.    Scope of Requested Work

14.    Plaintiffs' attorneys have requested that I explain how EFPs work and provide expert testimony about TEDAC's assessment of the manufacture, use and origin of EFPs in Iraq, including any role that Iran played in the EFP attacks on U.S. forces, U.S. civilians and U.S. government workers in Iraq.  I have also been asked to review the available evidence concerning the attacks on the four U.S. servicemen named in the Complaint – Second Lieutenant Peter Burks, Captain James David Hochstetler, Captain Benjamin David Tiffner and Sergeant First Class Randolph Delbert Nantz – to determine whether those servicemen were the victims of EFP attacks and whether Iran played a substantial role in those attacks.  Plaintiffs' counsel has also

requested that I express an opinion as to whether Iran played a material role in all EFP attacks in Iraq during the Class Period identified in Plaintiffs' Complaint.

## IV.    <u>Summary of Opinions</u>

15.    I have reviewed the available evidence of the attacks on Second Lieutenant Peter Burks, Captain Benjamin David Tiffner, Captain James David Hochstetler and Sergeant First Class Randolph Delbert Nantz.  For the reasons explained in detail below, it is my opinion that all four of these attacks were EFP attacks in which Iran played a substantial role – in other words, I do not believe those EFP attacks could have occurred without Iranian support.

16.    I have also surveyed the non-classified evidence that I was privy to as the Director of TEDAC and other publicly available information regarding the manufacture, use and origin of the EFPs deployed against U.S. forces, U.S. civilians and U.S. government workers in Iraq. Based on that information and my technical expertise regarding IEDs, I have determined that it is much more likely than not that Iran played a substantial role in all effective EFP attacks against U.S. Forces in Iraq.  Notably, TEDAC analyzed virtually all of the forensic data gathered in the field for EFP caches recovered in Iraq.  During my 5-year tenure as TEDAC Director, every effective EFP attack in Iraq examined by TEDAC about which I am aware involved at least some components manufactured or developed by Iran and/or some explosives tactics, techniques and procedures ("TTPs") directly influenced by Iran.  Similarly, I am unaware of any EFP cache examined by TEDAC in which there was a finding that Iran played no role.  Thus, it is my opinion that none of the EFP attacks that killed or injured U.S. Forces in Iraq could have occurred without the support of Iran.

17.     I can say with 100% confidence that it is much more likely than not that all effective EFP devices used against U.S. Forces in Iraq were made or deployed with Iranian support.

**V.     How EFPs Are Made, How They Function and Iran's Role in Their Manufacturing**

18.     EFPs contain precision-manufactured components that the groups of terrorists operating in Iraq during the Class Period could not have acquired or built without the material support of Iran.  The publicly available source material discussed below supports this conclusion.

19.     The EFP is an Iranian designed and manufactured weapon designed to pierce armored vehicles.  EFPs were first utilized by Iran's proxy, Hezbollah, against Israeli vehicles operating in Lebanon in the late 1990s.  EFPs were then employed by Iranian-backed Shi'a terror cells operating in Iraq between 2003 and 2011 (termed the Shi'a "Special Groups" by Coalition Forces).  As the State Department reported in 2007:

> Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hizballah.  The Iranian Revolutionary Guard was linked to armor piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hizballah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. These individuals then passed on this training to additional militants in Iraq.[5]

20.     Iranian EFPs consist of an end cap, a precision-manufactured concave copper liner, a cylindrical tube packed with plastic explosives and a detonator, and a base plate.  The TEDAC informational video, PX-9[6] (file name: "EFP Basic Understanding"), demonstrates how

---

[5]  U.S. Dep't of State, *Country Reports on Terrorism 2006*, at 147 (April 2007).

[6]  References to "PX __" refer to specific exhibits contained in Plaintiffs' Compendium of Exhibits submitted in support of Plaintiffs' motions for subject matter jurisdiction and class certification.

these components work to generate a lethal weapon against even heavily armored vehicles.[7]  As demonstrated in this video, when detonated, the plastic explosives reshape the copper metal liner of an EFP into a high-velocity slug.  That slug of molten copper is capable of penetrating the steel plating of many U.S. armored vehicles.  With the initiation of the device, the transformation of the liner into a penetrator is a function of the liner's composition, thickness and shape.[8]

21.     In other words, EFPs are a product of two explosive effects – the Munroe effect and the Misznay–Schardin effect.  By forming a deep cavity in the face of an explosive charge opposite the point of initiation the resulting explosion will invert the metal liner, transforming it from a bowl-shaped figure to a tadpole-shaped projectile. (see graphic below).



