**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALAN BURKS, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. 16-cv-1102 (CRC) |
| | ) | |
| vs. | ) | |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
**AND MEMORANDUM IN SUPPORT THEREOF**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

THE RELEVANT FACTS ................................................................................................... 4

    A.  Overview ................................................................................................... 4

    B.  Iran's Deadly, Determined Efforts to Defeat U.S. Foreign Policy Interests by
       Targeting U.S. Military Personnel with EFP Attacks ............................................ 6

    C.  The Plaintiffs and Their Catastrophic Injuries ..................................................... 13

    D.  The Proposed Class and Its Representatives......................................................... 15

ARGUMENT ................................................................................................... 16

I.  Standards on a Motion for Class Certification ................................................................ 16

    A.  The Applicable Burden and Standards of Proof ..................................................... 16

    B.  The Four Foundational Rule 23(a) Requirements ................................................. 17

    B.  The Rule 23(b)(3) Certification Requirements ..................................................... 17

II. The Class Satisfies Each of Rule 23(a)'s Fundamental Class Certification Requirements
    ................................................................................................... 18

    A.  The Class Is So Numerous That Joinder of All Members Is Impractical ............. 18

    B.  The Class Members' Claims Present Common Issues of Law and Fact .............. 21

    C.  Plaintiffs Satisfy the Typicality Requirement Because Their Claims Closely
       Parallel the Claims of Absent Class Members...................................................... 27

    D.  Plaintiffs and Their Counsel Satisfy the Rule 23 Adequacy Requirement.......... 29

III. The Class Satisfies the Predominance and Superiority Requirements for Class
    Certification Under Fed. R. Civ. P 23(b)(3).................................................... 31

    A.  The Class Satisfies the Predominance Requirement Because All Class Members'
       Claims Require the Same Liability Proof ............................................................ 31

    B.  A Class Action Is the Superior Means for Resolving the Class Members' Claim 37

IV. Alternatively, the Court Should Certify the Class with Respect to All Liability Issues
    Pursuant to Rule 23(c)(4) ................................................................................ 40

V.  The Court Should Approve Class Counsel as the Attorneys for the Class ..................... 43

VI. The Court Should Order Plaintiffs to Provide The Notice to the Class That Rule 23(b)(3)
     Requires Before Considering Plaintiffs' Motion for Entry of a Default Judgment ........ 44

CONCLUSION ....................................................................................................................... 45

The plaintiffs in this action ("Plaintiffs") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 23, to certify the class in this action (the "Class") and to approve Plaintiffs' choice of The Perles Law Firm, P.C. and Fleischman Bonner & Rocco LLP (collectively, "Class Counsel") to serve as counsel for the Class.

## PRELIMINARY STATEMENT

Plaintiffs seek the certification of a Class consisting of all U.S. service members, military contractors and American civilians injured by terrorist attacks (the "EFP Attacks") involving explosively formed penetrators ("EFPs") during the U.S. military's operations in Iraq between 2005 and 2011 (the "Class Period"), the personal representatives of individuals killed in EFP Attacks, and the immediate family members of the foregoing individuals, with the exception of people who have retained counsel other than Class Counsel to pursue those claims. All members of the Class (the "Class Members") assert one claim against the defendants, the Islamic Republic of Iran and the Iranian Revolutionary Guard Corps (collectively, "Iran"), pursuant to the terrorism exception to foreign sovereign immunity. *See* 28 U.S.C. § 1605A. The Class Members' injuries arise from Iran's role in fashioning EFPs, distributing them to Shi'a militia members in Iraq, and educating those terrorists in assembling and using EFPs, to deadly effect.

To obtain class certification under Rule 23, Plaintiffs must first satisfy the four fundamental requirements of Rule 23(a)—numerosity, commonality, typicality and adequacy. Plaintiffs must then demonstrate entitlement to class certification under one of Rule 23(b)'s sub-sections. Here, Plaintiffs seek certification under Rule 23(b)(3), which requires that common issues predominate with respect to all Class Members' claims and that a class action constitutes the superior means for resolving those causes of action.

The evidence before the Court demonstrates that the Class fulfills Rule 23(a)'s four basic class certification requirements. Plaintiffs have obtained official U.S. Central Command

1

("CENTCOM") data demonstrating that, between July 2005 and November 2011, EFP detonations in Iraq killed 196 servicemen and injured 861.  Plaintiffs' Exhibit ("PX") 44 (CENTCOM EFP Statistics Iraq 2005-2011) ["CENTCOM EFP Stats"].  The Foreign Sovereign Immunities Act ("FSIA") provides claims for all surviving military personnel, military contractors and other U.S. citizens injured by EFP Attacks, the representatives of any such individuals killed in EFP Attacks, and the close family members of those individuals.  *See* 28 U.S.C. § 1605A(c).  Thus, the Class, which includes thousands of individuals, easily satisfies the numerosity requirement, which merely demands that classes exceed roughly 40 members.

The Class also satisfies the commonality requirement, which requires a showing that class members' claims present common questions of law or fact.  Commonality exists where all class members' claims share even a single issue that the Court or factfinder can resolve based upon evidence common to all of those claims.  Plaintiffs' proof that Iran masterminded a vast conspiracy to distribute EFPs to Shi'a militias operating in Iraq and to train those terrorists to assemble and use those lethal explosives provides the factual basis for all Class Members' claims.  Because Plaintiffs will prove that Iranian conduct with evidence equally probative of all Class Members' claims, the Class satisfies the commonality requirement.

For similar reasons, Plaintiffs also fulfill Rule 23(a)'s typicality requirement, which demands that the Plaintiffs' claims share significant similarities with those of absent Class Members.  Typicality exists where the same course of conduct serves as the basis of the claims of the class representatives and absent class members so that the plaintiffs share litigation incentives with the non-party, represented claimants.  Plaintiffs satisfy that requirement here because, by proving the Iranian participation in the conspiracy to manufacture, distribute and deploy EFPs that serves as the basis for Plaintiffs' claims, they will also establish the factual bases for absent Class Members' causes of action.

2

Plaintiffs and their counsel also satisfy Rule 23(a)'s adequacy requirement, which demands that the party and counsel representatives of the Class possess the same interests as absent Class Members and demonstrate their ability to vigorously prosecute all Class Members' claims.  Particularly given Plaintiffs' military affiliations and the common nature of the evidence necessary to establish all Class Members' claims, Plaintiffs share the absent Class Members' interests in guaranteeing the successful prosecution of all claims this case encompasses. Moreover, Class Counsel's record demonstrates that they can prosecute class actions and FSIA and other terrorism-related claims successfully.

The Class also satisfies the predominance and superiority elements necessary for class certification under Rule 23(b)(3).  A class fulfills the first of those requirements when issues common to all class members' claims exhibit greater significance to the litigation than issues impacting only the claims of individual class members.  Like the Rule 23(a) commonality and typicality elements, predominance does not demand that class representatives' claims hinge upon precisely the same evidence as absent class members' causes of action.  In particular, the Supreme Court and the D.C. Circuit have explained that the need for class members to provide individual proof of damages does not preclude a finding that common issues predominate.

Here, all Class Members' claims share predominant issues concerning whether Iran engaged in a vast, destructive international conspiracy to target members of the U.S. military with a uniquely effective weapons system and thereby undermine the foreign policy objectives of the U.S. and its allies, as well as the burgeoning democracy in Iraq.  Once the Court resolves those common issues, the Court may rely upon streamlined procedures employing the assistance of a magistrate judge or special masters to assess individual Class Members' damages.  Because this Court has developed extensive precedent adopting formulas for assessing plaintiffs' damages in FSIA cases, the Court may determine Class Members' damages efficiently using the same

3

procedures it has employed in other large terrorism-related cases.  Accordingly, those individual damages issues pose no obstacle to finding the predominance requirement satisfied here.

Even if the Court does not conclude that common issues predominate with respect to Class Members' claims as a whole, Rule 23(c)(4)—which authorizes the certification of particular issues for class-wide resolution—provides an alternative basis for class certification. Courts frequently employ Rule 23(c)(4) to certify all liability issues for class resolution where damages issues are equally or more significant than the liability issues that class members' claims present.  While Plaintiffs believe that the predominant nature of the liability issues in this case raises justify certifying Class Members' claims as a whole under Rule 23(b)(3), the Rule 23(c)(4) alternative would still enhance judicial efficiency and protect the interests of the many absent Class Members who lack sufficient resources to pursue claims independently.

Finally, the Class easily satisfies Rule 23(b)(3)'s superiority requirement, which considers whether a class action will promote economies of time, effort and expense without sacrificing procedural fairness or otherwise promoting undesirable results.  Here, a class action will expedite decision making, preserve judicial resources, enable Class Members to litigate their claims efficiently and promote Class Members' ability to collect on their judgments by enabling counsel to spend significant resources locating and collecting Iranian assets, perhaps the most difficult element of most terrorism-related cases.  A class action thus promotes the important public policy objectives that motivated Congress's adoption of the FSIA's terrorism exception.

## THE RELEVANT FACTS

### A.  Overview

This case arises from Iran's campaign to distribute and deploy sophisticated and powerful EFPs in Iraq that targeted members of the U.S. military, military contractors, and other U.S. citizens.  *See* PX-31 (Casey Decl.) at ¶¶ 8-12, 15, 21-32; PX-32 (Carl Decl.) at ¶¶ 15-34; PX-30

(Oates Decl.) at ¶¶ 4-5, 11-13, 26-27, 29-32, 45-49, 51-53, 78-82; PX-36 (McDonnell Decl.) at ¶¶ 5-19; PX-29 (Levitt Decl.) at ¶¶ 5, 153-71.[1]  Iran executed that campaign of terrorist attacks between 2005 and the time U.S. troops withdrew from Iraq in 2011.  *See* PX-36 (McDonnell Decl.) at ¶¶ 16-19.

To undermine U.S. foreign policy interests and impede the development of a post-war democracy in Iraq, Iran enlisted the help of Shi'a militias operating in Iraq to carry out the EFP Attacks.  *See* PX-31 (Casey Decl.) at ¶¶ 8-12, 15, 25-32; PX-32 (Carl Decl.) at ¶¶ 19, 28-34; PX-30 (Oates Decl.) at ¶¶ 4, 11, 15, 22, 25-27, 29, 32, 45-59, 65-66, 69, 76, 78-82; PX-29 (Levitt Decl.) at ¶¶ 5, 119-72.  In part, Iran employed its proxy, the Lebanese terror organization Hezbollah, to provide EFPs and expertise regarding their use to the Shi'a militias.  *See* PX-31 (Casey Decl.) at ¶¶ 8, 10, 12, 25, 32; PX-32 (Carl Decl.) at ¶ 19; PX-30 (Oates Decl.) at ¶¶ 10-12, 29, 44-45, 50-52, 65-66, 68, 69, 76-77; PX-29 (Levitt Decl.) at ¶¶ 70-129.

The sectarian affiliation of the militias Iran exploited to deploy EFPs bears significance because Sunni Muslims had long dominated Iraqi politics before Saddam Hussein's regime was overthrown during the Second Gulf War.  *See* PX-29 (Levitt Decl.) at ¶ 71, 75.  Thereafter, Shi'a-dominated Iran undertook an extended proxy campaign designed to cause the post-war Iraqi government to adopt policies favorable to Iran and Iraq's Shi'a Muslim majority and to diminish U.S. influence in Iraq.  *See* PX-31 (Casey Decl.) at ¶¶ 10-12, 15; PX-30 (Oates Decl.) at ¶¶ 25, 30, 38, 71; PX-29 (Levitt Decl.) at ¶¶ 22, 25-38.

