## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAN BURKS, *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) No. 16-cv-1102 (CRC) |
| | ) |
| vs. | ) |
| | ) |
| ISLAMIC REPUBLIC OF IRAN, *et al.* | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFFS' MEMORANDUM IN RESPONSE TO COURT'S AUGUST 9, 2022 ORDER REQUIRING SUPLEMENTAL BRIEFING RE: 18 U.S.C. § 1605A

## Table of Contents

Table of Authorities................................................................................................. ii

Argument ................................................................................................................1

I.   Non-Fatal EFP Attacks That Cause Personal
     Injuries Can Support Claims Under § 1605A ..................................................1

     A.   The Controlling Statutory Interpretation Rules ........................................1

     B.   Non-Fatal EFP Attacks Constitute Attempted
          Extrajudicial Killings Actionable Under § 1605A ...................................1

     C.   Section 1605A's Material Support Prong Provides
          an Alternative Basis for Class Members' Claims.....................................10

II.  Force II Has No Impact Upon the Claims of Class
     Members or the Certification of the Proposed Class ................................15

<u>T<small>ABLE OF</small> A<small>UTHORITIES</small></u>

**Cases**                                                                                          **Page(s)**

*Abramski v. United States*,
   573 U.S. 169 (2014) ............................................................................ 13

*AFSCME Iowa Council 61 v. Iowa Pub. Emp't Relations Bd.*,
   846 N.W.2d 873 (Iowa 2014) .............................................................. 10

*Applera Corp. v. MJ Research Inc.*,
   292 F. Supp. 2d 348 (D. Conn. 2003) .................................................. 10

*Biden v. Texas*,
   142 S. Ct. 2528 (2022)..................................................................... 1, 12

*Boniface v. Viliena*,
   338 F. Supp. 3d 50 (D. Mass. 2018) ...................................................... 7

*Cabrera v. Republic*,
   2022 U.S. Dist. LEXIS 127290 (D.D.C. July 19, 2022) ........................ 5

*Cohen v. Islamic Republic of Iran*,
   238 F. Supp. 3d 71 (D.D.C. 2017) ......................................................... 6

*Doe v. Bin Laden*,
   663 F.3d 64 (2d Cir. 2011) .................................................................... 4

*Doe v. Constant*,
   2006 U.S. Dist. LEXIS 101961 (S.D.N.Y. Oct. 24, 2006) ..................... 7

*Donnelly Commodities Inc. v. BNSF Ry. Co.
   (In re Rail Freight Fuel Surcharge Antitrust Litig.)*,
   34 F.4th 1 (D.C. Cir. 2022) ........................................................ 1, 3, 13

*Flanagan v. Islamic Republic of Iran*,
   190 F. Supp. 3d 138 (D.D.C. 2016) ................................................... 7, 8

*Force v. Islamic Republic of Iran*,
   464 F. Supp. 3d 323 (D.D.C. 2020) ("*Force I*").............................. 6, 15

*Force v. Islamic Republic of Iran*,
   2022 U.S. Dist. LEXIS 118083 (D.D.C. July 5, 2022) ("*Force II*")........................ 2, 4, 6, 7, 9

*Genus Med. Techs. LLC v. FDA*,
   994 F.3d 631 (D.C. Cir. 2021) ........................................................... 1, 3

*Gill v. Islamic Republic of Iran*,
   249 F. Supp. 3d 88 (D.D.C. 2017) ...................................................... 6, 7

*Guedes v. BATFE*,
   2022 U.S. App. LEXIS 21998 (D.C. Cir. Aug. 9, 2022) .................................................. 10, 14

*Gundy v. United States*,
   139 S. Ct. 2116 (2019) ....................................................................................................... 12

*Han Kim v. Democratic People's Republic of Korea*,
   774 F.3d 1044 (D.C. Cir. 2014) ........................................................................................... 4

*Jane W. v. Thomas*,
   560 F. Supp. 3d 855 (E.D. Pa. 2021) ................................................................................... 7

*Karcher v. Islamic Republic of Iran*,
   396 F. Supp. 3d 12 (D.D.C. 2019) ..................................................................................... 4, 6

*Lee v. Islamic Republic of Iran*,
   518 F. Supp. 3d 475 (D.D.C. 2021) ...................................................................................... 5

*Leibovitch v. Islamic Republic of Iran*,
   697 F.3d 561 (7th Cir. 2012) ................................................................................................ 4

*Loughrin v. United States*,
   573 U.S. 351, 134 S. Ct. 2384, 189 L. Ed. 2d 411 (2014) .................................................... 2

*Morissette v. United States*,
   342 U.S. 246 (1952) ........................................................................................................... 14

*Niz-Chavez v. Garland*,
   141 S. Ct. 1474 (2021) ......................................................................................................... 1

*Opati v. Republic of Sudan,*
   149 S. Ct. 1601 (2020)........................................................................................................... 7

