## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALAN BURKS, *et. al.* ) | |
| ) | No.  16-cv-1102 (CRC) |
| *Plaintiffs,* ) | |
| ) | |
| vs. ) | |
| ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, ) | |
| ) | |
| *Defendants.* ) | |

## REPORT AND RECOMMENDATION OF THE SPECIAL MASTER REGARDING COMPENSATORY DAMAGES

Plaintiffs in this case are service persons along with their families (or their estates) who were injured or killed in various terrorist attacks carried out in Iraq during 2007 with Explosively Formed Penetrators ("EFP").  The Defendants are the Islamic Republic of Iran and the Iranian Revolutionary Guard ("Iran"). The Court issued a Memorandum Opinion and Order on liability and jurisdiction on September 30, 2022.  Burks v. Islamic Republic of Iran ("Burks I"), No. 16-CV-1102 (CRC), 2022 WL 20588923 (D.D.C. Sept. 30, 2022) (ECF No. 65).  The Court issued a second Memorandum Opinion granting default judgment to certain Plaintiffs on February 27, 2025 Burks v. Islamic Republic of Iran (Burks II) No. 16-CV-1102 (CRC), 2025 WL 637368 (D.D.C. Feb. 27, 2025) (ECF No. 70).[1]  Plaintiffs seek compensatory and punitive damages under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.

---

[1] The Court deferred a determination with respect to one Plaintiff pending the United States Supreme Court's action on the Petition for Writ of Certiorari in the *Borochov* case.  *See Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir., 2024), rehearing denied, 2024 WL 1809236 (D.C. Cir. Apr. 25, 2024), cert. denied, 2025 WL 1787731 (June 30, 2025).

The Court appointed the undersigned to evaluate the claims for compensatory damages of the Plaintiffs and to provide a report and recommendation to the Court.  ECF No. 71 at 1.

## BRIEF BACKGROUND

Section 1605A(c) of the Foreign Sovereign Immunities Act (FSIA) creates a private right of action for money damages for United States nationals, members of the U.S. armed forces, and United States government employees or contractors (acting within the scope of their employment) who are injured or killed by terrorist acts carried out by officials, employees, or agents of a foreign state that is designated as a state sponsor of terrorism. See 28 U.S.C. § 1605A(c). Family members of those injured or killed in such terrorist acts may also seek money damages for their own injuries. Qualified plaintiffs may seek compensatory damages including economic damages, solatium damages, and pain and suffering damages.[2]

The determination of the appropriate amount of compensatory damages depends on the specific facts and circumstances of each claim and the evidence submitted in support of the claim. The Court's Appointment Order outlines specific guidelines:

> Although the Court is not strictly bound by the Federal Rules of Evidence in a default proceeding against a state sponsor of terrorism, see Owens v. Republic of Sudan, 864 F.3d 751, 785–86 (D.C. Cir. 2017), the Special Master should be guided by those rules. Authentication as required by FRE 901 may be made by any counsel's representation as an officer of the Court that a proffered document is genuine and is an accurate copy of what that counsel proffers it to be.

> The Special Master shall hold damages proceedings "and make or recommend findings of fact on" the scope of each Plaintiff's physical, emotional, and economic injuries pursuant to Fed. R.Civ. P. 53(a)(1)(B). The Court authorizes the Special Master to receive and to review evidence in this case, including evidence filed under seal.

ECF No. 71 at 2.

---

[2] *See* 28 U.S.C. § 1605A(c).

Following the case law in this Circuit, I am entitled to rely on documentary evidence that is properly submitted and authenticated by sworn declarations, deposition testimony, and trial testimony.  Plaintiffs may prove their claims "using evidence that might not be admissible in a trial," because the Court is not required "to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." Owens v. Republic of Sudan, 864 F.3d 751, 785 (D.C. Cir. 2017), vacated and remanded on other grounds by Opati v. Republic of Sudan, 140 S. Ct. 1601 (2020).  Uncontroverted factual allegations that are supported by admissible evidence are deemed to be true.  Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 59 (D.D.C. 2010); Barry v. Islamic Republic of Iran, 437 F. Supp. 3d 15, 28-29 (D.D.C. 2020) ("Barry II") (collecting cases). In evaluating solatium damages, I may rely on written declarations from family member claimants describing the attack's effect on him or her.  See Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015) (relying on wife's declaration and finding her emotional distress "reasonably certain to occur" as a result of an attack on her husband).

The first portion of this Report and Recommendation sets forth factual findings for each of the Plaintiffs. The second portion of the Report and Recommendation outlines the applicable case law and my recommendations for compensatory damages for the Direct Victims.  The third portion of this Report and Recommendation outlines the case law and recommendations for compensatory damages for the Family Member Plaintiffs.  The final section of the Report and Recommendation addresses the Plaintiffs' request for prejudgment interest.

## FACTUAL FINDINGS

The Direct Victim Plaintiffs are the Estates of two deceased Direct Victims – Peter Burks and Benjamin Tiffner – and injured Direct Victim James Hochstetler.  The Family Member Plaintiffs are Alan Burks, Jackie Hlastan, Alison Burks McRuiz, Sarah Phillips, Zachary Burks,

Georgia Burks; Tim Tiffner, Judy Tiffner, Seth Tiffner, Joshua Tiffner, Sarah Crosby, Leanne Hochstetler, Kyle Marshall, James Hochstetler II, and P.H.   The Estates of the Direct Victims and the injured Direct Victim seek economic loss damages and pain and suffering damages.  Each of the Family Member Plaintiffs seeks solatium damages. All of the Plaintiffs have submitted documentation establishing that they are United States Nationals within the meaning of Section 1605A and therefore have standing to bring the claims.[3]

## I.    DIRECT VICTIMS

The Court has determined that the Direct Victims were killed or injured as a result of the use of Explosively Formed Penetrators – a particularly lethal type of explosive device that produces holes in armor plating and creates an explosion that 'wreaks havoc' in the interior of vehicles and can dismember and kill the occupants.  ECF No. 65 at 2-3.

### A.  Estate of Second Lieutenant Peter Burk

Second Lieutenant Peter Burks was killed in action on November 14, 2007, in Baghdad, Iraq.  The Court found that Peter Burks was killed when his vehicle was struck by a number of EFPs.  ECF No. 65 at 7.

Peter Burks's father, Alan Burks, provided declaration testimony in support of the claim of the Estate of Peter Burks and in support of his own claim.   *Declaration of Alan Burks*, Exhibit 1.  Pete was the oldest child. *Id*. at ¶ 7.  He had a drive for knowledge.  *Id.* at ¶ 8.  He graduated from Texas A&M.  *Id.* at ¶ 9.  He joined the Army and had plans to attend Officer Candidate School. *Id.* at ¶10.  He deployed to Iraq with his unit, even though he had already been accepted to Ranger School.  *Id*. at ¶ 12.  Pete was engaged and while he was deployed he spoke to his fiancé several times a day.  *Id*. at ¶ 14.  On the day Pete was killed, his fiancé called Alan:  she was

---

[3] All Plaintiffs are U.S. citizens. ECF No. 65 at 12.

worried because she had not heard from Pete. *Id*. at ¶ 15. Alan was traveling for business on the day Pete was killed. He learned of Pete's death because he was on the phone with his family when representatives from the Army arrived to inform the family of Pete's death. *Id*. Alan described the 'awful' crying and screaming. *Id*. Alan had to travel home from his business trip alone after learning of Pete's death. He says that the loneliest he had ever felt was while he was in the cab from the airport returning home. *Id*. Pete had a military funeral and Alan states that it was very difficult to receive the flag that had been placed on Pete's casket. *Id*. at ¶ 17. After the funeral Alan was so focused on taking care of his family that he neglected himself. He believes that this is the reason for his eventual divorce from his partner. *Id*. at ¶ 18. He states that he had trouble sleeping after Pete's death; he kept imagining the circumstance of his death. Alan states that he is still affected by Pete's death and that he is still processing it. *Id*. at ¶ 19. Alan states that his personality has changed as a result of Pete's death. He is less patient and more prone to anger. *Id*. at ¶ 20. Pete's death also affected his career. He became known as the person who lost a son. He feels he lost several job opportunities because employers felt that he would not be able to focus on his job. *Id*. at ¶ 21. He recalls identifying Pete's body – something 'no father should have to do…'. *Id*. at ¶ 22. The vision of his 'sweet boy' and the scars on his head still haunts him. *Id*. He is haunted by the lost potential. *Id*. at 23. Pete's death has caused significant emotional and mental pain, suffering, and anguish for Alan and his family. *Id*. at ¶ 25.

### B. Estate of Special Forces Operational Detachment Commander Benjamin Tiffner

Captain Benjamin Tiffner was killed in action on November 7, 2007, in Baghdad, Iraq. ECF No. 65 at 6. The Court found, based on the expert evidence proffered by Plaintiffs, that Captain Tiffner was killed by an Iran-sponsored EFP. *Id*. Captain Tiffner died from massive

injuries to his torso and extremities.  FUS PX-6 at 8.[4] The report of the investigation into the incident concludes that Captain Tiffner died instantly.  PX-13 at 5, 10.

Benjamin Tiffner's parents, Timothy and Judith Tiffner, provided declaration testimony in support of the claim of the Estate of Benjamin Tiffner and in support of their own claims. *Declaration of Timothy and Judith Tiffner*, Exhibit 2.   Benjamin was the third of five siblings. The family lived in the Philippines until Ben reached middle school age when they moved back to the United States.  *Id.* at ¶ 9.  When Ben was a high school senior, he expressed interest in applying to West Point.  *Id*. at ¶ 11.  Ben graduated from West Point and was then commissioned as a Second Lieutenant.  *Id*. at ¶ 13.  Ben was accepted into the Ranger school and then into the Special Forces pipeline.  *Id.*  Ben was deployed to Iraq as a special forces operational detachment commander. *Id.*  Ben remained close with his family and always took time to help others.  *Id*. at ¶¶ 14-17. Timothy and Judith state in their declaration that in their opinion, Ben would have had a career outside the military and likely a career that involved helping others.  *Id.* at ¶ 18.  Ben called his parents the day before he was killed and explained that he and his team were doing good things. *Id*. at ¶ 19.  Timothy and Judith did not have a good night sleep for at least a year after Ben was killed.  They worry about how Ben's death is affecting the other children and grandchildren.  *Id.* at ¶ 23.  Ben is a 'missing stich' in the fabric of the family.  *Id.* at ¶ 23.  His death has caused significant emotional pain, suffering and anguish.  *Id.* at ¶  24.

---

[4] Citations in the format PX-[Number] refer to Plaintiffs' Exhibits already submitted to the Court, appended to their motions for entry of default judgment. Those with the prefix [FUS] have been filed by Plaintiffs under seal.

###### C.    Direct Victim Major James Hochstetler

Plaintiff James David Hochstetler was a Captain in the U.S. Army Special Forces in Iraq in 2007.  On August 23, 2007, his convoy was attacked by multiple remote-denotated EFPs. ECF No. 65 at 6.  Captain Hochstetler suffered serious injuries in that attack.  *Id*.  James Hochstetler provided declaration testimony in support of his claim.  Declaration of James Hochstetler, Exhibit 3.  James Hochstetler was married to Leanne from January 2001 to February 2015.  *Id.* at ¶ 7. James and Leanne had two children together.  Leanne's son Kyle from a prior marriage lived with them (starting when Kyle was 4) and James formally adopted Kyle when he was 17.  *Id.* at ¶ 9. James Hochstetler graduated from West Point and later received special forces training.  *Id.* at ¶ 6. He was deployed to Iraq.  *Id*.  On August 23, 2007, he was on a Pre Deployment Site Survey when his vehicle was struck by an EFP.  *Id*. at ¶ 12.  The next thing he remembers is waking up at Balad air base.  He was transferred to Landstuhl Germany where he underwent multiple surgeries to save his eye and hand.  *Id*. at ¶ 13.  He was then transferred to Walter Reed where he had 18 hours of reconstructive surgery. *Id.* at ¶ 14.  His nose was rebuilt from cartilage from his ears and skin from his forehead. Id.  Recovery was miserable. *Id.*  He was in constant pain. Id.  He underwent multiple subsequent facial reconstruction surgeries. *Id.*   He began to have intense migraines. *Id*. at ¶ 15. He was diagnosed with a Traumatic Brain Injury. *Id*. at ¶ 16 His judgment, executive functioning and emotional regulation have declined over time.  *Id.*  He states that before the injury his performance in the military was exemplary and he could have succeeded in any career. *Id*. at ¶ 17. Now, he is living out of a suitcase. *Id.*  He states that he has learned about his limitations and that he can operate only with short bursts of functionality.  *Id*. at ¶ 18.  His inability to perform professionally is shameful and embarrassing. Id. at ¶ 19.  He feels he has failed.  *Id.* He states that he had intense survivor's guilt and insisted on re-deploying.  *Id.* at ¶ 21.  In 2014, he sought

treatment for the migraines and was prescribed a medication that interfered with his ability to drive. After ending up in a ditch, he concluded that it was time for him to seek medical retirement. *Id.* at ¶ 22. He says he did not recognize himself after the injury. He was impulsive, had problems with the law, and made ruinous financial decisions. *Id.* at ¶ 23. He attributes his divorce to his cognitive changes. *Id.* Even after all this time, he still feels like he is being 'ambushed'. *Id.* at ¶ 24.