The inversion of the liner forms into a "jet" and/or "slug" (depending on the liner geometry) of fluidized metal.[9]  With an EFP, there is only a slug, which is generally made of copper.  That copper slug has excellent penetrating properties.  This effect is known as the Munroe Effect.[10]  Upon detonation of a high explosive, forces from both the shock wave and the expanding gases act normal to the planar surface of the explosive charge, in other words they move in a 90-degree angle away from the face of the explosive charge to increase the force of that charge.  This effect

---

[7]  *See id.* at 0:36-0:57 and 2:20-2:34.

[8]  *Id.* at 0:59-1:08.

[9]  The "jet" is comprised of explosive gases.  The "slug" is the projectile formed by the liner.

[10]  *See* Brian Burch, *Determining and mitigating the effects of firing a linear shaped charge under water*, Missouri University of Science and Technology, at 17 (Summer 2014), https://scholarsmine.mst.edu/cgi/viewcontent.cgi?article=8304&context=masters_theses.

is known as the Misznay-Schardin Effect.  It is best observed when using broad, flat sheet explosives. Placing a heavy backing material against one side will direct more of the explosive energy orthogonally outward through the side opposite the backing material.  An excellent practical application of this is seen in an EFP.  An EFP is similar to a shaped charge, except that EFPs work from long range and shape charges are only effective at close distance.  Unlike a shaped charge, however, the EFP cavity is rounded and very shallow.  Instead of producing a cutting jet/slug mix with the metal liner, it produces a slug, which concentrates the energy of the explosion into a single, powerful projectile capable of traveling longer distances.[11]

22.    Upon detonation, the shockwave deforms the copper liner outwards, creating a symmetrical penetrator.  If optimally constructed, the penetrator can reach speeds upward of 20,000 feet per second or approximately 70% of the explosive's detonation velocity.[12]  Terrorists deploy EFPs singly, in pairs or in arrays.[13]

23.    Because they project a hypersonic slug of copper, EFPs produce a characteristic hole (or holes) in armor plating that are distinct from the damage inflicted by other, more typical IEDs.  An example of the distinct hole created by an EFP copper slug can be seen in PX-22 and PX-23, which are pictures of a test plate of armor pierced with an EFP projectile in the lab.  Upon impact, the copper slug creates a signature steel spall, or fragments, that along with the copper slug wreak havoc on the interior of vehicles, frequently dismembering and killing its occupants.  Indeed, Iranian EFPs were the only IEDs capable of piercing the enhanced armor used on U.S. army vehicles deployed in Iraq.

---

[11] *See id.* at 18

[12] PX-9 at 1:18-1:30.

[13] *Id.* at 2:10-2:19.

24. According to Col. Barry Schoop, the then-Chief Scientist for JIEDDO, EFPs made up only 2% of all IEDs deployed against Coalition forces in Iraq but accounted for a "very large percentage" of casualties from such attacks. [14]

25. The copper cone of an EFP must be lathed into a specific and precise parabolic arc, or the detonation will result in a relatively less harmful, diffuse spray of copper incapable of piercing the armor of U.S. military vehicles.  Though simple in design, EFPs' armor-penetration capabilities depend on sophisticated precision machining.  If the parabola of the copper cone is too "sharp," it will produce a stream rather than a slug that, while deadly at close range, dissipates its energy over the course of a few feet.  If the parabola is too flat, the copper will fragment into an expanding arc that is ineffective at piercing armor plate.  According to military officials associated with Joint Task Force Troy, a multinational task force operating in Iraq responsible for analyzing evidence retrieved by explosive ordnance disposal teams, the need for "very precise machining" in the manufacturing of EFPs means that they are not something "someone can produce in a garage."[15]  As an official for the unit explained, "[w]hen (explosive ordnance disposal) teams go out and they respond to an explosive event, they collect whatever evidence they find and bring it back . . . .  We take that evidence and take it apart and exploit it."[16]  Using forensic tools, Task Force Troy could "put all those puzzles together, and . . .

---

[14] Brookings INST., IRAQ INDEX: TRACKING VARIABLES OF RECONSTRUCTION & SECURITY IN POST-SADDAM IRAQ 31 (Oct. 1, 2007), http://www.brookings.edu/fp/saban/iraq/index.pdf.