The Shi'a militias that carried out the EFP attacks that killed and injured American servicemen lacked the technological capacity to build, deploy and detonate those precision

---

[1] Plaintiffs cite the declarations filed in support of this motion by the witness' last name (with additional identifying information in the case of family members who share surnames) and the declarations' paragraph numbers—*e.g.,* "Casey Decl. at ¶ 1."

explosive devices without the assistance of Iran, a U.S. government-designated state-sponsor of terrorism that has long exploited local militias in Iraq to achieve its nefarious aims. *See* PX-31 (Casey Decl.) at ¶¶ 11, 15; PX-32 (Carl Decl.) at ¶¶ 25-26, 28; PX-30 (Oates Decl.) at ¶¶ 13, 15, 29, 32, 49, 51; PX-29 (Levitt Decl.) at ¶¶ 5, 162. In fact, U.S. government investigative records demonstrate Iran's responsibility for *every* EFP Attack on U.S. forces in Iraq during the 2005-2011 Class Period. *See* PX-31 (Casey Decl.) at ¶¶ 11, 15, 25, 32; PX-32 (Carl Decl.) at ¶¶ 16-19, 23, 25-26, 28-34; PX-30 (Oates Decl.) at ¶¶ 13, 15-16, 32, 78-82; PX-29 (Levitt Decl.) at ¶¶ 5, 162; PX-25 (the "Wasit Report") at 002, 003, 009; PX-20 ("11/30/2007 JIDO Report") at 00028, 00029; PX-47 (Qais al-Khazali Interrogation Report 11 (Mar. 26, 2007)) at 099. The Plaintiffs therefore assert a cause of action under the FSIA's state-sponsor of terrorism exception to sovereign immunity, *see* 28 U.S.C. § 1605A(c), on their own behalf and on behalf of the thousands of Class Members injured by Iran's proxy campaign of EFP terrorism in Iraq.

## B. Iran's Deadly, Determined Efforts to Defeat U.S. Foreign Policy Interests by Targeting U.S. Military Personnel with EFP Attacks

Iran has a long history of conflict with the U.S. and Iraq. *See* PX-29 (Levitt Decl.) at ¶¶ 20-22, 25-30; PX-30 (Oates Decl.) at ¶¶ 11, 13, 15, 25, 30, 38, 71. Following the fall of Saddam Hussein's regime in 2003, Iran engaged in a multi-pronged strategy designed to extend its influence in Iraq, further the interests of Iraq's formerly oppressed Shi'a Muslim majority, and defeat U.S. foreign policy objectives in the region. *See* PX-31 (Casey Decl.) at ¶ 10-12; PX-30 (Oates Decl.) at ¶¶ 25, 30, 38, 71; PX-29 (Levitt Decl.) at ¶¶ 5, 22, 25-38, 119-72. In furtherance of those objectives, Iran worked closely with Shi'a militias that carried out a campaign of violence against civilians, Iraqi Defense Forces and American military personnel. *See* PX-31 (Casey Decl.) at ¶¶ 8-12, 15, 25-32; PX-30 (Oates Decl.) at ¶¶ 4, 11, 15, 22, 25-27, 29, 32, 45-59, 65-66, 69, 76, 78-82; PX-32 (Carl Decl.) at ¶¶ 19, 28-34; PX-36 (McDonnell

Decl.) at ¶¶ 15-19; PX-29 (Levitt Decl.) at ¶ 5, 119-72.  Frequently, the Shi'a militias worked closely with Iran's proxy, Hezbollah, which itself is a U.S. government-designated terrorist organization.  *See* PX-31 (Casey Decl.) at ¶¶ 8, 10, 25, 32; PX-30 (Oates Decl.) at ¶¶ 10-12, 29, 44-45, 50-52, 65-66, 68, 69, 76-77; PX-29 (Levitt Decl.) at ¶¶ 70-129.

This case concerns a particular form of violence that Iran targeted at American military personnel serving in Iraq as well as American allies—deadly, sophisticated EFP attacks that killed and injured victims primarily by piercing the shells of armored vehicles.  *See* PX-31 (Casey Decl.) at ¶¶ 10-11, 24-25, 32; PX-32 (Carl Decl.) at ¶¶ 18-30; PX-30 (Oates Decl.) at ¶¶ 26, 30, 32, 44-45, 49, 57, 66; PX-29 (Levitt Decl.) at ¶¶ 5, 153-71.  Overwhelming evidence common to the claims of all Class Members establishes Iran's connection to all of the Iranian EFP Attacks that injured Class Members and killed their decedents.  *See* PX-31 (Casey Decl.) at ¶¶ 11, 15, 25, 32; PX-32 (Carl Decl.) at ¶¶ 16-17, 19, 25, 28-34; PX-30 (Oates Decl.) at ¶¶ 13, 15-16, 32, 78-82; PX-36 (McDonnell Decl.) at ¶¶ 15-19; PX-29 (Levitt Decl.) at ¶¶ 5, 162.  Iran engaged in that pattern of violence to undermine the will of the American people to continue efforts to facilitate the development of a pro-Western Iraqi democracy.  *See* PX-31 (Casey Decl.) at ¶ 15; PX-30 (Oates Decl.) at ¶ 30; PX-29 (Levitt Decl.) at ¶ 28.

The evidence that supports Class Members' claims largely arises from the U.S. government's extensive efforts to determine the provenance and characteristics of the EFPs that killed and injured American military personnel in Iraq.  *See* PX-31 (Casey Decl.) at ¶¶ 8-12, 14-15, 17, 22-26; PX-32 (Carl Decl.) at ¶¶ 3-11, 16, 25, 29-34; PX-30 (Oates Decl.) at ¶¶ 29-32, 78-82; PX-36 (McDonnell Decl.) at ¶¶ 15-19; PX-37 (Mallak Decl.) at ¶¶ 4-5, 10, 18-20, 22-23, 31-32.  EFP Attacks in Iraq gravely concerned American military and civilian leaders during the Class Period because those attacks proved far more lethal than conventional IED attacks, in large part because the EFPs (unlike typical IEDs) could pierce even the enhanced armor of U.S.

military vehicles.  *See* PX-31 (Casey Decl.) at ¶¶ 10-11, 22, 25, 32; PX-32 (Carl Decl.) at ¶¶ 19, 23-24, 31-34; PX-30 (Oates Decl.) at ¶¶ 26, 30, 32, 44-45, 49, 57, 66; PX-29 (Levitt Decl.) at ¶¶ 154-56; PX-37 (Mallak Decl.) at ¶¶ 10, 22-23.  As a result, the military and the Federal Bureau of Investigation's ("FBI") Terrorist Explosive Device Analytical Center ("TEDAC") worked closely to determine the signature elements of EFP attacks and the sources of those deadly devices.  *See* PX-32 (Carl Decl.) at ¶¶ 3-11, 16, 29-30, 33-34; PX-30 (Oates Decl.) at ¶¶ 29-32; PX-37 (Mallak Decl.) at ¶¶ 5, 10, 18, 22-23.  The U.S. Department of Defense ("DOD") advanced those efforts in February 2006 by creating the Joint Improvised Explosive Device Defeat Organization ("JIEDDO") (later known as "JITDO" and now known as "JIDO") to lead, advocate, and coordinate the DOD's efforts to defeat IEDs as weapons of strategic influence.  *See* PX-32 (Carl Decl.) at ¶¶ 4-6; PX-30 (Oates Decl.) at ¶¶ 5, 16-17, 29-32.

Given the life and death consequences of that task, the military and government devoted extensive financial and technical resources towards investigating IED attacks in Iraq, including the Iranian EFP Attacks.  To the extent that personnel could safely access IED attack sites, targeted vehicles, and other relevant evidence collected in the field and elsewhere, JIDO and TEDAC worked cohesively to fully analyze *every* IED attack that targeted U.S. and coalition forces in Iraq.  *See* PX-32 (Carl Decl.) at ¶¶ 4, 9-11, 29-30; PX-30 (Oates Decl.) at ¶¶ 5, 16, 29-32; PX-36 (McDonnell Decl.) at ¶ 10; PX-37 (Mallak Decl.) at ¶¶ 4, 10, 18-19.  The investigative efforts also included examining unexploded IEDs and the sites where government personnel located those weapons.  *See* PX-32 (Carl Decl.) at ¶¶ 9-10, 30; PX-30 (Oates Decl.) at ¶¶ 32, 58.

In particular, TEDAC, JIDO and other military personnel undertook exhaustive measures to determine which IED attacks in Iraq involved EFPs, the mechanics and tell-tale signs of those attacks, and the source of the EFP devices.  *See* PX-31 (Casey Decl.) at ¶¶ 11, 15, 25, 32; PX-32

(Carl Decl.) at ¶¶ 7-11, 16, 19-20, 23, 25; PX-30 (Oates Decl.) at ¶¶ 26, 30-32, 78-82; PX-37

(Mallak Decl.) at ¶¶ 5, 10, 18-19, 22-23, 31-32.  Those government investigative efforts

produced actionable intelligence regarding the groups involved in planning and carrying out the

Iranian EFP Attacks and for countering those entities, including terrorist organizations.  *See* PX-

31 (Casey Decl.) at ¶¶ 10-12, 15, 22-25, 32; PX-32 (Carl Decl.) at ¶¶ 7, 11, 16, 29-34; PX-30

(Oates Decl.) at ¶¶ 29-32, 44-82; PX-36 (McDonnell Decl.) at ¶ 4.

These investigative efforts—much of which was conducted at the direction of Plaintiffs'

testifying experts—provide an extensive evidentiary record common to the claims of all Class

Members.  The common evidence, which would be admissible at the trials of *all* Class Members,

shows that the lethality and mechanics of EFP attacks differentiate them from other explosives

attacks that terrorists conducted in Iraq during the Class Period.  *See* PX-31 (Casey Decl.) at

¶¶ 22, 24-25; PX-30 (Oates Decl.) at ¶¶ 26, 30, 32, 44-45, 49, 57, 66; PX-32 (Carl Decl.) at

¶¶ 20-23, 29-30; PX-37 (Mallak Decl.) at ¶¶ 10, 18, 22-23, 31-32.[2]  In particular, JIDO and

---

[2] To say the least, Plaintiffs' experts include some of the foremost authorities regarding Iranian terrorism and EFP attacks.  General George Casey served as Commander of the Multi-National Force in Iraq from July 1, 2004 through February 10, 2007 and the Chief of Staff of the U.S. Army and a Member of the U.S. Joint Chiefs of Staff from April 10, 2007 through April 10, 2011.  *See* PX-31 (Casey Decl.) at ¶ 2.  In those capacities, General Casey was responsible for determining policy regarding the U.S. investigation of, and response to, Iranian EFP Attacks and was privy to all U.S. intelligence regarding those attacks.  *See id.* at ¶¶ 4-5, 8-9.  General Michael Oates served as the Director of JIDO from December 2009 through April 2011.  *See* PX-30 (Oates Decl.) at ¶¶ 3, 5.  In that role, he was responsible for leading JIDO's investigation of all Iranian EFP Attacks.  *See id.* at ¶¶ 5, 29-30.  Greg Carl served as the Director of TEDAC from November 2012 through January 2017, the Chief of TEDAC's Explosives Unit from July 2003 through November 2012, and the Acting Deputy Director and then Acting Director of TEDAC from July 2006 through August 2007.  *See* PX-32 (Carl Decl.) at ¶ 1.  In those roles, Mr. Carl was responsible for guiding TEDAC's investigation of many of the Iranian EFP Attacks upon U.S. personnel in Iraq.  *See id.* at ¶ 11.  Dr. Matthew Levitt has been qualified by numerous courts as an expert regarding Middle Eastern terrorist groups and Iranian support for terrorist attacks and terrorist organizations.  *See* PX-29 (Levitt Decl.) at ¶ 19.  He is a foremost expert regarding Iran's efforts to undermine U.S. foreign policy objectives in Iraq through the use of EFPs and otherwise.  *See id.* at ¶¶ 6-18.

TEDAC analyses show that only EFPs could penetrate the enhanced armor of U.S. military vehicles.  *See* PX-31 (Casey Decl.) at ¶ 22; PX-30 (Oates Decl.) at ¶¶ 26, 30, 32, 44-45, 49, 57, 66; PX-32 (Carl Decl.) at ¶¶ 19, 20, 23, 25, 27, 30.  Moreover, EFPs produce characteristic explosions, patterns of destruction and injuries that allowed TEDAC, JIDO and other military investigators and medical personnel to identify the attacks in which Shi'a militias employed Iranian EFPs, rather than conventional IEDs.  *See* PX-30 (Oates Decl.) at ¶¶ 26, 30-32, 78-82; PX-32 (Carl Decl.) at ¶ 23; PX-37 (Mallak Decl.) at ¶¶ 10, 18-19, 22-23, 31-32; PX-25 (Wasit Report) at 007-008, 014; PX-22 (photo of hole created by EFP copper slug, top view); PX-23 (photo of hole created by EFP copper slug, side view).