*Owens v. Republic of Sudan*,
   864 F.3d 751 (D.C. Cir. 2017) ........................................................................................... 7, 8

*Pennington v. Islamic Republic of Iran*,
   2021 U.S. Dist. LEXIS 117666 (D.D.C. June 24, 2021) ....................................................... 6

*Republic of Iraq v. Beaty*,
   556 U.S. 848 (2009) .............................................................................................................. 4

*Roberts v. Islamic Republic of Iran*,
   2022 U.S. Dist. LEXIS 12773 (D.D.C. Jan. 24, 2022) ................................................ *passim*

*Sissel v. United States HHS*,
   799 F.3d 1035 (D.C. Cir. 2015) .......................................................................................... 10

*Skinner-Smith v. Sec'y of HHS*,
   141 Fed. Cl. 348 (2018) ...................................................................................................... 11

*State v. Stewart*,
    386 P.3d 688 (Or. App. 2016) ............................................................. 10

*Torres v. Lynch*,
    578 U.S. 452 (2016) ............................................................................ 13

*United States v. Mohammad*,
    2017 U.S. Dist. LEXIS 83432 (N.D. Ohio May 31, 2017) ............................................. 13, 14

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009) ................................................................. 13

*Van Beneden v. Al-Sanusi*,
    709 F.3d 1165 (D.C. Cir. 2013) ......................................................... 3, 4

*Warfaa v. Ali*,
    33 F. Supp. 3d 653 (E.D. Va. 2014) ..................................................... 7

*Williams v. Taylor*,
    529 U.S. 362 (2000) ........................................................................ 1, 2

**Statutes**

1 U.S.C. § 1 ............................................................................................... 13

18 U.S.C. § 1605(a)(7) (repealed) ............................................................ 4

18 U.S.C. § 1605A ................................................................................. *passim*

18 U.S.C. § 2339A ..................................................................... 11, 13, 14

18 U.S.C. § 2339B .............................................................................. 11

Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 (note)........................................... 6, 7, 8

**Rules**

Fed. R. Civ. P. 23(a)(2) .......................................................................... 15

Fed. R. Civ. P. 23(b)(3) ......................................................................... 15

**Legislative History**

H.R. Rep. No. 104-383 (1995)................................................................... 4

Aiding Terrorists:  An Examination of the Material Support Statute:
    Hearing Before the S. Comm. on the Judiciary, 108th Cong. (2004) ......................................11

154 Cong. Rec. H75 (daily ed. Jan. 16, 2008) ............................................................3, 5

154 Cong. Rec. S54 (daily ed. Jan 22, 2008)..................................................................5

**Other**

Restatement (Second) of Torts (1965) ........................................................... 14

Plaintiffs respectfully submit this memorandum of law in response to the Court's August 9, 2022 Order (the "August 9 Order") requiring supplemental briefing concerning whether explosively formed penetrator ("EFP") attacks not involving a fatality can form the basis for claims under the Foreign Sovereign Immunities Act's terrorism exception (18 U.S.C. § 1605A). Plaintiff Randolph Nantz, among other members of the proposed Class in this action, suffered personal injuries caused by EFP attacks that did not produce any fatalities. *See* August 24 Declaration of Josh Perles ("Perles Decl.") at ¶ 2.

## ARGUMENT

## I.

### NON-FATAL EFP ATTACKS THAT CAUSE PERSONAL INJURIES CAN SUPPORT CLAIMS UNDER § 1605A

#### A.  The Controlling Statutory Interpretation Rules

To interpret statutes, "court[s] begin[] 'with the language of the statute itself' and, if necessary, 'may turn to other customary statutory interpretation tools, including structure, purpose, and legislative history.'"  *Donnelly Commodities Inc. v. BNSF Ry. Co. (In re Rail Freight Fuel Surcharge Antitrust Litig.)*, 34 F.4th 1, 9 (D.C. Cir. 2022) (quoting *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 637 (D.C. Cir. 2021)).  Courts "normally seek[] to afford the law's terms their ordinary meaning at the time Congress adopted them."  *Niz-Chavez v. Garland,* 141 S. Ct. 1474, 1480 (2021).  Courts must also "'give effect, if possible, to every clause and word of [the] statute.'"  *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)).

#### B.  Non-Fatal EFP Attacks Constitute Attempted Extrajudicial Killings Actionable Under § 1605A

In relevant part, § 1605A(a)(1) states:

> A foreign state shall not be immune . . . in any case . . . in which money damages
> are sought against a foreign state for personal injury or death that was caused by
> an *act of* . . . extrajudicial killing . . . or the provision of material support or
> resources for such an act. . . .

18 U.S.C. § 1605A(a)(1) (emphasis added).  Similarly, 18 U.S.C. § 1605A(c) provides a private

right of action against state sponsors of terrorism "for personal injury or death caused by acts

described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that

foreign state, for which the courts of the United States may maintain jurisdiction under this

section for money damages."  18 U.S.C. § 1605A(c).