Plaintiff Hochstetler submitted a report prepared by Dr. James Kelly, President of Kelly Neuroscience Consulting LLC, located in Aurora Colorado. Dr. Kelly received his Doctor of Medicine from Northwestern University Medical School in 1983. He did his residency in Neurology at the University of Colorado School of Medicine from 1985-1988. Following residency, he had a Fellowship in Behavioral Neurology and Neurotoxicology at the University of Colorado School of Medicine from 1988-1989. He has had numerous academic appointments from 1985 to the present at the University of Colorado School of Medicine, the Northwestern University Medical School, and the College of Health and Human Services at Western Michigan University. He currently is Professor Emeritus, Departments of Neurology and Physician Medicine and Rehabilitation at the University of Colorado School of Medicine. He holds a Provider Certificate, Advanced Trauma Life Support (ATLS), American College of Surgeons 1985-1994. He is a Diplomate, National Board of Medical Examiners, 1985, and Diplomate in Neurology, American Board of Psychiatry and Neurology, 1991. He is licensed in Michigan, Illinois, and Colorado. He has served on multiple panels, initiatives, advisory boards, and studies regarding Traumatic Brain Injuries, including for the Department of Defense and the NCAA. He is a member of the American Academy of Neurology. He is the author of numerous peer reviewed papers. He worked with the Department of Defense and Walter Reed National Military Medical

Center to lead the establishment of a traumatic brain injury center for active duty military personnel and he created a traumatic brain injury institute for military personnel. Dr. Kelly has focused his career on Traumatic Brain Injury and its neurobehavioral consequences.  Report of Dr. James Kelly (with CV) Exhibit 4.  Based on his extensive experience and credentials, I conclude that Dr. Kelly is qualified to provide an expert opinion on the diagnosis and effects of a traumatic brain injury suffered by plaintiff Hochstetler.

Dr. Kelly reviewed Mr. Hochstetler's medical records and the declarations of the Hochstetler family plaintiffs in this case.  He interviewed and examined Plaintiff Hochstetler, and interviewed two eyewitnesses who were present in Iraq on the day of the attack that injured James Hochstetler.  Id. at page 2.  He states that the medical records from the period of Plaintiff Hochstetler's initial hospitalization detailed multiple procedures and diagnoses including facial reconstruction with the removal of retained fragments, post traumatic headaches, migraine headaches, tinnitus, TBI (Traumatic Brain Injury) and post-concussion syndrome.  Id.  Subsequent diagnoses are consistent and show ADHD, PTSD, and TBI.  Id.  Dr. Kelly interviewed Captain Hunt, who was in the same vehicle as Plaintiff Hochstetler at the time of the attack. Captain Hunt pulled Plaintiff Hochstetler from the vehicle, cleared blood and debris to enable Plaintiff Hochstetler to breathe, and administered first aid while waiting for the med evac helicopters. Id. at 3.  Dr. Kelly also interviewed Sergeant Chris Love, who was in a vehicle farther back in the convoy at the time of the attack.  Dr. Kelly reports that Sergeant Love saw Plaintiff Hochstetler sitting beside the vehicle after the attack, unable to move. Id. Dr. Kelly also reports that Sergeant Love has maintained contact with Plaintiff Hochstetler since the attack and that Sergeant Love reports that James Hochstetler's demeanor has changed since the attack.  Id.

Dr. Kelly made the following observations about James Hochstetler's condition after his

examination and based on the interviews:

> His examination reveals a subtle short term memory deficit manifest by his inability
> to recall a five-word list over a span of five minutes. More worrisome is the fact
> that he substitutes other words he had heard, thus misremembering without
> awareness of his error.
>
> His physical examination finds the residual effects of the traumatic injuries to his
> face and right hand. The finding of the loss of the sense of smell may be due to the
> known physical tissue injury to nasal structures, to trauma to his olfactory nerves,
> or a combination of these injuries. This loss of the ability to smell odors puts him
> at risk of being aware of noxious or dangerous odors in his environment.
>
> The deviation of his tongue to one side seems likely due to an injury to right Cranial
> Nerve VII, the right hypoglossal nerve. This would also be due to the blast.
>
> He exhibited very subtle balance and equilibrium deficits which he is aware of and
> works to overcome. This is due to the blast effect as well.

*Id.* at 9.

Dr. Kelly opines, to a reasonable degree of medical certainty, the following:

> 1.    James Hochstetler sustained a traumatic brain injury on while on military
> duty in Iraq when his vehicle was struck by an EFP. His injury meets criteria for
> the diagnosis of TBI determined by the National Academy of Neuropsychology in
> 2009 and criteria most recently established by the American Congress of
> Rehabilitation Medicine in 2023. (Ruff) (Silverberg)
>
> 2.    The force of such explosive blasts is now known to cause a specific type of
> brain injury called interface astroglial scarring seen on microscopic analysis of
> brain tissue at autopsy which cannot be detected on CT scans or MRI scans.
> (Shively)
>
> 3.    His TBI could be categorized as either a complicated mild TBI (meaning
> with an identified focal traumatic lesion on brain imaging) or a moderate TBI, based
> on the length of post-traumatic amnesia. Neurobehavioral outcomes are known to
> be worse in those with complicated mild TBI compared with those with
> uncomplicated mild TBI. (Levin} (CENTER-TBI }
>
> 4.    A recent study of psychiatric symptom severity in a large cohort of military
> personnel who were less seriously blast-concussed than Hochstetler revealed that
> they experienced more severe PTSD anxiety, depression, and sleep disturbance on
> self-report measures and clinician assessments than those military personnel who
> were deployed without blast injuries. (McDonald)

5.      He was rendered unconscious by the blast and remained so for several minutes while unresponsive and motionless in the vehicle. He required extrication from the vehicle by others at the scene. The blast effect led to unconsciousness by causing diffuse brain injury immediately upon impact, complicated by the presence of a brain contusion in the medial aspect of his right temporal lobe adjacent to and part of the limbic system which controls emotional regulation.

The human limbic system is a complex network of brain structures that monitor and regulate emotional behavior. Injury to the limbic system is known to cause impairment of emotional regulation leading to mood swings, irritability, anger outbursts, behavioral disinhibition, and verbal or physical aggression. His irritability, short fuse, restlessness and his self-perceived need to keep in motion are directly related to the state of anxiety and agitation resulting from the limbic system injury. These new vulnerabilities predispose him to interpersonal conflict and social disruption in his premorbid lifestyle and pattern of interactions with others. (Maresca)

6.    His cognitive deficits, psychological problems and neurobehavioral conditions subsequent to this incident, as described to me during our discussion, and as recorded in his declaration and those of his family members, are entirely due to the injuries he sustained at the time. There is no indication in his previous history to suggest that he had these problems as pre-existing conditions. Entire textbooks have been written on the neurobehavioral consequences of traumatic brain injury, describing in great detail the range of behavioral, cognitive and emotional changes following such injuries. (Levin)

*Id.* at 10-11.

## II.    INDIRECT VICTIMS

### A.  FAMILY OF PETER BURKS

#### 1.  ALAN BURKS (FATHER OF PETER BURKS).

The testimony of Alan Burks in support of the claim of the Estate of Peter Burks and his own claim is addressed above.

#### 2.  JACKI HLASTAN (MOTHER OF PETER BURKS).

Jacki Hlastan, mother of Peter Burks, provided declaration testimony in support of her claim.  Declaration of Jacki Hlastan, Exhibit 5.  Jacki remembered Peter as a wonderful and loving child who was full of life.  *Id.* at ¶ 6. Pete was a rule follower, had great imagination, and loved sports and reading.  *Id.*  Jacki was 'thankful' to be able to stay at home and raise her family.  *Id.* at ¶ 11.  She described Pete as very spiritual and intelligent.  *Id.* at ¶¶ 12, 13. Pete was a nurturer and took it upon himself make sure his younger siblings took their responsibilities seriously.  *Id.* at ¶ 15.  Pete's decision to join the military caused tension between them.  Pete convinced his mother it was the right choice after he explained that he had prayed and knew that it was God's will that he serve.  *Id.* at ¶ 19.  Jacki learned that Pete had been killed when two officers came to her door. When they told her Pete had been killed it was as if the vessel holding her life shattered into a million pieces.  *Id.* at ¶ 21.  She wept and kept asking whether they were sure.  *Id.*  Pete death was the most tragic life altering event in her life and in the lives of all of Pete's family.  His death forever changed their lives.  *Id.* at ¶ 24.  Pete's death has caused significant mental and emotional pain, suffering and anguish to her and her family.  *Id.* at ¶ 25.

### 3.   ALISON BURKS MCRUIZ (SISTER OF PETER BURKS).

Alison Burks McRuiz provided declaration testimony in support of her claim.  Declaration of Alison Burks McRuiz, Exhibit 6.  Alison is Pete's younger sister.  *Id.* at ¶ 3.  Alison states that the siblings were a tight knit 'clan'.  *Id.* at ¶ 5.  The siblings played together as children. *Id.* at ¶ 6.  Alison describes Pete as a great older brother and very protective.  *Id.* at ¶ 8.  Alison went to the same college as Pete.  *Id.*  She describes Pete as very studious and says that he did well in school.  *Id.* at ¶ ¶ 11-12.  She states that if he had survived, Pete could have done "anything he set his mind to."  *Id.* at ¶ 13.   Alison learned of Pete's death in a phone call from her father. *Id.* at ¶ 14.  She drove to her fiancé's house and cried.  *Id.*  She drank red bull for two days so that she would not have to sleep.  *Id.*  She says she just did not want to have to deal with anything emotionally.  *Id.*  She could barely function. *Id.* at ¶ 15. Her oldest son reminds her of Pete.  *Id.* at ¶ 17.  Pete's death has caused significant mental and emotional pain, suffering, and anguish to Alison, her parents and her siblings.  *Id.* at ¶ 18.

### 4.   SARAH PHILLIPS (SISTER OF PETER BURKS).

Sarah Phillips provided declaration testimony in support of her claim.  Declaration of Sarah Phillips, Exhibit 7.   Sarah is Pete's sister.  *Id.* at ¶ 2.   She is three years younger than Pete.  *Id.* at ¶ 3.  Sarah says that she and her siblings had a 'picture perfect' childhood.  *Id.* at ¶ 5.  She was very close to Pete.  They went to the same school and spent time together during and after school. *Id.* at ¶ 6. Sarah describes Pete as "the best older brother."  *Id.* at ¶ 7.  The siblings were 'incredibly' close.  *Id.* at ¶ 8.  Pete was their 'true north' and a great moral compass.  *Id.* at ¶¶ 14, 15. Sarah and Pete talked frequently when Pete was overseas.  *Id.* at ¶ 16.  She describes Pete as brilliant.  She says Pete got into business school and she believes he would have gone into international business after completing his service.  *Id.* at ¶ ¶ 17-18.   Sarah last saw Pete when he left for

Germany. *Id.* at ¶ 23. Sarah learned of Pete's death when she was traveling in a car two weeks after her son was born. *Id.* at ¶ 26. She felt like she was suffocating. She had to get out of the vehicle and sit on the curb to cry. *Id.* She was so stressed by Pete's death that her milk production stopped. *Id.* at ¶ 27. Sarah feels a huge void in her life and even 18 years later thinks of Pete every day. *Id* at ¶¶ 30, 31. She cries on the anniversary of his death and his birthday. *Id.* at ¶ 31. She dreams about Pete and states that Pete's death has caused significant mental and emotional pain, suffering, and anguish to herself, her parents and siblings. *Id.* at ¶¶ 32, 33.