[15] Jim Garamone, *Extremists Use Iranian Weapons, Iraq Command Spokesman Says*, U.S. Army (Jul. 12, 2011), https://www.army.mil/article/61458/extremists_use_iranian_weapons_iraq_command_spokesman_says.

[16] *Id.*

determine where [the EFPs were] from."[17]  Based on that analysis, "the forensic teams can categorically state that the weapons are from Iran."[18]

      26.     A great deal of metallurgical and technical acumen is required to manufacture copper EFPs.  The precision manufacturing process described above requires either sophisticated hydroforming equipment or a specialized press and die, along with a high-precision lathe and an appropriately trained machinist.  Those resources were not domestically available to terrorist groups operating in Iraq for from 2005 to 2011.[19]

      27.     PX-24 (file name: "Manufacturing Equipment Indicators") is a TEDAC informational video that demonstrates the two types of sophisticated equipment required to manufacture an EFP effective against the enhanced armored vehicles used by the U.S. in Iraq – a hydroforming machine and a sophisticated press and dye.  As seen in the video, the hydroforming process requires massive technical equipment and a skilled operator to make large EFP copper liners of eight inches or more.[20]  The video also demonstrates the sophisticated press

---

[17] *Id.*

[18] *Id.*

[19] Kimberly Kagan, *Iran's Proxy War against the United States and the Iraqi Government*, Iraq Report, May 2006 – August 20, 2007, http://www.understandingwar.org/sites/default/files/reports/IraqReport06.pdf.  *See also* Kimberly Kagan, *The Surge: A Military History* (Encounter Books 2010); Michael R. Gordon, *Deadliest Bomb in Iraq Is Made in Iran, U.S. Says*, N.Y. Times, (Feb. 10, 2007), https://www.nytimes.com/2007/02/10/world/middleeast/10weapons.html; Michael R. Gordon and Scott Shane, *U.S. Long Worried That Iran Supplied Arms in Iraq*, N.Y. Times (Mar. 27, 2007), https://www.nytimes.com/2007/03/27/world/middleeast/27weapons.html; James Glanz, *U.S. Presents Evidence of Iranian Weapon in Iraq*, N.Y. Times (Feb. 11, 2007), https://www.nytimes.com/2007/02/11/world/middleeast/11cnd-weapons.html.

[20] PX-24 at 0:30-2:48.

and dye equipment and skilled operator necessary to make the smaller EFP liners effectively used against U.S. Forces in Iraq.[21]

28.     Because the Shi'a Special Groups in Iraq lacked this sophisticated equipment, Iran smuggled both completed EFPs and expertly made copper liners across the border to its Special Groups operating in Iraq.  To the limited extent any EFP cones were ever manufactured in Iraq, it was by individuals trained in this manufacturing process by Iran.  This has been confirmed by chemical analysis of the copper liners recovered by CEXC teams from cache sites in Iraq, by interception of the smuggled material, and by other sources of intelligence.

29.     During my tenure at TEDAC, we processed thousands of precisely manufactured EFP copper liners recovered in Iraq – the vast majority of which were manufactured using the press and dye method described above.  Each press used to make those copper liners creates unique toolmarks (fingerprints) that allowed us to link the copper liners recovered to specific presses. To the best of my recollection, we identified at least 12 unique "fingerprints" left by presses on the EFP liners examined by TEDAC.  That means there were 12 separate presses that manufactured those precision-made EFP copper liners.  Because these presses were crucial to Iran's supply of EFPs to the Shi'a Special Groups in Iraq, U.S. forces were all alerted to be on the lookout for those presses and any manufacturing operations in Iraq using them.[22]

30.     Despite numerous raids that recovered thousands of EFPs and related equipment and components in Iraq, there were no press and dies recovered in Iraq that matched any of the

---

[21] *Id.* at 2:49-3:50.  The video also demonstrates sandcasting, a more primitive method of making an EFP liner.  *Id.* at 3:51-5:12.  However, based on my work at TEDAC, I know that the sandcasting methodology was not capable of manufacturing the precision EFP liners that were effective against U.S. armored vehicles in Iraq.  To the contrary, virtually all of the recovered EFPs that we examined in the TEDAC lab were made with the more sophisticated Iranian press and dye methodology and the remainder were created by hydroforming.

[22] Whenever EFPs, EFP components and/or EFP manufacturing devices were recovered in Iraq they were routinely sent to us at TEDAC for examination.