Relying upon that complex, technical evidence, government investigators and medical personnel could and did determine which Class Period IED attacks involved EFPs.  *See* PX-32 (Carl Decl.) at ¶¶ 16-17, 23, 25, 28-34; PX-37 (Mallak Decl.) at ¶¶ 10, 18-23, 31-32; PX-25 (Wasit Report) at 002-003, 009; PX-20 (11/30/2007 JIDO Report) at 00028-00029.  One JIDO summary of investigative findings, the 11/30/2007 JIDO Report, identifies 299 EFP Attacks that killed or injured 806 U.S. military personnel, government contractors, or other U.S. citizens between December 1, 2006, and November 25, 2007.  *See* PX-32 (Carl Decl.) at ¶¶ 33-34; PX-20 (11/30/2007 JIDO Report) at 00029.  Another, more comprehensive, U.S. government summary of investigative efforts identifies 1534 detonations of EFPs in Iraq that took place between 2005 and 2011 that injured 861 Class Members and killed 196 more.  *See* PX-36 (McDonnell Decl.) at ¶¶ 15-19 (citing PX-44) (CENTCOM EFP statistics Iraq 2005-2001).

Other official U.S. government records—including AR 15-6 reports that the military compiled regarding most EFP Attacks (each an "AR 15-6") and the military medical records concerning the victims of those attacks—likewise evidence individuals' membership in the Class.  *See* PX-30 (Oates Decl.) at ¶¶ 83-104; PX-32 (Carl Decl.) at ¶¶ 35-39, 41-44, 46, 52-53;

PX-36 (McDonnell Decl.) at ¶¶ 13, 19; PX-31 (Casey Decl.) at ¶ 33; PX-13 (Tiffner AR 15-6

report); PX-21 (Burks AR 15-6 report); PX-38 (Hochstetler AR 15-6 report).[3]  Plaintiffs can rely

upon all of these government investigative findings to identify the members of the Class, *i.e.,* the

individuals whose injuries arise from Iranian-sponsored EFP Attacks.

Class Members can also rely upon an extensive body of U.S. government investigative

findings and other evidence common to all of their claims to demonstrate that Iran played an

essential causative role in every successful EFP Attack in Iraq during the Class Period.  *See* PX-

31 (Casey Decl.) at ¶¶ 11, 15, 25, 32; PX-30 (Oates Decl.) at ¶¶ 13, 15-16, 32, 78-82; PX-32

(Carl Decl.) at ¶¶ 15-18, 25, 28-34; PX-36 (McDonnell Decl.) at ¶¶ 13, 16-19; PX-29 (Levitt

Decl.) at ¶¶ 160-71; PX-25 (Wasit Report) at 002-003, 007-008, 014; PX-20 (11/30/2007 JIDO

Report) at 00004-00005, 00028-00029); PX-47 (Qais al-Khazali Interrogation Report 11) at 099;

PX-34 (Qais al-Khazali Interrogation Report 18 (Mar. 30, 2007)) at 137.[4]  For example, in the

absence of class certification, every Class Member could introduce testimony at trial from four

experts proffered by Plaintiffs who rely heavily upon the government investigation findings as

support for their opinions that:  *all* effective EFPs used against Class Members in Iraq during the

Class Period originated in Iran or used Iranian components; the Shi'a militias and other terrorist

groups operating in Iraq during the Class Period could not have acquired, built or deployed

---

[3] In some cases, military investigators could not produce AR 15-6 Reports concerning attacks
that injured military personnel because the investigators could not safely access the sites of those
attacks.  *See* PX-36 (McDonnell Decl.) at ¶ 10.  For that reason, the attack that injured Sergeant
First Class Nantz was not memorialized in an AR 15-6 Report.  *See id.*  Other official
government records, including Sergeant First Class Nantz's military medical records, evidence
that he was injured by an EFP and, as a result, is a Class Member.  *See* PX-36 (McDonnell Decl.)
at ¶¶ 9; PX-43 (Nantz Decl.) at ¶¶ 2-3; PX-32 (Carl Decl.) at ¶¶ 52-53.

[4] Other Courts in this District have already concluded that Iran played an indispensable role in
the manufacture, distribution and deployment of EFPs in Iraq.  *See* Pl. Motion for Entry of a
Default Judgment at 2-5, 13-21 (discussing authorities in depth).

successful EFPs without the material support of Iran or its proxy, Hezbollah, because EFPs required sophisticated machinery that Shi'a militias lacked as well as precision manufacturing knowledge and skill that those terrorists could not have duplicated without Iranian training; and the Shi'a militias used explosives tactics, techniques and procedures that originated with Iran in carrying out the EFP Attacks against Class Members. *See* PX-31 (Casey Decl.) at ¶¶ 11, 15, 25, 32; PX-30 (Oates Decl.) at ¶¶ 13, 15-16, 29, 32, 49, 51, 78-82; PX-32 (Carl Decl.) at ¶¶ 16-19, 23, 25, 28-34; PX-29 (Levitt Decl.) at ¶¶ 5, 70-172.  This evidence would establish the claims of all absent Class Members. *See Pennington v. Islamic Republic of Iran*, 2021 WL 2592910, at *2 (D.D.C. June 24, 2021) (using general proof of Iranian support for EFPs to find liability for individual attacks).

The evidence supportive of the conclusions those experts reached include the results of investigations undertaken by Joint Task Force Troy, a multinational task force responsible for analyzing evidence retrieved by explosive ordnance disposal teams in Iraq. *See* PX-32 (Carl Decl.) at ¶ 25.  The Joint Task Force examined EFPs used against U.S. and Coalition forces and concluded that "'the forensic teams can categorically state that the weapons are from Iran.'"  PX-32 (Carl Decl.) at ¶ 25.  Similarly, the 11/30/2007 JIDO Report emphasizes that Shi'a militias relied upon Iran's Islamic Revolutionary Guard Corps for EFPs, financing, and technological guidance.  *See* PX-32 (Carl Decl.) at ¶ 34; PX-20 (11/30/2007 JIDO Report) at 00028.

Historical evidence equally supportive of the claims of all Class Members lends credence to the conclusions that Plaintiffs' experts have reached concerning Iran's responsibility for the EFP Attacks.  For example, General Oates and Dr. Levitt could testify at the trial of every Class Member that Iran has long sponsored terrorist groups and utilized acts of terrorism to advance Iran's state interests.  In furtherance of those malign objectives, Iran frequently deployed and used its proxy, Hezbollah, and built alliances with Shi'a militias operating in Iraq in order to

influence Iraqi politics. *See* PX-30 (Oates Decl.) at ¶¶ 10-12, 44-45, 50-52, 65-66, 68, 69, 76-77; PX-29 (Levitt Decl.) at ¶¶ 5, 70-172. The same experts could also testify at each Class Member's trial that Iran has long maintained operations to smuggle weapons to the Shi'a militias across the Iranian-Iraqi border. *See* PX-30 (Oates Decl.) at ¶¶ 12, 20, 40 n.12, 46, 51-52, 69, 78; PX-29 (Levitt Decl.) at ¶¶ 88, 90, 154, 162, 170. Moreover, Iran has long employed similar smuggling tactics to ship EFPs and EFP components to its proxy, Hezbollah, for use against Israeli military forces. *See* PX-31 (Casey Decl.) at ¶¶ 12, 26, 32; PX-32 (Carl Decl.) at ¶ 31.

That historical evidence underpins the testimony of Plaintiffs' experts, which is again supported by documents summarizing the results of extensive U.S. government investigations, that Iran smuggled EFPs and EFP component parts from Iran to the Shi'a militias in Iraq. *See* PX-30 (Oates Decl.) at ¶¶ 12, 20, 32, 46, 51-52, 78, 91; PX-29 (Levitt Decl.) at ¶ 5. That conclusion is bolstered by the fact that—despite numerous raids on Shi'a militia groups in Iraq that produced the recovery of thousands of EFPs—the U.S. military never recovered any equipment in Iraq capable of manufacturing a successful EFP. *See* PX-32 (Carl Decl.) at ¶ 30. Again, *all* of that evidence is equally probative of the claims of all Class Members.

### C. The Plaintiffs and Their Catastrophic Injuries

The Plaintiffs include: the fathers and personal representatives of Second Lieutenant Peter Burks (Alan Burks) and Captain Benjamin David Tiffner (Timothy Tiffner); and Captain James David Hochstetler and Sergeant First Class Randolph Delbert Nantz.[5] Second Lieutenant Burks, Captain Tiffner, Captain Hochstetler and Sergeant Nantz (collectively, the "Direct Victims") were members of the U.S. Army serving in Iraq at the time Iran targeted them with

---

[5] *See* PX-40 (A. Burks Decl.) at ¶ 1; PX-41 (T. Tiffner Decl.) at ¶ 1; PX-42 (J. Hochstetler Decl.) at ¶ 1; PX-43 (Nantz Decl.) at ¶ 1.

EFPs.  *See* PX-30 (Oates Decl.) at ¶¶ 86-104; PX-36 (McDonnell Decl.) at ¶¶ 5-14; PX-37 (Mallak Decl.) at ¶¶ 9, 11-15, 24-30.[6]

Second Lieutenant Peter Burks was killed in an Iran-sponsored EFP Attack in Baghdad, Iraq on November 14, 2007.  *See* PX-40 (A. Burks Decl.) at ¶ 2; PX-32 (Carl Decl.) at ¶¶ 40-45; PX-30 (Oates Decl.) at ¶¶ 90-96; PX-37 (Mallak Decl.) at ¶ 24.  The Iran-sponsored EFP Attack that killed Captain Tiffner occurred in Baghdad, Iraq on November 7, 2007.  *See* PX-41 (T. Tiffner Decl.) at ¶ 2; PX-32 (Carl Decl.) at ¶¶ 46-49; PX-30 (Oates Decl.) at ¶¶ 97-100; PX-37 (Mallak Decl.) at ¶ 25-26.

On August 23, 2007, at least three Iranian EFPs penetrated the vehicle in which Retired Special Forces Major Hochstetler was traveling in Al Azizyah, Iraq.  *See* PX-32 (Carl Decl.) at ¶¶ 35-39; PX-42 (J. Hochstetler Decl.) at ¶ 2; PX-30 (Oates Decl.) at ¶¶ 86-89; PX-37 (Mallak Decl.) at ¶ 29.  Major Hochstetler (then a Captain) suffered a traumatic brain injury, a severed nose, and permanent injuries to the left side of his face, his left eye, and his right hand and forearm.  *See* PX-42 (J. Hochstetler Decl.) at ¶ 2; PX-37 (Mallak Decl.) at ¶ 29.

Retired Special Forces Sergeant First Class Nantz suffered severe injuries as a result of an Iran-sponsored EFP Attack in Baghdad, Iraq on December 22, 2006.  *See* PX-32 (Carl Decl.) at ¶¶ 50-53; PX-30 (Oates Decl.) at ¶¶ 101-04; PX-43 (Nantz Decl.) at ¶¶ 2-3; PX-37 (Mallak Decl.) at ¶¶ 27-28.  Sergeant First Class Nantz's injuries included severe nerve damage, burns on roughly one-quarter of his body, and the amputation of his left leg below the knee.  *See* PX-43 (Nantz Decl.) at ¶¶ 2-3; PX-37 (Mallak Decl.) at ¶¶ 27-28.

As the FSIA's terrorism exception contemplates, the Plaintiffs also include the following immediate family members of the Direct Victims (collectively, the "Family Member Plaintiffs"):

---

[6] *See also* PX-40 (A. Burks Decl.) at ¶ 2; PX-41 (T. Tiffner Decl.) at ¶ 2; PX-42 (J. Hochstetler Decl.) at ¶ 2; PX-43 (Nantz Decl.) at ¶ 2.