As the August 9 Order notes, *Force v. Islamic Republic of Iran*, 2022 U.S. Dist. LEXIS

118083 (D.D.C. July 5, 2022) ("*Force II*") held that only terrorist attacks involving a

*consummated* extrajudicial killing can support a claim under § 1605A.  Among *many* other cases,

Judge Lamberth's 2022 decision in *Roberts v. Islamic Republic of Iran*, 2022 U.S. Dist. LEXIS

12773, at *37-39 (D.D.C. Jan. 24, 2022), demonstrates that *Force II* erred by failing to give

effect to all of § 1605A's terms and by disregarding the statute's remedial purpose and

legislative history.

As *Roberts* emphasized, § 1605A does not demand an "extrajudicial killing;" rather, the

statute requires proof that a terrorist state engaged in or provided material assistance for "'*act[s]*

*of* … extrajudicial killing.'"  *See Roberts,* 2022 U.S. Dist. LEXIS 12773, at *37 (quoting 18

U.S.C. § 1605A(a)(1) (alteration in original, emphasis added)).  Investing each word of the

statute with significance, Judge Lamberth found that the words "act of" created an ambiguity that

required the court to resort to other tools of statutory interpretation.  The court explained:

> And it is a "cardinal principle" of statutory interpretation that "courts 'must give
> effect, if possible, to every clause and word of a statute,' *Loughrin v. United*
> *States*, 573 U.S. 351, 358, 134 S. Ct. 2384, 189 L. Ed. 2d 411 (2014) (quoting
> *Williams v. Tay*lor, 529 U.S. 362, 404, 120 S. Ct. 1495, 146 L. Ed. 2d 389
> (2000)), suggesting that the "act of" language inserted in § 1605A(a)(1) is

significant.  The term "act of" could be read multiple ways.  An "act" could refer to "a thing done" or a specific "deed."  *Act, New Oxford English Dictionary* (2d ed. 2005).  But an "act" might also refer to "[t]he process of doing" something.  *Act, Oxford English Dictionary* (2d ed. 1989); *accord Act, Merriam-Webster's Collegiate Dictionary* (10th ed. 2005) (defining "act" as both "the doing of a thing" and "the process of doing").  Plausibly read, § 1605A(a)(1) could encompass (1) the specific deed of an extrajudicial killing or (2) the process of committing an extrajudicial killing.  But the process of committing an extrajudicial killing does not imply that death results—meaning that an *attempted* extrajudicial killing could constitute an "act of extrajudicial killing."

*Id.* at *38 (emphasis in original).

To resolve the identified ambiguity, *Roberts* examined § 1605A's "'structure, purpose, and legislative history.'"  *Donnelly*, 34 F.4th at 9 (quoting *Genus Med.*, 994 F.3d at 637); *see Roberts,* 2022 U.S. Dist. LEXIS 12773, at *38-39.  That analysis led the court to conclude that § 1605A's remedial purpose, Congress's intent in enacting the statute, and the D.C. Circuit's mandate to interpret the statute broadly in favor of terrorism victims all supported construing the phrase "*an act of* … extrajudicial killing" in favor of imposing liability for attempted killings.  *Roberts,* 2022 U.S. Dist. Lexis 12773, at *38 ("[i]n light of this ambiguity, the Court will interpret § 1605A(a)(1) broadly" to include attempts).

As *Roberts* emphasized, that conclusion harmonizes with the D.C. Circuit's analysis of a different provision of § 1605A in *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 (D.C. Cir. 2013) (considering whether two attacks should be deemed part of the same "act or incident" under § 1605A).  *See Roberts*, 2022 U.S. Dist. LEXIS 12773, at *39.  As *Van Beneden* held, § 1605A's legislative history "reflect[s] Congress's judgment that 'American citizens who have been aggrieved by any state sponsor of terrorism . . . deserve every possible means of redress available to them.'"  709 F.3d at 1167 n.4 (quoting 154 Cong. Rec. H258 (daily ed. Jan. 16, 2008) (statement of Rep. McHugh)); *see also, e.g., Roberts*, 2022 U.S. Dist. LEXIS 12773, at *39 (§ 1605A reflects Congress's intent to "lighten the jurisdictional burdens borne by victims of

terrorism seeking judicial redress").  *Van Beneden* therefore concluded that, given the FSIA's

"text and purpose, we interpret its ambiguities flexibly and capaciously."  709 F.3d at 1167;

*accord, e.g., Doe v. Bin Laden*, 663 F.3d 64, 70 (2d Cir. 2011) ("The text, history, and purpose

of [§ 1605A] make clear that the statute does not counsel a narrow reading."); *Force II*, 2022

U.S. Dist. LEXIS 118083 at *19-20 ("As the D.C. Circuit has explained, '[c]oncerned with

victims' inability to obtain redress in terrorism cases,' Congress 'enacted the terrorism exception

expressly to bring state sponsors of terrorism . . . to account for their repressive practices' and 'to

prevent [them] from escaping liability for their sins.'") (quoting *Han Kim v. Democratic

People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014)).