### 5. ZACHARY BURKS (BROTHER OF PETER BURKS).

Zachary Burks provided declaration testimony in support of his claim. Declaration of Zachary Burks, Exhibit 8. Zachary Burks is Peter Burks's younger brother. *Id.* at ¶ 2. They shared a bedroom when they were growing up. *Id.* at ¶ 6. Inspired by his brother's military service, Zachary enlisted in the Navy. *Id.* at ¶ 11. Zachary also attended Texas A&M, where Peter attended college, and joined the same fraternity—Pi Kappa Phi—as Peter. *Id.* at ¶ 16. They were always close but became even closer as adults – and spent time together planning their lives. *Id.* at ¶ 17. Zachary chose to quit the Navy after Pete's death, recognizing that his family could not take another death if he were to die in action like Peter. *Id.* at ¶ 12. Zachary has been incredibly sad since Peter's death, and he has struggled to maintain personal relationships. *Id.* ¶ 23. Pete's death has taken a physical and emotional toll on the family. *Id* at ¶ 20. Zachary feels robbed of his brother, and feels anger that his daughter was robbed of her uncle. *Id.* at ¶ 21. Pete's death has affected the way Zachary relates to the world. There is a massive void in his life. *Id.* at ¶ 23. Pete's death has caused significant emotional pain, suffering, and anguish to Zachary and to the rest of his family. *Id.* at ¶ 24.

### 6.   GEORGIA BURKS (SISTER OF PETER BURKS).

Georgia Burks provided declaration testimony in support of her claim.  Declaration of Georgia Burks, Exhibit 9.  Georgia is 20 years younger than Pete and was only 6 years old when Pete died.  *Id.* ¶¶ 3, 5.  Georgia and Pete have the same father but different mothers.  *Id.* at ¶ 3. Georgia recalled Peter being smart, kind, caring, and an amazing big brother. She recounted numerous memorable events with Pete.  *Id.* at ¶ ¶ 7-16.  Georgia kept in touch with Pete when he was away.  *Id.* at ¶ 17.  She described the day they learned that Pete had died.  The soldiers came to her house.  Her mother was screaming.  She described it as pure panic, sobbing, screaming, crying.  *Id.* at ¶ 19.  She did not really understand what was happening and did not conceptualize it for another six months.  *Id.* at ¶ 21. She recalls that Pete never got the chance to propose to his girlfriend and that her sister Sarah held up the ring and proposed for him.  *Id.* at ¶ 22.  She did not really understand Pete's death until she was about 10.  She has not been able to watch war movies or discuss warfare – because it gives her panic attacks.  *Id.* at ¶ 23.

Georgia states that Pete's death caused her family to unravel.  *Id*. ¶ 26. Georgia's parents— Alan Burks and Laura Forman—got divorced after Peter's death.  *Id*. Georgia believes she was robbed of a two-parent household and siblings by those who took Peter's life.  The siblings had to split up – and Georgia went to live with her mother while her other siblings went to live with their father Alan. *Id*. Following Peter's death, Georgia was diagnosed with PTSD, generalized anxiety, and panic depression disorder. *Id*. at ¶ 28. She takes medication daily to treat her panic attacks, and to this day, Georgia takes off work on Peter's birthday and the anniversary of his death because it is too much to handle.  *Id*.  Georgia states that Pete's death has caused significant mental and emotional pain, suffering, and anguish to her and to the rest of her family.  *Id.* at ¶ 31.

### B.  FAMILY OF BENJAMIN TIFFNER

#### 1.  TIMOTHY AND JUDITH TIFFNER (PARENTS OF BENJAMIN TIFFNER).

The declaration testimony of Timothy and Judith Tiffner – submitted in support of their claims and of the claim of the Estate of Benjamin Tiffner – is addressed above.

#### 2.  SETH TIFFNER (BROTHER OF BENJAMIN TIFFNER).

Seth Tiffner provided declaration testimony in support of his claim.  Declaration of Seth Tiffner, Exhibit 10.  Seth is the younger brother of Benjamin Tiffner.  *Id*. at ¶ 2. They were a very close family – and during Seth's early childhood, they lived in the Philippines. *Id.* at ¶¶ 4, 7.   Seth and Ben shared a bedroom at one point, and they went to school and played sports together.  *Id.* at ¶¶ 11-12. When Ben went to West Point, Seth and the rest of the family would visit.  *Id.* at ¶ 19. Seth recalls the last time they were all together just before Ben's last tour of duty.  *Id.* at ¶ 20.  Seth learned about Ben's death while traveling with business associates.  He went home immediately and broke down. He felt disbelief and numbness. *Id.* at ¶23- 24.  Even after the initial shock, Seth felt numb and had difficulty focusing and connecting with reality. *Id.*  at ¶ 27.  "When you lose a brother that you were close to growing up the pain is still there, and the memories don't go away". *Id.* at ¶ 28.  Ben's death has caused significant mental and emotional pain, suffering, and anguish to Seth and his family.  *Id.* at ¶ 29.

#### 3.  JOSHUA TIFFNER (BROTHER OF BENJAMIN TIFFNER).

Joshua Tiffner submitted declaration testimony in support of his claim.  Declaration of Joshua Tiffner, Exhibit 11.  Joshua is Ben's older brother.  *Id*. at ¶ 3.  Joshua described the family as 'very close'.  *Id*. at ¶ 7.  Joshua and Ben spent their entire childhood playing and going to school together. They shared a bedroom for nearly their entire childhood.  *Id*. at ¶ 9. Both brothers decided to join the military.  Joshua joined the Marine Corps and Ben joined the Army. *Id*. at ¶ 17.  Joshua

described the process Ben went through to get into West Point. *Id*. at ¶ 15. Joshua described Ben as the 'most driven' person he had ever seen. *Id.* at ¶ 16. Joshua notes that Ben had a strong desire to start a family and, in Joshua's opinion, Ben would have pursued a career outside the military. He states that Ben could have been in the 'c-suite' of a non-profit or a service driven corporation. *Id.* at ¶ 22.

> Joshua described learning of Ben's death:

> "I was playing golf when I got the call that Ben had been killed. I don't know that I've ever reacted to anything in in my life in the same way I reacted at that instant. There was so much that went through my head at that time. Complete devastation, sadness, anger. I was so angry at the people responsible. In a lot of ways these feelings are still fresh wounds. *"*

*Id.* at ¶ 20.

> Joshua states that:

> After Ben's death I had trouble sleeping, and this still troubles me during important dates such as his birthday. I have no doubt in my mind that the grief of losing Ben has affected my interpersonal relationships. At the time Ben died my marriage was already starting to fracture, but Ben's death cause[d] me to withdraw emotionally from my family, to lock stuff away and that didn't help my marriage at all. I withdrew from a lot of my friends and I still have trouble forming strong friendships.

*Id*. at ¶ 21.

> Ben's death has caused significant mental and emotional pain, suffering, and anguish to Joshua and the rest of the family. *Id.* at ¶ 25.

### 4. SARAH CROSBY (SISTER OF BENJAMIN TIFFNER).

Sarah Crosby submitted declaration testimony in support of her claim. Declaration of Sarah Crosby, Exhibit 12. Sarah is Ben's younger sister. She was three years younger than Ben. *Id.* at ¶ 3. She, like her siblings, notes that her family was very close. *Id.* at ¶ 7. She had a deep bond with Ben, and she felt connected to him in a unique way. *Id*. at ¶ 9. She always went to Ben

when she had questions about school or homework. *Id.* at ¶ 12. When the family moved and their parents started home schooling, Sarah and Ben had more time together. *Id.* at ¶ 15. Their relationship 'blossomed' more when Ben left home for college and West Point. They would meet in New York or in South Carolina where Sarah was in school. Sarah looked up to Ben. *Id.* at ¶ 19. Sarah last talked to Ben on the phone a few days before he was killed. They had a typical conversation. *Id.* at ¶ 22. She learned of Ben's death when a van pulled up to the house. She could not come to terms with what had happened. *Id.* at ¶ 23. She described her feelings:

> I felt, first of all, very overwhelmed. It felt like this massive wave had come and just engulfed my world, and I think that's partly because we did have such a tight bond. It also felt like up to that point the world had been very, very safe. And now the world was not safe. That feeling has waned over the years but it's still there.

*Id.* at ¶ 24.

Sarah described the effect of Ben's death on the family dynamic:

> I think my family managed the incredible grief of Ben's loss with a lot of grace, but as you would expect grief changes relationships. Ben was in many ways the "glue" that held our family together.

*Id.* at ¶ 26.

> Sarah felt 'afraid' after Ben's death. "Ben's death also made me afraid. I don't think it was rational, but I had this sense that if something bad could happen to Ben, it meant that everybody was now vulnerable. I worried that something would happen to my parents when they travelled. I just had this feeling that we were all unsafe because if that can happen to him, then it can happen to anybody."

*Id.* at ¶ 27.

Like her siblings, Sarah noted Ben's desire to have a family and the likelihood that he would have pursued a meaningful career and succeeded at whatever he chose to do. *Id.* at ¶¶ 29-30.

### C.  FAMILY OF JAMES HOCHSTETLER

#### 1.  LEANNE RENFROE (EX-WIFE OF JAMES HOCHSTETLER).

Leanne Renfroe submitted declaration testimony in support of her claim.  Declaration of Leanne Renfroe, Exhibit 13.  Leanne married Jim at the beginning of his military career and supported his decision to join the Special Forces. *Id*. at ¶ 11-12. When they got married, Leanne had a 4-year-old child (Kyle) from a previous relationship. *Id.* ¶ 8.  Jim was Kyle's parent in every meaning of the word. *Id.*  Jim provided for Kyle, took him to school, provided support and advice, and treated him the same as Jim's two biological children. *Id.*  Jim formally adopted Kyle when Kyle was 17. *Id.*  When Jim was deployed to Iraq, Leanne was gearing up to attend nursing school. *Id*. at ¶ 13. Leanne withdrew from nursing school after Jim was injured to help him and to manage the household.  She has never had the chance to follow that career path. *Id.*

In August 2007 Leanne received a garbled message from Jim saying that he was ok. Later that night she received a call advising that Jim was badly injured and had severe burns. *Id.* at ¶ 14.  When Jim was transferred to Walter Reed, Leanne arranged for her grandparents to watch the children so she could be with Jim.  It was a traumatic experience. *Id*. at ¶ 16.  She was with Jim for his first surgery, which lasted 12 hours. *Id.* at ¶ 17.  It was difficult to look at Jim.  He did not look like himself because of what they had to do to reconstruct his face. *Id.*  Jim was very withdrawn during his recovery and Leanne could not communicate with him. *Id*. ¶ 19-20. Jim returned to Iraq within six months of his incident, and his decision was stressful for Leanne. *Id.* ¶ 20-21. Leanne was so stressed during this period that she had frequent panic attacks and "migraines with knife-like pain and auras." *Id.* at ¶ 21. Leanne also had trouble sleeping. *Id.*

Leanne and the children witnessed Jim's change in personality after the incident and watched his downward spiral. They feared his disproportionate anger and it began to affect her

health and the health of the children. *Id*. at ¶¶ 22-23. Leanne and Jim separated, and she believes that Jim's injury caused their marriage to become "pure chaos." *Id*.  Leanne described the change in Jim after the injury:

> He became erratic, he became impulsive, he became thoughtless. I feel like the decisions hes made now are not what he would have done before. He's still intelligent, still smart, but there's something not right with him. I don't even know how to put my finger on it, but he just has made such bad decisions.

*Id*. at ¶ 24.

Leanne believes if it were not for Jim's injury, the two would still be married, her children would have a supportive father, and she would have had the ability to pursue nursing school. *Id*. ¶ 27.

## 2. KYLE MARSHALL (ADOPTIVE SON OF JAMES HOCHSTETLER).

Kyle Marshall submitted declaration testimony in support of his claim.  Declaration of Kyle Marshall, Exhibit 14.  Jim became Kyle's father when Kyle was four years old. *Id*. at ¶ 4. Jim and Kyle lived in the same house from the time Kyle was four until Kyle left for college. *Id*. at ¶ 5. Jim officially adopted Kyle when he was seventeen, and Kyle recalls that Jim was an "excellent father," pushed him to be better, and always provided for him. *Id*. ¶¶ 5-6. After the family moved to Hawaii, Jim often took Kyle on hikes and taught him how to ride a bike, surf, and scuba dive. *Id*. ¶¶ 8-11. Kyle looked up to Jim and appreciated his intellect and thoughtfulness. *Id*. ¶ 12.

Kyle was pulled out of school in August 2007 after his mother received news that something had happened to Jim. *Id*. at ¶ 15. Kyle was terrified at not knowing Jim's condition or whether he was alive or dead. *Id*. at ¶¶ 16-17. "I remember seeing pictures of Jim in the hospital with what looked like his entire face blown off. I kept asking myself, "is he going to be able to come back from that?" He was hospitalized for a really long time. I was really worried I was going to lose my father". *Id*.at  ¶ 17. It was very hard to witness the effect of Jim's injuries on  his mom.