12 unique toolmarks of the presses that were used to manufactured the thousands of precision-made copper liners that were recovered in Iraq and sent to TEDAC for examination.[23]  This corroborates the conclusion of U.S. intelligence (shared with TEDAC) that all of the precision-made EFP copper liners capable of piercing U.S. armored vehicles were being manufactured in Iran, using Iranian presses and technical expertise.

**VI.    Documents Produced by DTRA Support My Opinion That Iran Played a Substantial Role in all EFP Attacks in Iraq**

31.    In response to Plaintiffs' subpoena, DTRA produced an intelligence report entitled Wasit Province Study Update (the "Wasit Report") bearing Bates number BURKS_DTRA_PROD_00006-00024, PX-25.  That report details 32 EFP events in Wasit Province in Iraq in January 2008.  The report notes, among other things, that "[t]he EFPs in the Hilla area are smuggled in with produce trucks from Mahran . . . Iran" and "[s]muggling between Iran and Iraq will continue as it has for hundreds of years."[24]  The report further notes that "Iran will continue to supply and train Iraqi surrogates but has a vested interest in maintaining 'plausible deniability'"[25] and that "[c]urrent US intelligence community analysis indicates EFP technology and RPG 29s certainly were introduced to Iraqi Shia militants by Iranian or Lebanese Hizballah actors."[26]

---

[23] Toolmark identification is a forensic science discipline that has as its primary concern the determination of whether or not a toolmark was produced by a particular tool. This determination is based on the class and individual marks in a given toolmark, which are products of the manufacturing process. *See* "What is Firearm and Tool Mark Identification?," Association of Firearm and Tool Mark Examiners, https://afte.org/about-us/what-is-afte/what-is-firearm-and-tool-mark-identification.

[24] PX-25 at 002.

[25] *Id.* at 003.

[26] *Id.* at 009.

13

32.    The findings in the Wasit Report support my opinion that Iran was responsible for, or substantially contributed to, all effective EFP attacks against U.S. Forces in Iraq.

33.    In response to Plaintiffs' subpoena, DTRA produced a JIEDDO Report entitled "Counter IED Operational Integration Center, Iraq EFP TAI, RFS 3166 – Final Product – Information Cutoff Date: 11/30/2007" ("11/30/2007 JIEDDO Report") bearing Bates number BURKS_DTRA_PROD_00025- 00073, PX-20.

34.    The 11/30/2007 JIEDDO Report details 736 EFP/AAIED events in the ITO (Iraq Theater of Operations) from 1 Dec 2006 to 25 Nov 2007 resulting in 806 Coalition Forces casualties associated with 299 events, i.e., attacks, resulting in 134 killed in action and 672 wounded in action.[27]   The executive summary in that report provides:

> EFP networks are mostly comprised of [Jaysh al-Mahdi "JAM"] special group members with ties to [the Iranian Islamic Revolutionary Guard Corp-Quds Force] for supply and re-supply of EFPs and financing . . . .   JAM receives financial and weapons support from Iranian Intelligence agents.   An organized cell structure with redundant finance and weapons supply chains allow JAM members within Baghdad to be highly effective and provide quick reorganization should a member be captured by [Coalition Forces ("CF")]. Small arms, mortar and rockets, and IED/EFP attacks against Coalition Forces and Iraqi CF supporters are the primary targets for JAM operations.[28]

The findings in the 11/30/2007 JIEDDO Report support my opinion that Iran was responsible for, or substantially contributed to, all effective EFP attacks against U.S. Forces in Iraq.

**VII.   The Available Evidence of the Attacks on Burks, Tiffner, Hochstetler and Nantz Demonstrate That They Were All Victims of EFP Attacks Sponsored By Iran**

**A. Attack on Plaintiff Captain Hochstetler**

35.    The U.S. Army produces reports known as "AR 15-6" to reflect the conclusions reached by Army investigators regarding a variety of topics, including bombing attacks on military personnel.   I have reviewed the AR 15-6 report concerning the August 23, 2007 attack in

---

[27] PX-20 at 00029.

[28] *Id.* at 00028.

Al Azizyah, Iraq that severely injured Captain Hochstetler.  That report's conclusion that Captain

Hochstetler's vehicle was struck by an EFP is consistent with the TTPs typical in Iranian EFP

attacks.