Alison Burks Ruiz, Sarah Denmark Denson, Zachary Burks, and Jackie Merck Hlastan (immediate family members of Second Lieutenant Burks); Judith Tiffner, Joshua Tiffner, Seth Tiffner, and Sarah Crosby (immediate family members of Captain Tiffner); Leanne Lizabeth Hochstetler (individually and as the parent and guardian of her minor children), James Hochstetler, Jr. and Kyle Austin Marshall (immediate family members of Captain Hochstetler).[7]

**D. The Proposed Class and Its Representatives**

Plaintiffs bring this action in their personal capacities and as representatives of the Class, which consists of all U.S. service members, military contractors and American civilians injured by EFP Attacks in Iraq during the Class Period, the personal representatives of individuals killed in EFP Attacks, and the immediate family members of the foregoing individuals. The Class excludes, however, all individuals who have retained counsel other than the Class Counsel to pursue claims against Iran related to injuries that they sustained in Iraq. The contours of the Class follow the scope of the cause of action that Congress has provided to the victims of state-sponsored terrorism. *See* 28 U.S.C. § 1605A(c).

Plaintiffs propose that each of the adult named Plaintiffs serve as a representative of the Class.[8] All of the Plaintiffs have also explained that they eagerly serve as representatives of the

---

[7] *See* PX-40 (A. Burks Decl.) at ¶ 1; PX-40 (Z. Burks Decl.) at ¶ 1; PX-40 (Hlastan Decl.) at ¶ 1; PX-40 (McRuiz Decl.) at ¶ 4; PX-40 (Phillips Decl.) at ¶ 1; PX-41 (T. Tiffner Decl.) at ¶ 1; PX-41 (Judith Tiffner Decl.) at ¶ 1; PX-41 (Crosby Decl.) at ¶ 1: PX-41 (Joshua Tiffner Decl.) at ¶ 1; PX-41 (S. Tiffner Decl.) at ¶ 1; PX-42 (L. Hochstetler Decl.) at ¶ 1; PX-42 (J. Hochstetler, Jr. Decl.) at ¶ 1; PX-42 (Marshall Decl.) at ¶ 1.

[8] *See* PX-40 (A. Burks Decl.) at ¶ 4; PX-40 (Z. Burks Decl.) at ¶ 4; PX-40 (Hlastan Decl.) at ¶ 4; PX-40 (McRuiz Decl.) at ¶ 4; PX-40 (Phillips Decl.) at ¶ 4; PX-41 (T. Tiffner Decl.) at ¶ 4; PX-41 (Judith Tiffner Decl.) at ¶ 4; PX-41 (Crosby Decl.) at ¶ 4: PX-41 (Joshua Tiffner Decl.) at ¶ 4; PX-41 (S. Tiffner Decl.) at ¶ 4; PX-42 (J. Hochstetler Decl.) at ¶¶ 5-6; PX-42 (L. Hochstetler Decl.) at ¶ 5; PX-42 (J. Hochstetler, Jr. Decl.) at ¶ 5; PX-42 (Marshall Decl.) at ¶ 5; PX-43 (Nantz Decl.) at ¶¶ 5-6.

Class because they recognize the grave damage that Iran has caused to military personnel and their family members and wish to deter future Iranian support for terrorism.[9]

The proposed counsel for the Class, the Perles Law Firm, P.C. and Fleischman Bonner & Rocco LLP, are also well qualified to represent Class Members.  The Perles Firm has regularly prosecuted groundbreaking cases on behalf of the victims of terrorism under the FSIA and the Anti-Terrorism Act, as well as the common law, including many of the most successful actions brought on behalf of terrorism-related plaintiffs.  *See* PX-46 (Perles Decl.) at ¶¶ 2-12.  Fleischman Bonner & Rocco LLP has worked side-by-side with the Perles Firm in some of its most successful terrorism-related litigations and has a long history of representing classes in a variety of high-stakes litigation.  *See* PX-50 (Bonner Decl.) at ¶¶ 3, 6.

## ARGUMENT

## I.

### STANDARDS ON A MOTION FOR CLASS CERTIFICATION

#### A.  The Applicable Burden and Standards of Proof

The Court "'exercises broad discretion in deciding whether to permit a case to proceed as a class action.'"  *In re McCormick & Co.*, 422 F. Supp. 3d 194, 223-24 (D.D.C. July 10, 2019) (quoting *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994)); *accord, e.g., In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014) ("in general, a district court has a good deal of discretion" with respect to whether to certify a case as a class action).  "Plaintiffs must generally show that they have met the requirements of Rule 23 by a preponderance of the evidence."  *Hoyte v. District of Columbia*, 325 F.R.D. 485, 492 (D.D.C. 2017) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011)).

---

[9] *See* note 8, *supra.*

### B. The Four Foundational Rule 23(a) Requirements

Every class must satisfy Rule 23(a)'s four fundamental requirements: (1) numerosity – the class members must be so numerous that joinder of all members is impractical; (2) commonality – class members' claims must present common questions of law or fact; (3) typicality – the plaintiffs' claims must be typical of the claims of the absent class members; and (4) adequacy – the plaintiffs and proposed class counsel must demonstrate their ability to fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); *see, e.g., Wal-Mart*, 564 U.S. at 349 ("Rule 23(a)'s four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.") (internal quotations and citations omitted); *In re Rail Freight Fuel Surcharge Antitrust Litig. - Mdl No. 1869*, 725 F.3d 244, 249 (D.C. Cir. 2013) ("First, the proposed class must satisfy all four 'prerequisites' to certification: numerosity, commonality, typicality, and adequate representation.").

### C. The Rule 23(b)(3) Certification Requirements

Class representatives must also demonstrate entitlement to class certification under one of Rule 23(b)'s three subsections.  *Brown v. District of Columbia*, 928 F.3d 1070, 1079 (D.C. Cir. 2019).  Here, Plaintiffs seek certification under Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); *see, e.g., Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) ("To obtain certification of a class action for money damages under Rule 23(b)(3), a plaintiff must satisfy Rule 23(a)'s above-mentioned prerequisites of numerosity, commonality, typicality, and adequacy of representation, … and must also establish that 'the questions of law or fact common to class members predominate over any questions

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'").

## II.

### THE CLASS SATISFIES EACH OF RULE 23(A)'S FUNDAMENTAL CLASS CERTIFICATION REQUIREMENTS

#### A. The Class Is So Numerous That Joinder of All Members Is Impractical

A class satisfies Rule 23(a)(1)'s "numerosity" requirement where "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). "As a rule of thumb, a class of over 40 members satisfies the numerosity requirement." *McCormick*, 422 F. Supp. 3d at 235; *accord, e.g., Abraha v. Colonial Parking, Inc.*, 2020 U.S. Dist. LEXIS 136538, at *11 (D.D.C. July 31, 2020). In analyzing numerosity, courts also consider whether class members are geographically dispersed. *See, e.g., Encinas v. J.J. Drywall Corp.*, 265 F.R.D. 3, 8 (D.D.C. 2010) ("[e]ven though both sub-classes fall short of forty confirmed members, the plaintiffs still have satisfied their required showing of numerosity" because the sub-classes numbered at least 20, evidence suggested larger number of class members existed, and those class members were geographically dispersed over "hundreds of miles"); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 259 (D.D.C. 2002) ("courts often take the geographical location of the proposed class members into consideration").

To find numerosity satisfied, the Court need not determine the exact number of class members. Rather, "'[t]he numerosity requirement can be satisfied so long as there is a reasonable basis for the estimate provided.'" *Hoyte*, 325 F.R.D. at 490 (quoting *Feinman v. FBI*, 269 F.R.D. 44, 49 (D.D.C. 2010)); *see also, e.g., Pigford v. Glickman,* 182 F.R.D. 341, 347 (D.D.C. 1998) ("Mere conjecture, without more, is insufficient to establish numerosity, but

plaintiffs do not have to provide an exact number of putative class members in order to satisfy the numerosity requirement.").

Here, the U.S. government investigative reports concerning the EFP Attacks demonstrate that the Class includes no fewer than 1057 military personnel, military contractors and other U.S. citizens killed or injured in those attacks.  PX-44 (CENTCOM EFP Stats) at 6; PX-36 (McDonnell Decl.) at ¶¶ 16-19.  Those totals suggest that thousands of additional immediate family members (spouses, parents, children, and siblings) possess claims under Section 1605A. *See, e.g.*, *Blank v. Islamic Republic of Iran*, 2021 U.S. Dist. LEXIS 133262, at *24 (D.D.C. July 17, 2021) (parents, siblings, spouses, and children can assert solatium claims under the FSIA); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) (same).  This evidence thus provides a reasonable basis for the Court to conclude that the Class easily satisfies the numerosity requirement.

Notably, Rule 23(a) does not require that the proposed Class be "ascertainable" in the sense that Plaintiffs currently know the Class Members' identities.  Indeed, the D.C. Circuit has never grafted any sort of implied "ascertainability" requirement onto Rule 23.  *E.g., J.D. v. Azar*, 925 F.3d 1291, 1320 (D.C. Cir. 2019) (the D.C. Circuit "has not addressed whether Rule 23 contains an ascertainability requirement for class certification"); *McCormick*, 422 F. Supp. 3d at 241 (quoting *Azar*); *O.A. v. Trump*, 404 F. Supp. 3d 109, 159 (D.D.C. 2019) ("It is 'far from clear . . . that there exists in this district a requirement that a class certified under Rule 23(b)(2) must demonstrate ascertainability to merit certification.'") (quoting *Ramirez v. U.S. Immig. & Customs Enf't*, 338 F. Supp. 3d 1, 48 (D.D.C. 2018)).

As this Court has noted, "some courts have imposed an 'implied' fifth requirement that the class be adequately defined and clearly ascertainable," *i.e.,* that "plaintiffs … 'be able to establish that the general outlines of the membership of the class are determinable at the outset of

the litigation.'" *Hoyte*, 325 F.R.D. at 489 and n.3 (quoting *Thorpe v. District of Columbia*, 303 F.R.D. 120, 139 (D.D.C. 2013)).  *Hoyte* further recognized that the ascertainability requirement has been "disavowed by four federal appellate courts."  *Id.* at 489 n.3.

Even assuming that the proposed Class must be "ascertainable," courts in this District have recognized that this implied requirement "'is not designed to be … particularly stringent.'" *O.A. v. Trump*, 404 F. Supp. 3d at 160 (citation omitted).  Any implied ascertainability requirement is satisfied where the proposed class is "defined by clear and objective criteria."  *Id.*; *see also, e.g., McCormick*, 422 F. Supp. 3d at 241 ("'All courts essentially focus on the question of whether the class can be ascertained by objective criteria.'") (quoting 1 *Newberg on Class Actions* § 3:3 (5th ed., June 2019 Update)).

Three objective criteria define the scope and membership of this Class:

(1) The claims of all Class Members arise from injuries or deaths that the U.S. government has identified as resulting from EFP Attacks in Iraq.

(2) Those attacks took place between 2005 and 2011.

(3) At the time of the relevant EFP Attacks, the Class Members were U.S. nationals, members of the U.S. armed forces, U.S. government employees or contractors acting within the scope of their employment, or an immediate family member of one of those individuals.

Official U.S. government records admissible under Fed. R. Evid. 803(8) will provide the proof that Class Members satisfy the first two criteria.  *See, e.g., Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 163-70 (1988) (factual findings and related conclusions and opinions expressed in military report concerning plane accident were admissible under Fed. R. Evid. 803(8), which provides a hearsay exception for "factual findings from a legally authorized investigation" of "a public office").  For example, CENTCOM provided data regarding all known EFP attacks for which the DOD generated reports.  Those data, which are reflected in PX-44, contain grid

coordinates of each EFP attack in Iraq that the DOD recorded.  *See* PX-36 (McDonnell Decl.) at

¶¶ 16-17; *see also* PX-32 (Carl Decl.) at ¶¶ 31-35, 37-38, 41-44, 46, 52.