      Other elements of the legislative history of § 1605A and the FSIA section it replaced, 18

U.S.C. § 1605(a)(7), bolster the conclusion that Congress intended for courts to interpret

§ 1605A liberally to provide claims for attempted extrajudicial killings.[1]  Congress enacted the

terrorism exception to punish and deter all terrorism directed at Americans, not just attacks that

achieved their desired result.  *See, e.g., Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 563

(7th Cir. 2012) (Congress adopted § 1605(a)(7), "to 'deter terrorism' directed at United States

citizens and supported by foreign sovereigns as well as to 'provide justice' for victims of terrorist

acts") (citing Pub. L. No. 104-132, § 221(a), 110 Stat. at 1214).[2]  Indeed, § 1605A's sponsors

---

[1] Courts frequently look to the legislative history of the repealed § 1605(a)(7) to assist in interpreting its successor, § 1605A.  *See, e.g., Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 57 (D.D.C. 2019) ("The relevant language of this exception did not change materially when the exception was transferred from Section 1605(a)(7) to the new Section 1605A(a)(1), so the original legislative history remains applicable.").

[2] *See also, e.g., Republic of Iraq v. Beaty*, 556 U.S. 848, 859 (2009) (§ 1605(a)(7) "was intended as a sanction, to punish and deter undesirable conduct"); H.R. Rep. No. 104-383, at 62 (1995) ("the Committee has determined that allowing suits in the federal courts against countries responsible for terrorist acts … is warranted" because Iran and other terrorist states "consider terrorism a legitimate instrument of achieving their foreign policy goals" and "have become better at hiding their material support for their surrogates"); *id.* (emphasizing the need to "give American citizens an important economic and financial weapon against these outlaw states"); *id.* at 37 (Congress enacted § 1605(a)(7) "to deter terrorist acts and to punish those who engage in terrorism").

highlighted the statute's broad deterrence and retribution objectives. *E.g.,* National Defense Authorization Act For Fiscal Year 2008 ("2008 NDAA"), 154 Cong. Rec. S54 (daily ed. Jan. 22, 2008) ("I believe this legislation is essential to providing justice to those who have suffered at the hands of terrorists and is an important tool designed to deter future state-sponsored terrorism.") (statement of legislation sponsor, Sen. Lautenberg); 2008 NDAA, 154 Cong. Rec. H257 (daily ed. Jan. 16, 2008) (statement of Rep. Saxton noting that § 1605A "ensure[s] terrorism victims have the legal redress against state sponsors of terrorism" and emphasizing that "it's something that is near and dear to many of our hearts, and some of us worked very closely with Members of the other body, in particular Senator Lautenberg, over several years to bring the language that we had in the original bill to the attention of the House and inclusion in the NDAA bill"). *Force II's* restrictive interpretation of § 1605A would undermine those fundamental statutory objectives.

Moreover, *Roberts* is by no means alone in concluding that attempted extrajudicial killings suffice to support liability under § 1605A.  In fact, virtually every court that has considered the issue has concluded that § 1605A's text, context, and history support that statutory construction.  *See, e.g., Cabrera v. Republic*, 2022 U.S. Dist. LEXIS 127290, at *134 (D.D.C. July 19, 2022) (Bates, J.) ("[E]ven where an attack killed no one—*i.e.*, where it caused only physical injuries—the terrorism exception continues to apply.  Although '[t]he text of § 1605A(a)(1) does not expressly address attempts to commit acts' such as extrajudicial killing, courts in this District have concluded that injuries 'resulting from "deliberated" attempts to kill fall within the scope' of the terrorism exception.") (citation omitted); *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021) (Mehta, J.) ("Section 1605A(a)(1) and the court's mandate to construe ambiguities in the FSIA broadly permits the court to exercise jurisdiction

where a designated state supplies material resources in an attempt to commit an extrajudicial killing."); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019) (Kollar-Kotelly, J.) (given § 1605A's legislative history and the D.C. Circuit's instruction to interpret the statute broadly, "injuries resulting from 'deliberated' attempts to kill fall within the scope of Section 1605A(a)(1)" and "[d]eploying an EFP represents a 'deliberated' attempt to kill someone"); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 98 (D.D.C. 2017) (Walton, J.).[3]

In rejecting that precedent, *Force II* failed to appreciate the significance of Congress's use of the phrase "*act of* … extrajudicial killing."  Unlike *Roberts*, *Force II* perceived no ambiguity arising from that language.  *See Force II,* 2022 U.S. Dist. LEXIS 118083, at *20. That conclusion conflicts not only with the weight of authority, but also an earlier opinion in the *Force* case where Judge Moss found § 1605A ambiguous and held that the statute permits recovery for attempted extrajudicial killings.  *See Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 360 (D.D.C. 2020) ("*Force I*") ("[T]he Court is also persuaded that the waiver of sovereign immunity includes attempted extrajudicial killings that result in serious physical injuries, even if no one is killed in the attack.").  At a minimum, the inconsistent *Force* rulings add weight to the *Roberts* court's conclusion that the "act of … extrajudicial killing" requirement is ambiguous.