It was like a 'cloud' hanging over the house.  *Id.* at ¶ 18.  Jim had to go back to the hospital for more surgery and in between surgeries it looked like they had plastered a second nose on top of the original nose.  It made him angry to see how kids would stare at his father with disgusted looks on their faces.  *Id*. at ¶19.

Jim's personality changed after the injury.  *Id.* at ¶ 20.  "And for those of us that knew him before his injury, it's shocking sometimes to see his behavior and see the positions he puts himself in, because he would have never done that before. It's like a different person? I don't really know how else to put it other than before and after. It's like a night and day."  *Id.* at ¶ 21. Through no fault of his own, Kyle's father went from someone he emulated to someone who was chaotic and erratic.  *Id*. at ¶ 22.  He thinks about the opportunities that he and his siblings missed; they missed any chance for normalcy.  *Id.* at ¶ 23.

### 3.  JAMES HOCHSTETLER II (SON OF JIM HOCHSTETLER).

James Hochstetler II submitted declaration testimony in support of his claim.  Declaration of James Hochstetler II, Exhibit 15.  James Hochstetler II ("Jimmy") recalls a change in his father after the injury. By the time Jimmy was 10 or 11, his father was a completely different person.  *Id.* at ¶ 4. Jimmy recalls that his father became "depressed, full of shame, quick to temper." *Id*. at ¶ 5. Sometimes his father's actions were scary.  *Id.* at ¶ 7.  His father started to make worse decisions and suffered from substance and anger issues.  *Id*. at ¶ 8.  Watching his father deteriorate was really hard.  *Id.* at ¶ 9.  Jimmy says life would be so different if his father had not been 'blown up." *Id.* at ¶ 10.

> I hear all these stories from my mom and Kyle and my dad's buddies about what a badass he was, about how good he was at his job, about how he was at the top of his class at West Point. Even now I feel such pride and respect towards him. It's always kept me motivated. That said, it's so sad for me to see what was taken away from him, how hard that loss was on him, how much strain it puts on him mentally. I didn't necessarily understand all of that when I was a kid, but I do now. Now I

understand the hopes and the aspirations he had, not just for himself, but for us as a family. He had a plan for us, and we had to watch it all fall apart. It was really hard for him. He's had some really dark times where he's felt depressed, ..."

*Id.* at ¶ 11.

His father's deterioration and problems caused difficulties for Jimmy. Jimmy was depressed and became functionally immobilized. He stopped attending school. He says he was 'blanking out the chaos' and before his father's injury he was a happy kid. *Id.* ¶ 6.

### 4. P.H. (DAUGHTER OF JAMES HOCHSTETLER).

Leanne Renfroe, mother of P.H. (who was a minor when this case was filed) submitted declaration testimony on behalf of P.H. Declaration of Leanne Renfroe for P.H. Exhibit 16. P.H. was born in 2011, four years after Jim's injury and three years before Leanne and Jim divorced. *Id.* at ¶ 2. Leanne, P.H.'s mother, is certain that Jim's injury will negatively affect their daughter for the rest of her life. Declaration of Leanne Renfroe, Exhibit 13 at ¶ 25. Due to Jim's injury and subsequent decline, P.H. has never experienced a normal relationship with her father. *Id.* P.H. is emotionally closed off and Leanne believes that this is due to the difficult relationship with her father. Exhibit 16 at ¶ 6. Leanne believes that the people who hurt Jim stole the chance for P.H. to have a relationship with her father. *Id.* at ¶ 7.

## ANALYSIS OF COMPENSATORY DAMAGES

I.    **ECONOMIC LOSS ANALYSIS**

"Section 1605A of the FSIA explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (Syrian Arab Republic was liable to citizens' estates and families, under FSIA, for economic losses) (citing 28 U.S.C. § 1605A(c)).  *See also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

Economic loss damages must be supported by credible evidence and the amount of such loss may be proven by the submission of a forensic economist's expert report that is based on reasonable data and assumptions.  *Winternitz v. Syrian Arab Republic*, No. CV 17-2104 (TJK), 2022 WL 971328, at *10 (D.D.C. Mar. 31, 2022) ("The report of a forensic economist may provide a reasonable basis for determining the amount of economic damages in an FSIA case") (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)); *Roth*, 78 F. Supp. 3d at 402 (citing *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009)).  "In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)); *see also Thuneibat*, 167 F. Supp. 3d at 48-49.

The "estate of a plaintiff who would have had standing to sue 'is expressly covered by, and entitled to bring claims under, Section 1605A(c).'" *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 138 (D.D.C. 2019) ("W.A. I") (quoting *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78-79 (D.D.C. 2017)).  In order for an estate-plaintiff to bring an action under the FSIA,

"the plaintiff must first establish the estate's standing, or '[its] power . . . to bring and maintain legal claims.'" *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 36 (D.D.C. 2020) ("*Barry II*") (quoting *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017) ("*Cohen I*")). The "threshold question regarding the 'power of the estate to bring and maintain legal claims'" is governed by the "law of the state which also governs the creation of the estate." *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12-13 (D.D.C. 2011)).   Plaintiffs have submitted the Letters of Administration issued by the Probate Court of Collin County Texas appointing Alan Burk as the Independent Administrator of the Estate of Peter Haskell Burk and the Letters of Administration issued by the Probate Division of the Chancery Court of Montgomery County Tennessee appointing Timothy Tiffner the personal representative of the Estate of Benjamin Tiffner.  Exhibits 17 and 18. These letters establish the legal authority of Alan Burk and Timothy Tiffner to pursue the claim on behalf of the respective estates.   The pertinent state law establishes the power of the estates to bring and maintain claims:  Under Texas law, if an injured claimant dies a wrongful death, his or her cause of action "survives" to the estate and may be prosecuted by heirs or legal representatives. Tex. Civ. Prac. & Rem. Code Ann. § 71.021(b).[5] Tennessee law similarly provides

---

[5] Sec. 71.021.  SURVIVAL OF CAUSE OF ACTION.
    (a)  A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person or because of the death of a person liable for the injury.
    (b)  A personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person.  The action survives against the liable person and the person's legal representatives.
    (c)  The suit may be instituted and prosecuted as if the liable person were alive.

that the cause of action for wrongful death survives and may be pursued by the heirs or legal representatives.  TN Code § 20-5-106 (2024).[6]

Plaintiffs submitted economic loss reports prepared by John Beauzile for each of the Direct Victims.  Mr. Beauzile is a principal at Beauzile Forensic Economics.  He received a BBA degree in Public Accounting from Pace University in 2007. He has a BA in Mathematics from Marist College, and an MS in Actuarial Science from Columbia University.  Mr. Beauzile is a member of The American Academy of Economic and Financial Experts and the National Association of Forensic Economics.  He has worked at financial and insurance institutions providing accounting and actuarial services.  He has served as an expert witness on economic damages in a number of cases – including preparing economic loss reports for claimants in the September 11 Victim Compensation Fund.  Based on his education and training, and his prior and current experience as an expert witness, I conclude that Mr. Beauzile is qualified to provide economic loss reports in support of the claims in this case.  The details of the economic loss reports and analyses are outlined below in connection with each individual plaintiff.

---

[6] TN Code § 20-5-106 (2024)
- (a) The right of action that a person who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another, would have had against the wrongdoer, in case death had not ensued, shall not abate or be extinguished by the person's death but shall pass to the person's surviving spouse and, in case there is no surviving spouse, to the person's children or next of kin; to the person's personal representative, for the benefit of the person's surviving spouse or next of kin; to the person's natural parents or parent or next of kin if at the time of death decedent was in the custody of the natural parents or parent and had not been legally surrendered or abandoned by them pursuant to any court order removing such person from the custody of such parents or parent; or otherwise to the person's legally adoptive parents or parent, or to the administrator for the use and benefit of the adoptive parents or parent; the funds recovered in either case to be free from the claims of creditors.

The Direct Victim Plaintiffs also submitted a declaration from Kevin McDonnell in support of the economic loss analyses prepared by Mr. Beauzile. Declaration of K. McDonnell, Exhibit 19. Kevin McDonnell was the commanding officer for Benjamin Tiffner and James Hochstetler. He knew both of them before the attack and had impressions about their intelligence, capability, aspirations, education, and character. *Id.* at ¶ 4. He also states that he has reviewed Peter Burks's records and has formed similar impressions. Kevin McDonnell states, as relevant:

> I consulted with Mr. Beauzile as he prepared his economic damages reports. His assumptions regarding the likely military career progression, post-military career paths, marriage, and child rearing plans of Peter Burks, Benjamin Tiffner, and James Hochstetler are entirely consistent with my expectations of what would have happened absent the attacks at issue in this case. They are also consistent with the life-trajectories of similarly-situated Special Forces and Regular Army officers with whom I am familiar.

*Id.* at ¶ 7.

## A.    Economic Loss Damages: Estate of Peter Burks (Direct Victim)

Mr. Beauzile prepared a detailed economic loss analysis for the Estate of Peter Burks. Report of John Beauzile Regarding Peter Burks. Exhibit 20. Mr. Beauzile recites the basic relevant facts: Peter Burks was born on April 10, 1981, he had a Bachelor's degree in International Relations and was commissioned as a Second Lieutenant in the Army at the time of his death on November 14, 2007. *Id.* at 2. Mr. Beauzile made the following assumptions in computing lost wages and benefits.

1. Peter Burks would have remained in the military until 2016 and then retired and married.[7]

---

[7] I note that Mr. Burks had purchased an engagement ring for his girlfriend before his death. See Declaration of Georgia Burks, sister of Peter Burks, Exhibit 9 at ¶ 22; Declaration of Alan Burks, Exhibit 1 at ¶ 14.

2.  After leaving the military, Mr. Burks would have obtained an MBA.[8]

3.  He would have pursued a career as a business executive after graduation (in 2018).

4.  He would have had three children, each two years apart.

Mr. Beauzile first computed wage loss during the projected military career. Mr. Beauzile applied pay scales from historical military pay charts found on the Defense Finance and Accounting Services website. To compute pay over the approximately 8-year period of assumed military career, Mr. Beauzile factored in likely promotions based on research regarding the average time for promotions (assuming satisfactory performance) from 2nd Lieutenant to 1st Lieutenant and then to Captain and then Major. He estimated promotions in 2008, 2012, and 2016 – which he characterized as conservative assumptions. Mr. Beauzile assumed that Mr. Burks would be deployed during that entire period, which would mean that his earnings were tax exempt.[9] He reduced the earnings by 57.2 percent for personal consumption based on the Patton Nelson Personal Consumption tables. (Mr. Beauzile states that this is a conservative assumption.) This component of the economic loss analysis covers the period 2007 through 2016. Mr. Beauzile then determines the starting wage for Peter Burks in a post military, post business school, career as a business executive. Based on Mr. Burks's military background (as assumed), Mr. Beauzile focuses

---

[8] Peter Burks's sister Sarah Phillips testified that Peter had been accepted to business school and that she believed he would have had a career in international business. Exhibit 7 at ¶¶ 17,18.

[9] The Combat Zone Exclusion applies to certain service persons in designated combat zones. Mr. Beauzile's report does not provide any detail; however, Iraq was designated as a Combat Zone by Executive Order No. 12744. Because Mr. Burks and the other Direct Victims were serving in Iraq at the time of their deaths or injuries, it is not unreasonable to apply this assumption. Data compiled by Institute of Medicine indicates that 40% of service persons served multiple tours in Iraq. *See* Returning Home from Iraq and Afghanistan: Preliminary Assessment of Readjustment Needs of Veterans, Service Members, and Their Families, Institute of Medicine (US) Committee on the Initial Assessment of Readjustment Needs of Military Personnel, Veterans, and Their Families. Washington (DC): National Academies Press (US); 2010. ISBN-13: 978-0-309-14763-7ISBN-10: 0-309-14763-8

on positions that emphasize leadership, operations, and strategy. He concludes that a common 'landing spot' for military veterans with MBAs would include consulting, technology, defense/ aerospace, manufacturing/operations, energy, and financial services. *Id*. at 5-6. He concludes, based on his military experience, that Mr. Burks would achieve a management level role in his first civilian job after the military and that consulting would have been the most likely option for Mr. Burks and therefore applies that assumption in determining the likely wages for a post military civilian career. Mr. Beauzile finds the starting salary in 2018 for someone with an MBA in the consulting field is $145,000 plus a signing bonus of $25,000 to $30,000 and bonuses of $10,000 to $47,000.