      36.    I have also analyzed the photo below, which is a post-attack picture of the

armored vehicle in which Captain Hochstetler was riding.  As noted below, the damage caused

at the entry point of the projectile into Captain Hochstetler's vehicle is consistent with the

molten projectile formed by a copper EFP liner penetrating the armor.



Damage consistent with
EFP liners penetrating
armored vehicle

      37.    DTRA has produced a SIGACT Report that explicitly identifies the August 23,

2007 attack on Captain Hochstetler's convoy as an EFP attack for which Iran was responsible.  A

copy of that report appears at PX-10 (BURKS_DTRA-PROD_00118-00119) ("Hochstetler

SIGACT Report").

      38.    The Hochstetler SIGACT Report concludes that "ON 23 AUGUST 2007 AT

1100 HOURS, ABD-AL-SADAHS CELL DETONATED AN IRANIAN MADE

EXPLOSIVELY FORMED PENETRATOR (EFP) AGAINST A U.S. CONVOY."[29]  The
Report further notes that the attack was perpetrated by "IUSAYN 'ALWAN ABD-AL-SADAHS
IMPROVISED EXPLOSIVE DEVICE CELL [which] HAS TIES TO IRAN AND USES
IRANIAN MADE EXPLOSIVELY FORMED ENETRATORS" and that the Abd al Sadahs Cell
"WORKS WITH IRANIAN INSURGENTS."[30]

39.     Based on the foregoing evidence, it is my opinion that the attack on Captain
Hochstetler was an EFP attack sponsored by Iran.

**B.  Attack on Lieutenant Peter Burks**

40.     I have reviewed documents that show that Second Lieutenant Peter Burks was
killed in an Iran-sponsored EFP attack in Baghdad, Iraq on November 14, 2007.  In 2007, there
were many Shi'a militia groups that were prevalent in the area of the attack on Lieutenant Peter
Burks that were directly backed by Iran or Iran's proxy, Hezbollah.

41.     DTRA produced a report in response to Plaintiffs' subpoena entitled Abu Sajad
al-Gharawi - Target Package -OBJ WELLINGTON (As of 04 July 2008), which appears at PX-
11 (BURKS_DTRA-PROD_00388–00390).  That report notes: "Abu Sajad al-Gharawi has
direct links to the IRGC-QF  . . . Gharawi [oversees]  . . . a lethal aid facilitation network that
specializes in the smuggling of weapons components and financial support from Iran into
Iraq."[31] It further notes:  "A JAM special group is most likely responsible for the EFP" detonated
on November 14, 2007.[32]

---

[29] PX-10 at 00118 (capitalization in original).

[30] *Id.*

[31] PX-11 at 00389.

[32] *Id.* at 00390.

42.     The EFP detonated on November 14, 2007 is the explosive that killed Lieutenant Burks.  According to a declaration of former Secretary of Defense Esper that he submitted in response to Plaintiffs' motion to compel the production of documents, the DTRA report specifically attributes the attack on Lieutenant Burks to a JAM controlled by Abu Sajad al-Gharawi, an Iranian operative.  *See* Secretary Esper's Second Declaration of November 3, 2020 (Docket Entry #50) at paragraph 7 ("DoD has also released information stating that Jaysh Al-Mahdi, an organization linked to Iran, was likely responsible for the attack on Second Lieutenant Peter Burks.").

43.     DTRA produced a report in response to Plaintiffs' subpoena entitled Report 14 0815C Nov 07 EFP ATTK (NOT IED) on 4-2 SCR IN KARKH (prepared by C3 OPS), which appears at PX-12 (BURKS_DTRA_PROD_00107-00112).  That report establishes that Lieutenant Burks was killed by an EFP attack.

44.     While the precise location of that attack is redacted, the report refers to a November 14, 2007 attack on a three-vehicle convoy in Karkh (western portion of Baghdad) across the street from the Iraqi Ministry of Public Affairs, which is when and where Lieutenant Burks was killed.  The report also notes that there were "5 WIA" (wounded in action) and "1 KIA" (killed in action), which corresponds with the injury and death toll of the Burks attack.[33] The report includes photos of the attack location and notes "First Stryker of three vehicle convoy was struck by [redacted] EFP just prior to turning into Checkpoint 2 (IZ)."[34]

45.     Based on the foregoing evidence, it is my opinion that the attack on Lieutenant Burks was an EFP attack sponsored by Iran.

---

[33] PX-12 at 00111.