Thus, Plaintiffs can identify anyone killed or injured at those locations as a victim of an

EFP attack.  To the extent that those data do not identify some EFP victims, Plaintiffs and other

Class Members can establish membership in the Class by employing other official government

records, "such as medical treatment reports, autopsy reports, and U.S. Army AR 15-6

investigation reports."  PX-36 (McDonnell Decl.) at ¶ 19.  General Casey has also testified that,

using complementary capabilities of several medical and operational databases within the DOD,

the military can assist in identifying troops injured by EFPs in Iraq.  PX-31 (Casey Decl.) at ¶ 33.

Through the use of these records and other logical efforts to contact Class Members,

Plaintiffs and the government can provide notice to the Class and thereby alert the represented

parties of their rights and ability to pursue a judgment.  *See, e.g.,* Fed. R. Civ. P. 23(c)(2)(B)

(describing the notice requirements for classes certified pursuant to Rule 23(b)(3)); PX-39

(Lorraine Decl.) at ¶¶ 9-10.  Accordingly, the Class satisfies any implied ascertainability

requirement that Rule 23 imposes.  *See, e.g., Hinton v. District of Columbia*, 2021 U.S. Dist.

LEXIS 187719, at *40-41 (D.D.C. Sep. 30, 2021) (ascertainability satisfied with respect to class

consisting of individuals who, in the future, would become imprisoned and subject to allegedly

unlawful criteria regarding the housing of transgender inmates); *Hoyte*, 325 F.R.D. at 493 ("the

class is ascertainable because Plaintiffs have shown that [the Metropolitan Police Department]

has the names and addresses of the [class members]").

## B.  The Class Members' Claims Present Common Issues of Law and Fact

"'To establish commonality under Rule 23(a)(2), a plaintiff must identify at least one

question common to all members of the class.'"  *McKinney v. United States Postal Serv.*, 2013

U.S. Dist. LEXIS 6246, at *19 (D.D.C. Jan. 16, 2013) (quoting *Garcia v. Johanns*, 444 F.3d 625,

631 (D.C. Cir. 2006)).  That shared issue of fact or law satisfies the commonality requirement as long as it is "'of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Cobell v. Salazar*, 679 F.3d 909, 922 (D.C. Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350); *accord, e.g., Howard v. Liquidity Servs.*, 322 F.R.D. 103, 118 (D.D.C. 2017) ("'The touchstone of the commonality inquiry is 'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'") (quoting *Coleman v. District of Columbia*, 306 F.R.D. 68, 82 (D.D.C. 2015) (quoting in turn *Wal-Mart*, 564 U.S. at 350).  "Because the commonality requirement may be satisfied by a single common issue, courts have noted that it is 'often easily met.'"  *Taylor v. Dist. of Columbia Water & Sewer Auth.,* 241 F.R.D. 33, 37 (D.D.C. 2007) (quoting *Vitamins*, 209 F.R.D. at 259); *accord, e.g., Harris v. Koenig*, 271 F.R.D. 383, 389 (D.D.C. 2010).

Under this permissive standard, "'factual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members.'"  *Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 483 (D.D.C. 2019) (quoting *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003)); *accord, e.g., Azar*, 925 F.3d at 1299, 1321 (commonality satisfied in action challenging government "policy effectively barring any unaccompanied alien child in its custody from obtaining a pre-viability abortion" despite "certain factual variations among the class members—namely, their age, maturity, stage of pregnancy, mental health, length of sponsorship search, and ability to return to country of origin").  In particular, the fact that class members' damages require individual proof does not prevent a finding that a class satisfies the commonality requirement.  *See Alliota v. Gruenberg*, 237 F.R.D. 4, 11 (D.D.C. 2006) (certifying class consisting of roughly 99 former employees pursuing claims that the FDIC carried out a reduction in force in a discriminatory

manner although "the plaintiffs' claims and damages may be individualized in nature (as the defendant argues)"); *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 9 (D.D.C. 2002).

The Class satisfies the commonality requirement because Plaintiffs will establish Iran's liability to all Class Members by proving a single cause of action based upon the same essential facts regarding Iran and its course of conduct in Iraq. All Class Members are pursuing a single legal claim under 28 U.S.C. § 1605A, the FSIA's terrorism exception. As a result, they all must prove, among other common facts, that the U.S government had designated Iran as a state sponsor of terrorism before the relevant attacks occurred. *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

Moreover, Plaintiffs' evidence shows that all Class Members' claims arise from the same course of Iranian conduct designed to undermine the interests of the U.S. in Iraq by building and fashioning EFPs, distributing them to Shi'a militia members in Iraq, and training those terrorists in the use of those deadly devices. *See* pp. 6-7, 11-13, *supra.* Throughout the Class Period, Iran employed and directed the use of the powerful EFPs to kill and injure American military personnel, government contractors and other U.S. citizens in Iraq. *See* pp. 6-7, 9-13, *supra.* As Plaintiffs' expert testimony and the findings of extensive U.S. government investigations confirm, the EFP Attacks are distinct from those involving other explosive devices that injured American service members. *See* pp. 7-11, *supra.* Furthermore, only Iran possessed both the motive to target American military personnel with EFPs and the technological capability to manufacture and deploy those precision explosives. *See* pp. 5-6, 11-13, *supra.*

Thus, Plaintiffs tie all EFP Attacks directly to Iran by means of evidence common to the claims of all Class Members who were injured in attacks targeting American military personnel. The family members whose claims arise by virtue of their relationships with those service members can likewise rely upon the same proof to establish their claims and membership in the Class. *See* 28 U.S.C. § 1605A(c) (providing for solatium damages for the family members of

military personnel who possess claims under § 1605A).  As a result, the Class easily satisfies the permissive commonality requirement.[10]

The leading Supreme Court precedent finding a lack of commonality—*Wal-Mart*, 564 U.S. at 354—does not suggest that this Class fails that requirement.  The class in that employment sex discrimination action numbered more than 1.5 million.  *Id.* at 342.  No common proof existed to establish that *Wal-Mart* had discriminated against all class members because all of the millions of relevant promotion decisions presented different candidates, decision-makers and circumstances.  *Id.* at 352 ("Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*.") (emphasis in original).  Indeed, the flawed expert evidence the plaintiffs introduced in *Wal-Mart* provided no basis for concluding that the defendant had discriminated against any significant percentage of class members.  *Id.* at 354 (commonality and typicality were lacking because plaintiffs' expert could not specify "'whether 0.5 percent or 95 percent of the employment

---

[10] *See, e.g., Cobell,* 679 F.3d at 922 (commonality satisfied despite differences regarding class members' damages because their claims hinged upon common issues regarding the government's obligations to holders of trust accounts established for Native American land owners under federal statutes); *Howard,* 322 F.R.D. at 118 ("'Ultimately, '[w]hen the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.'") (quoting *Coleman,* 306 F.R.D. at 82) (quoting in turn *Newberg on Class Actions* § 3:20 (5th ed. 2014)); *McKinney,* 2013 U.S. Dist. LEXIS 6246, at *20 (commonality satisfied where "all of the potential class members' claims will hinge on a central legal question—whether the Postal Service is obligated to pay interest on additional benefits issued to beneficiaries under the Annuity Protection Program"); *Lindsay v. Gov't Employees Ins. Co.*, 251 F.R.D. 51, 55 (D.D.C. 2008) (commonality satisfied with respect to claims that defendant improperly classified class members as administrative employees to avoid paying overtime because "the most crucial issues (that is, the duties of GEICO adjusters, and the legality of GEICO's classification of adjusters as administrative employees in light of those duties) are common to every member of the proposed class").

decisions at Wal-Mart might be determined by stereotyped thinking'" although that issue was "the essential question on which respondents' theory of commonality depend[ed]").

The sprawling nature of the proposed class also resulted in class members in many instances serving as the Wal-Mart employees who allegedly made discriminatory employment decisions after advancing through the Wal-Mart ranks.  *Id.* at 343, 355-56.  Because none of those factors find any parallel here, where the claims of all Class Members rely upon completely common evidence regarding Iran's role in deploying EFPs in Iraq, *Wal-Mart* does not suggest that this Class fails the commonality test.

Two post-*Wal-Mart* decisions of the D.C. Circuit, *Brown v. District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019) and *DL v. District of Columbia (*"*DL II*"*)*, 860 F.3d 713 (D.C. Cir. 2017), underscore the distinctions between this action and *Wal-Mart*.  In *Brown*, the plaintiffs alleged that two federal statutes entitled the class to broad-ranging equitable relief related to placing people with physical disabilities in less restrictive settings than nursing home care and educating class members regarding their right to that relief.  928 F.3d at 1072-75.  The court explained that Supreme Court precedent required the government to transition physically disabled individuals from nursing homes to community-based care if the government could provide that service "with reasonable modifications to its policies and procedures."  *Id.* at 1073.

Despite the disparate needs of the class members and the varying costs necessary to transition those individuals to community living, the court held that the class satisfied *Wal-Mart*, which demands "common proof leading to a common *answer* to the common *question at the heart of each plaintiff's claim*."  *Id.* at 1080 (emphasis in original).  The court found that requirement satisfied with respect to each form of injunctive relief the class sought because all class members' claims presented common issues regarding:  whether the District maintained an adequate plan for transitioning disabled individuals to community living; the costs entailed in

implementing each of the four forms of injunctive relief the class sought; and whether it was "unreasonable to require the District to transfer its limited resources from other disabled individuals to pay that cost" with respect to each form of injunctive relief.  *See id.* at 1081-82.

The *Brown* court found support for its ruling in *DL II*, where the D.C. Circuit affirmed the certification of three sub-classes of parents seeking relief under the Individuals with Disabilities Act related to the District's alleged failure to provide certain special education services to three-to-five-year-olds.  *DL II,* 860 F.3d at 724-26.  As the *Brown* court emphasized, *DL II* held that, under *Wal-Mart*, each sub-class satisfied the commonality requirement because its claims were "organized around a common question" "which was subject to a common answer."  *Brown,* 928 F.3d at 1081; *see also id.* ("subclass four was organized around a common question—did the District fail to provide certain individuals a smooth and effective transition from early intervention to preschool?—which was subject to a common answer—yes—based on common proof—evidence showing that 30 per cent of toddlers were denied a smooth transition from early intervention to preschool").

The facts necessary to prove the class members' claims in *Brown* and *DL II* varied to a far greater extent than the evidence that Plaintiffs will cite to establish Iran's liability to all Class Members.  In both D.C. Circuit opinions, the classes included individuals pursuing claims requiring courts to make complex cost-benefit analyses regarding whether the government had to provide class members suffering from varied disabilities with disparate services.  *See Brown*, 928 F.3d at 1073-75; *DL II,* 860 F.3d at 717-20.  In contrast, uniform proof will demonstrate Iran's responsibility for all EFP Attacks in Iraq during the Class Period.  *See* pp. 6-7, 11-13, *supra. Brown* and *DL II* therefore support finding the commonality requirement satisfied here.

## C. Plaintiffs Satisfy the Typicality Requirement Because Their Claims Closely Parallel the Claims of Absent Class Members

Under Rule 23(a)(3), class representatives' claims must be "typical" of the claims of the absent class members. "A class representative's claim is typical if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member where his or her claims are based on the same legal theory." *Nat'l Veterans Legal Servs. Program v. United States*, 235 F. Supp. 3d 32, 40 (D.D.C. 2017) (citations and internal quotations omitted).[11]

"The typicality requirement is 'liberally construed.'" *McCormick*, 422 F. Supp. 3d at 237 (quoting *Vitamins*, 209 F.R.D. at 260). Accordingly, "[t]he facts and claims of each class member do not have to be identical," *Meijer, Inc. v. Warner Chilcott Holdings Co.*, 246 F.R.D. 293, 301 (D.D.C. 2007), and "factual variations between the claims of the plaintiffs" do not defeat typicality, *Bynum,* 214 F.R.D. at 35. *Accord, e.g., Howard*, 322 F.R.D. at 118 (the "facts and claims of each member of the class need not be identical" to satisfy the typicality requirement); *Encinas,* 265 F.R.D. at 9 ("A plaintiff's claims can be typical of those of the class even if there is some factual variation between them.").