*Force II's* reasoning also conflicts with controlling D.C. Circuit authority.  As *Force II* correctly notes, § 1605A adopts the definition of "extrajudicial killing" set forth in Section 3(a) of the Torture Victim Protection Act ("TVPA").  *Force II*, 2022 U.S. Dist. LEXIS 118083, at

---

[3] Courts have also repeatedly held that plaintiffs who suffered non-fatal injuries may assert § 1605A claims related to attacks that killed other individuals.  *See, e.g., Pennington v. Islamic Republic of Iran*, 2021 U.S. Dist. LEXIS 117666, at *9 (D.D.C. June 24, 2021) (Boasburg, J.); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) (Cooper, J.) ("It is not necessary, however, for one of the plaintiffs to have died in the attack in order for the state-sponsor-of-terrorism exception to apply. . .. Because Hamas's decision to bomb a busload of civilians was deliberate, unauthorized, and resulted in the death of 23 people, it qualifies as an 'extrajudicial killing.'").

*15.  But *Force II* based its holding that attempted extrajudicial killings cannot support § 1605A claims on *other* TVPA provisions *not incorporated in* § 1605A.  *Id.* at *16-17.

　　As an initial matter, *Force II's* conclusion that the TVPA bars claims based upon attempted extrajudicial killings reflects a minority view.[4]  More importantly, as the D.C. Circuit held in *Owens v. Republic of Sudan*, "When one statute, such as the FSIA, incorporates a definition from another statute, here the TVPA, it imports only the specified definition and not the broader purpose of the statute from which it comes."  864 F.3d 751, 776 (2017), *vacated on other grounds, Opati v. Republic of Sudan*, 140 S. Ct. 1601 (May 18, 2020).  As a result, the D.C. Circuit rejected Sudan's argument that the FSIA incorporated the TVPA's requirement that a "state actor" must commit the extrajudicial killing.  *Id.* at 775.

　　In contrast to § 1605A, the TVPA imposes liability only where a defendant "subjects an individual to extrajudicial killing," *i.e.,* it lacks the critical "act of" language upon which *Roberts* turned.  28 U.S.C. § 1350 (note).  *Owens* therefore dictates that *Force II* erred by superimposing TVPA requirements other than the definition of "extrajudicial killing" upon § 1605A, which contains very different liability requirements.  *See also, e.g., Flanagan v. Islamic Republic of Iran,* 190 F. Supp. 3d 138, 164 (D.D.C. 2016) ("And there is no indication that when Congress imported the definition of 'extrajudicial killing' from section 3 of the TVPA into the FSIA, it similarly meant to carry over the state-actor limitation from section 2.").

---

[4] *See, e.g., Jane W. v. Thomas*, 560 F. Supp. 3d 855, 881 (E.D. Pa. 2021) ("Courts have interpreted the TVPA to allow liability for attempted extrajudicial killings, 'even if no one died as a result of [the] attempt.'") (quoting *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017)); *Boniface v. Viliena*, 338 F. Supp. 3d 50, 67-68 (D. Mass. 2018) ("Defendant has not demonstrated that Plaintiffs' TVPA claim for attempted extrajudicial killing should be dismissed."); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 665-66 (E.D. Va. 2014) (denying defendant's motion to dismiss TVPA claim arising from an attempted extrajudicial killing), *aff'd*, 811 F.3d 653 (4th Cir. 2016); *Doe v. Constant*, 2006 U.S. Dist. LEXIS 101961, at *18 (S.D.N.Y. Oct. 24, 2006) (finding defendant liable for torture and attempted extrajudicial killing under the TVPA), *aff'd, Doe v. Constant*, 354 F. App'x 543, 544 (2d Cir. 2009).

In relying upon extraneous TVPA text to determine whether attempted extrajudicial killings satisfy § 1605A, *Force II* also disregarded the two statutes' contrasting scopes and purposes.  Unlike the TVPA, which applies to all state actors, § 1605A narrowly seeks to deter and punish the misconduct of a handful of designated state sponsors of terrorism.  Given that narrow focus, courts recognize that § 1605A addresses a broader scope of improper conduct than the TVPA.  *Owens*, 864 F.3d at 776 ("[T]he different purposes of the TVPA and the FSIA are plain on the face of those statutes.  The TVPA targets individual state officials for their personal misconduct in office, while the terrorism exception to the FSIA targets sovereign nations in an effort to deter them from engaging, either directly or indirectly, in terrorist acts."); *Flanagan*, 190 F. Supp. 3d at 165 (restrictions upon the TVPA's scope do not apply to § 1605A, which "is limited solely to those foreign states that are 'designated as a state sponsor *of terrorism*'") (emphasis in original).