Mr. Beauzile bases these numbers on an analysis of data from prominent business schools, consulting firms, and industry compensation reporters. The starting salary range among all of these sources is consistent for both base salaries and bonus structure. *Id.* at 7-9. Mr. Beauzile surveyed data on salary growth and promotions in the industry and analyzed the compensation factors for those who move to the financial sector or to corporate in-house positions. He reports that the data shows salary increases in the consulting field of about 10-20% annually. After a few years, the individuals either progress or leave the field. *Id.* at 9. Mr. Beauzile compiled salary ranges for each stage of progression – from first year to senior partner. He states that he applied the minimum amount in the ranges for each stage of progression until Mr. Burks would have had ten years of consulting experience. At that point, Mr. Beauzile applied a 2% per year inflation adjustment for salary growth. *Id.* at 10-11. Mr. Beauzile included a value for an assumed employer contribution of 5% of salary to a 401k. Mr. Beauzile determined the remaining years of work life using "The Markov Model of Labor Force Activity 2012-17" in the Journal of Forensic Economics 233 (2019) – which is a generally accepted source for computing work life.

Mr. Beauzile applied a factor to account for risk of unemployment based on historical unemployment rate data from 2013 - 2024 and then applied a consistent factor of 3.2% for 2025 and beyond. *Id*. at 11. Mr. Beauzile then applied a consumption factor to account for the portion of income that Mr. Burks would have consumed for his own support.[10] Mr. Beauzile then adjusts the compensation values for taxes. He assumed a New York domicile because it has the third highest marginal tax rate – and applied a combined federal and state tax percentage based on 2024 data. This component of the economic loss analysis runs from 2018 (the assumed date of completion of the MBA program) through 2046. Mr. Beauzile then applies a factor to account for lost Social Security retirement benefits using the online SSA calculator. This calculation assumes that Mr. Burks would have received Social Security retirement benefits from his retirement age (based on work life as noted above) until the estimated date of death – which is calculated using the 2021 US Life Expectancy tables for males. After computing an amount of loss for each year as described above, Mr. Beauzile discounted the amounts after 2025 to present value using a discount rate of 2.98%, which is the 18-month average of certain US treasury securities. The calculations described above yield an economic loss for the military portion of his career of $305,845.20 (present value); an economic loss for the civilian portion of his career of $9,680,776.81(present value); and $306,250.03 (present value) in lost social security benefits. The total economic loss on a present value basis, per Mr. Beauzile, is $10,292,872.

The economic loss analysis was calculated using relevant data from reliable sources and applying a generally accepted methodology. Based on experience with loss analyses for

---

[10] The consumption factor is based on a generally accepted and reliable source - Wright, Krieg, Patton, and Nelson, "Patton-Nelson Personal Consumption Tables 2018-19," *Journal of Legal Economics,* Vol. 30, Number 1-2, September 2024, pp. 5-24. *Id.* at 12, fn. 15.

uniformed personal – including military personnel – I believe that the assumptions applied are reasonable and justifiable.   It is reasonable to assume a civilian career after a military career, and to assume that a person who had already been accepted to graduate school would continue on that logical path.   It is also reasonable to assume that a person who was already engaged or intending to get engaged would have married and had children.   (The inclusion of a spouse and children affects the consumption factor deduction in the calculation.   Mr. Beauzile properly adjusted the consumption percentage as the assumed children would reach adulthood – so that the consumption deduction increases over the period of work life.)   Mr. Beauzile compiled pertinent and reliable data from which to determine the starting salary and wage growth and in fact applied conservative assumptions in the calculation.   Accordingly, I believe that the economic loss calculation is reasonable and recommend an economic loss award for the Estate of Peter Burks of $10,292,872.

### B.    Economic Loss Damages: Estate of Benjamin Tiffner (Direct Victim)

Mr. Beauzile prepared a detailed economic loss report for the Estate of Benjamin Tiffner. *Economic Loss Report for Benjamin Tiffner*, Exhibit 21.   Mr. Beauzile stated the initial pertinent facts:  Benjamin Tiffner graduated from the United States Military Academy at West Point ("West Point") in May 2000, with a Bachelor of Science in Engineering, and was commissioned as a Second Lieutenant in the U.S. Army. At the time of death in 2007, he had over seven years of commissioned service and held the rank of Captain. *Id*. at 2

Mr. Beauzile outlined the basic assumptions he applied in the loss analysis (similar to the assumptions applied in his analysis of economic loss for the Estate of Peter Burks).   Mr. Beauzile assumed that Captain Tiffner would have

- retired from the U.S. Military and married at the age of 35 (in 2011),

- gone to graduate business school to pursue a Master of Business Administration ("MBA"),

- graduated with an MBA degree at age 37 (in 2013),

- pursued a career as a Business Executive,

- had three (3) children, one every two years, starting at age 35.[11]

*Id.* at 2-3.

Mr. Beauzile computed an initial loss based on the assumption that Benjamin Tiffner would have remained in military service until August 31, 2011, deployed in Iraq, and would have been promoted to Major in 2009 – based on the average time for promotions based on the Defense Officer Personnel Management Act ("DOPMA4 ") guidelines and Captain Tiffner's performance record. Mr. Beauzile computed the military pay to which Captain Tiffner would have been entitled based on these assumptions using the historical military pay charts on the Defense Finance and Accounting Services website. *Id*. at 3. Mr. Beauzile applied a deduction for personal consumption based on Wright, Krieg, Patton, and Nelson, *Patton-Nelson Personal Consumption Tables 2018-19,* Table 1, Journal of Legal Economics, Vol. 30, No. 1-2, September 2024, which is a standard source. Mr. Beauzile characterizes this consumption factor as conservative because it is based on U.S. data and the cost of goods and services in Iraq is likely to be lower. *Id.* at 4.

Mr. Beauzile then computes loss based on a post military civilian career. After considering various options, taking into account Captain Tiffner's military training and leadership skills, Mr.

---

[11] The testimony in the record provides a basis for concluding that Captain Tiffner planned to be married and have a family. The inclusion of a spouse and children affects the consumption factor deduction in the calculation – and thus increases the net amount of loss as explained above in the discussion regarding the economic loss for the Estate of Peter Burks. The alternative would be to assume that Captain Tiffner remained single. It is not unreasonable to assume the presence of a family in this context.

Beauzile concludes that Captain Tiffner would likely have pursued an MBA and opted for a career in management consulting. There is support for the conclusion that Benjamin Tiffner would have attained an MBA in the testimony of his commanding officer Kevin O'Donell and of his family members. *See* Exhibit 12, *Declaration of Sarah Crosby* at ¶ 29. "Given what we've seen his colleagues in the Special Forces community achieve after retirement, it wouldn't surprise me at all to see Ben in the c-suite of a nonprofit, or even a corporation with a service-driven focus. Ben was easily capable of this." *See also* Exhibit 10, *Declaration of Seth Tiffner* at ¶ 21; Exhibit 19, *Declaration of Kevin O'Donnell*, at ¶ 7.   I have also located studies of the post military career paths of veterans.  A study conducted through a public-private partnership among Student Veterans of America, the National Student Clearinghouse, and the U.S. Department of Veterans Affairs' Veterans Benefits Administration entitled the National Veteran Education Success Tracker (NVEST) Project - A Report on the Academic Success of Student Veterans Using the Post-9/11 GI Bill (2017), available at https://studentveterans.org/research/nvest – found that "[b]y far, the largest number of degrees (96,270) were in the Business, Management, Marketing, and Related Support Services majors." *Id.* at 46.  The authors state that this accounts for 27% of the degrees earned by veterans after using the post 9/11 GI bill. *See id*. at Appendix B.  Based on the declaration testimony of family members, the declaration of Kevin O'Donnell, and the data showing that a significant percentage of veterans who sought post military degrees pursued a business track, it is reasonable to assume a post military civilian career in business consulting.[12]

---

[12] An alternative would be to use the average wage of college graduates with a Bachelors Degree in Engineering in the United States as a starting point for computing wage loss after military service, which was about 68% of the starting salary used in Mr. Beauzile's computation.  Of course, that is an average salary, and any individual could have a higher or lower starting salary.

Mr. Beauzile conducted an analysis of multiple sources of data for starting salaries for business school graduates in 2013.  He concludes, based on a synthesis of employment reports from leading business schools and compensation data from major consulting firms active during that period, that the predominant starting base salary for this profile in 2013 was $135,000, with signing bonuses of $20,000, and performance bonuses of $35,000. Exhibit 21 at 7.[13]  Mr. Beauzile then determined the salary progression for top performers in the consulting field over a ten-year period, based on a website providing a compilation of such data.  *Id.* at 10-12.  Mr. Beauzile applied these statistics – and assumed that Captain Tiffner would have been a top performer based on his performance history in the military.  After assuming a promotion track through the ten-year period,[14] Mr. Beauzile then applies an inflation-based growth rate for the remainder of the assumed work life.  *Id.* at 12.  Mr. Beauzile includes in the loss calculation an assumed employer 401k contribution of 5% of after-tax salary.  Mr. Beauzile computes the lost wages based on these assumptions through work life – which is determined based on standard and reliable data.[15] He then applies discounts to account for unemployment risk, consumption factors, and taxes using the same data applied in the Report of Economic Loss for the Estate of Peter Burks, discussed above.

---

[13] Mr. Beauzile reviewed data from multiple reliable sources including major business schools (Wharton, Columbia among others) and consulting firms (Accenture, Bain, DeLoitte among others). Exhibit 21 at 7-10.

[14] This methodology results in very high wages at the end of the 10-year period – with bonus payments of approximately 100% of base salary. This is consistent with general salary information for the consulting profession.  Mr. Beauzile applied the higher end of the bonus and salary range in this computation because of Captain Tiffner's past track record as a top performer.  Mr. Beauzile states:  "According to information provided … Decedent would have been ranked in the top 3 out of 130 Captains in his year group. I have, therefore, assumed that he would have been ranked a top performing consultant as well."  Exhibit 21 at 12.

[15] Mr. Beauzile determines work life using Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger, titled 255 "The Markov Model of Labor Force Activity 2012-17" in the Journal of Forensic Economics 256 (2019).

The calculation assumes, as noted, that Captain Tiffner would have married and had three children. The testimony does not indicate that Captain Tiffner was already engaged or intending to be engaged, but the testimony of his family members is consistent in noting his desire to have a family. (The effect of including a spouse and children in the calculation is to reduce the deduction for consumption. The calculations properly adjust the consumption percentage as the assumed children reach the age of majority resulting in a higher percentage deduction and lower net economic loss in those years.) Mr. Beauzile also calculates lost social security retirement benefits from the end of work life to the projected date of death. Finally, he discounts the resulting amounts starting in 2026 to present value using the yield on certain U.S. Treasury securities, as described above. Mr. Beauzile states that he is confident that these values are correct based on a reasonable degree of economic and actuarial certainty.

The above-described calculations result in the following: Lost Military Pay $137,236 (present value); Lost post-Military Pay $17,150,260[16] (present value); Lost Social Security Benefits $337,831 (present value): Total Damages $17,625,327 (present value).

As a general matter, the assumptions applied are not unreasonable, the methodology is appropriate, and the data inputs are based on reliable and verifiable sources. An alternative loss calculation based on Captain Tiffner's Engineering degree – as opposed to an MBA – *might* yield a lower economic loss amount. (A general review of reports on post military salaries indicates that there is a wide range of salary levels for post military engineers based on the type of engineering work. In some cases, the salaries appear to approach the salary levels for business

---

[16] Principal reasons for a larger economic loss number for Captain Tiffner as compared to the loss amount calculated for Peter Burks include that Captain Tiffner's post military employment is assumed to start earlier thus resulting in more years of undiscounted 'past' loss, and higher projected future compensation and bonuses.

school graduates.) The economic loss analysis prepared by Mr. Beauzile meets the general standards set in the case law for proof of economic loss. While I believe some different assumptions would be reasonable, I cannot conclude that the assumptions applied are unreasonable or inconsistent with generally accepted methodologies in the context of economic loss analyses. Accordingly, I recommend accepting the economic loss computations set forth in Mr. Beauzile's report.

### C.    Economic Loss Damages: James Hochstetler (Direct Victim)

Mr. Beauzile prepared a detailed report assessing economic loss for Plaintiff James Hochstetler. *Economic Loss Report for James Hochstetler*, Exhibit 22. Mr. Beauzile stated the basic factual predicates for the computations:

> Plaintiff is male, born on June 1, 1978. He graduated from the United States Military Academy at West Point ("West Point") in May 2000, with a Bachelor of Science in Engineering Management and was commissioned as a Second Lieutenant in the U.S. Army. At the time of his injury in 2007, he was in the rank of a Captain and was married with two children. On or about December 19, 2016, Plaintiff retired from the military with a rank of Major.

*Id.* at 2.