[34] *Id.*

17

## C. Attack on Plaintiff Captain Tiffner

46.     The AR 15-6 report concerning the attack on Captain Tiffner notes that the "Post-Blast Analysis confirms that the attack, was, in fact, an EFP."[35]  Another report concerning the attack produced by DTRA notes: "Team conducted analysis of M1151 that had damage consistent with a 3 EFP Array. Vehicle was struck at GRID MB 39286 90521 on 071430 NOV 07."[36]  As described above, those findings are reliable and were based on the data that an expert CEXC team gathered at the blast site and analyzed in field.

47.     I understand from Colonel Kevin McDonnell (ret.), who was the Commander of all Special Operations Forces in Iraq in 2007 and Captain Tiffner's commanding officer, that PX-27 is a video of the EFP attack on Captain Tiffner's convoy.  That video, which I have examined, is consistent with an attack utilizing an EFP that was concealed on the side of the road.  In particular, I examined the frame-by-frame slow motion of the video.  I observed the EFP slug moving from the initiation point to the Humvee (right to left) and impacting the Humvee prior to the arrival of the shockwave as depicted in the image in ¶ 48 below.  That is the unique hallmark sign of an EFP, which distinguishes this explosive device from other devices used against U.S. Forces in Iraq.

48.     I also understand from Colonel McDonnell that PX-28 are still frames from the video of the attack on Captain Tiffner's vehicle.  An examination of those frames reveals a molten slug emanating from the side of the road and striking the passenger side of Captain Tiffner's vehicle at 14:48:22 on 11/07/07.  Notably, those frames also reveal that the slug hits the vehicle before the shock wave reaches the vehicle.  As noted above, that is a tell-tale sign of an

---

[35] PX-13 [Tiffner AR 15-6 report] at 11.

[36] PX-26 [BURKS_DTRA_PROD 00341-00352] at 00341.

EFP.



15640 11/07/07 - 14:48:22

Molten slug

49.     I am confident based on the foregoing evidence that the attack on Captain Tiffner was an EFP attack that was the work of Iran because the only EFPs that could penetrate US military armored vehicles like the one in which Captain Tiffner was killed in Iraq were designed by Iran and used Iranian components.

**D. Attack on Plaintiff Sergeant Nantz**

50.     Based on my discussions with Colonel McDonnell, Sergeant Nantz's commanding officer at the time of his attack in Iraq, and my review of Col. McDonnell's Declaration, I understand that the attack on Sergeant First Class Nantz took place in the Al Jadida neighborhood of Baghdad, Iraq on December 22, 2006.  At that time, Sergeant Nantz's Humvee was riding in a three-vehicle convoy.

51.     I understand from General Michael Oates (ret.) that, in late 2006, many Shi'a militia groups operated in the area of the attack on Sergeant Nantz that were directly backed by Iran or Iran's proxy, Hezbollah.

52.     The U.S. Army post-attack medical report and related documents on Sergeant First Class Nantz that I have reviewed indicates copper shrapnel was removed from his body

19

after the attack. *See* PX-3 (U.S. Army medical report) at p. 3; PX-35 (image of copper shrapnel); PX-43 (Nantz Declaration), at ¶ 2.  The presence of copper shrapnel is a key indicator of an EFP weapon.  All of the effective EFPs utilized in Iraq during the Class Period were comprised of a copper liner as the penetrator.  I know of no other weapon used in Iraq that would leave copper shrapnel behind at the point of attack, and there is no copper inside a U.S. military vehicle like the one in which Sergeant First Class Nantz was riding that could serve as shrapnel.

53.     Based upon this "signature" existence of copper shrapnel in Sergeant First Class Nantz's body and the information provided by Colonel McDonnell and General Oates noted above, I feel confident concluding that Sergeant First Class Nantz was attacked with an EFP and that Iran provided to Shi'a militia members.

**VIII.   CONCLUSION**

54.     Based on the foregoing, it is my expert opinion that it is substantially more likely than not that Iran played a material role in all EFP attacks in Iraq that were effective against U.S. Forces – in other words, those attacks could not have happened without Iran's support.  It is also my expert opinion, based on all available data, that the four attacks on Second Lieutenant Burks, Captain Hochstetler, Captain Tiffner, and Sergeant First Class Nantz were all EFP attacks in which Iran played a substantial role.

Dated: November 12, 2021

Gregory A. Carl, Retired Special Agent, FBI