Rather than complete identity, "the typicality requirement calls for 'sufficient factual and legal similarity between the class representative's claims and those of the class to ensure that the representative's interests are in fact aligned with those of the absent class members.'" *Howard*, 322 F.R.D. at 119 (quoting *In re Navy Chaplaincy*, 306 F.R.D. 33, 53 (D.D.C. 2014) (quoting in

---

[11] *Accord, e.g., Azar*, 925 F.3d at 1322 (typicality is satisfied "'if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory'") (quoting 7A Wright et al., *Federal Practice and Procedure* § 1764); *McKinney*, 2013 U.S. Dist. LEXIS 6246, at *20-21 ("A proposed class representative's claim is 'typical if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member's where his or her claims are based on the same legal theory.'") (quoting *Stewart v. Rubin*, 948 F. Supp. 1077, 1088 (D.D.C. 1996), *aff'd,* 124 F.3d 1309 (D.C. Cir. 1997)).

turn William B. Rubenstein, *Newberg on Class Actions* § 3:31 (5th ed. 2013)).  Thus, differences

regarding the Class Members' damages are "'of little consequence to the typicality determination

when the common issue of liability is shared.'"  *In re Lorazepam & Clorazepate Antitrust Litig.*,

202 F.R.D. 12, 28 (D.D.C. 2001) (citation omitted); *see also Vitamins,* 209 F.R.D. at 261

(variances regarding the facts necessary to prove damages do not defeat typicality).

Plaintiffs' claims satisfy the typicality requirement because their causes of action arise

from the same facts and legal theories as the claims of all other Class Members.  All Class

Members assert the same single claim under 28 U.S.C. § 1605A(c) based upon Iran's conduct in

targeting American service members with EFP Attacks.  The Plaintiffs will prove their own

claims by introducing the same fact and expert testimony that links Iran to every EFP Attack that

forms the basis for the claims of absent Class Members.  *See* pp. 4-6, 11-13, *supra.*  Furthermore,

Plaintiffs, like all other Class Members, will establish that EFPs (not another type of explosive

device) caused their injuries by introducing the same fact and expert evidence that demonstrates

Iran's culpability for all of the EFP Attacks.  *See* pp. 5-6, 11-13, *supra.*

In light of these facts, Plaintiffs can prove all Class Members' claims with the same

evidence necessary to establish Iran's liability for the injuries that Plaintiffs suffered.  Plaintiffs'

claims therefore easily satisfy the typicality requirement.[12]

---

[12] *See, e.g., Azar*, 925 F.3d at 1321-22 (typicality satisfied in action challenging government
restrictions on abortions for alien minors in government custody because, despite the factual
differences among class members, including "their age, maturity, stage of pregnancy, mental
health, length of sponsorship search, and ability to return to country of origin," the plaintiffs
"allege they are subject to the same policy that operates against every pregnant minor to deprive
her of her constitutionally protected right"); *Abraha*, 2020 U.S. Dist. LEXIS 136538, at *14
(finding typicality satisfied in ERISA action involving the allegedly improper payment of fees to
a benefit administrator and the alleged failure to credit certain assets to the accounts of plan
participants although "each class member may claim a varying amount of damages due to
variations in the number of hours worked at the relevant facility" because "'demonstrating
typicality does not mean showing that there are no factual variations between the claims of the

**D. Plaintiffs and Their Counsel Satisfy the Rule 23 Adequacy Requirement**

Plaintiffs and their counsel also qualify as adequate under Rule 23(a)(4), which requires

that "the representative parties … fairly and adequately protect the interests of the class."

"Adequacy embraces two components: the class representative (i) 'must not have antagonistic or

conflicting interests with the unnamed members of the class' and (ii) 'must appear able to

vigorously prosecute the interests of the class through qualified counsel.'" *Azar*, 925 F.3d at

1312 (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997));

*accord, e.g., Abraha*, 2020 U.S. Dist. LEXIS 136538, at *15.

Plaintiffs satisfy the adequacy requirement because they and the absent Class Members

were injured by the same Iranian misconduct—engaging in a vast international conspiracy and

smuggling operation designed to target American personnel in Iraq with EFPs. *See* pp. 4-6, 11-

13, *supra*. By proving their own claims, Plaintiffs will likewise demonstrate Iran's responsibility

for all of the EFP Attacks that occurred in Iraq during the Class Period. *See* pp. pp. 4-6, 11-15,

*supra*. Thus, Plaintiffs' interests are entirely coextensive with those of the absent Class

Members.

Plaintiffs have also demonstrated their willingness and ability to pursue the interests of

all Class Members aggressively. The Plaintiffs who served in the U.S. military in Iraq (Captain

James Hochstetler and Sergeant Nantz) know first-hand the extent of the damage Iran caused to

the Plaintiffs' fellow servicemen. *See* PX-42 (Hochstetler Decl.) at ¶ 2; PX-43 (Nantz Decl.) at

¶¶ 2-3. The Family Member Plaintiffs have likewise experienced and witnessed the horrific

impact of Iran's illicit conduct upon themselves and their loved ones. As a result, all Plaintiffs

---

plaintiffs'") (quoting *Bynum*, 214 F.R.D. at 35); *Nat'l Veterans*, 235 F. Supp. 3d at 40-41
(representative's claims satisfied typicality requirement where all class members asserted that
PACER charges violated a statute limiting those charges to the amount necessary to reimburse
the cost of providing the service).

share a determination to force Iran to answer for its past misconduct and to deter further Iranian support for terrorist attacks against American service members.[13]  The Plaintiffs therefore have agreed to serve as class representatives and have supervised the progress of this litigation by conferring with Class Counsel and the Class's experts and by providing counsel with the information necessary to prepare the Complaint, this motion, and Plaintiffs' application to have the Court enter judgment against Iran in favor of all members of the Class.[14]

The proposed Class Counsel also possess the motivation and resources necessary to adequately represent the Class.  *See, e.g., Howard*, 322 F.R.D. at 135 ("Particularly in complex cases, 'the qualifications of class counsel are generally more important in determining adequacy than those of the class representatives.'") (quoting *Harris,* 271 F.R.D. at 392).  The Perles Law Firm, P.C. and Fleischman Bonner & Rocco LLP have vast experience litigating cases under the FSIA and other terrorism-related statutes as well as class actions.  *See* PX-46 (Perles Decl.) at ¶¶ 2-12; PX-50 (Bonner Decl.) at ¶¶ 2-3, 5-6 and Ex. A.  In other matters, Class Counsel have shown their ability to collect multi-billion-dollar judgments from Iran, although other terrorism victims have experienced little success collecting from that terrorist state.  *See* PX-46 (Perles Decl.) at ¶¶ 9-12; PX-50 (Bonner Decl.) at ¶ 6.a.  That unprecedented success and counsel's long history of representing plaintiffs successfully in class actions evidence their adequacy.

---

[13] *See* PX-40 (A. Burks Decl.) at ¶ 4; PX-40 (Z. Burks Decl.) at ¶ 4; PX-40 (Hlastan Decl.) at ¶ 4; PX-40 (McRuiz Decl.) at ¶ 4; PX-40 (Phillips Decl.) at ¶ 4; PX-41 (T. Tiffner Decl.) at ¶ 4; PX-41 (Judith Tiffner Decl.) at ¶ 4; PX-41 (Crosby Decl.) at ¶ 4; PX-41 (Joshua Tiffner Decl.) at ¶ 4; PX-41 (S. Tiffner Decl.) at ¶ 4; PX-42 (L. Hochstetler Decl.) at ¶ 4; PX-42 (J. Hochstetler, Jr. Decl.) at ¶ 4; PX-42 (Marshall Decl.) at ¶ 4.

[14] *See* PX-42 (J. Hochstetler Decl.) at ¶¶ 5-6; PX-42 (L. Hochstetler Decl.) at ¶ 5; PX-42 (J. Hochstetler, Jr. Decl.) at ¶ 5; PX-42 (Marshall Decl.) at ¶ 5; PX-43 (Nantz Decl.) at ¶¶ 5-6; PX-40 (A. Burks Decl.) at ¶ 5; PX-40 (Z. Burks Decl.) at ¶ 5; PX-40 (Hlastan Decl.) at ¶ 5; PX-40 (McRuiz Decl.) at ¶ 5; PX-40 (Phillips Decl.) at ¶ 5; PX-41 (T. Tiffner Decl.) at ¶ 5; PX-41 (Judith Tiffner Decl.) at ¶ 5; PX-41 (Crosby Decl.) at ¶ 5: PX-41 (Joshua Tiffner Decl.) at ¶ 5; PX-41 (S. Tiffner Decl.) at ¶ 5.

## III.

### THE CLASS SATISFIES THE PREDOMINANCE AND SUPERIORITY REQUIREMENTS FOR CLASS CERTIFICATION UNDER FED. R. CIV. P 23(B)(3)

**A.  The Class Satisfies the Predominance Requirement Because All Class Members' Claims Require the Same Liability Proof**

To demonstrate that common issues predominate over individualized issues, a plaintiff need not 'prove that each element of his claim is susceptible to classwide proof.'"  *Howard*, 322 F.R.D. at 136 (quoting *Amgen*, 568 U.S. at 469); *accord, e.g., Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 193-94 (D.D.C. 2011) ("Plaintiffs must establish that the common issues in this case predominate over any non-common issues, bearing in mind that 'common issues need only be predominant, not dispositive of the litigation.'") (quoting *Cohen v. Warner Chilcott Pub. Ltd. Co.*, 522 F. Supp. 2d 105, 116 (D.D.C. 2007)).  Rather, a class satisfies the predominance test when "'the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, *Newberg on Class Actions* §4:49, pp. 195-96 (5th ed. 2012)).[15]  As the Supreme Court explained in *Tyson Foods*, "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Id.* (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196-197 (5th ed. 2012) (internal quotation marks omitted)).

---

[15] *Accord, e.g., McCormick*, 422 F. Supp. 3d at 243 (quoting *Tyson Foods*); *Rogers v. Lumina Solar, Inc.*, 2020 U.S. Dist. LEXIS 108259, at *18 (D.D.C. June 19, 2020) ("'predominance is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class

As a result, courts have found predominance satisfied even where class members had to provide individualized evidence to establish essential elements of their claims.[16]  In particular, the need for Class Members to prove their damages individually does not defeat predominance where the class representatives can establish liability with common evidence.  *See, e.g., id.* ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'") (quoting 7AA C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* §1778, pp. 123-124 (3d ed. 2005) (footnotes from *Federal Practice* omitted)); *accord, e.g., McCormick*, 422 F. Supp. 3d at 243 (quoting *Tyson Foods*).

The issues common to all Class Members' that Plaintiffs address in Section II.B., *supra,* predominate over the damages-related matters that Class Members must prove individually. Indeed, no individual issues exist with respect to Iran's responsibility for particular EFP Attacks because Iran provided material supports for all EFP Attacks against U.S. servicemembers and personnel in Iraq that generated casualties.  *See* pp. 4-6, 11-13, *supra*; Plaintiffs' Motion for Entry of a Default Judgment at pp. 2-5, 13-21.  By proving the entirely common facts regarding Iran's responsibility for building EFPs, distributing them to Shi'a militias in Iraq, and teaching

---

member['s] individual position'") (quoting *Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 162 (D.D.C. 2014) (internal quotations omitted).

[16] *E.g., McKinney,* 2013 U.S. Dist. LEXIS 6246, at *31 (predominance requirement satisfied despite existence of individual issues related to the date class members' claims accrued because, "[t]o the extent that any individual statute-of-limitations issues remain, the Court is confident that they can be easily resolved without jeopardizing the overall class-wide nature of McKinney's claims"); *Alliota*, 237 F.R.D. at 12 ("'When one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though important matters will have to be tried separately.'") (quoting *Bynum*, 214 F.R.D. at 39) (citation omitted).

those militants how to employ EFPs against U.S. personnel, Plaintiffs will therefore provide an adequate, indeed compelling, basis for the Court to find Iran liable to all Class Members.