The unique qualities of this case and the EFP attacks it addresses underscore the difference between an "extrajudicial killing" and the broader "act of extrajudicial killing."  This case narrowly focuses upon a single weapons system that Iran introduced into Iraq by means of an elaborate plot to produce maximum carnage among American and allied military members.  Over multiple years, Iran fashioned EFPs, distributed them and their components to Shi'a militias in Iraq, and educated those terrorists in assembling and using EFPs, all to serve the specific purpose of killing American and allied soldiers.  *See* Motion for Entry of Default Judgment, ECF No. 58 at pp. 2-4, 8-9, 12-21.  Iran undertook those long-term, concerted efforts because killing military personnel in a gruesome fashion with EFPs was essential to Iran's plot to cause the U.S. and its allies to abandon efforts to promote a peaceful, democratic Iraq.  *See id.* at 9-13.  Interpreting the phrase "act of" as "'[t]he process of doing'" something, as *Roberts* did,

Class members' injuries therefore arose from "acts of … extrajudicial killing," *i.e.,* the process by which Iran implemented its scheme to kill American soldiers with EFPs. *See Roberts*, 2022 U.S. Dist. LEXIS 12773, at *38 (quoting Act, Oxford English Dictionary (2d ed. 1989)).

It is also significant that Judge Moss's departure from his *Force I* opinion was motivated by a concern for imposing liability without meaningful limits that this case does not implicate. *Force II* arose from a renewed motion for a default judgment filed by a plaintiff whose home was struck by a rocket that Hamas fired into Israel. *Force II,* 2022 U.S. Dist. LEXIS 118083, at *3-7. The plaintiff, who was away from home at the time and knew that none of her family members were present, claimed only psychological injuries. *Id.* at *5-6. Even counsel for that plaintiff described her cause of action as a "stretching-it claim." *See* Perles Decl., Ex. A at 9.

Despite that concern, in a recent status conference, Judge Moss expressed willingness to re-examine his analysis with respect to plaintiffs who suffered severe injuries in non-fatal missile attacks. *See id.* at 8. At the same time, Judge Moss observed that "there would have to be some boundaries to this . . . It can't be that Congress had in mind that every . . . person in Israel is entitled to recover damages, because everyone in their right mind suffers psychiatric or psychological injury when missiles are raining down on your small country." *Id.* Judge Moss has ordered additional briefing by September 21. *Id.* at 11.

In sharp contrast to *Force II*, here Iran targeted soldiers with a uniquely deadly weapons system, and all primary victims of the EFP attacks (*i.e.*, the soldiers and other Class members targeted by the attacks) suffered physical injuries because they were present when EFPs detonated. *See* ECF No. 58 at pp. 21-25. Those factors address Judge Moss's concerns regarding boundless liability. Courts can better serve the policy objective that motivated *Force II* by limiting or eliminating damages awards to plaintiffs allegedly injured by attacks that

produced no physical injury, rather than by rejecting the claims of victims who suffered severe injuries in attacks designed to kill them.

### C. Section 1605A's Material Support Prong Provides an Alternative Basis for Class Members' Claims

Congress's decision to withdraw sovereign immunity where terrorist states provide "material support or resources *for*" an "act of … extrajudicial killing" supplies an alternative basis for concluding that § 1605A supports a claim for personal injuries arising from non-lethal EFP attacks.  18 U.S.C. § 1605A(a)(1) (emphasis added); *see also* 18 U.S.C. § 1605A(c) (providing a claim "for personal injury or death caused by acts described in subsection (a)(1)").

The word "for" is the key determinant of the scope of § 1605A "material support" liability.  As in *Roberts,* courts required to determine the meaning of common words frequently consult dictionary definitions.  *See, e.g., Guedes v. BATFE*, 2022 U.S. App. LEXIS 21998, at *13 (D.C. Cir. Aug. 9, 2022); *Roberts,* 2022 U.S. Dist. LEXIS 12773, at *38.  Indeed, courts have looked to dictionary definitions where the Constitution, statutes, or agreements use the word "for" in defining legal requirements.  *See, e.g., Sissel v. United States HHS*, 799 F.3d 1035, 1043 (D.C. Cir. 2015) ("The Clause's critical word for this analysis is 'for.'  The word 'for' in this context means 'with the purpose or object of.'  *See Webster's Third New International Dictionary of the English Language* 886 (1981); *see also* Samuel Johnson, *A Dictionary of the English Language* 353 (10th ed. 1792) (defining the word 'for' as meaning, among other things, 'with intention of')."); *Applera Corp. v. MJ Research Inc.*, 292 F. Supp. 2d 348, 363 (D. Conn. 2003) ("The word 'for' is defined as 'with the aim or purpose of; suitable to; appropriate for.'") (quoting *Webster's New World Dictionary of the American Language* 544 (2d ed. 1984)).[5]