Mr. Beauzile made the following assumptions in computing the economic loss for Plaintiff Hochstetler:

- But for the injury, Plaintiff Hochstetler would have retired from the U.S. Military at the age of 35 (in 2013),
- gone to graduate business school to pursue a Master of Business Administration ("MBA")
     and financed it through the G.I. Bill,
- graduated with the MBA degree at age 37 (in 2015),
- pursued a career as a Business Executive.

*Id*. at 3.

Mr. Beauzile calculates economic loss assuming a post military career as a business executive using the same basic data sources as those applied in the computations discussed above.

The assumptions underlying this computation, however, require examination. Plaintiff Hochstetler was not killed in the pertinent attack and, in fact, continued in the military until near the end of 2016. As an initial matter, the assumption that Plaintiff Hochstetler would have retired from the military *earlier* – in 2013 – and then embarked on a civilian career had he not been injured is difficult to reconcile with the facts. Mr. Beauzile's analysis does not clarify the basis for that assumption. Plaintiff Hochstetler's declaration testimony indicates that he continued serving in the military despite the effects of his traumatic brain injury until he finally recognized that he had to accept medical retirement. His testimony indicates somewhat obliquely that he had 'survivor's guilt' and that may be why he pursued re-deployment – but there is nothing in the record to indicate that it is likely that had he not been injured he would have retired as early as 2013.

Mr. Beauzile assumes that Plaintiff Hochstetler would have pursued an MBA (*i.e.,* would have followed the same career path projected for the other two Direct Victims). There is no indication in the James Hochstetler's declaration or the family member testimony that Plaintiff Hochstetler was considering a business career after service. However, the report of James Kelly – who provided the diagnosis of a traumatic brain injury – states that James Hochstetler moved to Hawaii to obtain a graduate degree and that he in fact received an MBA. Exhibit 4 (Kelly Report), at 5. The declaration of Kevin McDonnell – in support of the economic loss analysis computation and the assumptions applied by Mr. Beauzile – does not mention that Mr. Hochstetler had obtained an MBA. He states instead that an MBA is consistent with his knowledge of Mr. Hochstetler's intentions. Exhibit 19 at ¶7. Based on the record as a whole, I assume that the statement in the Kelly Report is simply an error.

As discussed above, it is not unreasonable to assume for purposes of computing future loss that an individual with Mr. Hochstetler's background and experience would have opted to pursue

a career in business consulting – consistent with the declaration of Mr. McDonnell and the study (noted above) regarding the prevalence of business degrees among military veterans.  It seems inappropriate, however, to assume a start date for post military employment that pre-dates Mr. Hochstetler's actual retirement from the military.  The calculations – which apply the same basic methodology as discussed above for Direct Victims Burks and Tiffner – also include an offset calculation – presumably reflecting Mr. Hochstetler's residual earning capacity in light of his injuries.  That offset appears to incorporate actual earnings – from Exhibit B to Exhibit 22, Report of Economic Loss for James Hochstetler.  That exhibit shows an earnings record through 2023 – but does not identify the source.  The exhibit shows earnings in 2017 of $36,115 and in 2023 of $15,197 – with varying amounts in the intervening years.  The computation of the offset amount, in contrast, shows earnings in 2017 of $36,115 in military and other employer pay *plus* $123,362 in 'consulting pay'.  The record does not include the back up documentation for the consulting pay.  In response to a question, counsel provided the following explanation.  Mr. Hochstetler continued to receive military pay after his retirement because he retired for medical reasons.  Mr. Hochstetler attempted to start a consulting business and was able to secure a contract in 2017 but shortly after that the business failed.

In addition to including actual income as part of the offset, the offset calculation adopts assumed future earnings starting in 2023 of $48,490 – which amount is carried through until the end of work life without adjustment for inflation or wage growth.  This calculation is not explained in Mr. Beauzile's report.  It is appropriate and correct to account for residual earnings for a person who was injured.  Mr. Hochstetler's actual earnings do indicate an ability to earn but at level that is far lower than the type of income that would be earned by a person with an MBA who is a high performer.  Based on the record provided, I conclude:

1.  It is appropriate to find that Mr. Hochstetler has a reduced earning capacity due to his traumatic brain injury diagnosed by Dr. Kelly.

2.  The reduced earning capacity should be an 'offset' against the projected future 'lost' earnings.  The future lost earnings should start after the date of military retirement.  I note that in the loss calculations for the other Direct Victims, Mr. Beauzile incorporated a period of time for the individual to earn the MBA degree.  If the same assumptions are applied here, the MBA earnings would start two years after the date of military retirement – or 2018.

3.  The offset should include the actual earnings from 2018 through 2023 (which is the last year for which earnings are provided).

4.  It is not unreasonable to assume that the highest amount Mr. Hochstetler earned post military retirement outside of the failed consulting business provides a basis to compute residual earning capacity.  That amount is $47,679 according to Exhibit B.  That compares reasonably with the amount used by Mr. Beauzile – of $48,490.

5.  The residual earnings should be subject to the same assumptions applied to 'but for' earnings – *i.e.*, a reasonable growth factor, and reduction for taxes, and consumption. The offset computation provided by Mr. Beauzile does account for taxes and consumption but not for growth.

6.  The residual earnings and the projected lost earnings should both be reduced to present value using the same discount factor.

7.  It might be appropriate to request a revised economic loss report from Mr. Beauzile – or, in the alternative, a detailed explanation in support of the calculations provided.  To assist the Court, I have prepared a modified calculation applying the guidelines noted

above and applying the calculation factors used in Mr. Beauzile's report for growth, taxes, and consumption.  This revised calculation commences loss in 2018 instead of 2015, adopting the 2015 assumptions and corresponding dollars reflected in Mr. Beauzile's report as the 2018 amounts instead of 2015 amounts, and carrying those corresponding adjusted calculations forward from 2018 to 2040.   The revised calculation also adjusts the earnings offsets to commence in 2018 and to use only actual amounts for 2018-2023 as identified in Exhibit B to Mr. Beauzile's report.  The revised offset calculation also applies a 2% annual growth rate to the projected income from a consulting business after 2024. The revised calculation uses the same lost Social Security benefits projection as calculated by Mr. Beauzile.  The resulting amounts are discounted to present value using the discount rate identified by Mr. Beauzile.  Using this alternative analysis, and accepting Mr. Beauzile's approach of a projected loss based on a post military business consulting practice, the economic loss would be $9,072,791.  Mr. Beauzile's report calculated an economic loss of $10,431,847.

Accordingly, I recommend an award of economic loss for Mr. Hochstetler of $9,072,791.

## II.  NON-ECONOMIC PAIN AND SUFFERING DAMAGES – DIRECT VICTIMS

As the courts have recognized, it is always difficult to place a dollar value on pain and suffering.  It is even more difficult in the case of terrorist attacks resulting in the death of the victim where one must often infer the nature and duration of pain and suffering from autopsy reports, emergency room notes, and analysis of the nature, type and timing of wounds leading to death. Decisions in previous cases provide important guidance, but, of course, each case must be analyzed based on the facts and evidence and each case presents unique circumstances.

For victims who are killed in the terrorist attack, the analysis begins with the basic guideposts outlined in the body of case law in this circuit:  If there is evidence of conscious pain and suffering before death, even if for a very short period of time, then pain and suffering damages may be awarded to a victim killed in the terrorist attack.  The amount of damages is based on multiple factors including the duration of the pain and suffering, the nature and extent of the injuries, the fear and terror experienced by the victim, and the circumstances surrounding the death. In general, courts in this district have concluded that an award of $1 million in pain and suffering for a victim who lives and endures pain or fear for a few seconds or minutes after sustaining injuries is appropriate, although there is some variation in the awards based on the individual facts of each case.  *See Est. of Fishbeck v. Islamic Republic of Iran*, No. 1:18-CV-2248-CRC, 2024 WL 4119382, at *2 (D.D.C. Sept. 9, 2024) ("[W]hen the victim endured extreme pain and suffering for several hours or less", courts in these cases have rather uniformly awarded $1 million, adjusting upward when the victim's pain is longer and downward when the victim survived for only a few minutes) (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 53 (D.D.C. 2007), abrogated on other grounds by *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9 (D.C. Cir. 2015)); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5, 8 (D.D.C. 2000) ($1 million for pain and suffering endured in the several minutes between the suicide bombing of a passenger bus and the victim's death); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112-13 (D.D.C. 2000) ($1 million for pain and suffering endured while victim of assassination fought with his attacker, a period of less than four minutes);  *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C.2006) ("When the victim endured extreme pain and suffering for a period of several hours or less, courts in these [terrorism] cases have rather uniformly awarded $1 million.").

Pain and suffering damages are not limited to physical pain, but also take into account mental anguish based on the conscious knowledge of imminent death.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 81–82 (D.D.C. 2011) ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent."); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 157 (D.D.C. 2010) (victim was "entitled to additional compensation in the amount of $1,000,000 for the portion of his life that he spent facing certain death alone"); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (award of $500,000 to the estate of the executed victim "for the pain and suffering he endured prior to being singled out for execution" and an additional $1 million for "the several minutes of anguish and pain [the victim] endured as and immediately after being shot by [a terrorist] and thrown from the [air]plane").

If the victim is killed instantly, there is no award for pain and suffering.  Courts generally have not awarded pain and suffering damages for a deceased victim where the death was instantaneous and the evidence does not show that the victim had any awareness of impending death or experienced pain or fear before death.  *See Roth*, 78 F. Supp. at 402 ("Plaintiffs who were killed in the attack giving rise to the cause of action cannot receive an award for pain and suffering if their death was instantaneous . . . Also, a court must refuse to award damages for pain and suffering if the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his or her death.").[17]

---

[17] In some cases, courts have approved significantly higher awards, that generally are based on the relative egregiousness of the circumstances.  *See, e.g., Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 221, 266 (D.D.C. 2008) ($18,000,000 in pain and suffering damages to victim who survived just a few minutes after a plane bombing); *Gates v. Syrial Arab*

The case law outlines ranges of values for victims who have been injured but not killed in terrorist attacks. In general, the cases have identified a "baseline" award that may be increased or decreased based on the severity of the injuries and the ongoing physical and psychological effects. This Court has articulated the relevant framework: "For servicemembers who survive an attack with "substantial injuries," the baseline award is $5 million. *Bathiard v. Islamic Republic of Iran*, No. 16-cv-1549 (CRC), No. 17-cv-2006 (CRC), 2020 WL 1975672, at *3 (D.D.C., April 24, 2020) (quoting *Valore*, 700 F. Supp. 2d at 84). That baseline includes injuries such as "vision impairment, many broken bones, severe shrapnel wounds or burns, lengthy hospital stays ... and permanent injuries." *Schertzman Cohen v. Islamic Republic of Iran,* No. 17-cv-1214 (JEB), 2019 WL 3037868, at *6 (D.D.C. July 11, 2019) (quoting *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 92-93 (D.D.C. 2014),  aff'd in part., vacated in part on other grounds sub nom. *Owens v. Republic of Sudan,* 864 F.3d 751 (D.C. Cir. 2017), vacated & remanded on other grounds sub nom. *Opati v. Republic of Sudan*, 590 U.S. 418 (2020)). "The $5 million award baseline may be adjusted up or down 'based on the nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment.'" *Estate of Fishbeck*, 2024 WL 4119382, at *8 (quoting *Bathiard*, 2020 WL 1975672, at *3 (quoting *Goldstein v. Islamic Republic of Iran*, 383 F. Supp. 3d 15, 19 (D.D.C. 2019)). *See also Taitt v. Islamic Republic of Iran*, 664 F. Supp. 3d 63 (D.D.C. 2023); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d, 24, 37-38 (D.D.C. 2012). "Decisions to deviate from the starting points provided by the *Heiser* framework are

---

*Republic*, 580 F. Supp. 2d 53,72-74 (D.D.C. 2008) (in this extreme case, the Court awarded $50,000,000 for pain and suffering to each of two victims who were publicly decapitated – but slowly so that "each man suffered unimaginable mental and physical agony.").

committed to the discretion of the particular court in each case ...." *Oveissi v. Islamic Republic of Iran* ("*Oveissi I*"), 768 F. Supp. 2d 16, 26 (D.D.C. 2011).

Courts generally have adopted the principle that such damage awards should be consistent to the extent the circumstances appropriately can be characterized as similar. *See, e.g., Wamai*, 60 F. Supp. 3d at 91 (quoting *Peterson v. Islamic Republic of Iran ("Peterson II")*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007), abrogated on other grounds by *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9 (D.C. Cir. 2015); *Winternitz*, 2022 WL 971328, at *9 ("In determining the 'reasonable estimate,' courts may look to expert testimony and prior awards for comparable injuries.") (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)); *Peterson II*, 515 F. Supp. 2d at 54 ("In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards").