Proving that a nation spearheaded a vast conspiracy designed to defeat the interests of the U.S. and its allies in Iraq, kill American servicemen, and undermine peace and democracy in Iraq is both a complex task and a matter of great international significance.  By comparison, proving the damages of individuals—even those who experienced the extreme, life-altering injuries many Class Members suffered—constitutes a simpler, less globally important undertaking.  Plaintiffs' class-wide proof regarding Iran's culpability for the EFP Attacks thus predominates over the individual damages issues that Class Members' claims present.  *See, e.g., Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004) (while it "may be that if and when the defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlements of the individual class members to relief," "[t]hat prospect need not defeat class treatment of the question whether the defendants violated RICO"); *Moore v. Napolitano*, 926 F. Supp. 2d 8, 33 (D.D.C. 2013) (common issues of whether Secret Service promotion program discriminated against African-American special agents and whether the Secret Service has a pattern and practice of race discrimination predominated over individual issues where "[a]ll members of the class will rely on the same statistical evidence to make the same claim: that the MPP process discriminates against African-American SAs seeking promotions," even though the defense presented "non-common factual issues" regarding whether "there were legitimate, nondiscriminatory reasons not to promote a specific [special agent]").

The conclusion that the Class satisfies the predominance requirement is bolstered by the fact that the Court may employ multiple efficient means to assess Class Members' damages, particularly given this Circuit's well-developed precedent regarding the payments available to the victims of terrorism under the FSIA.  In many terrorism-related actions, including matters in

33

which Class Counsel have participated, courts in this District and elsewhere have employed

streamlined strategies to assess the damages of groups of terrorism-related plaintiffs comparable

in size to, or even much larger than, this Class.  For example, in *Peterson v. Iran,* a long-running

case brought on behalf of servicemen injured in the Iranian-sponsored 1983 Beirut Marine

Barracks bombing and their family members and survivors, this Court relied upon Special

Masters to make initial assessments regarding the damages of hundreds of plaintiffs.  *See*

*Peterson v. Islamic Republic of Iran,* 515 F. Supp. 2d 25, 37, 60-66 (D.D.C. 2007).  Similarly, in

the *September 11* litigation currently pending in the Southern District of New York, the Court

has implemented a system whereby Judge George Danield and Magistrate Judge Sarah Netburn

have efficiently entered default judgments against Iran on behalf of thousands of victims of the

September 11 attacks.  *See* PX-50 (Bonner Decl.) at ¶ 9.

   The speed with which Magistrate Judges or Special Masters can assess the Class

Members' damages is enhanced by this Circuit's well-developed precedent regarding: (a) the

presumptive pain and suffering damages awards for military personnel injured in terrorist

attacks; and (b) the solatium damages available to family members eligible to bring claims under

the FSIA.  Applying the leading decisions of *Peterson,* 515 F. Supp. 2d at 25, and *Heiser v.*

*Islamic Republic of Iran,* 466 F. Supp. 2d 229 (D.D.C. 2006)—both of which involved attacks

upon U.S. military personnel—courts in this Circuit have recognized the following presumptive

damages awards: (a) $8 million, $5 million, $5 million, and $2.5 million, respectively, for the

spouses, parents, children and siblings of service members killed in an attack; (b) $5 million, $4

million, $2.5 million, $2.5 million, and $1.25 million, respectively, for service members

physically injured in an attack, and their spouses, parents, children and siblings; and (c) $1.5

million, $850,000, $850,000, and $500,000, respectively, for service members who suffer

psychological (but not physical) injuries as a result of an attack, and their parents, children and

siblings.[17]  This well-established precedent, which will substantially expedite the resolution of all

damages issues, bolsters the conclusion that the Class satisfies the predominance requirement.[18]

Individual damages issues do remain despite the efficiencies entailed in following the

*Heiser* and *Peterson* precedents.  For example, a Magistrate Judge or Special Master must assess

the economic damages that estates suffered.  *See, e.g., Heiser*, 466 F. Supp. 2d at 268-356

(analyzing types of damages available under various states' wrongful death statutes, including

loss of support and pecuniary damages).  Moreover, some fact patterns require upward or

downward departures from the *Heiser/Peterson* scale, including life-long injuries involving

severe pain or disability, or particularly close or estranged relationships among family

members.[19]  Again, however, courts in this District and elsewhere have tackled these issues

---

[17] *See, e.g., Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 248-50 (D.D.C. 2020);
*Levinson v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 251129, at \*39 (D.D.C. July 16,
2020); *Doe v. Syrian Arab Republic*, 2020 U.S. Dist. LEXIS 167697, at \*47 (D.D.C. July 27,
2020); *Sheikh v. Republic of the Sudan*, 485 F. Supp. 3d 255, 270-72 (D.D.C. 2020); *Davis v.
Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12, 14 (D.D.C. 2012).

[18] *See, e.g., Carnegie*, 376 F.3d at 661 ("Rule 23 allows district courts to devise imaginative
solutions to problems created by the presence in a class action litigation of individual damages
issues," including bifurcating liability and damages or appointing special masters or magistrate
judges to assess damages individually); *Bame v. Dillard*, 2008 U.S. Dist. LEXIS 40805, at \*24
(D.D.C. May 22, 2008) (predominance requirement satisfied despite need to make individual
damages assessments for class members subject to alleged illegal strip searches by U.S. Marshals
following arrests at political protest because court could employ multiple procedures for
assessing damages efficiently after resolving the common liability issues, including "'bifurcating
liability and damages trials'" and "'appointing a magistrate judge or special master to preside
over individual damages proceedings'") (quoting *Johnson v. District of Columbia*, 248 F.R.D.
46, 57 (D.D.C. 2008) (internal quotations omitted)).

[19] *See, e.g., Doe v. Syrian Arab Republic*, 2020 U.S. Dist. LEXIS 167697, at \*44 (when
considering the claims of physically injured individuals, courts should "'depart upward from this
[$5 million] baseline to $7.5-$12 million in more severe instances of physical and psychological
pain, such as where victims suffered relatively more numerous and severe injuries, were
rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead'" and will
"'depart downward to $2-$3 million where victims suffered only minor shrapnel injuries or
minor injury from small-arms fire'") (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp.
2d 52, 84 (D.D.C. 2010)).

quickly and efficiently with the assistance of Magistrate Judges or Special Masters.  *See, e.g.,*

*Peterson*, 515 F. Supp. 2d at 37 (court reviewed damages recommendations made by special

masters); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 5-6, 23-24 (D.D.C. 2011)

(entering liability judgment against Iran on behalf of 59 plaintiffs pursuing claims under the

FSIA in action related to the Iranian-sponsored bombings of the U.S. Embassy in Beirut and

referring damages determinations to Magistrate Judge).

    As a result, the individual damages issues Class Members' claims present pale in

importance to the predominant question of whether Iran engaged in a vast international

conspiracy to kill Americans and undermine U.S. policy interests in the Middle East.  The

extensive precedent finding the predominance requirement satisfied despite the existence of

individual damages issues therefore supports certifying the Class Plaintiffs propose.[20]

    The fact that Congress intended the FSIA to serve a remedial purpose, *i.e.,* to punish and

deter state-sponsored terrorism, also bolsters the conclusion that the Class satisfies the

predominance requirement.  *See, e.g., Tyson Foods,* 577 U.S. at 456-57 (citing *Anderson v. Mt.*

---

[20] *See, e.g., McCormick*, 422 F. Supp. 3d at 243 (certifying Rule 23(b)(3) class asserting claims
regarding allegedly misleading under-filling of pepper containers despite the need for class
members to provide individualized proof of damages such as the number of containers they
purchased and the price they paid for those items); *Encinas*, 265 F.R.D. at 10 (in action involving
allegations that employer unlawfully withheld 10% of workers' wages, "the common issues of
whether [the defendant] maintained [that] policy … and whether that practice violates D.C. or
Maryland law predominate over any issues that may affect individual class members" although
the claims involved "non-common factual issues" regarding "which job sites and for how many
hours each member of the class worked"); *Rogers*, 2020 U.S. Dist. LEXIS 108259, at *17-18
("'the mere fact that damage awards will ultimately require individualized fact determinations is
insufficient by itself to preclude class certification'") (quoting *McCarthy v. Kleindienst*, 741 F.2d
1406, 1415 (D.C. Cir. 1984)); *Alliota*, 237 F.R.D. at 13 ("The individualized nature of the
potential damages does not 'preclude a finding that common questions of law and fact
predominate over individualized questions.'") (quoting *Bynum*, 214 F.R.D. at 39); *Wells,* 210
F.R.D. at 9 ("'[A] fraud perpetrated on numerous persons by the use of similar representations
may be an appealing situation for a class action, and it may remain so despite the need, if liability
is found, for separate determinations of the damages suffered by individuals within the
class.'") (quoting Fed. R. Civ. P. 23(b)(3), Advisory Committee Notes, 1966 amendment).

*Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) in ruling that the remedial nature of the Fair

Labor Standards Act weighed in favor of permitting a class of plaintiffs to prove the number of

uncompensated hours they worked by utilizing statistical averages for all workers, rather than by

individualized proof).

### B.  A Class Action Is the Superior Means for Resolving the Class Members' Claim

The Class also satisfies Rule 23(b)(3)'s superiority requirement because adjudicating

these claims on a class-wide basis will produce significant judicial efficiency and time and cost

savings for the Class.  The superiority requirement hinges upon whether resolution of the case

through a class action will "'achieve economies of time, effort, and expense, and promote

uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or

bringing about other undesirable results.'"  *McKinney v. United States Postal Serv.*, 292 F.R.D.

62, 65 (D.D.C. 2013) (quoting Fed. R. Civ. P. 23(b)(3), Advisory Committee Note); *Alliota* 237

F.R.D. at 13 ("Class actions are the superior method when they serve the purpose of efficient

resolution of the claims or liabilities of many individuals in a single action, as well as the

elimination of repetitious litigation and possibly inconsistent adjudications.").

Rule 23(b)(3) specifies four factors courts should consider when assessing superiority:

(a) class members' interests in individually controlling separate actions; (b) the extent and nature

of any litigation concerning the controversy already commenced; (c) the desirability of

concentrating the litigation of the claims in one forum; and (d) the likely difficulties in managing

a class action.  Each of those factors strongly favors certifying this Class.

**(a).  <u>Individual Control.</u>**  Given that Plaintiffs have excluded individuals represented by

other counsel from the Class, pursuing individual actions would not serve the interests of absent

Class Members.  More than ten years have passed since the U.S. withdrew its troops from Iraq in

2011.  While the filing of this case tolled the ten-year statute of limitations applicable to Class

Members' claims (*see* 28 U.S.C. § 1605A(b)), the actions of those individuals demonstrate that

they do not have an interest in pursuing their claims individually.[21]

In fact, a class action that amasses a significant number of terrorism victims in a single

action provides a more likely foundation for Class Members to secure a full and timely recovery

from Iran.  *See Coleman,* 306 F.R.D. at 88 ("Superiority is also often found when use of the class

action device would 'enable[] vindication of the rights of groups of people who individually

would be without effective strength to bring their opponents into court at all.'") (quoting

*Newberg on Class Actions* § 4:65 (5th ed. 2014) (internal quotations and citations omitted).

With the exception of the plaintiffs in Class Counsel's *Peterson* litigation, other victims in

sizable terrorism litigations have had little success collecting Iranian assets.  *See, e.g.,* CRS

Report for Congress, "Suits Against Terrorist States by Victims of Terrorism" (Aug. 8, 2008)

("The scarcity of assets within U.S. jurisdiction that belong to States subject to economic

sanctions has made judgments against terrorist States difficult to enforce.") (available at

https://sgp.fas.org/crs/terror/RL31258.pdf).  Thus, obtaining class-wide relief will benefit Class

Members by making it economical for counsel to expend the substantial financial and

professional resources necessary to locate and collect Iranian assets with any connection to the

U.S.  *See* PX-46 (Perles Decl.) at ¶ 9 (describing significant expense and professional time

necessary to secure the recovery of $1.8 billion for the plaintiffs in the *Peterson* action).