---

[5] *Accord, e.g., AFSCME Iowa Council 61 v. Iowa Pub. Emp't Relations Bd.*, 846 N.W.2d 873, 877 (Iowa 2014) ("In the court's mind, this hinges upon the word 'for,' which is defined in this context as a function word used to indicate purpose or an intended goal.") (citing *Merriam-Webster's Collegiate Dictionary* 454 (10th ed. 2001)); *State v.*

As those cases suggest, dictionary definitions provide that "for" is "used as a function word to indicate purpose" or "used as a function word to indicate an intended goal." *Merriam-Webster Online Dictionary,* https://www.merriam-webster.com/dictionary/for; *accord, e.g., Macmillan Dictionary*, https://www.macmillandictionary.com/us/dictionary/american/for ("intended to help or benefit someone/something"). Legal dictionaries' definitions of "for" also emphasize the purpose or intent of the party undertaking the relevant action. *See, e.g., Skinner-Smith v. Sec'y of HHS*, 141 Fed. Cl. 348, 370 (2018) ("The plain meaning of the word 'for,' as defined by dictionaries contemporaneous to the passage of the Vaccine Act is to indicate 'purpose.'") (citing, *inter alia*, *A Dictionary of Modern Legal Use* 78 (defining "for" as a "general-purpose causal" conjunction)).

With that definition in mind, § 1605A's "material support" prong hinges upon the purpose or intention of the terrorist state that provided the actionable assistance, not whether the defendant succeeded in producing the desired extrajudicial killing. Thus, a terrorist state provides "material support or resources *for*" an extrajudicial killing whenever that nation intends for its assistance to further the objective of killing.

That reading logically attributes to Congress a desire to punish material support that caused personal injury irrespective of when the terrorist state provided that assistance or whether it achieved the desired deadly effect.[6] In contrast, *Force II's* interpretation imposes an additional

---

*Stewart*, 386 P.3d 688, 693 (Or. App. 2016) ("The word 'for,' as relevant here, is defined as 'in order to bring about or further'; 'with the purpose or object of'; 'in order to obtain . . . or gain'; or 'so as to secure as a result.'") (quoting *Webster's Dictionary* at 886).

[6] *See, e.g.,* Aiding Terrorists: An Examination of the Material Support Statute:  Hearing Before the S. Comm. on the Judiciary, 108th Cong. 6 (2004) ("The chronology of a terrorist plot, I think, is best understood as a continuum from idea to planning to preparation to execution and attack, and the material support statutes enable us to strike earlier and earlier on that continuum.  We would much rather catch a terrorist with his hands on a check than on a bomb.") (testimony of then-Assistant Attorney General Christopher A. Wray concerning proposed amendments to 18 U.S.C. §§ 2339A and 2339B); *id.* at 11 (material support statutes are a "vital component" of law enforcement's efforts "to neutralize persons who occupy positions within the terrorist organizational structure but are also at a distance from

requirement that Congress did not adopt (*i.e.*, a consummated killing) and shifts the statute's focus from the defendant's intent when it provided the material support to the fortuity of whether that conduct ultimately produced the desired result.

Under *Force II*, plaintiffs who suffer relatively minor injuries as a byproduct of a fatal attack successfully targeting others—for example, an individual who suffers a flesh wound arising from a ricocheting bullet directed at a victim hundreds of feet away—would possess a viable claim.  But soldiers paralyzed and disfigured by a sophisticated weapon designed and deployed for the specific purpose of killing *them* would have no claim if, through the wonders of modern battlefield medicine, none of them died when an EFP detonated below their vehicle. That illogical, inequitable result neither accords with the statute's plain words nor promotes the deterrence and retribution objectives Congress sought to advance.

Thus, the same interpretive guideposts that Plaintiffs cite above favor rejecting *Force II's* more restrictive interpretation of § 1605A's material support prong.  Plaintiffs' reading comports with § 1605A's plain meaning by giving effect to Congress's choice of the word "for," as opposed to alternative formulations that would have made clear that only a consummated killing can support liability.  *See, e.g., Biden v. Texas*, 142 S. Ct. at 2539; *Roberts,* 2022 U.S. Dist. LEXIS 12773, at *38.  Moreover, § 1605A's context and statutory history again favor adopting Plaintiffs' more permissive interpretation of the statute.  *See Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) ("And beyond context and structure, the Court often looks to 'history [and] purpose' to divine the meaning of language.") (citation omitted).

---

the actual terrorist attacks themselves") (testimony of Gary M. Bald, Assistant Director, Counterterrorism Division, FBI).