Courts have increased awards from the baseline to "$7.5–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *Valore*, 700 F. Supp. 2d at 84. *See also Peterson II*, 515 F. Supp. 2d 25 (awarding $12 million to a victim rendered quadriplegic and $9 million to a victim with severe injuries including skull and face fractures). Some courts have adjusted the pain and suffering amounts where the injuries were caused by Explosively Formed Penetrators. *See, e.g.*, *Karcher* v *Islamic Republic of Iran,* 396 F. Supp. 3d 12 (D.D.C. 2019) (awarding pain and suffering damages for plaintiffs injured by Explosively Formed Penetrators of between $7.75 million and $13.5 million). The matrix developed in *Karcher* includes enhancements of awards based on hospital stays longer than one year, ongoing psychological injuries, and permanent injuries.

Court have departed "downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 47 (D.D.C. 2012), *abrogated on other grounds, Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161 (D.D.C. 2019) (*"Barry I"*) (citation and internal quotation marks omitted). For servicemen suffering modest emotional injury but no physical injury some courts have established a baseline of $1.5 million. *See Relvas v. Islamic Republic of Iran*, No. 1:14-CV-01752 (RCL), 2018 WL 1092445, at *2 (D.D.C. Feb. 28, 2018); *Wamai*, 60 F. Supp. 3d at 92.

Where the victim suffered less severe physical injuries but significant psychological injuries – particularly where the victim demonstrates ongoing treatment, or disability, or severe reactions – courts have found higher amounts appropriate. *See, e.g., Taitt* 664 F. Supp. 3d  at 99, 100 (awarding $6.5 million to plaintiff who had a head injury, shrapnel scars, ruptured ear drum, post traumatic migraines, PTSD resulting in insomnia, increased irritability, anger management issues, increased alcohol consumption, and an overactive startle response; awarding $5 million to plaintiff who had post-traumatic headaches, Major Depressive Disorder, and PTSD resulting in insomnia, nightmares, anxiety; and awarding $6 million to plaintiff who suffered two ruptured ear drums resulting in hearing loss and requiring surgery, post-blast Tinnitus resulting in ear ringing and pain, fractured right elbow requiring surgery, fragment wounds to his left eye, hot water and oil burns, a TBI resulting in headaches, General Anxiety Disorder, and back pain).  Courts have also awarded amounts at or above the baseline where the victim has suffered a permanent impairment – such as hearing loss or damage to eyesight.  *See, e.g.*, *Peterson II,* 515 F. Supp. 2d at 54  (awarding $7.5 million to plaintiff who lost sight in one eye, had a perforated eardrum, and shrapnel injuries); *Messina v. Syrian Arab Republic*,  No. 20CV1237 (RJL), 2024 WL 4199369, at *6 (D.D.C. Sept. 16, 2024) (awarding $7.5 million for plaintiff with traumatic brain injury, loss

of vision, seizures, and COPD coupled with depression, nightmares, and bad temper; awarding $6 million for plaintiff who required 6 oral surgeries, has PTSD, depression, and suicidal ideation; and awarding $6 million for plaintiff who had injuries to the eye, ringing in the ears, headaches, phantom burning pain, and extreme difficulty sleeping).  The damage award might also take into consideration disfigurement and the resulting psychological impact resulting therefrom.  *See Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 25 (D.D.C. 2017) ("*Cohen II*"), *abrogated on other grounds by Goldstein v. Islamic Republic of Iran*, 383 F. Supp. 3d 15 (D.D.C. 2019) (awarding $5 million to an injured child victim who suffered a broken nose, neck injury, and significant damage to her eardrum, leading to PTSD and depression; and $7 million to a child who suffered permanent disfigurement and loss of vision coupled with psychological injuries given her young age).

In *In re Estate of Fishbeck*, this Court applied a compensation framework outlined in the *Wamai* framework.  *See In re Est. of Fishbeck*, 2024 WL 4119382, at *9.  Under this framework, a victim that suffers "some mix of serious hearing or vision impairment, many broken bones, severe shrapnel wounds or burns, lengthy hospital stays, serious spinal or head trauma, and permanent injuries" would fall into Category 5 – warranting an award of $5 million – and  a victim who suffers "grievous wounds such as lost eyes, extreme burns, severe skull fractures, brain damage, ruptured lungs, or endured months of recovery in hospitals"  would fall into Category 6 and warrant a higher award.  *Id*. at *11.

### 1.  Pain And Suffering Damages: Estate of Peter Burks (Direct Victim)

Plaintiffs request a pain and suffering award of $1 million.  The incident report detailing the circumstances of the attack and the injuries to personnel indicates that Peter Burks was given first aid at the site of the attack but by the time he arrived at the base, there were no signs of life.

The Chronological Record of Medical Care, PX 21 at 43, states that Peter Burks received a field dressing and had evidence of blood from the ears, nose, and mouth and had been intubated – indicating that he was not killed instantly. Multiple reports from persons who were in the same convoy state that various people were administering aid to Peter Burks, including applying bandages. The reports show that the attack occurred at 8 am and the time of death was 8:35 am.  It is reasonable to conclude that Mr. Burks did not die instantly.  There is no statement either way about whether Peter Burks was conscious.  *See Est. of Fishbeck*, 2024 WL 4119382, at*3 (denying pain and suffering damages where "the plaintiff is unable to prove that the decedent *consciously* experienced the time between an attack and his or her death.") (citing *Roth*, 78 F. Supp. 3d at 402 (emphasis added) (citing *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 244 (D.D.C. 2012))).  The question, therefore, is whether the circumstances indicate that there would have been conscious awareness of pain or imminent death.  In some cases, the analysis of the location and type of injuries that lead to death support a conclusion that the victim was aware of the impending death but there is no such information or testimony available in this case.  *See*, *e.g., Force v. Islamic Republic of Iran,* 617 F.Supp.3d 20, 34 (D.D.C. 2022); *Stetham, supra.*  It is certainly possible that Peter Burks experienced acute pain for some small period of time before death and there is no evidence in the record that Mr. Burks was rendered unconscious immediately.  Descriptions of the types of injuries caused by IED or EFP explosions indicate that the victim may feel the concussive force of the blast even before the initial penetration.   In this case, it is not unreasonable to conclude that Mr. Burks would have been aware of the initial blast – and that would warrant a pain and suffering award.  But to the extent that the case law requires *affirmative* proof (as indicated above) of conscious pain and suffering, there is no such proof in this case and therefore no award for pain and suffering.   If the Court concludes that an inference

of conscious suffering is permissible in the absence of any evidence to the contrary, I would recommend an award of $500,000 (half of the amount typically awarded for a period of pain and suffering ranging from minutes to hours).

### 2. Pain And Suffering Damages: Estate of Benjamin Tiffner (Direct Victim)

Plaintiffs request an award of $1 million for Benjamin Tiffner. Plaintiffs assert that the language in the autopsy report states that Captain Tiffner died rapidly – which could permit a presumption that Captain Tiffner experienced pain and suffering albeit for only a moment. However, the incident reports state that Captain Tiffner died instantly. PX-13 at 5, 10. Under these circumstances, the case law, unfortunately, prohibits a pain and suffering award.

### 3. Pain And Suffering Damages: James Hochstetler (Direct Victim)

Plaintiff Hochstetler seeks a pain and suffering award of $6 million. James Hochstetler sustained serious injuries from the blast that resulted in multiple painful surgeries over an extended period of time and permanent scarring and disfigurement. James Hochstetler spent months away from home recovering from surgeries. Dr. Kelly determined that James Hochstetler suffered multiple physical effects from the blast injury – including loss of sense of smell and balance and equilibrium deficits. He further found that James Hochstetler suffers from long term effects of a traumatic brain injury including short term memory loss, behavioral impairments, and cognitive deficits – all of which are permanent. The testimony of Mr. Hochstetler's family members and former commanding officer document the debilitating effects of these deficits. Mr. Hochstetler's condition has contributed to his impaired relationship with his former wife and children. His declaration testimony reflects despair – he notes that he went from being a star performer to someone who can barely function. Based on the evidentiary record, Mr. Hochstetler suffers from permanent and painful disabling physiological injuries that have impaired his personal

relationships and caused and will continue to cause cognitive limitations. These injuries are comparable at least to the injuries identified in *Fishbeck* as the type of serious injuries that warrant a pain and suffering award of $5 million. While some of those plaintiffs who received a Category 5 award in *Fishbeck* suffered from a traumatic brain injury, it is not clear that they suffered the level of cognitive deficit documented in the expert evaluation of James Hochstetler. On balance, I propose an enhancement of 15% over the $5 million amount for a Category 5 injury – for a total award of $5.750 million.

## III.    NON-ECONOMIC/SOLATIUM AWARDS FOR FAMILY MEMBERS OF VICTIMS

### A.    OVERVIEW: LEGAL BASIS FOR SOLATIUM DAMAGES FOR FAMILY MEMBERS OF VICTIMS

Section 1605A(c) expressly provides for solatium damages to immediate family members of victims. Solatium damages provide compensation for mental anguish, grief, and loss of society and comfort. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010) ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim. Solatium is awarded to compensate the the [sic] mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort.") (internal citations, quotation marks, and alterations omitted)).

The immediate family is defined as the victim's spouse, parents, siblings, and children. Estate of *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001), aff'd sub nom. *Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003)).

In general, there is a presumption that immediate family members suffer grief and emotional injury as a result of a terrorist attack on another family member. *See Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) ("The guidelines emerging from prior decisions begin with the 'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'") (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015) ("Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish. As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages.") (citations omitted).

Terrorist attacks are expressly intended to cause fear and anguish among the public in general and family members in particular. *See Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d. 105, 115 (D.D.C. 2005) (a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families). Accordingly, immediate family members need not be present at the attack to be eligible for solatium damages. *See Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) ("*Cohen I*") ("Solatium claims are typically brought by family members who were not present or injured themselves"); *see id*. at 85 ("[B]ecause of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it") (citing *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81-83 (D.D.C. 2017); *Ben–Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 56–57 (D.D.C. 2008)).

An immediate family member who provides credible testimony about the effect on him or her of the attack is eligible for an award of solatium damages – provided that the relationship is sufficiently close. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015) (declaration that victim's detention and torture caused claimant significant "mental anguish" supported awarding solatium damages consistent with framework of *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*")).

**B.    SOLATIUM DAMAGES FOR "NON-TRADITIONAL" FAMILIES – INCLUDING "HALF-BLOOD" FAMILY MEMBERS AND "STEP-RELATIONS"**

Courts have determined that the immediate family includes immediate family members of half-blood. *See Peterson II*, 515 F. Supp. 2d at 52 ("[s]iblings of half-blood to the servicemen in this case are presumed to recover as a full-blood sibling would[.]").  The immediate family also includes stepparents, stepchildren as well as others who are the "functional equivalent" of an immediate family member to the extent that these individuals demonstrate a sufficiently close relationship to the victim. *See, e.g., Fritz v. Islamic Rep. of Iran*, 324 F. Supp. 3d 54, 62-63 (D.D.C. 2020) ("*Fritz I*") (awarding solatium damages to a stepmother and a stepbrother based on evidence that the relationships were the functional equivalent of a parent or sibling); *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2024 WL 4345784, at *5 (D.D.C. Sept. 30, 2024) (immediate family members "includes members of the victim's household who are viewed as the functional equivalents of immediate family members," even if they are not legally or biologically related); *Valore*, 700 F.Supp.2d at 79-80 (awarding solatium damages to plaintiffs who, to extent considered stepfather or stepbrother, respectively considered and treated victim as own son or brother and were functional equivalents of a father and brother). *See also Bettis*, 315 F.3d at 337 ("recently, the District Court allowed recovery for intentional infliction of emotional distress to a

woman who, although not legally married to the victim, had lived with him for over 20 years in a 'bond that was the functional equivalent of marriage.'") (citation omitted).

In sum, the parents, spouses, siblings, and children, including step relations and those who function in such roles even if not biologically related or related by adoption of victims of terrorist attacks are entitled to an award of solatium damages provided that the evidence confirms the nature of the relationship.