The many Class Members who remain unaware of Iran's role in EFP Attacks in Iraq will

also benefit from the certification of the Class.  Without the opportunity to consult with counsel

---

[21] *E.g., China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1803-04 (2018) (under *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974), "the timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint").

or other knowledgeable parties, most Class Members will never learn of Iran's culpability for EFP Attacks, or even that their injuries were caused by EFPs, as opposed to other explosive devices. Many Class Members also remain unaware that counsel exist with the wherewithal to bring, prove and collect upon claims against Iran. *See, e.g.,* PX-46 (Perles Decl.) at ¶ 13 (explaining that, even decades after the Beirut Marines Barracks bombing and many years after litigation related to that attack commenced, additional victims stepped forward to seek representation for their injuries).

(b). **Pending Litigation.**  Given the passage of time since the relevant terrorist attacks, the pending litigation factor also favors protecting Class Members' interests in pursuing claims against Iran. Besides the litigants in other actions whom Plaintiffs have excluded from the Class, there is no pending litigation concerning Iran's use of EFPs in Iraq.

(c). **Concentrating the Litigation in This District.**  This District has a long history of presiding over litigation concerning terrorist attacks upon U.S. military personnel abroad. As a result, this Court can rely upon well-developed precedent to expedite this action and may draw upon magistrate judges and local special masters experienced in terrorism litigation to help manage this litigation efficiently. In light of the concentration of federal governmental operations in Washington, this District also has a particular interest in protecting the members of the U.S. military and the nation's foreign policy interests. Accordingly, judicial efficiency and public policy factors strongly favor concentrating this litigation in this District. *See, e.g., McKinney*, 292 F.R.D. at 66 ("In this case, the claims of all of the proposed class members, including those of the so-called 'unfound' beneficiaries, all turn on the same legal issue: whether the Postal Service is obligated to pay interest on additional death benefit payments. Resolving this uniform legal issue through a single, cohesive proceeding is far superior to requiring the potential class members to initiate a multiplicity of individual actions.").

**(d).  Manageability Issues.**  Cases like *Peterson* and *Heiser* demonstrate that the Court will not encounter difficulties in managing this case as a class action.  As Plaintiffs explain in Point II.B., the Court can resolve the entirely common issue regarding Iran's liability for the EFP Attacks on a class-wide basis.  Thereafter, as in *Peterson* and *Heiser*, the Court can work with the assistance of a Magistrate Judge or Special Masters to assess Class Members' damages.  In contrast, absent a class action, multiple courts will have to analyze the same evidence to determine whether EFPs injured individual Class Members and whether Iran bears responsibility for all of those attacks.  The permissive manageability factor thus supports certification of the Class.  *See, e.g., Mullins v. Direct Dig., Ltd. Liab. Co.,* 795 F.3d 654, 663 (7th Cir. 2015) (citing authorities supporting "the well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns").

## IV.

### ALTERNATIVELY, THE COURT SHOULD CERTIFY THE CLASS WITH RESPECT TO ALL LIABILITY ISSUES PURSUANT TO RULE 23(C)(4)

If the Court determines that individual damages issues predominate over common issues related to Iran's liability, Fed. R. Civ. P. 23(c)(4) provides an alternative procedural means for adjudicating Class Members' claims efficiently.  Rule 23(c)(4) states, "When appropriate, an action may be brought or maintained as a class action with respect to particular issues."  Rule 23(c)(4) allows courts "the option not to make class certification an all or nothing proposition" by authorizing "class-wide adjudication of one or more issues that are common to all class members even if other issues will have to be litigated separately by individual class members."  1 *McLaughlin on Class Actions* § 4:43 (16th ed. October 2019 Update).

Although the D.C. Circuit has not addressed when certifying certain issues for class treatment qualifies as "appropriate" under Rule 23(c)(4), a distinct majority of decisions hold

that courts should consider whether the predominance and superiority requirements are satisfied *after* identifying common issues that may justify class treatment under Rule 23(c)(4).  *E.g., In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) (court can certify particular issues for class treatment "regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement"); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4) and proceed with class treatment of these particular issues.").  In other words, plaintiffs need only satisfy the predominance and superiority tests with respect to the certified issues.[22]  Consistent with that authority, courts have favored liberal use of Rule 23(c)(4) to promote the efficient resolution of complex cases.  *See, e.g.*, *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 167 (2d Cir. 2001) ("District courts should 'take full advantage of th[is] provision' to certify separate issues 'in order . . . to reduce the range of disputed issues in complex litigation' and achieve judicial efficiencies.") (quoting *Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993) (internal quotation omitted)).

As the Advisory Committee Note to Rule 23(c)(4) contemplates, courts frequently employ Rule 23(c)(4) to decide common liability issues on a class-wide basis while preserving the flexibility to fashion individual damages awards.  *See* Fed. R. Civ. P. 23(c)(d) Advisory Committee Note, 1966 Amendment (issue certification may be used to bifurcate "the

---

[22] *Accord, e.g., Nassau Cnty. Strip Search Cases,* 461 F.3d at 226 ("As [Rule 23(c)(4)'s] plain language and structure establish, a court must first identify the issues potentially appropriate for certification 'and … then' apply the other provisions of the rule [including] subsection (b)(3) and its predominance analysis.") (quoting Fed. R. Civ. P. 23(c)(4)); 2 *Newberg on Class Actions* § 4:91 (citing authorities supporting this "broad view" of issue certification under Rule 23(c)(4)).

adjudication of liability to the class" from "the amounts of [class member's] respective claims").[23]  In addition, "courts commonly use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual adjudication."[24]

As Plaintiffs demonstrate in Points II.B. and III.A., all Class Members' claims share common issues related to Iran's liability for the EFP Attacks it planned and set in motion in Iraq. Indeed, Plaintiffs cannot prove their own entitlement to relief without establishing the factual basis for the liability claims of *all* Class Members.  At a minimum, therefore, the Court should certify the Class with respect to the liability issues that the Class Members' claims present.

---

[23] *Accord, e.g., Nassau Cnty. Strip Search Cases*, 461 F.3d at 226 ("'in a fraud or similar case the action may retain its 'class' character *only* through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims'") (quoting Fed. R. Civ. P. 23(c)(4), Adv. Comm. Note to 1966 Amend.); *Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994) (even where claims required individual damages determinations, court could bifurcate case and "resolve the central issue of liability for the alleged misrepresentations and omissions" on a class-wide basis while "[t]he individual damage determinations could be made … at a separate phase of the trial"); 1 *McLaughlin on Class Actions* § 4:43 (noting that the "most commonly requested issue certification is that 'liability' be determined on a class-wide basis, and damages to individual class members be determined at follow-on trials or other proceedings" and that Rule 23(c)(4) is "the underpinning of the black letter principle that individual variations in the amount of damages sustained as a result of a common course of conduct will not preclude class certification").

[24] *Chiang v. Veneman*, 385 F.3d 256, 267 (3d Cir. 2004) (affirming certification of one issue); *accord, e.g., Martin v. Behr Dayton Thermal Prods. LLC,* 896 F.3d 405, 410, 413-16 (6th Cir. 2018) (affirming certification of seven issues relating to defendants' conduct and knowledge, which left for individualized determination issues concerning fact-of-injury, proximate causation, and extent of damages); *Medjrech v. Met-Coil Systems Corp*., 319 F.3d 910, 911-12 (7th Cir. 2003) (affirming certification of "'the core questions'" of whether and to what extent the defendant contaminated soil and groundwater while leaving questions regarding the existence and extent of liability to particular home owners for resolution in individual proceedings).

**V.**

**THE COURT SHOULD APPROVE CLASS COUNSEL AS THE ATTORNEYS FOR THE CLASS**

The Court should also approve the Class Representatives' choice of Class Counsel as counsel for the Class. *See* Fed. R. Civ. P. 23(g) (court must appoint class counsel when certifying a class action). As Plaintiffs demonstrate above, Class Counsel possess substantial expertise with respect to all of the substantive areas relevant to this litigation, including class actions, FSIA litigation generally, and collecting substantial judgments in FSIA cases. *See* PX-46 (Perles Decl.) at ¶¶ 2-12; PX-50 (Bonner Decl.) at ¶¶ 2-3, 6.

Class Counsel have also demonstrated their commitment to this action by devoting substantial resources to prosecuting Class Members' claims. Among other steps, Class Counsel have: (a) gathered and analyzed the facts necessary to support the Complaint; (b) located multiple experts and worked with those individuals to develop the record necessary to prove Class Members' claims and to certify the Class; (c) communicated with Plaintiffs and other Class Members regarding the litigation and their claims; (d) interacted with the government, military officials and veterans groups to gather relevant evidence and to identify Class Members injured in EFP Attacks; and (f) drafted the papers in support of this motion and Plaintiffs' motion for entry of a default judgment against Iran. *See* PX-46 (Perles Decl.) at ¶ 14.

Counsel's past experience also demonstrates that they will aggressively pursue the steps necessary to collect Class Members' judgments against Iran. *See* PX-46 (Perles Decl.) at ¶¶ 6, 9-12; PX-50 (Bonner Decl.) at ¶ 6.a. As a result, Class Counsel are appropriate representatives of the Class under Rule 23(g). *See, e.g., In re Pfizer Sec. Litig.,* 282 F.R.D. 38, 47 (S.D.N.Y. 2012) (appointing class counsel that had "devoted considerable resources to this case since it was first filed and … effectively protected the interests of Plaintiffs and the putative class").

43

# VI.

## THE COURT SHOULD ORDER PLAINTIFFS TO PROVIDE THE NOTICE TO THE CLASS THAT RULE 23(B)(3) REQUIRES BEFORE CONSIDERING PLAINTIFFS' MOTION FOR ENTRY OF A DEFAULT JUDGMENT

Due process principles and the text of Rule 23(c)(2)(B) demand that class members receive notice of a class certified under Rule 23(b)(3).  *E.g., Lindsay v. Gov't Emples. Ins. Co.*, 448 F.3d 416, 419 (2006); *In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002) ("Certification pursuant to Rule 23(b)(3), however, comes with certain procedural requirements: Because members of a class seeking substantial monetary damages may have divergent interests, due process requires that putative class members receive notice and an opportunity to opt out."). Among other information, the notice must alert class members of their right to opt out of the class and pursue their claims individually.  *E.g., Veneman*, 309 F.3d at 792.  In conjunction with granting Plaintiffs' motion for class certification, the Court should therefore order Plaintiffs to provide the notice to Class Members that Rule 23(c)(2)(B) requires.

Because the commonality, typicality, adequacy and predominance requirements for class certification under Rule 23(a) and Rule 23(b)(3) require that Plaintiffs maintain the incentive to prove facts common to all class members' claims (*see* Points II.B.-II.D., III.A., *supra*), the Court should delay ruling upon Plaintiffs' motion for entry of a default judgment with respect to their individual causes of action until after the absent Class Members receive the class notice and the opt-out period passes.  While Plaintiffs have every intention of pursuing the best interests of all Class Members irrespective of Plaintiffs' personal litigation incentives, the procedure Plaintiffs suggest protects the interests of absent Class Members, adheres to the conventional practice of resolving class certification issues before deciding the merits of class members' claims, and avoids creating theoretical obstacles to Plaintiffs' ability to serve as class representatives.

## CONCLUSION

For all of the reasons set forth above, the Court should grant Plaintiffs' motion for class certification in all respects.

Dated: November 12, 2021                          Respectfully Submitted,

/s/ Steven R. Perles
Steven R. Perles (D.C. Bar No. 326975)
Edward B. MacAllister (D.C. Bar No. 494558)
Joshua K. Perles (D.C. Bar No. 1031069)
PERLES LAW FIRM, PC
816 Connecticut Ave., NW
12th Floor
Washington, DC 20006
Tel: (202) 955-9055

James P. Bonner
Patrick L. Rocco
Susan M. Davies
Thomas M. Caroccia
FLEISCHMAN BONNER & ROCCO LLP
447 Springfield Avenue, 2nd Fl.
Summit, NJ  07901
Tel: (908) 516-2045

*Attorneys for Plaintiffs*