The interpretive principle that 1 U.S.C. § 1 outlines buttresses that conclusion.  Under § 1, "In determining the meaning of any Act of Congress, unless the context indicates otherwise—words importing the singular include and apply to several persons, parties, or things."  Applying that principle, § 1605A eliminates sovereign immunity when a terrorist state engages in "act[*s*] of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such … act[*s*]."  18 U.S.C. § 1605A(a)(1).  That formulation clarifies that the material support § 1605A addresses can include long-term activity intended to cause multiple extrajudicial killings—like the deaths Iran sought to produce by designing and implementing its complex EFP campaign.  Employing 1 U.S.C. § 1 to read § 1605A's references to "act[*s*]" in the plural thus advances Congress's intention of deterring and punishing terrorism by avoiding a statutory construction improperly focused on the vagaries of single attacks.  *See, e.g., Donnelly*, 34 F.4th at 10 (relying upon § 1 in concluding that "the statute's use of the singular phrase 'an interline movement' should be interpreted to include multiple movements.").

The overall statutory context of Congress's use of material support statutes to punish and deter terrorism also supports Plaintiffs' interpretation of § 1605A.  *See, e.g., Torres v. Lynch*, 578 U.S. 452, 459 (2016) ("[W]e must, as usual, 'interpret the relevant words not in a vacuum, but with reference to the statutory context.'") (quoting *Abramski v. United States*, 573 U.S. 169, 179 (2014)).  Section 1605A(h)(3) incorporates by reference the definition of "material support or resources" set forth in 18 U.S.C. § 2339A.  The latter statute criminalizes material support for terrorism, irrespective of whether that conduct produces the desired result.  *See, e.g., United States v. Stewart*, 590 F.3d 93, 119 (2d Cir. 2009) (knowingly providing aid to terrorists suffices to support a criminal conviction under § 2339A); *United States v. Mohammad*, 2017 U.S. Dist.

LEXIS 83432, at *1 (N.D. Ohio May 31, 2017) ("By its elements, § 2339A criminalizes material support given 'in preparation for' the object offense—clearly, the object offense need not even have been completed yet, let alone proven as an element of the material support offense.").

Of course, §§ 1605A and 2339A are separate statutes and employ different wording. Nonetheless, Congress presumptively recognized when it adopted § 1605A in 2008 that § 2339A made providing material support to terrorists a criminal offense subject to up to 15 years in prison without regard for whether that conduct caused any injury.  Particularly given § 1605A's specific incorporation of § 2339A's definition of material support, the courts' pre-existing interpretation of the criminal offense supports the conclusion that Congress did not intend § 1605A to require a successful extrajudicial killing.  *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."); *Guedes*, 2022 U.S. App. LEXIS 21998, at *13 (pre-existing case law provided guidance regarding whether regulation reasonably interpreted statute).

Finally, Plaintiffs' interpretation of § 1605A addresses the policy concerns that *Force II* expressed by meaningfully limiting victims' ability to establish claims against terrorist states. Plaintiffs must prove "personal injury or death" "caused by" conduct intended to result in "torture, extrajudicial killing, aircraft sabotage, [or] hostage taking."  The statute thus requires conduct designed to achieve particularly egregious results (extrajudicial killings), a high level of scienter (intent), and proximate causation.  *Force I* also emphasized that traditional tort principles appropriately limit plaintiffs' ability to assert "stretching-it claims" like those both

14

*Force* opinions rejected. *See Force I,* 464 F. Supp. 3d at 363 (emphasizing that the *Restatement (Second) of Torts* does not permit recovery where "no one suffered physical injuries and no one was even placed in imminent apprehension of physical harm").

## II.

### *FORCE II* HAS NO IMPACT UPON THE CLAIMS OF CLASS MEMBERS OR THE CERTIFICATION OF THE PROPOSED CLASS

Because *Force II* was wrongly decided, the opinion does not impact Class members' claims or the certification of the proposed Class. This question of law simply provides an additional legal issue shared by many Class members. *See* Fed. R. Civ. P. 23(a)(2) (commonality requirement); Fed. R. Civ. P. 23(b)(3) (predominance requirement).

If the Court were to follow *Force II* and bar recovery for non-fatal EFP attacks, that ruling would preclude all claims by Sergeant Nantz and other Class members who suffered often catastrophic injuries in EFP attacks that, fortuitously, did not produce fatalities. The EFP data available from the government allows Plaintiffs and the Court to determine which proposed Class members fall into that category. *See* Motion for Class Certification, ECF No. 60 at 20-21. Thus, even an adverse ruling would not impact the certification of a class of victims injured in attacks that produced fatalities.

Dated: August 24, 2022    Respectfully submitted,

           PERLES LAW FIRM, PC
           Steven R. Perles (D.C. Bar No. 326975)
           Edward B. MacAllister (D.C. Bar No. 494558)
           Joshua K. Perles (D.C. Bar No. 1031069)
           816 Connecticut Ave., NW, 12th Floor
           Washington, DC 20006
           Tel: (202) 955-9055

   /s/ James P. Bonner
James P. Bonner (*admitted pro hac vice*)
Patrick L. Rocco (*admitted pro hac vice*)
FLEISCHMAN BONNER & ROCCO LLP
317 George Street, Suite 320
New Brunswick, NJ 08901
Tel: (908) 516-2045

*Attorneys for Plaintiffs*