## C.    GUIDELINES FOR VALUING SOLATIUM DAMAGES

Compensatory damages cannot, of course, make up for the permanent loss of a family member or the devastation to family life caused by traumatic injuries to a family member.  The courts in this Circuit have developed guidance outlining the considerations to be applied in determining the appropriate amount of solatium damages for family members of victims of terrorist attacks. These guidelines, and the dollar amounts applied in numerous decisions, help to foster equality of treatment among similarly situated victims of terrorism. *See Cabrera v. Islamic Republic of Iran*, No. 19-3835 (JDB), 2022 WL 2817730, at *48 (D.D.C. Jul. 19, 2022) ("*Cabrera I*") (emphasizing the importance of providing similar solatium awards to similarly situated plaintiffs). Courts have generally applied values set forth in *Heiser I*, and *Peterson II*, to set a framework for analysis. That framework and pertinent case law provide a baseline for solatium damages for family members of victims killed in a terrorist attack of $8 to $12 million for spouses, $5 million for parents and children, and $2.5 million for siblings. *See generally, id.* at*47 (citing *Peterson II)*. The case law further provides that solatium damages for family members of victims injured in a terrorist attack are half of these amounts:  $4 million for spouses, $2.5 million for parents and children, and $1.25 million for siblings.  *See, e.g., Goldstein*, 383 F. Supp. 3d at 21–22 (quoting *Kaplan*, 213 F. Supp. 3d at 38); *Taitt v. Islamic Republic of Iran*, 664 F. Supp. 3d

63,92 (D.D.C. 2023); *Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C.

2012); *Allan v. Islamic Republic of Iran*, No. CV 17-338 (RJL), 2019 WL 2185037 (D.D.C. May

21, 2019) (explaining that solatium awards for family members of living victims are typically set

at $4 million for spouses, $2.5 million for parents, and $1.25 million for siblings, reflecting the

emotional impact on each relationship).

These amounts are guideposts – and they are neither mandatory nor applicable in all cases.

*See Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361-62 (D.C. Cir. 2018); *Murphy v. Islamic

Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). Courts have awarded both upward and

downward adjustments from the baseline values. *See, e.g., Estate of Brown v. Islamic Republic of

Iran*, 872 F. Supp. 2d 37, 44 (D.D.C. 2012) (departing downward for a mother who had lost contact

with her victim son for the sixteen years preceding his death). Conversely, courts typically have

awarded higher amounts where the evidence shows more extreme or significant short and long-

term effects on the family member. Upward adjustments have been applied in  cases where a family

member is under medical care for depression or other emotional injury, or where the testimony

makes clear that the family member continues to experience and feel the loss and change, or where

the family member is aware that the victim suffered horribly while captive.  *See, e.g., Oveissi v.

Islamic Republic of Iran*, 768 F. Supp. 2d 16, 30 (D.D.C. 2011) ("*Oveissi I*") (awarding a 50

percent enhancement due to the family member's lifelong emotional trauma including depression,

anger, and alcoholism following the victim's death); *Valore*, 700 F. Supp. 2d at 86 (granting

upward departures when family members experienced "a general feeling of permanent loss or

change caused by the decedent's absence" or received "medical treatment for depression and

related affective disorders"); *Bernhardt v. Islamic Republic of Iran*, No. 1:18-cv-2739 (TJK) 2023

WL 2598677, at *16 (D.D.C. March 22, 2023) (awarding a 25 percent enhancement to baseline

solatium damages to family members for their severe mental distress from the victim's sudden death). In the most extreme cases, upward departures may exceed 40 percent. *See, e.g., Oveissi I*, 768 F. Supp. 2d at 30 (awarding a 50 percent enhancement); *W.A. v. Islamic Republic of Iran*, No. 18-cv-1883, 2020 WL 7869218 (D.D.C. March 23, 2020), at *16 (*W.A. II*) (awarding a 50% enhancement for pain and suffering for a surviving family member who experienced acute feelings of permanent loss or change caused by the decedent's absence).

### D.    RECOMMENDED SOLATIUM AWARDS

Initially, as noted above, each of the family member plaintiffs seeking solatium awards has established standing and the necessary familial relationship (or equivalent) that provides the legal basis for a solatium award. The recommended compensation amounts set forth below are based on the testimony, nature of the relationship between the family member and the victim, and pertinent case law.

### 1.    BURKS FAMILY

Each member of the Burks family has established the requisite close, familial relationship that supports an award of solatium damages. Each of the family members has eloquently described the devastating effect of the loss of their son and brother. Plaintiffs have requested an enhanced award for each of the Burks family members. Based on the precedent in this Court, I recommend an enhanced award of 10% over the baseline for Sarah Phillips – whose testimony establishes that the shock of the loss of her brother two weeks after she gave birth caused her to lose milk production. I also recommend an award of 5 percent over the full baseline value for Georgia Burks – who, despite her relatively young age at the time of her brother's death, has experienced psychological injuries requiring treatment.

- Alan Burks (Father of Peter Burks): $5 million.

- Jackie Hlastan (Mother of Peter Burks): $5 million.

- Zachary Burks (Brother of Peter Burks): $ 2.5 million.

- Georgia Burks (Sister of Peter Burks): $2.625 million.

- Alison Burks McRuiz (Sister of Peter Burks): $2.5 million.

- Sarah Phillips (Sister of Peter Burks): $2.750 million.

### 2.  TIFFNER FAMILY

Each member of the Tiffner family has demonstrated through competent testimony the requisite close familial relationship to warrant an award of solatium damages.  Indeed, the testimony of each member of the Tiffner family paints a vivid picture of a very close knit and caring family that lived, played, and learned together in relative isolation from the broader society. Plaintiffs have requested enhanced awards for each member of the Tiffner family.  Based on the precedent in this Court, I recommend the full baseline awards for each of the family members with the exception of Joshua Tiffner, whose testimony states that his grief over the loss of his brother contributed to the break up of his marriage and has stifled his ability to form personal relationships. For Joshua, I recommend a 5% enhancement.  The recommendations for the Tiffner family are as follows:

- Judith and Timothy Tiffner (Parents of Benjamin Tiffner):  $5 million each.

- Joshua Tiffner (Brother of Benjamin Tiffner):  $2,625,000.

- Sarah Crosby (Sister of Benjamin Tiffner):  $2,500,000.

- Seth Tiffner (Brother of Benjamin Tiffner):  $2,500,000.

### 3. HOCHSTETLER FAMILY

The Hochstetler family has similarly demonstrated through testimony the requisite familial relationships that warrant an award of solatium damages. The Plaintiffs have requested enhancements over the baseline solatium awards for all but one of the family members. For P.H. who was born after James Hochstetler was injured – the Plaintiffs suggest a 40% reduction from the baseline award for the child of an injured victim. The testimony establishes that P.H. has suffered from the broken household and lack of meaningful relationship with her father. She grew up in an environment that was affected strongly by the results of James Hochstetler's injury. In short, she was deprived of a normal childhood. Under these circumstances, a solatium award is appropriate and it is reasonable to adjust the amount downward to account for the fact that P.H. did not know her father before his injury. In addition, Kyle Marshall, the adoptive sone of James Hochstetler, who lived with James from the time he was 4 years old, is the equivalent of a biological child and entitled to at least a full baseline award. Based on the testimony, I recommend an enhanced award for Leanne Renfroe the former spouse of James Hochstetler. Leanne Renfroe gave up her planned career to care for James, and her testimony demonstrates that their marriage and family broke up because of James' cognitive issues. Under these circumstances, I recommend a 15% enhancement from the baseline award.

- Leanne Renfroe (Spouse of James Hochstetler): $4.6 million.

- Kyle Marshall (Son of James Hochstetler): $2.5 million.

- James Hochstetler II (Son of James Hochstetler): $2.5 million.

- P.H. (Daughter of James Hochstetler): $1.5 million.

## IV.    PRE JUDGMENT INTEREST

The plaintiffs requested an award of prejudgment interest in their memorandum in support of damages.  However, it does not appear that the plaintiffs included a demand for prejudgment interest in their complaint.   *See* Complaint, ECF No. 1. In the context of a default judgment, prejudgment interest must be specifically pled. *See Foley v. Syrian Arab Republic*, 281 F.Supp.3d 153 (D.D.C. 2017) ("Prejudgment interest is a specific type of relief and, for Plaintiffs to have been able to collect that relief as part of a default judgment, it needed to be requested specifically. Requesting "pecuniary losses" in their complaint was not sufficient to put Defendants on notice that, if they defaulted, they might be subject to prejudgment interest."); *Gill v. Islamic Republic of Iran*, 249 F.Supp.3d 88, 103, n.7 (D.D.C. 2017) ("The plaintiff also seeks prejudgment interest…but he did not request this relief in his Complaint. …[T]his Court can consider only the damages requested in the plaintiff's Complaint*."); Cohen II*, 268 F. Supp.3d 19, 27 ("Plaintiffs also seek prejudgment interest on their compensatory damages award. This request for relief, however, appears only in their Proposed Findings of Fact and Conclusions of Law… and not in the initial Complaint. … Because "a default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings," Fed. R. Civ. P. 54(c), the Court will consider only the relief requested in the Complaint and will not award prejudgment interest on the compensatory damages award*."). See also Frost v. Islamic Republic of Iran*, 419 F.Supp.3d 112 (D.D.C. 2020) ("Courts have invoked Rule 54(c) to deny, for example, prejudgment interest on compensatory damage awards when that specific form of relief was not demanded in the complaint. …. And courts have also held that general language seeking "other" relief does not suffice to permit the award of types of damages not otherwise requested in the complaint in the context of a default

judgment.") (citing *Salmeron v. D.C.*, 77 F. Supp. 3d 201, 211–12 (D.D.C. 2015), vacated on other grounds, 113 F. Supp. 3d 263).

  This Court has declined to award prejudgment interest in FSIA cases even where requested in the complaint.  And, as this Court knows, the Judges in this Circuit have differing views about awarding prejudgment interest in FSIA cases.  I do not repeat here the different analyses for and against prejudgment interest.  I have, however, conducted the analysis in the event that the Court were inclined to consider prejudgment interest and I can provide those calculations.

  For those calculations, prejudgment interest is calculated at the prime rate for each year from the date of attack for non economic damages using the methodology described in *Fritz I,* 324 F. Supp. 3d at 64, 67 n. 2.  *See also Jakubowicz v. Islamic Republic of Iran*, No. 18-1450 (RDM), 2024 WL 1826610, at *3 (D.D.C. Apr. 25, 2024); *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250 n.3 (D.D.C. 2020).[18]  A multiplier was calculated based on each of the terrorist attacks using the Federal Reserve's data for the average annual prime rate from the date of respective attack through July 15, 2025.  *See* Bd. of Governors of the Fed. Reserve Sys., Historical Data, available at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (last accessed July 8, 2025).  The calculations would add $64,952,987 to the recommended compensatory awards.

---

[18] For 2025, I applied the current prime rate through July 2025, and not a discounted six-year average that had been described in *Ewan*.

**Summary Chart**

| Plaintiff | Nonpecuniary Damages | Economic Damages | Total |
|---|---|---|---|
| **Estate of Peter Burks** | **$500,000** | **$10,292,872** | **$10,792,872** |
| Alan Burks | $5,000,000 | | $5,000,000 |
| Jackie Hlastan | $5,000,000 | | $5,000,000 |
| Alison Burks McRuiz | $2,500,000 | | $2,500,000 |
| Sarah Phillips | $2,750,000 | | $2,750,000 |
| Zachary Burks | $2,500,000 | | $2,500,000 |
| Georgia Burks | $2,625,000 | | $2,625,000 |
| **Estate of Ben Tiffner** | **$0** | **$17,625,327** | **$17,625,327** |
| Timothy Tiffner | $5,000,000 | | $5,000,000 |
| Judith Tiffner | $5,000,000 | | $5,000,000 |
| Sarah Crosby | $2,500,000 | | $2,500,000 |
| Seth Tiffner | $2,500,000 | | $2,500,000 |
| Joshua Tiffner | $2,625,000 | | $2,625,000 |
| **James Hochstetler** | **$5,750,000** | **$9,072,791** | **$14,822,791** |
| Leanne Renfroe | $4,600,000 | | $4,600,000 |
| Kyle Marshal | $2,500,000 | | $2,500,000 |
| James Hochstetler II | $2,500,000 | | $2,500,000 |
| P.H. | $1,500,000 | | $1,500,000 |

Dated: July 9, 2025

Respectfully submitted,


By: */s/ Deborah E. Greenspan*
Deborah E. Greenspan, Esq.
Special Master

**CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2025, I electronically filed the foregoing document with the

Clerk of the Court using the Court's ECF system, which will send notification of such filing to

attorneys of record.

Dated: July 9, 2025                              */s/ Deborah E. Greenspan*
                                                 Deborah E. Greenspan
                                                 Special Master
                                                 BLANK ROME LLP
                                                 1825 Eye Street, N.W. Washington, DC 20006
                                                 Telephone: (202) 420-2200
                                                 Facsimile: (202) 420-2201
                                                 Deborah.Greenspan@blankrome.com